UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

MERRILL LYNCH CAPITAL SERVICES,
INC.,

                  Plaintiff,

                    vs.

UISA FINANCE and USINAS
ITAMARATI S.A.,

                  Defendants.

-----------------------------------------------------------

:
:
:
:
:
:
:
:
:
:
:
:

ECF Case

No. 09 CV 2324 (RJS)

## PRE-TRIAL BRIEF OF PLAINTIFF
## <u>MERRILL LYNCH CAPITAL SERVICES, INC.</u>

MLCS commenced this action to recover the nearly $150 million due and owing under certain derivative transactions (the "Swap") entered into between MLCS and UISA Finance in and after April 2008 and guaranteed by Itamarati.  This Court has already ruled that UISA Finance is liable to MLCS under the Swap.  The two remaining issues in this matter are the amount of damages and the enforceability of Itamarati's guaranty of UISA Finance's obligations under the Swap ("the Guaranty").  As discussed below and as is set forth more fully in Plaintiff's Proposed Findings of Fact and Conclusions of Law, there is no legitimate basis for contesting the amount sought by MLCS and that the Guaranty is enforceable against Itamarati.

## BACKGROUND

**A.      Procedural History**

On March 12, 2009, MLCS filed this breach of contract claim, seeking US$146,138,856 in damages representing the amount Defendants owed MLCS at the time the Swap was terminated (the "Early Termination Amount."), plus interest and expenses, including attorneys fees, as provided for by the parties' contract.  Defendants filed an Answer and Counterclaims.  On motion, the Court dismissed Defendants' counterclaims but granted leave to replead and Defendants filed an Amended Answer and Counterclaims on October 16, 2009.  On November 4, 2009, MLCS filed a renewed Motion for Summary Judgment and, along with Merrill, Lynch, Pierce, Fenner & Smith, Inc. and Merrill Lynch & Co., Inc., (collectively the "Counterclaim Defendants"), a Motion to Dismiss the Counterclaims.  Following oral argument, and the Court's ruling from the bench, the Court issued its June 18, 2010 Order granting MLCS and Counterclaim Defendants' Motion to Dismiss the Counterclaims, granting MLCS's Motion for Summary Judgment against UISA Finance with respect to liability, and denying MLCS's Motion for Summary Judgment against Itamarati.  The Court ordered discovery to proceed "solely on the issues of (1) damages, (2) ratification of the guaranty, and (3) apparent authority of the signer of

the guaranty, including but not limited to MLCS's exercise of 'standard diligence.'"  June 18, 2010

Order at 1.

Fact discovery and expert discovery have been completed and the case is scheduled

for a bench trial on the remaining issues commencing June 20, 2011.

**B.**   **Facts**

1.   The 2007 Loan and Guaranty Agreement

On November 13, 2007, UISA Finance entered into a $125 million credit agreement

(the "Loan") with Merrill Lynch Credit Products ("MLCP").  The Loan was guaranteed by

Itamarati and two of its affiliates.  The interest rate on the loan was six-month LIBOR plus 6%.

Most of the loan proceeds were transferred to and used by Itamarati and the remaining proceeds

were transferred to and used by its affiliates.[1]

UISA Finance is a shell subsidiary of the Brazilian parent company that also owns

Itamarati. Itamarati and its affiliates used UISA Finance as a tax advantaged financing vehicle.

The parties understood that MLCP required a guaranty because UISA Finance was a non-operating

shell company with little or no assets.[2]

2.   The Swap Transaction

On April 24, 2008, MLCS and UISA Finance entered into the Swap transaction

governed by an ISDA Master Agreement (the "Master Agreement").  Defendants viewed the Swap

as an integral part of the Loan[3] and it was designed to potentially reduce Defendants' borrowing

costs.  Simply stated, UISA Finance would receive periodic payments from MLCS sufficient to pay

---

[1]   Earlier in 2007, MLCP had previously made two loans directly to Itamarati and then a $25 million loan to UISA Finance, guarantied by Itamarati.

[2]   Coutinho Tr. 118:5–24.

[3]   E. Oliveira Decl. ¶12, July 3, 2009; Transcript of the deposition of Ernesto Possari ("Possari Tr.") at 105:18–106:5.

the interest due on the Loan, in return for paying interest at a lower rate (initially LIBOR plus 1.6%) to MLCS.  The Swap further obligated UISA Finance, via a strip of 14 currency options that were embedded in the Swap, to pay additional amounts to MLCS depending on Brazilian real/U.S. dollar exchange rates – more specifically, additional payments would be due to MLCS if the dollar strengthened against the real (or conversely, the real weakened against the dollar) beyond certain trigger ratios.  Itamarati was willing to bear the risk associated with the Swap because Itamarati had significant revenues in U.S. dollars, so that its operating profits tended to increase when there was a strengthening of the U.S. dollar against the real.[4]  The Master Agreement provided that, under certain specified conditions, MLCS and UISA Finance were required to post collateral as security for their respective positions under the Swap.

3. <u>Execution and Delivery of  The Swap and Guaranty</u>

MLCS and Itamarati entered into a Guaranty dated as of April 24, 2008, pursuant to which Itamarati guaranteed payment of all amounts owing under the Master Agreement by UISA Finance to MLCS.  The parties' actions and communications before, at the time of, and after the Swap made clear their mutual expectation, intent and agreement that Itamarati would act as guarantor for the Swap and evidenced the apparent authority of Itamarati to give that Guaranty.

MLCS sent Itamarati draft confirmations for the Swap and for earlier forms of derivatives that were discussed in connection with the Loan.  Each of these draft confirmations stated that Itamarati "absolutely and irrevocably . . . guarantees (as primary obligor and not merely as surety) the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of any amounts owed by Party B [UISA Finance] to Party A [MLCS] under the Transaction," and contained signature lines for Itamarati as guarantor.[5]  MLCS also sent Itamarati draft and final term

---

[4]    Affidavit of Fabio DaSilva dated March 27, 2011 ("DaSilva Aff.") ¶17.

[5]    PX32; PX33; PX41; PX44.

sheets for the Swap indicating that MLCS's approval was conditioned on Itamarati acting as guarantor.[6]  The term sheets also indicated that the Swap would be documented by an ISDA Master Agreement and a trade confirmation.

The Swap was orally agreed and confirmed by e-mails on April 24, 2008.  It is common for derivatives to be executed on the basis of oral agreement and/or e-mail, with the formal documentation to follow.[7]

On April 28, 2008, MLCS sent Itamarati a draft of the Master Agreement, Credit Support Annex, and UISA Finance's legal opinion for review, completion and execution.[8]  Part 4 of the Schedule to the Master Agreement required that UISA Finance would provide as credit support for the transaction the "Guarantee of Usinas Itamarati S.A. in the form to be agreed to between [the] parties."[9]  Part 3 of the Schedule required that UISA Finance would also supply an opinion of counsel to Itamarati, as UISA Finance's credit support provider.[10]

On April 30, 2008, MLCS sent Itamarati a confirmation for execution and, on May 13, 2008, MLCS re-sent the confirmation amended at Itamarati's request to provide for a different individual to sign for UISA Finance because the signatory in the previous draft did not have authority to execute the confirmation on behalf of UISA Finance.  As before, the confirmation stated that Itamarati "absolutely and irrevocably . . . guarantees (as primary obligor and not merely as surety) the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of any amounts owed by Party B [UISA Finance] to Party A [MLCS] under the Transaction," and

---

[6]   PX35; PX44; PX46; PX47.

[7]   DaSilva Aff. ¶31

[8]   PX48.

[9]   PX48 at ITA0003496.

[10]   PX 48 at ITA0003494.

contained signature lines for Itamarati as guarantor.[11]

On May 13, 2008, UISA Finance and Itamarati (as guarantor) executed and delivered the Swap confirmation.[12] The signed confirmation also stated that the parties "agree[d] to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement" and that until the Master Agreement was signed, the confirmation would "supplement, form a part of, and be subject to, an agreement in the form of the Master Form as if we had executed an agreement in such form [] on the Trade Date of the first such transaction between us."[13] The confirmation was signed on behalf of Itamarati by its chief financial officer, Mr. Rocha, and its chief legal officer, Ernesto Valdomiro Possari.

Following the execution of the May 13 confirmation, MLCS pursued Itamarati for an executed Master Agreement and related documents, including by e-mails dated May 28, 2008, July 1, 2008 and July 29, 2008.[14]

On August 27, 2008, UISA Finance signed and delivered the Master Agreement, Credit Support Annex and its legal opinion.[15] Because of issues MLCS identified with the executed

---

[11]   PX49.

[12]   PX51.

[13]   PX51.  The May 13 confirmation, as well as the subsequent confirmations, also stated that "the provisions of Article VII (Guaranty) of the Loan and Guaranty Agreement [defined as the November Loan] shall be deemed to apply, with changes as applicable so that the guarantee is on behalf of Party B [UISA Finance] in favor of Party A [MLCS], and in respect of the Transaction to include all amounts owed by Party B to Party A under the Transaction described herein."  PX51 at ITA0018882. Article VII of the November Loan expressly provides that "[i]t is not necessary for the Lender to inquire into the capacity or powers of any Guarantor or Borrowers or the officers, directors or any agents acting or purporting to act on behalf of any of them."  PX11 at UISA_015733.

[14]   PX51; PX57; PX58.

[15]   PX59.

documents, MLCS re-sent the Master Agreement on September 11, 2008 for signature.[16]  At that

time MLCS also reminded Itamarati that it was required to execute and deliver the Guaranty.  *Id.*

        On September 18, 2008, MLCS again requested executed copies of the Master

Agreement, Credit Support Annex, Guaranty and Legal Opinion. At that time MLCS also advised

Itamarati that, pursuant to Itamarati's request, MLCS would initially accept a legal opinion from an

in-house lawyer for Itamarati.[17]

        On September 22, 2008, UISA Finance delivered the executed Master Agreement.[18]

The following day, Itamarati signed and delivered the Guaranty and a Legal Opinion from its in-

house counsel.[19]  Mr. Rocha acknowledged that the Guaranty was analyzed by counsel prior to its

execution.[20]

        The Guaranty, signed by Mr. Rocha and another Itamarati representative, provided

that Itamarati "unconditionally guarantee[d] to [MLCS] the due and punctual payment of any and

all amounts payable by UISA Finance" under the Master Agreement.  The Guaranty also

"certifi[ed] and warrant[ed] that this Guarantee constitutes the valid obligation of Guarantor,

complies with all applicable laws, and is enforceable against the Guarantor in accordance with its

terms."  Mr. Rocha understood and believed he had the authority to sign the Guaranty on behalf of

Itamarati.[21]

        The Legal Opinion stated that Itamarati's counsel had "examined originals or

---

[16]   PX62.

[17]   PX77.

[18]   PX85.

[19]   PX92.

[20]   PX87; PX90; Rocha Tr. at 134:21–134:24, 197:19–197:25.

[21]   Transcript of the deposition of Alexandre Rocha ("Rocha Tr.") at 85:4–87:11.

copies, certified or otherwise identified to my satisfaction, of such documents, corporate records,

certificates of public officials and other instruments and have conducted such other investigations

of fact and law as I have deemed necessary or appropriate for purposes of this opinion" and

represented that the Guaranty (i) had been "duly authorized" and (ii) "constitutes the valid and

legally binding obligation of Guarantor enforceable in accordance with its terms."[22]

Defendants claim there is no Board resolution authorizing Itamarati to enter into the

Guaranty and that, because the Board was deprived of its right to review and approve the Guaranty,

the Guaranty should not be enforced.  Defendants did not assert any purported lack of authorization

at any time before the commencement of this litigation.  Moreover, discovery has shown that

Itamarati's Board served no real purpose and, for that matter, did not even meet during the relevant

time frame.  Itamarati's owner and President of the Board, Ana Claudia Tamer, admitted at her

deposition that the Board, comprised of Ms. Tamer, her ex-husband and ex-mother-in-law, held no

meetings and that the other board members never made any business decisions.[23]  Indeed, Itamarati

dissolved the Board in May of 2009.[24]

    4.   <u>Defendants' Default</u>

Starting in September 2008, the world's financial markets entered an unprecedented

and increasingly volatile and stressful period.  The value of the U.S. dollar increased significantly

against the Brazilian real and there was a lack of liquidity in markets worldwide.   At the same

---

[22]  On September 17 and September 24, 2008, UISA Finance and Itamarati (as guarantor) executed
and delivered a further amended trade confirmations for the Swap.  PX5; PX6.  In September and
October, 2008, two additional amended confirmations pertaining to the Swap were delivered to
Itamarati.  PX7; PX8.

[23]  Transcript of the deposition of Ana Claudio Tamer ("Tamer Tr.") at 16:2–22; 39:10–40:14.
Ms. Tamer also testified that the Guaranty would have been approved if it had been brought to
her attention.  Tamer Tr. 74:10-19.

[24]  Possari Tr. 78:11–78:17.

time, Itamarati's business suffered as its customers cut back on their spending. This caused a dramatic increase in UISA Finance's net potential losses under the Swap which were not offset, as Itamarati had expected would happen, by increased U.S. dollar revenues. In September and October 2008, MLCS issued margin calls to UISA Finance for the posting of collateral as required under the terms of the Master Agreement.[25] Itamarati—*not* UISA Finance—posted approximately $5 million of its cash and, additionally, offered to post its trade receivables and land to partially meet these margin calls. However, UISA Finance and Itamarati failed to post all of the required collateral in response to the margin calls by MLCS.

MLCS worked with Itamarati to restructure the Swap and the Loan so as to avoid a default. These efforts were not successful and, by letter dated October 23, 2008, MLCS formally notified Defendants of their default. Defendants' failure to cure that default constituted an Event of Default that entitled MLCS to terminate the Swap under the Master Agreement and recover an "Early Termination Amount." By letters dated October 28 and 29, 2008, MLCS notified Defendants of MLCS's exercise of its right to terminate the Master Agreement and the transactions thereunder and its calculation that, as a result, Defendants owed MLCS $146,138,856 as the contractual Early Termination Amount.[26] On November 6, 2008, MLCS formerly made demand of Itamarati, as guarantor, to pay this amount.

Itamarati informed MLCS that it was unable to pay the Early Termination Amount, as well as various other obligations to creditors, because it was facing a number of financial

---

[25]   MLCS provided Defendants, and their financial advisor, Capitania Asset & Risk Management ("Capitania"), detailed information about MLCS's calculation of UISA Finance's liabilities and resulting margin calls under the Swap. PX168; PX170. Neither Defendants nor Capitania provided an alternative valuation or contested the amount of the margin calls. DaSilva Aff. ¶86.

[26]   MLCS calculated the gross amount payable to be $151,963,091. After deducting the $5,824,235 Itamarati already posted as collateral, the Early Termination Amount of $146,138,856 was reached. PX19.

challenges including a fall off in its business and reduction in its lines of credit.  Itamarati proposed restructuring its obligations to MLCS and MLCP under the Swap and the Loan.  The parties engaged in negotiations concerning the proposed restructuring which did not result in an agreement and, eventually, MLCS had no choice but to commence this action.

As noted above, Itamarati never asserted prior to this litigation that the Guaranty was not authorized.  If it had done so, MLCS would have terminated the Swap at that time and accordingly would have suffered significantly less harm than it has actually sustained.

## ARGUMENT

### I.      The Guaranty is Valid and Binding

The Guaranty is valid and binding under both Brazilian and New York law despite Defendants' belated claim that no one signed a Board Resolution authorizing the Guaranty as purportedly required by Itamarati's By-Laws.

*Brazilian Law*

As discussed in the declaration of MLCS's Brazil law expert, Mr. Rene Medrado, the Guaranty is valid and binding under Brazilian law, even if it was not officially authorized by the full Board of Directors.[27]

Under the objective good faith principle, Brazilian courts recognize the validity and enforceability of contracts that were not formally authorized where the party seeking enforcement proceeded with standard diligence, and the issuance of a legal opinion – in particular -- suffices to meet this standard.[28]  As Mr. Medrado's  testimony makes clear, MLCS's good-faith and diligence were established by the following facts: (i) MLCS acted on the parties' expectation and intention

---

[27]  Defendants claim that a written Board resolution was required to authorize the Guaranty.  No evidence of such a specific Board resolution has been located.

[28]  Medrado Aff. ¶¶37, 49.

that Itamarati would act as guarantor; (ii) MLCS required, as part of the documentation for the derivative transaction, a Legal Opinion regarding the validity of Itamarati's Guaranty; (iii) MLCS repeatedly requested and followed-up with Itamarati to obtain the Legal Opinion as well as signed copies of the other Swap documentation; and (iv) MLCS did not rest in pursuing these documents until Itamarati provided them.[29]

Defendants have argued that MLCS failed to act with standard diligence because it did not obtain an executed Guaranty and Legal Opinion until after the transaction and did not request a copy of a Board resolution authorizing the Guaranty. However, derivative transactions are typically entered into via a telephone call during which the basic economic terms are established with the documentation to follow.[30] Moreover, the issuance of a legal opinion suffices to meet the standard of diligence required by Brazilian law.[31] Indeed, Brazilian Courts do not require a high standard of diligence in order to apply the objective good faith principle and the apparent authority theory.[32]

Brazilian law also recognizes the applicability of apparent authority in upholding contracts where "someone represented an entity or ratified its acts without proper powers or authorization."[33] Given that Mr. Rocha, who signed the Guaranty, effectively was Itamarati's chief financial officer and believed that he was authorized to sign, and given that Itamarati's counsel provided a Legal Opinion stating that Itamarati was authorized to enter into the transaction, it was

---

[29]  Medrado Aff. ¶32.  Itamarati has also argued that a Legal Opinion from in-house counsel is insufficient.  In fact, Brazilian law does not distinguish between legal opinions provided by in-house lawyers and outside counsel. Medrado Aff. ¶49.

[30]  DaSilva Aff. ¶31.

[31]  Medrado Aff. ¶50.

[32]  Medrado Aff. ¶49.

[33]  Medrado Aff. ¶38.

reasonable for MLCS to believe Mr. Rocha's execution of the Guaranty had all necessary authorizations.

Further, Brazilian law recognizes the theory of ratification. Itamarati's provision of cash margin and offers to provide additional collateral (discussed above) constituted performance of subsequent material acts confirming the validity and enforceability of the entire transaction so as to operate as ratification recognized under Brazilian law.[34]

Finally, under the principle of *venire contra factum proprium*, a party that acted in one manner—creating a deceptive situation when it is convenient to that party—is not entitled to later claim the lack of validity of the same situation. In light of the fact that Itamarati's Board of Directors did not hold meetings as a Board or make actual decisions concerning Itamarati's business, Itamarati cannot now turn to the absence of such meetings or Board approval to claim that the lack of such meetings or approvals should render the Guaranty voidable.[35]

Defendants have argued that, under Brazilian law, a guaranty provided without Board authorization is "null and void" on the basis that Board approval is a mandatory legal requirement. Accordingly, Defendants argue that such a guaranty cannot be remedied by good faith, apparent authority or ratification. In fact, under Brazilian law an unauthorized guaranty is at most "voidable" rather than "void." Brazilian corporate law sets forth a special set of rules (Law No. 6404/76) pertaining to the invalidity of corporate acts which prevails over the more general rules of the Brazilian Civil Code.[36] Specifically, Law No. 6404/76 provides that unauthorized corporate acts are, except in very rare cases not applicable here, voidable rather than void.[37] In any

---

[34] Medrado Aff. ¶60.

[35] Medrado Aff. ¶91.

[36] Medrado Aff. ¶¶82-87.

[37] Medrado Aff. ¶83.

event, Board approval is not a "mandatory legal requirement" in this case.  Under Brazilian law,

Boards of Directors of closely-held family-owned corporations such as Itamarati are simply not

required or expected to adhere to rigid corporate formalities.[38]

*New York Law*

In its opposition to MLCS's motion for summary judgment, Itamarati suggested that

New York law, rather than Brazil law, might apply to the issue of the enforceability of the

Guaranty, and there is some recent case law supportive of that notion.  However, the Guaranty is

similarly valid and binding under New York's application of the theory of apparent authority,

which applies where a "principal causes his agent to have apparent authority by conduct which,

reasonably interpreted, causes third persons to believe that the principal consents to have an act

done on his behalf."  *First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda-Permanent Mission*,

877 F.2d 189, 193 (2d Cir. 1989) (citing Restatement (Second) of Agency § 27).

Here, Itamarati's senior officers received documents reflecting, and were aware of,

the terms of the Swap including that Itamarati guaranty UISA Finance's obligation.  Senior officers

also executed trade confirmations, the Guaranty and other documents in connection with the Swap.

Yet, no one from Itamarati ever suggested that the Guaranty was not authorized.   Quite to the

contrary, Itamarati's in-house counsel provided a legal opinion attesting to the due authorization

and enforceability of the Guaranty.  Edezio Oliveira, who acted as Itamarati's CEO and Alexandre

Rocha, Itamarati's chief financial officer, among other senior Itamarati officers, were directly

involved in negotiating the Swap with MLCS and approved its terms.[39]  Mr. Rocha and Ernesto

Possari, Itamarati's chief legal officer, signed multiple confirmations on behalf of Itamarati as

---

[38] Medrado Aff. ¶¶74-75.

[39]   Da Silva Aff. ¶15.

guarantor of UISA Finance's obligations.[40]  These confirmations each contained guaranties of

UISA Finance's obligations under the Swap. [41]  The confirmations also stated that MLCS was not

required to inquire into the authority of the officers signing on Itamarati's behalf.[42]  Mr. Rocha and

Christiano Morales (another Itamarati officer) signed the Guaranty which expressly represented

that Itamarati was authorized to provide the Guaranty.[43]  Itamarati provided the opinion of its in-

house lawyer, Marcio de Moraes, confirming authority.[44]  No one at Itamarati ever told MLCS that

either Rocha or Morales was not authorized to sign the Guaranty or that Moraes was not authorized

to sign the Legal Opinion.  At no point before this lawsuit was anyone at MLCS advised that

Itamarati's Guaranty or Legal Opinion was not properly authorized or that it was invalid or

ineffective for any other reason.[45]  Moreover, the Legal Opinion, signed by Itamarati's in-house

counsel,  Mr. Moraes, stated that counsel had "examined originals or copies, certified or otherwise

identified to my satisfaction, of such documents, corporate records, certificates of public officials

and other instruments and have conducted such other investigations of fact and law as I have

deemed necessary or appropriate for purposes of this opinion" and represented that the Guaranty (i)

had been "duly authorized" and (ii) "constitutes the valid and legally binding obligation of

Guarantor enforceable in accordance with its terms."[46]

        The facts are thus clearly sufficient to invoke the apparent authority doctrine.  *See,*

---

[40]   PX 4; PX 5; PX 6.

[41]   PX 6.

[42]   PX51 at ITA0018882; PX11 § 7.09.

[43]   PX2.

[44]   PX 2; PX 3.

[45]   Da Silva Aff. ¶57.

[46]   PX3.

*e.g.*, *Indosuez Int'l Finance B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 701 (N.Y. 2002) (by

signing confirmations, pursuant to which the company accepted payments into its New York bank

account in connection with option transactions, the deputy chairperson of the board's conduct made

an implied representation that he had authority to bind the company); *Goldston v. Bandwidth Tech.*

*Corp.*, 859 N.Y.S.2d 651, 653–55 (N.Y. App. Div. 1 Dep't 2008) (defendants were bound by an

agreement signed by their president because he had "at least apparent authority to enter into the

agreement" even though he did not have actual authority to do so because board approval was

required and "[t]he president or other general officer of a corporation has power, *prima facie*, to do

any act which the directors could authorize or ratify . . . The true test of his authority to bind the

corporation is . . . whether, at the time, he is engaged in the discharge of the general duties of his

office, and in the business of the corporation . . . the law imposes no duty on a third party who

deals with the corporation to inquire into its employee's actual authority.") (internal quotations and

citations omitted); *Goetel v. Wallace*, 556 N.Y.S.2d 577, 578 (N.Y. App. Div. 1 Dep't 1990)

(corporation's CFO had apparent authority by virtue of his title and "[t]he risk of loss from an

unauthorized act of a dishonest employee falls on the corporation which appointed him to act on its

behalf and not on the party who relies on his apparent authority." (citing *Rudge v. Laidlaw-*

*Coggeshall*, 465 N.Y.S. 2d 591 (N.Y. App. Div. 2 Dep't 1983))).

        The Guaranty is also enforceable under New York's ratification principle.  Under

New York law, a party may ratify a contract, thereby rendering the contract binding upon itself,

even when the contract was not initially binding on that party. *See RLI Ins. Co. v. Athan*

*Contracting Corp.*, 667 F.Supp.2d 229, 235 (E.D.N.Y. 2009) (applying New York law).  A party

may ratify the acts of its agents where, as here, it "retains the benefits of those acts for corporate

purposes." *Zanoni v. 855 Holding Co., Inc.*, 465 N.Y.S.2d 763, 764 (N.Y. App. Div. 1983); s*ee*

*Indosuez International Finance B.V. v. National Reserve Bank*, 774 N.E.2d 696, 701–02 (N.Y.

2002) (holding that where the party failed to raise the issue of authority in the course of
performance under 14 ISDA currency exchange agreements, having accepted payment on six of the
option transactions, the agreement was ratified, and the party could not disavow the agreements
after the value of the ruble declined simply because the agreements became disadvantageous to the
party); *Goldston*, 859 N.Y.S.2d at 655 (holding in part that because defendants accepted the
benefits of the work performed by plaintiffs, they were bound by the agreement entered into by the
company's president "whether they authorized it or not," and therefore did not need to take into
account the company practice to have "two principals sign all approved corporate contracts"); *IRB-
Brazil Resseguros, S.A. v. Inepar Investments, S.A.*, 2011 WL 1544527, at *2 (N.Y. App. Div. 1
Dep't. Apr. 26, 2011) (not yet reported) (holding the "acceptance of benefits flowing from an
agreement that [the defendant] now asserts was unauthorized when executed, constitutes an
affirmance of the agreement giving rise to a ratification."); *Wright v. Eastman Kodak Co.*, 445
F.Supp.2d 314, 319 (W.D.N.Y. 2006) (holding that "[p]laintiffs cannot have it both ways:
enjoying . . . the benefits [of the contract], but then asking that they be excused from living up to
their end of the bargain").

   Here, Itamarati ratified the Guaranty by accepting the benefits thereof.  The
benefits came in the form of a potential reduction in the interest rate on the November Loan,
which the Swap provided.[47]  MLCS would not enter into the Swap without the Guaranty because
UISA Finance was merely a shell company with no assets of its own.[48]  Having accepted those
benefits, Itamarati "cannot have it both ways." *Wright v. Eastman Kodak Co.*, 445 F.Supp.2d at
319.  In other words, Itamarati may not, after having accepted the benefits of the contract, later

---

[47] PX 63; Rocha Tr. 146:18–147:7.

[48] DaSilva Aff. ¶35; PX 25; Transcript of the deposition of Sylvio Coutinho ("Coutinho Tr.") at
  118:5–24.

repudiate the contract in an attempt to "be excused from living up to their end of the bargain."  *Id.*;
*see also Indosuez*, 774 N.E.2d at 702.[49]

       A party may also ratify a contract that was previously unenforceable by acting upon,
performing under, or affirmatively acknowledging the contract.  *See Niosi v. Niosi*, 641 N.Y.S.2d
93, 94 (N.Y. App. Div. 1996) (holding that payment of maintenance pursuant to the agreement for
a period of six years least five years ratified the agreement); *Mulitex USA, Inc. v. Marvin Knitting
Mills, Inc.*, 784 N.Y.S.2d 506, 507 (N.Y. App. Div. 2004) (holding that partial payment of invoices
pursuant to the agreement ratified the agreement); *Cooper v. Greenberg*, 542 N.Y.S.2d 631, 631
(N.Y. App. Div. 1 Dep't 1989) (holding that delivery of eight scheduled payments on a note,
totaling $90,000, ratified the note).

       Itamarati ratified the Guaranty by acting upon and performing under the Guaranty,
namely by posting collateral as required.  Moreover, as discussed above, Itamarati offered its sugar
and ethanol stocks in response to MLCS's margin calls on UISA Finance.  At no time prior to the
commencement of this lawsuit did Itamarati suggest that its posting of collateral and offers to post
additional collateral were not pursuant to its obligations under the Guaranty.  To the contrary, at all
times Itamarati's conduct was consistent with its obligations under the Guaranty.

---

[49]   A principal may ratify a contract formed by its agents even without knowledge of the material
facts where, as here, it has knowledge that the contract exists and reason to believe it does not
know all the material facts, and accepts the benefits thereof without qualification or
investigation.  *Cologne Life Reinsurance Co. v. Zurich Reinsurance (North America) Inc.*, 730
N.Y.S.2d 61 (N.Y. App. Div. 2001), (citing Restatement (Second) of Agency § 91 (1958))
("[i]f, learning that one who had no authority acted for him, [the principal] affirms without
qualification and without investigation, when he has reason to believe that he does not know all
the facts, it may be inferred that he is willing to assume the risks of facts of which he has no
knowledge").  Here, the senior officers of Itamarati and Ms. Tamer, the sole shareholder, knew
or should have known from the time of its execution that Itamarati of the Swap and that
Itamarati was guarantying UISA's obligations.  Yet, even after Ms. Tamer and Mr. Oliveira
admittedly knew of the Swap and the Guaranty, neither they nor anyone at Itamarati attempted
to cancel the transactions or asserted that the Guaranty was unauthorized.

**II.      MLCS is Entitled to Damages Equaling the Early Termination Amount**

          MLCS determined the Early Termination Amount according to the methodology set forth in the Master Agreement.  The Schedule to the Master Agreement states in paragraph (f) that payments due on for Early Termination will be determined by the "Market Quotation" method.  Under the Market Quotation method, the Early Termination Amount is calculated based on quotations, if available, from three or more leading dealers for the amount MLCS would have to pay to enter into a transaction that would provide MLCS the economic benefits of the terminated transactions.  MLCS sought quotations from four qualified dealers but did not receive any quotes on October 28, 2008 and only received one quotation shortly thereafter.[50]  MLCS's expert, Professor John C. Hull, noted that "[i]t is not at all surprising that MLCS did not obtain three quotes in response to its request" due to prevailing market conditions.  "Dealers were interested in reducing their exposure to market movements rather than quoting for transactions that would increase this exposure and providing a live quote could increase their exposure to market movements.  Moreover, I understand that even in normal market conditions it is not uncommon for fewer than three quotes to be obtained as a result of such a request."[51]

          Because MLCS did not receive the required three quotations, it was required to calculate the Early Termination Amount based on the "Loss" method.  The Master Agreement defines "Loss" in § 14 as the amount the non-defaulting party "reasonably determines in good faith to be its losses and costs . . . including any loss of bargain, cost of funding, or . . . loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or rated trading position."  MLCS calculated its Loss under the Swap by inputting objective market data for

---

[50]  The quote subsequently obtained from one of the four dealers was actually greater than MLCS's own calculation of the Early Termination Amount.  PX175.

[51]  Affidavit of John C. Hull dated May 27, 2011 ("Hull Aff.") ¶43.

interest rates, exchange rates and exchange rate volatility into a Black-Scholes valuation model. The Early Termination Amount calculated by MLCS represents the amount that MLCS reasonably determined in good faith to be its losses as a result of the termination of the Swap.  Professor Hull independently calculated the Early Termination Amount using three different methods; the most conservative of these methods yielded a calculation equaling US$153,200,000.  This is a less than 1% difference from MLCS's estimate of US$151,960,000.[52]

Defendants have not disputed the reasonableness of MLCS's calculation of the Early Termination Amount, offering no response to Professor Hull's opinions and offering no alternative calculation.

Defendants instead argue that MLCS did not properly seek the market quotations. That is no so, as will be shown at trial.  However, even if Defendants could somehow show that market quotes should have been sought differently, that does not lead to the conclusion that the Loss calculation should not be used as the measure of damages.  *See High Risk Opportunities HUB Fund Ltd. v. Credit Lyonnais,* No. 600229/00 at 14, 22 (Sup. Ct. N.Y. County July 7, 2005) (holding that even though the defendant "failed to obtain adequate market quotations in good faith pursuant to section 14 of the Master Agreement because it interfered with the Market-makers' independence in valuing the NDFs as of the termination date . . . [t]he Master Agreement provided that in the event that adequate Market Quotations were not obtained, as here, the parties were required to follow a valuation procedure called Loss").   Indeed, as is apparent from terms and structure of the ISDA Master Agreement, the purpose of obtaining market quotes as a measure of damages is to avoid disagreements as to the reasonableness of one party's Loss calculation.   Here, however, no issue has even been raised as to the reasonableness of MLCS' calculation and it

---

[52]   Hull Aff. ¶58.

should be accepted as the measure of damages owed to MLCS by the Defendants.

## CONCLUSION

For all of the foregoing reasons and on the evidence that will be submitted at the trial of this matter, MLCS respectfully submits that judgment should be entered in its favor against defendants UISA Finance and Itamarati in the amount of US$146,138,856, plus interest and expenses, including attorneys fees.


Dated: May 27, 2011

                        /s/ Thomas C. Rice                                   _____
                       Thomas C. Rice
                       William T. Russell, Jr.
                       Paul J. Sirkis

                       SIMPSON THACHER & BARTLETT LLP
                       425 Lexington Avenue
                       New York, NY 10017
                       Telephone: (212) 455-2000
                       Facsimile: (212) 455-2502
                       trice@stblaw.com
                       wrussell@stblaw.com
                       psirkis@stblaw.com

                       *Counsel for Plaintiff Merrill Lynch Capital Services, Inc.*