UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------

MERRILL LYNCH CAPITAL SERVICES,
INCÏ,

              Plaintiff,

                   vs.

UISA FINANCE and USINAS
ITAMARATI S.A.,

              Defendants.

             :
             :
             :
             :
             :   ECF Case
             :
             :   No. 09 CV 2324 (RJS)
             :
             :
             :

-------------------------------------------------------------

### PLAINTIFF MERRILL LYNCH CAPITAL SERVICES INC.'S
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.      Introduction/Procedural History**

1.      Merrill Lynch Capital Services, Inc. ("MLCS") commenced this action on March 12, 2009 by filing a complaint asserting claims for breach of contract and seeking to recover approximately $146 million due and owing under a derivative transaction (the "Swap") entered into on April 24, 2008 between MLCS and UISA Finance and guarantied by Usinas Itamarati S.A. ("Itamarati") (and collectively with UISA Finance, "Defendants").[1]

2.      On April 22, 2009, Defendants filed an answer and counterclaims against MLCS, Merrill Lynch Capital Products LLC ("MLCP") and Merrill Lynch Pierce Fenner & Smith, Inc. ("MLPFS") (together, the "Counterclaim Defendants").[2]

3.      Defendants' counterclaims included claims for (i) negligent misrepresentation, (ii) breach of fiduciary duty, (iii) breach of implied duty of good faith and fair dealing, (iv) professional malpractice, (v) breach of contract and (vi) unjust enrichment.[3]

4.      On June 3, 2009, MLCS filed a motion for summary judgment on its complaint and Counterclaim Defendants filed a motion for dismissal of the counterclaims with prejudice.[4]

5.      On October 1, 2009, the Court granted the Counterclaim Defendants' motion to dismiss and denied without prejudice MLCS's motion for summary judgment while granting Defendants leave to replead their counterclaims.[5]

---

[1]    Complaint, filed March 12, 2009.

[2]    Answer and Counterclaims, filed April 22, 2009.

[3]    *Id.* ¶¶105-151.

[4]    Motion for Summary Judgment and Motion to Dismiss, filed June 3, 2009.

[5]    October 1, 2009 Order.

6.      On October 16, 2009, Defendants filed an amended answer and counterclaims pursuant to the October 1 Order.[6]

7.      On November 4, 2009, MLCS and Counterclaim Defendants renewed their motion for summary judgment and motion to dismiss the counterclaims.[7]

8.      On June 18, 2010, the Court granted the motion to dismiss the counterclaims, granted the motion for summary judgment against UISA Finance with respect to liability and denied the motion for summary judgment against Itamarati.[8]  The Court ordered that discovery would proceed solely on the issues of (1) damages, (2) ratification of Itamarati's guaranty of UISA Finance's obligation under the Swap (the "Guaranty"), and (3) apparent authority of the signer of the Guaranty, including MLCS's exercise of standard diligence.[9]

9.      A bench trial was held on the remaining issues in this case on  June 20 - __, 2011. After trial, the Court finds the following facts and makes the below conclusions of law.

## II.     Findings of Fact

### A.      Parties

10.     Merrill Lynch Capital Services, Inc., ("MLCS") is a Delaware corporation and an affiliate of Merrill Lynch & Co., Inc. and Merrill Lynch Pierce Fenner & Smith.  MLCS operates primarily as a derivatives dealer and acts as a counterparty for derivative financial products.[10]

---

[6]   Amended Answer and Counterclaims, filed October 16, 2009.

[7]   Renewed Motion for Summary Judgment and Motion to Dismiss, filed November 4, 2009.

[8]   June 18, 2010 Order.

[9]   *Id*.

[10]   Affidavit of Fabio Da Silva dated May 27, 2011 ("Da Silva Aff.") ¶7.

11.     Usinas Itamarati S.A. ("Itamarati") is a Brazilian company engaged in the production and sale of sugar, ethanol and related products.[11]

12.     UISA Finance is a Cayman Islands-based affiliate of Itamarati.[12]

13.     As a Cayman Islands entity, UISA Finance is not subject to the same withholding tax on interest payments as companies operating in Brazil and thus UISA Finance was formed as a financing vehicle for Itamarati and its affiliates.[13]

14.     UISA Finance was thinly capitalized and had no operations or employees.[14]

15.     Itamarati and its affiliates are privately held.  Ana Claudia Tamer is the ultimate owner of all of the companies affiliated with or related to Itamarati.[15]

---

[11]   Response Of UISA Finance And Usinas Itamarati To MLCS's Statement Of Undisputed Material Facts Pursuant To Local Rule 56.1 at 1.

[12]   *Id.*

[13]   Da Silva Aff. ¶14; Amended Answer and Counterclaims ¶ 8.

[14]   Transcript of the deposition of Ernesto Possari ("Possari Tr.") at 53:12-54:20 ("Q. Is it correct that UISA Finance was formed as a company to obtain financing for direct and indirect affiliates? ... A. Yes. Q. Does UISA Finance have any business operations of its own, like as an example, manufacturing or buying or selling assets? ... A. No. Q. Does UISA Finance have any employees? ... A. No. Q. Does it have any income other than financing it obtains for its indirect and direct affiliates? ... A. No, it does not have. Q. Does it have any assets? ... A. No.").

[15]   Transcript of the deposition of Ana Claudia Tamer ("Tamer Tr.") at 26:4-7 ("Q. Are you the ultimate owner of all the companies affiliated with or related to Usinas Itamarati? A. I am."); Coutinho Tr. at 66:8-70:7 ("Q. Do UISA Finance and Usinas Itamarati have a common owner? ... A. All the way up, yes. Q. Who currently owns -- I'm sorry -- currently who owns UISA Finance? A. CI Investments. Q. Is that Companhia Itamarati De Investimentos? A. Correct. Q. And who owns Companhia Itamarati De Investimentos? ... Q. Who owns Usinas Itamarati? A. So approximately -- Usinas Itamarati has two parties who have interests. Approximately 80 percent is CI, and approximately 20 percent is W-I-R-I-U, Rio Wiriu. ... Q. Are both Companhia Itamarati De Investimentos and Rio Wiriu both ultimately owned by Ana Claudia Tamer? A. Well, everything gets to her. I wouldn't be able to tell you exactly what is the corporate structure of the whole thing, but everything gets to her.").

16.     At all relevant times, Edezio Oliveira acted as the senior executive at Itamarati[16] and he was an authorized signatory for UISA Finance.[17]  He served in a role equivalent to a U.S. chief executive officer for Itamarati and, indeed, Ana Claudia Tamer expressly referred to him as the CEO.[18]

17.     Oliveira was a member of Itamarati's executive committee, an informal committee that kept Itamarati's shareholder, Ms. Tamer, apprised of relevant issues and made significant decisions for the company.[19]

---

[16]   Da Silva Aff. ¶15; Tamer Tr. at 32:18-33:2 ("Q. What is Mr. Oliveira's title or position at Usinas Itamarati? A. He is the Usinas CEO. He is the one who does all things at the Usinas. Q. Has he had that position since 2007? A. I don't remember the year precisely, but he has had that position since he started."); Rocha Tr. at 36:1-36:12 ("Q. To whom did you report? A. On a daily basis, Mr. Edezio Oliveira. Q. And what was his title or position at Usinas Itamarati? A. I am not aware of him having any title or position. Q. To your understanding, what was his role at Usinas Itamarati? A. I know that he had a contract with a Usinas Itamarati shareholder, Ms. Ana Claudia. I do not know his exact role, but worked as the main or principal executive for the company.").

[17]   Transcript of the deposition of Edezio Oliveira ("Oliveira Tr.") at 163:13-163:14 ("I was an officer of UISA Finance. I could sign documents.").

[18]   Tamer Tr. at 32:18-33:2 ("Q. What is Mr. Oliveira's title or position at Usinas Itamarati? A. He is the Usinas CEO. He is the one who does all things at the Usinas. Q. Has he had that position since 2007? A. I don't remember the year precisely, but he has had that position since he started.").

[19]   Tamer Tr. at 42:2-8 ("Who calls you if there is an important document to be signed? A. When you talk about Board of Directors, I am getting confused because there are two. I don't know if you're talking about the Board of Directors [ERRATA CHANGE: executive committee] whose people are Sergio, I and Edezio."); Tamer Tr. at 29:16-30:11 ("I am asking who actually makes decisions on behalf of UISA Finance, do you know? A. I always talk to Edezio about the main issues. And we talk about the major things. And when I have any doubt I talk to Spinelli about it. Q. Do you talk to Edezio regularly? I think you said you speak to him every 15 days or every two weeks? A. I talk to Edezio by phone constantly. But if there is any decision to make, I meet with him about once a week or every two weeks. I do not talk to him on a daily basis. But, if necessary, I talk to him. Q. And when you said you always talk to Edezio about the main issues, were you referring specifically to UISA Finance or just all the Usinas Itamarati business in general? A. About Usinas Itamarati.").

18.     Ana Claudia Tamer, sole shareholder and president of Itamarati's board of directors, relied heavily on the advice of Edezio Oliveira in making decisions with respect to Itamarati.[20]

19.     Alexandre Rocha was the Finance Director of Itamarati, *i.e.*, the most senior member of Itamarati's finance department, at the time the derivative transaction at issue was agreed to and through the remainder of 2008.[21]

20.     At all relevant times, Ernesto Possari was the Legal Director, *i.e.*, the most senior lawyer, at Itamarati.[22]

---

[20]   Tamer Tr. at 30:22-31:23 ("Q. I understand that. My question is a simple one. Do you know who makes decisions on behalf of UISA Finance? A. Like I've already answered, if UISA Finance is inside the Usinas structure, like I said, it is me and Edezio. Q. Do you rely on Mr. Oliveira to keep you informed of all the important information concerning Usinas Itamarati and its related companies? A. Totally. Q. And do you believe that he does keep you informed of all the important issues concerning Usinas Itamarati and its related companies? A. I do.").

[21]   PX39; Transcript of the deposition of Alexandre Rocha ("Rocha Tr.") at 35:18-37:18 ("Q. At the time were you essentially the chief financial officer of Usinas Itamarati? A. I was the financial manager for Usinas Itamarati. In Brazil we do not have that term, chief financial officer. Q. Was there anyone in Usinas Itamarati's financial department who was senior to you? A. No. ... Q. Why did you leave Itamarati in February or March of 2007? A. Because I had a different work proposal from a different company, and I thought it was a good idea to accept it. Q. Why did you come back in March of 2008? A. Because the operation that I had been hired for at the company, the other company, with Dreyfus had been completed, and I was invited to return to Itamarati, and I thought it would be a good idea. Q. When you returned to Itamarati, did you return as financial manager? A. Yes. Q. And did you remain financial manager until you left in December of 2008 or January of 2009? A. Officially, yes.").

[22]   Possari Tr. at 40:25-42:1 ("Q. Mr. Possari, I believe you told us that in 2004, you became a director of Usinas Itamarati; is that correct? A. Yes. Q. Was that -- A. If you need a precise day, I was actually elected in the beginning of 2005. The beginning of 2005, March of 2005. Q. And was your title director of -- legal director? A. At the time, when I was elected at that time, there was an attribution, it was legal director. And in May of 2009, we abolished the name 'legal' and it became just director. Q. From March of 2005 until the present time, I understand your title was legal director and then became director. Has the nature of your duties for Usinas Itamarati changed at all from March of 2005 until the present time? ... A. No. Q. From March of 2005 until the present time, have you been the most senior lawyer at Usinas Itamarati? A. Yes.").

21.     At all relevant times the members of Itamarati's board of directors were Ana Claudia Tamer, Julio Tamer and Linda Tamer.[23]

22.     However, Itamarati's board of directors did not hold meetings as a Board.[24]

23.     Julio Tamer and Linda Tamer did not take any meaningful part in decisions on behalf of Itamarati.[25]

24.     Instead, when requested Ana Claudia Tamer would generally approve matters recommended to her by Edezio Oliveira, occasionally with the advice of Sergio Spinelli, an outside lawyer.[26]

---

[23]   Tamer Tr. at 15:8-15:25, 19:9-19:15, 42:10-42:16.

[24]   Tamer Tr. at 15:16-16:22, 19:20-19:25, 39:10-40:14 ("Q. My question is does the Board meet regularly every month, every quarter, once a year? A. Well, we get together, yes. We meet. Not always to talk about the Usinas, because it is about a family. Q. My question though, meeting as a Board of Directors to discuss the business of Usinas Itamarati, how often do you meet as a Board of Directors to discuss the business of Usinas Itamarati? A. No. They do not discuss the companies' issues with me. It's very rare for that to happen. Q. Do you ever have formal Board meetings where the three of you either sit down or get on the phone and say we are meeting as the Board of Directors of Usinas Itamarati? A. It is Edezio who does that. All of these companies, negotiations and meetings are done by Edezio. Then he comes to me and discuss things, discusses these things with me. And I go to Spinelli and discuss them with Spinelli. Q. Does Mr. Oliveira ever come to you with an issue and then you go and meet with Julio Tamer and Linda Tamer to discuss it and come to a decision? A. No.").

[25]   Tamer Tr. at 16:2-16:22 39:10-40:14 ("Q. What is your relationship with Julio Tamer? A. My ex-husband and my ex-mother-in-law. Q. Ms. Linda Tamer is your former mother-in-law? A. Yes. Q. When you said they do not take part effectively in the Board, what did you mean? A. They are people of trust in the family, but they do not participate in the Board because we have this trust policy. Q. By trust policy do you mean the other members of the Board of Directors, Mr. Julio Tamer and Linda Tamer trust you to make decisions on behalf of Usinas Itamarati? A. They do. Q. Do they make any decisions on behalf of Usinas Itamarati? A. No.").

[26]   Tamer Tr. at 73-74 ("Q. You trusted Mr. Oliveira's judgement? A. I did. Q. If he had brought the derivative transaction to your attention at the time that they did it, in April, would you have approved it? … A. If there had been a meeting with Edezio and Spinelli and Spinelli would have said yes, yes."); *Id.* at 39:16-40:14 ("Q. My question though, meeting as a Board of Directors to discuss the business of Usinas Itamarati, how often do you meet as a Board of

25.    Obtaining a Board resolution from Itamarati's board of directors was a mere

formality as board members would effectively sign any resolution presented to them by Ana

Claudia Tamer or the executive committee.[27]

26.    Itamarati's board of directors and was dissolved in May of 2009, and the company

has since functioned without a board of directors.[28]

**B.    Loan Transactions**

27.    On or about November 13, 2007, MLCP and UISA Finance entered into a Loan

and Guaranty Agreement (the "November Loan") pursuant to which UISA Finance borrowed

$125 million from MLCS to be repaid, together with interest calculated at the London Interbank

---

Directors to discuss the business of Usinas Itamarati? A. No. They do not discuss the companies' issues with me. It's very rare for that to happen. Q. Do you ever have formal Board meetings where the three of you either sit down or get on the phone and say we are meeting as the Board of Directors of Usinas Itamarati? A. It is Edezio who does that. All of these companies, negotiations and meetings are done by Edezio. Then he comes to me and discuss things, discusses these things with me. And I go to Spinelli and discuss them with Spinelli. Q. Does Mr. Oliveira ever come to you with an issue and then you go and meet with Julio Tamer and Linda Tamer to discuss it and come to a decision? A. No.").

[27]    Tamer Tr. at 45-46 ("Q. I am talking about approval by you, Julio Tamer and Linda Tamer. Were there times when there was a decision that needed, you know, a signature by all three of you? A. Yes. Q. How would that process work? A. In that case Edezio or Spinelli would get in touch with me on an issue that would call for our signature. And we would make a decision if we would sign it or not. But it would depend on the type of business if it would call for our signature or not. Q. Who made the decision whether it was the type of business that required your signature or not; is that something you decided or did you rely on Mr. Oliveira or Mr. Spinelli for that? A. The Legal Department of the company would be always the one who would come and say if that would require or not a signature. Q. And if there was a decision that required the signatures of yourself, Julio Tamer and Linda Tamer, who would obtain those signatures; would you all get together and sign together or would somebody from legal get your signature and then get signatures from the other two people? A. In some cases if Julio was home we would sign the document together. In other cases, if not, the Legal Department would collect the signatures.").

[28]    Possari Tr. at 78:11-78:17 ("Q. And in May of 2009, Usinas Itamarati's Board was dissolved? A. It was dissolved in May of 2009. Q. Why was the Board of Usinas Itamarati dissolved in 2009? A. It was dissolved because we wanted to make it less red tape and to simplify the bylaws.").

Offered Rate ("LIBOR") plus 6%, in semi-annual installments from November 13, 2009 through November 13, 2014.[29]

28.      Itamarati and two of its affiliates, Grupo Itamarati Empreendimentos E Participacoes S.A. ("Grupo Itamarati") and Companhia Itamarati De Investimentos (together, the "Guarantors"), guarantied UISA Finance's obligations under the November Loan.[30]

29.      Most of the proceeds from the November Loan were transferred to Itamarati for its use.[31]  The remaining amounts were transferred to another affiliate.[32]

30.      MLCP had previously made other loans to Itamarati and UISA Finance.  MLCP initially loaned $20 million directly to Itamarati in March 2007[33] and an additional $5 million to Itamarati in June 2007.[34]

31.      At Itamarati's request, the $25 million loaned to Itamarati was replaced in September, 2007 by a $25 million loan to UISA Finance, guarantied by the Guarantors.[35]   The

---

[29]  Weinstein Aff ¶12; PX11 § 2.04(a).

[30]  *Id.*

[31]  Weinstein Aff ¶13; PX25.

[32]  Weinstein Aff ¶13; *Id.*

[33]  Weinstein Aff ¶7; PX22; PX23.

[34]  Weinstein Aff ¶8; PX24; 7/3/2009 Declaration of E. Oliveira ¶ 11 ("The amount of the loan was initially US$20 million in March 2007, and it was later increased to US$25 million in September 2007, and, finally, to US$125 million in November 2007.").

[35]  Weinstein Aff ¶9; PX25 ("The structure is to make the loan to UISA Finance (Cayman) – an offshore SPV held 100% by UISA, established to issue bonds and not yet used – having as a guarantor Usinas Itamarati S.A. ('UISA')."); PX26.

change from Itamarati to UISA Finance as borrower was for Itamarati's corporate purposes as

UISA Finance was used purely as a financing vehicle for Itamarati and its affiliates.[36]

      32.    At the time of the November Loan, the parties discussed ways in which UISA

Finance might be able to reduce the interest it would have to pay.[37]

      33.    Initially, the discussions centered on a dual currency loan structure in which, in

return for taking currency risk, the interest rate would be reduced.[38]

      34.    Ultimately, on or about November 13, 2007 the November Loan closed without

the dual currency option[39] but Itamarati remained interested in a derivative that might reduce its

funding costs.[40]

---

[36]   Weinstein Aff ¶9; Amended Answer and Counterclaims ¶8.

[37]   Da Silva Aff. ¶¶10-11; Weinstein Aff. ¶¶15-16; Transcript of the deposition of Sylvio
Coutinho ("Coutinho Tr.") at 62:8-62:21 ("Q. Getting back to the November 2007 loan, did
the parties have discussions about using transactions to lower the interest rate at the time they
entered into the loan in November? ... A. Yes. The exact date. Actually, the principal was on
November 30th. Q. 30th or 13th? A. 13th of November. Q. And at that time the parties were
having discussions about ways to reduce the interest rate? ... A. Yes."); Rocha Tr. at 57:18-
58:24 ("Q. When you say the derivative was related to the loan transaction, and I believe
earlier you said that they were linked, what do you mean by that? A. What I learned when I
went back to Itamarati is that the loan transaction would have a risk mitigating aspect, and
that it had not been signed at the time because we did not come to an agreement as to the
instrument. ... Q. Mr. Rocha, when you say the loan transaction would have a risk mitigating
aspect, what did you mean by that? A. I would like to re -- to say the sentence in a different
way, please. When I went back to Itamarati, I was informed about the loan contract between
UISA Finance in that case and Merrill Lynch, and that would be -- that could be an
opportunity to lower the cash disbursement for the company. That is what I mean when I say
risk mitigation. Maybe I did not use an appropriate term when I said risk mitigation. Q. And
when you say "lower the cash disbursement," what do you mean? A. Specifically, to lower
the payment of interest rates.").

[38]   Da Silva Aff. ¶¶10-11; Weinstein Aff. ¶¶15-16.

[39]   Da Silva Aff. ¶12; Weinstein Aff. ¶17; PX11.

[40]   Da Silva Aff. ¶13; Weinstein Aff. ¶17; PX33; PX35; PX36; PX38; PX40; PX42.

35.     Itamarati has acknowledged that the November Loan and Swap that was ultimately entered into were thus closely related.[41]

36.     The November Loan agreement provided that the obligation of MLCP to advance funds was subject to a number of conditions precedent, including, *inter alia*, MLCP's receipt in form and substance acceptable to it of (a) documents evidencing the taking of all necessary action to authorize the MLCP Loan Agreement and other Transaction Documents (as defined), (b) a favorable opinion of counsel to the Guarantors (as defined to include Itamarati) and (c) a certificate of incumbency for each Guarantor.[42]

37.     UISA Finance and the Guarantors provided MLCP with copies of requested documents for the November Loan, including a legal opinion from Itamarati's outside counsel,[43] a resolution of Itamarati's Board of Directors authorizing Itamarati's guaranty of UISA Finance's obligations[44] and a certificate of incumbency for Itamarati's officers.[45]

---

[41]   Declaration of E. Oliveira ¶ 12 ("As an integral part of the discussions regarding the $125 million loan, Merrill Lynch marketed a derivative product it told Itamarati would reduce the cost of financing the loan."); Possari Tr. at 105:18-106:5 ("Q. When you signed this document that is part of Exhibit 6 [May 13, 2008 trade confirmation for the Swap], did you understand that it related to a derivative or swap transaction between Merrill Lynch Capital Services and UISA Finance? ... A. No. Q. When you signed this document, did you have any understanding what it related to? A. That it was a continuation to the principal agreement. It was in addition to the main or the principal contract that was the $125 million contract.").

[42]   PX11 §3.01.

[43]   PX15.

[44]   PX14.

[45]   PX12.  Itamarati also provided a legal opinion from Itamarati's outside counsel with respect to its guaranty of UISA Finance's obligations under the prior $25 million loan in September 2008.  PX28.  It also appears that Itamarati created a Board resolution in connection with Itamarati's guaranty of UISA Finance's obligations under that prior loan.  PX89.

38.     Nevertheless, Article VII, section 7.09 of the November Loan agreement specifically provided that "[i]t is not necessary for the Lender to inquire into the capacity or powers of any Guarantor or Borrowers or the officers, directors or any agents acting or purporting to act on behalf of any of them."[46]

C.     **Swap Transaction**

39.     After the November Loan was closed, Itamarati continued to be interested in a derivative transaction in which it took exposure to the foreign exchange ("FX") market in return for a reduction in the interest payable on the loan.[47]

40.     Between November 2007 and April 2008, senior members of Itamarati's management discussed the structure and terms of such a derivative with representatives of MLCS (principally Fabio Da Silva).[48]  The contemporaneous emails reflect that, among others, Edezio Oliveira,[49] Sergio Spinelli,[50] Roberto Haaland (who was the general manager[51] of Itamarati)[52] and Alexandre Rocha[53] were involved on behalf of UISA Finance and Itamarati.

---

[46]  PX11 §7.09.

[47]  Da Silva Aff. ¶13; PX33; PX35; PX36; PX38; PX40; PX42.

[48]  Da Silva Aff. ¶¶13-26.

[49]  PX32; PX33, PX36; PX37; PX41; PX42; PX43.

[50]  PX35; PX43.

[51]  Rocha Tr. at 88:7-11 ("Q. Who was Mr. Haaland? A. At that time he was the general manager for the company. Q. For Usinas Itamarati? A. For Usinas Itamarati.").

[52]  PX33, PX36; PX37; PX41; PX42.

[53]  PX41; PX42; PX43.

41.     Eventually, the parties settled on a derivative transaction (the "Swap") in which Itamarati accepted exposure to a weakening in the Brazilian real ("BRL") or a strengthening of the U.S. dollar ("USD") in relation to each other, in return for a reduction in interest rate.[54]

42.     Itamarati told MLCS that it was comfortable with this exposure because it had substantial revenues in U.S. dollars and production costs in Brazilian reais.[55] As a result, Itamarati's operating profits would tend to increase when there is a strengthening of the U.S. dollar against the Brazilian real and operating profits would tend to decrease when there is a strengthening of the real against the U.S. dollar.[56]

43.     MLCS was informed that Itamarati's board approved the Swap transaction.[57]

44.     Derivative transactions such as the Swap differ from loans in the sense that cash is not distributed to any party on closing.  Also, the value of a derivative transaction is very sensitive to market conditions that change daily and it is therefore customary to close a derivative transaction on an oral agreement or email exchange or other informal method with the documentation to follow.[58]  Additionally, the documentation of derivatives is different than for loans.   Derivatives are typically documented pursuant to the form ISDA Master Agreement (as modified by the parties) and a standard form of transaction confirmations.

---

[54]   Da Silva Aff. ¶¶ 26-28; PX46.

[55]   Da Silva Aff. ¶17,

[56]   *Id.*

[57]   Da Silva Aff. ¶17.

[58]   Hull Aff. ¶33; Da Silva Aff. ¶31.

45.     The Swap was agreed to orally and confirmed via exchanges of emails on April 24, 2008.[59]

46.     The effective date of the Swap was November 13, 2007 to correspond with the closing of the November Loan.  In the Swap:

(a) MLCS paid UISA Finance LIBOR plus 6% on the outstanding November Loan amount;

(b) UISA Finance paid MLCS LIBOR plus 1.6% on the outstanding November Loan amount;

(c) UISA Finance granted MLCS 14 foreign exchange options ("FX Options"), one maturing on each of the May and November payment dates of the November Loan.[60]

47.     The effect of the Swap was to reduce the interest rate on the November Loan from LIBOR plus 6% to LIBOR plus 1.6% in return for the 14 FX Options granted to MLCS by Itamarati.[61]

48.     Simply stated, if the value of the U.S. dollar declined against the real, no payment would be required on the FX Options embedded in the transaction and the effect of the Swap would be to reduce the interest paid on the November Loan from LIBOR plus 6% to LIBOR plus 1.6%.[62]  If the value of the U.S. dollar increased against the real, a payoff on the FX Options

---

[59]   Da Silva Aff. ¶26; PX46; Coutinho Tr. at 76:19-76:23 ("Q. April 24th was not the date the contract was signed, but it was the date that the parties actually did the swap deal; is that correct? … A. Correct."); Rocha Tr. at 119:25-120:7 ("Q. And April 24th was the date that the parties actually executed the derivative transaction; is that correct? A. I believe so, according to the documentation. Q. And does that comport with your best recollection as well? A. Yes.").

[60]   PX4.

[61]   Da Silva Aff. ¶17, Hull Aff. ¶16.

[62]   Da Silva Aff. ¶28; Hull Tr. at 42-64.

might be required, but this would tend to be offset by an improvement in Itamarati's operating profit.[63]

49.     In May 2008, Itamarati saved approximately $2.7 million in interest payments on the November Loan as a result of the Swap.[64]

50.     Itamarati could have saved approximately $22.5 million in interest payments on the November Loan if no payoff on the FX Options were required throughout the course of the Swap.[65]

---

[63]  Da Silva Aff. ¶17; Hull Aff. ¶16; Rocha Dep. Tr. 58:14-24 ("When I went back to Itamarati, I was informed about the loan contract between UISA Finance in that case and Merrill Lynch, and that would be -- that could be an opportunity to lower the cash disbursement for the company. . . . Q. And when you say 'lower the cash disbursement,' what do you mean? A. Specifically, to lower the payment of interest rates."); *Id.* at 76:3-76:17 ("Q. How did that transaction work, if you can describe it to me generally, your understanding of the derivative transaction? . . . A. The agreement, the loan agreement had as an interest rate at 6 percent per year plus LIBOR. And within this derivatives transaction it would -- it would be reduced to LIBOR plus 1.7 or something similar, which would bring us to an interest rate reduction of over $5 million a year, and we were utilizing a few options in order to obtain this.").

[64]  PX63; Rocha Tr. at 146:18-147:7 ("Q. And when the derivative transaction was first executed back in April of 2008, initially it made money for UISA Finance; is that correct? … A. I would say that in the beginning it had reached its goal to reduce the disbursement with interest rates, yes. Q. And that saved UISA Finance money, right? A. Yes, that's correct. Q. And if the real had remained strong against the dollar and volatility had remained low, the derivative would have continued to save UISA Finance money; is that correct? A. Probably."); 2/25/2011 Oliveira Tr. at 264:6-19 (6 Q. It's true, is it not, as a result of the closing of the swap transaction between UISA Finance and Merrill Lynch, that Usinas Itamarati was able to record a financial benefit on its financial statements; correct? A. Directly related to UISA Finance's gains -- earnings. Q. Okay. But related to those 14 earnings it -- withdrawn.  Is it fair to say that any financial benefit under the swap transaction with Merrill Lynch was effectively passed through to Usinas Itamarati? A. Yes. That is correct.").

[65]  Deposition transcript of Andrew Smith ("Smith Tr.") at 96:7-96:13 ("Q. Did you calculate what the total savings would be over the life of the transaction? … A. We did. I think it is approximately if I -- I don't have the numbers with me, but approximately $22 1/2 million.").

51.     The Swap was designed to correspond to the terms of the November Loan.  For example, the effective date of the Swap was November 13, 2007 to correspond with the start of the November Loan.  The notional amounts in the Swap were the same as the outstanding amounts under the November Loan.  The payment periods under the Swap matched the interest payment periods on the November Loan.[66]

52.     UISA Finance (as opposed to Itamarati) was selected as MLCS's counterparty for the Swap because UISA Finance was also the counterparty for the November Loan.[67] Itamarati's representatives understood the Swap to be a continuation of the November Loan.[68]

---

[66]   Da Silva Aff. ¶27; PX4; PX11.

[67]   Da Silva Aff. ¶14; Rocha Tr. at 89:14-89:20 ("Q. Why was UISA Finance the counter party in the derivative transaction as opposed to Usinas Itamarati? A. When I returned to the company, it was already set up to be that way, and as I understood at the time, due to the fact that it was a continuation of a loan transaction.").

[68]   Rocha Tr. 89:14-90:2 ("Q. Why was UISA Finance the counter party in the derivative transaction as opposed to Usinas Itamarati?  A. When I returned to the company, it was already set up to be that way, and as I understood at the time, due to the fact that it was a continuation of a loan transaction.  Q. Why did Usinas Itamarati agree to guarantee the obligations of UISA Finance in the derivative transaction? . . . A. Again, as I remember, because it would be a continuation of the loan transaction."); Possari Tr. 105:25-106:5 ("Q. When you signed this document [May 13, 2008 confirmation], did you have any understanding what it related to?  A. That it was a continuation to the principal agreement [November Loan]. It was in addition to the main or the principal contract that was the $125 million contract."); Oliveira Tr. at 41:15-42:16 ("Q. My question is, what was the purpose -- what was UISA Finance's purpose in entering into the swap? Why did it enter into the swap? ... Q. And if you need to read your declaration first, that is fine. Just let us know. A. I am rereading paragraph 12. Q. But my question is, can you answer the question without looking at paragraph 12? A. I will answer the question. If he has any questions or any doubts, he can ask me again. As I understand paragraph 12, that at the moment of the $125 million loan, Merrill Lynch had offered a derivative transaction to UISA Finance. At that time, at that exact time or opportunity, the operation that was executed was a loan transaction. And at that specific time, the swap transaction had not been executed. Q. What was the purpose of the swap transaction? Why did UISA Finance enter into it? ... A. The swap transaction had been executed after the loan. It had as an objective to reduce the loan's related costs and it had been agreed upon between UISA Finance and Merrill Lynch.").

53.     The Swap was documented by a trade confirmation dated May 13, 2008.[69]   This May 13 confirmation was signed after the original confirmation, April 24, 2008, was amended to replace Alexandre Rocha's name with Edezio Oliveira as signatory for UISA Finance because, as MLCS was told, Rocha did not have authority to sign on behalf of UISA Finance.[70]

54.     No one told MLCS that Rocha was not authorized to sign trade confirmations on behalf of Itamarati.   Rocha believed that he was authorized.[71]

55.     Thereafter, the Swap was amended several times in September and October 2008 as the value of the transaction began to turn against Itamarati and UISA Finance.[72]   In essence, in return for giving back some of the interest savings that could be achieved with respect to the November Loan, UISA Finance received a degree of relief on its obligations related to the FX options, which relief was reflected in other derivative transactions or, in the case of the last iteration of the transaction, in the Swap confirmation itself.[73]

56.     The amendments to the Swap are reflected in confirmations dated September 17, 2008,[74] September 24, 2008,[75] September 29, 2008[76] and October 7, 2008.[77]   While the last two

---

[69]   PX4.

[70]   Da Silva Aff. ¶32; PX4; PX50; Rocha Tr. at 115:14-115:18 ("Q. Do you have an understanding that your name was replaced with Mr. Oliveira because, as you told us earlier, you couldn't sign on behalf of UISA Finance? A. I believe so."); Oliveira Tr. at 163:13-163:14 ("I was an officer of UISA Finance. I could sign documents.").

[71]   Rocha Tr. at 85:4-7.

[72]   Da Silva Aff. ¶60; PX5; PX6; PX7; PX8.

[73]   Da Silva Aff. ¶62; PX73; PX81; PX94; PX97; PX98; PX100; PX101; PX102; PX103; PX104; PX111; PX112; PX116; PX132; PX134; PX135; PX144; PX145 at ITA0008988.

[74]   On September 17, 2008, UISA Finance purchased a US $200 million call option with a maturity date of November 14, 2008 and in exchange, the interest rate payable by UISA Finance on the Swap (the "Spread") was changed from LIBOR plus 1.6% to LIBOR plus 2.6% for all remaining maturity dates.  PX5; PX81; PX145 at ITA0008988.

of these confirmations were not executed by UISA Finance or Itamarati, Defendants

acknowledge that the trades were agreed[78] and, in any event, the unsigned confirmations reflect

amendments that reduced Defendants' exposure under the Swap.[79]   Accordingly, the damages

calculation in this case (discussed below) was made by reference to the Swap as amended by

these subsequent trade confirmations.

---

[75]   On September 24, 2008, UISA Finance purchased a US $80 million call option with a
maturity date of December 26, 2008 and sold a Knock-In US $80 million put option with a
maturity date of December 26, 2008 and in exchange, the Spread was changed from LIBOR
plus 2.6% to LIBOR plus 3.165% for all remaining maturity dates. PX6; PX101; PX145 at
ITA0008988.

[76]   On September 29, 2008, UISA Finance purchased a US $150 million call option with a
maturity date of December 26, 2008 and sold a Knock-In US $200 million put option with a
maturity date of December 26, 2008 and in exchange, the Spread was changed from LIBOR
plus 3.165% to LIBOR plus 3.635% for all remaining maturity dates.  PX7; PX103; PX111;
PX104; PX145 at ITA0008988.

[77]   On October 7, 2008, the parties unwound (1) the US $200 million call option with a maturity
date of November 14, 2008 (purchased on September 17, 2008); (2) the US $80 million call
option with a maturity date of December 26, 2008 (purchased on September 24, 2008); (3)
the US $150 million call option with a maturity date of December 26, 2008 (purchased on
September 29, 2008); and (4) the four FX Options embedded in the Swap with maturity dates
of November 14, 2008, May 15, 2009, November 13, 2010 and May 14, 2010.  In exchange,
the Spread was changed from LIBOR plus 3.635% to LIBOR plus 4.4% for maturity dates in
November 2008, May 2009, and November 2010.  PX8; PX135; PX144; PX145 at
ITA0008988.  The Knock-In US $80 million put option with maturity date of December 26,
2008 (purchased on September 24, 2008) and the Knock-In US $200 million put option with
maturity date of December 26, 2008 (purchased on September 29, 2008) remained open until
the Swap was unwound on October 28, 2008.

[78]   PX112; PX140; PX141; PX144; PX146; Rocha Tr. at 177:17-178:4 ("Q. What did you mean
when you say that UISA Finance recognizes the execution of the transactions described in
these documents? ... A. That in that specific case, I was acting on behalf of UISA Finance. I
wasn't sure if the transaction had been closed by phone. I'm sorry. That is not what I said. I
actually affirm, I said the transaction had been closed over the phone. I had done it. And they
had requested an email confirmation, and I confirmed it in good faith.").

[79]   Hull Aff. ¶57.

57.     Two of the additional derivative transactions entered into by the parties in connection with the amendments of the Swap in September and October 2008 remained open until the Swap was unwound on October 28, 2008 (the "Currency Options").  The first of these Currency Options was a three-month knock-in put option in which MLCS had the right to sell $200 million to UISA Finance for Brazilian reais at an exchange rate of 1.8000 reais per U.S. dollar if the exchange rate fell below 1.6500 reais per U.S. dollar during the three-month period.[80]  The second Currency Option was a similar transaction where the amount that could be sold by MLCS is $80 million.[81]

**D.     Itamarati's Guaranty**

58.     As noted above, Itamarati guarantied payment of the November Loan, and its predecessor loan in September 2007.   MLCP required Itamarati's guaranty because UISA Finance was a non-operating shell company with little or no assets that had been inserted in the transaction at Itamarati's request.[82]

59.     UISA Finance was the obligor on the Swap because it was the obligor on the Loan.[83]  It was always understood between the parties that Itamarati would need to guaranty UISA's obligations to MLCS.[84]

---

[80]   PX9.

[81]   PX10.

[82]   Weinstein Aff. ¶13; Coutinho Tr. at 118:5-118:24 ("Q. Did you have an understanding that Merrill Lynch Credit Products would not loan money to UISA Finance without a guaranty by Usinas Itamarati because UISA Finance had no assets? … A. I believe, actually, I can tell you for sure that the reason – UISA Finance equities were no more than 50,000 reais. Q. Is it your understanding that that is why it was a condition of the $125 million loan to UISA Finance that Usinas Itamarati guaranty UISA Finance's obligations? … A. Yes.").

[83]   Da Silva Aff. ¶14.

60.     This understanding is reflecting in the communications between the parties regarding the derivative transaction that ultimately became the Swap, including draft and final term sheets, in which the expectation and the intention of the parties was clearly and repeatedly expressed that Itamarati would act as guarantor.[85]

61.     MLCS also sent Itamarati draft trade confirmations indicating the terms of the Swap (and its predecessor forms of derivatives that were under discussion), including Itamarati's Guaranty of UISA Finance's obligations.  Each of these draft confirmations provided that Itamarati "absolutely and irrevocably . . . guarantees (as primary obligor and not merely as surety) the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of any amounts owed by Party B [UISA] to Party A [MLCS] under the Transaction," and contained signature lines for Itamarati as guarantor.  MLCS sent Itamarati such draft confirmations on:

- November 15, 2007;[86]
- November 28, 2007;[87]
- January 11, 2008;[88]
- April 17, 2008;[89] and
- April 23, 2008.[90]

---

[84]   Rocha Tr. at 89:21-90:2 ("Q. Why did Usinas Itamarati agree to guarantee the obligations of UISA Finance in the derivative transaction? … A. Again, as I remember, because it would be a continuation of the loan transaction.").

[85]   Da Silva Aff. ¶¶16-35; PX32; PX33; PX35; PX41; PX45.

[86]   PX 32.

[87]   PX33.

[88]   PX35.

[89]   PX41.

[90]   PX45.

62.    On April 23, 2008 (on the eve of entering into the Swap), MLCS also sent Itamarati another draft term sheet indicating that it was one of the credit conditions for MLCS' approval that Itamarati would act as guarantor.[91]

63.    On April 24, 2008, the parties entered into the Swap and MLCS sent Itamarati yet another term sheet listing the terms of the trade, indicating that Itamarati acted as guarantor.[92] The term sheet (like prior draft term sheets and confirmations) also indicated that the Swap would be documented by an ISDA Master Agreement and a trade confirmation.[93]

64.    On April 30, 2008, MLCS sent Itamarati a trade confirmation documenting the Swap.[94] The confirmation reflected that Alexandre Rocha and Ernesto Possari would sign for UISA Finance and for Itamarati as guarantor, and Possari alone would sign for the other two guarantors.[95] As noted above, this trade confirmation was amended on May 13, 2008 to replace Rocha's name with Edezio Oliveira as signatory for UISA Finance because, as MLCS was told, Rocha did not have authority to sign on behalf of UISA Finance.[96] No changes were made to the signature blocks for Itamarati or the other guarantors.[97]

---

[91]    PX44.

[92]    PX46.

[93]    *Id*. at UISA_001335.

[94]    PX49.

[95]    *Id*.

[96]    PX4; PX50; Rocha Tr. at 115:14-115:18 ("Q. Do you have an understanding that your name was replaced with Mr. Oliveira because, as you told us earlier, you couldn't sign on behalf of UISA Finance? A. I believe so."); Oliveira Tr. at 163:13-163:14 ("I was an officer of UISA Finance. I could sign documents.").

[97]    PX4.

65.     Oliveira, as Director of UISA Finance, signed the May 13 confirmation for UISA Finance.[98]   Rocha as Itamarati's "Chief Financial Officer" and Possari as Itamarati's "Legal Counsel" signed for Itamarati.[99]   Possari also signed for the two other guarantors.[100]   Itamarati's signature block was on same page as UISA Finance's signature block and clearly reflected that Itamarati was signing as guarantor.[101]   Itamarati delivered the executed confirmation to MLCS on May 13, 2008.[102]   Oliveira testified that he was capable of reading the Itamarati signature block and understanding that Itamarati was acting as guarantor.[103]

---

[98]   PX51 at ITA0018886.

[99]   *Id*.

[100]   *Id* at ITA0018888.

[101]   *Id*. at ITA0018886.

[102]   *Id*.

[103]   2/25/2011 Oliveira Tr. at 234:13-24 ("Q. Look directly below your signature on page 1886 of Oliveira Exhibit 8, do you see below that on the same page the words 'Usinas Itamarati S.A., as guarantor?' A. Are you asking if I see it in this document? Q. Correct. A. Yes, I do see it in this document. Q. And, sir, do you understand the meaning of the English word "guarantor?" A. Yes, I do.").  Although Oliveira has testified that he is not fluent in English, Oliveira Tr. at 12:24-13:2 ("Q. Mr. Oliveira, do you speak English? A. I understand English. Q. Do you speak it? A. Not fluently."), he has admitted that he is capable of reading and understanding English, received his university degree from a British school doing coursework in English, conducts business in English and, at his deposition, responded to questions in English before they were interpreted into Portuguese. Oliveira Tr. at 17:10-18:16 ("Q. Do you understand everything in Exhibit 1 in English? A. I believe so. Q. So is it fair to say you have no trouble reading everything in English that is in Exhibit 1 and understanding that? A. Regular day-to-day English, I have no difficulty.  Q. That was not my question, sir. My question, sir, is do you read and write English well enough to understand everything that is written in English in Exhibit 1? ... A. Yes.); *Id*. at 68:2-17 ("Q. You got your master's degree in metallurgy from the University of Sheffield; is that correct? A. Yes. Around, yes. Q. Around when did you get that degree? A. 1978, 1979. Q. And that is Sheffield, England? A. Yes. Q. Was your course work in English? A. Yes. Q. Did you submit written work in English?  A. When it came to the technical subjects, yes. Q. Did you submit course work other than in connection with technical subjects in some other language? A. No, no, no. Always in English."); *Id*. at 13:21-14:10 ("Q. Do you ever conduct business in English? ... A. Yes. But usually assisted by translators.  Q. Do you ever send business-related

66.     The May 13 confirmation provided that Itamarati "absolutely and irrevocably . . . guarantees (as primary obligor and not merely as surety) the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of any amounts owed by Party B [UISA Finance] to Party A [MLCS] under the Transaction."[104]

67.     The May 13 confirmation, as well as the later amended confirmations, also stated that "the provisions of Article VII (Guaranty) of the Loan and Guaranty Agreement [defined as the November Loan] shall be deemed to apply, with changes as applicable so that the guarantee is on behalf of Party B [UISA] in favor of Party A [MLCS], and in respect of the Transaction to include all amounts owed by Party B to Party A under the Transaction described herein."[105]  As noted above, Article VII, Section 7.09 of the November Loan provides that "[i]t is not necessary for the Lender to inquire into the capacity or powers of any Guarantor or Borrowers or the officers, directors or any agents acting or purporting to act on behalf of any of them."[106]

68.     Subsequently, Rocha and Possari (as Itamarati's CFO and Legal Counsel respectively) executed on behalf of Itamarati amended trade confirmations for the Swap dated September 17, 2008 and September 24, 2008.  Each of these amended trade confirmations contained the same terms with respect to Itamarati's guaranty, including that Itamarati

---

communications in English? A. Yes. Q. Do you ever do that without a translator? A. Yes, I do. Q. And you submitted sworn testimony to the Court in this lawsuit in English; is that correct? ... A. Correct."); 2/25/2011 Oliveira Tr. at 280:24-281:11 ("Q. Whatever your focus, sir, did you learn in September of 2008 that Merrill Lynch had requested that Itamarati provide a guarantee of UISA Finance's obligations under the swap? A. I don't remember. THE INTERPRETER: Should the interpreter interpret anyway? "I don't remember." MR. RICE: It's okay. He understood the English and answered in English.").

[104]  PX51 at ITA0018882.

[105]  *Id*. at  ITA0018882.

[106]  PX11 §7.09.

"absolutely and irrevocably . . . guarantees (as primary obligor and not merely as surety) the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of any amounts owed by Party B [UISA Finance] to Party A [MLCS] under the Transaction."[107]

69.    Oliveira also signed the September 17 and 24 amended Swap confirmations.[108] Oliveira has acknowledged that he observed that his signature was above that of Itamarati as guarantor and was therefore aware that Itamarati was providing a guaranty by the time of the amended confirms in September.[109]

70.    Before the commencement of the case, neither Oliveira, nor anyone acting on behalf of defendants ever suggested to MLCS that Rocha or Possari lacked authority to sign the confirmations on behalf of Itamarati, as guarantor.[110]

### E.    ISDA Master Agreement

71.    Prior to April 24, 2008, MLCS sent Itamarati draft confirmations and term sheets indicating that the Swap would be governed by an ISDA Master Agreement.[111]

---

[107]  PX5; PX6.

[108]  PX4, PX5, PX6.

[109]  Deposition transcript dated February 25, 2011 of Edezio Oliveira ("2/25/2011 Oliveira Tr.") at 287:22-288:22 ("Q. Okay. My question, though, sir, is -- first, take a look at page 17810. On that page you signed this confirmation on behalf of UISA Finance; correct? A. Yes. Q. And Mr. Possari similarly signed on behalf of UISA Finance on the same page; right? A. Yes. Q. And directly below your signature and that of Mr. Possari's are the words "Usinas Itamarati S.A. as guarantor" correct? Do you see that? A. Yes. Correct. Q. If you turn to the next page, page 811, you see that Mr. Rocha and Mr. Possari signed on behalf of Usinas Itamarati S.A. as guarantor; correct? A. Correct. Q. And you knew in September when you signed this that Mr. Rocha and Mr. Possari were signing on behalf of Usinas Itamarati as guarantor; correct? A. Within this time frame, that's correct.").

[110]  Da Silva Aff. ¶35; Weinstein Aff. ¶29; 2/25/2011 Oliveira Tr. at 291:22-292:7 ("Q. Whether it was necessary or not, you don't recall any conversation with anyone from Merrill Lynch in which you ever told them that the signatures in the confirmations executed with Merrill Lynch that were done on behalf of Usinas Itamarati as guarantor were, in your view, without authority; correct? … A. I don't remember, but I probably did not.").

72.     The executed May 13, 2008 trade confirmation included the parties' agreement "to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement" and that until the Master Agreement was signed, the confirmation would "supplement, form a part of, and be subject to, an agreement in the form of the Master Form as if we had executed an agreement in such form [] on the Trade Date of the first such transaction between us."[112]

73.     On April 28, 2008, MLCS sent Itamarati a draft ISDA Master Agreement, Schedule, Credit Support Annex and UISA Finance's legal opinion for review and execution.[113]

74.     Part 4 of the Schedule to the ISDA Master Agreement indicated that UISA would provide as credit support for transactions under the ISDA Master Agreement the "Guarantee of Usinas Itamarati S.A. in the form to be agreed to between [the] parties."[114]  Part 3 of the Schedule provided that UISA Finance would also supply an opinion of counsel to Itamarati, as UISA Finance's credit support provider.[115]

75.     Over the next several months, MLCS pursued UISA Finance and Itamarati for an executed ISDA Master Agreement and ancillary agreements.[116]  The documentary record reflects

---

[111]  PX32; PX33; PX35; PX41; PX45; PX46.

[112]  PX51.

[113]  PX48.

[114]  *Id*. at ITA0003496.

[115]  *Id*. at ITA0003494.

[116]  Da Silva Aff. ¶¶ 38-56.

that MLCS contacted the defendants in this regard on a number of occasions.[117]   The record further reflects that Itamarati received and was considering the drafts.[118]

76.     On May 28, 2008, one month after sending the draft agreements to Itamarati, MLCS emailed UISA Finance and Itamarati (specifically, Rocha, Itamarati's Finance Director and Christiano Morales, an employee in Itamarati's finance department[119]) requesting an executed ISDA Master Agreement.[120]

77.     On June 17, 2008, Morales forwarded MLCS's May 28 email to Possari, Itamarati's Legal Director, attaching the draft ISDA Master Agreement and requesting that Possari review it.[121]

78.     One week later, on June 23, 2008, Possari responded to Morales that because the ISDA Master Agreement is in English, it should be sent to Itamarati's outside counsel, Mattos Filho, for review and that Mattos Filho should then discuss their analysis with Itamarati's financial and legal departments.[122]

79.     On July 1, 2008, not having received a response from Itamarati, MLCS once again contacted Morales requesting that UISA Finance execute and return the ISDA Master

---

[117]  PX55; PX56; PX57; PX58.

[118]  PX56; PX57.

[119] Rocha Dep. Tr. 136:4-8.

[120] PX 55; PX 56.

[121] PX 55.

[122] *Id.*

Agreement.[123]  Morales forwarded this email to Possari, asking him once again whether Possari has any comments on the ISDA Master Agreement.[124]

80.     On July 29, 2008, Felipe Lachowski, who worked at the offices of a Brazilian affiliate of MLCS and whose duties included supporting Fabio Da Silva in the conduct of MLCS's business in Brazil, emailed Rocha asking to speak with him by phone in order to remind him that an executed ISDA Master Agreement was outstanding and that "the open derivative transaction that we have is major and during this past week we've been pressured to obtain a response from your end."[125]

81.     On August 27, 2008, UISA Finance signed and delivered the ISDA Master Agreement, Schedule, Credit Support Annex and UISA Finance legal opinion.[126]

82.     MLCS, however, identified certain issues with the executed documents and, on September 11, 2008, re-sent the ISDA Master Agreement to UISA Finance and Itamarati for additional revisions and signature.[127]  MLCS also reminded Itamarati that it was required to execute and deliver a guaranty of UISA Finance's obligations under the Swap and attached a draft guaranty and form of legal opinion for Itamarati's review, comment and execution.[128]

---

[123]  PX 57 ("We are being strongly pressured by our legal department to move forward with this negotiation, since we already have open operations with UISA Finance.  Could you please ask your legal department for a response, so we can streamline signature of the contract as much as possible?").

[124]  *Id.*

[125]  *Id.*

[126]  Da Silva Aff. ¶43; PX59.

[127]  PX62.

[128]  *Id.*

83.    Starting in September 2008, the world's financial markets entered an unprecedented and increasingly volatile and stressful period.[129] The value of the U.S. dollar increased significantly against the Brazilian real and there was a lack of liquidity in markets worldwide.[130] This caused a dramatic increase in UISA Finance's net potential losses under the Swap which were not offset, as Itamarati had expected would happen, by increased U.S. dollar revenues.[131] At the same time, Itamarati's business suffered as its customers cut back on their spending.[132] MLCS began making margin calls on UISA Finance.[133] MLCS also further increased its efforts to obtain the finalized and executed ISDA Master Agreement and related documents from Itamarati and UISA Finance.[134]

84.    On September 18, 2008, MLCS emailed UISA Finance and Itamarati requesting once again executed copies of the ISDA documentation.[135] MLCS also included in the email to Itamarati that "Merrill Lynch will initially accept a Legal Opinion from its own legal department for Usinas Itamarati S.A.  We must receive, within 30 days, an outside Legal Opinion that will replace the existing one."[136] On the same date, MLCS also followed up with UISA Finance and

---

[129] Da Silva Aff. ¶60.

[130] *Id.*

[131] 2/25/2011 Oliveira Tr. at 275:18-275:23 ("Q. When did the swap transaction turn negative in a substantial way to your company, to the best of your recollection? A. Specifically in, especially when the crisis in the economy started in September of 2008.").

[132] *Id.*

[133] Da Silva Aff. ¶60; PX60.

[134] Da Silva Aff. ¶¶44-53.

[135] PX77.

[136] *Id.*

Itamarati by phone.[137]   On that call, Morales informed MLCS that he was obtaining signatures and would provide the executed ISDA documentation as soon as possible.[138]

85.     On September 22, 2008, UISA Finance delivered the executed ISDA Master Agreement.[139]   On that same day, MLCS reminded Itamarati that the Guaranty and Legal Opinion remained outstanding.[140]

86.     Later on September 22, 2008, MLCS re-sent the April 24, 2008 email attaching the final term sheet for the Swap to Rocha for his review in connection with MLCS's request for an executed Guaranty.[141]   MLCS noted that the term sheet "contain[ed] the loan conditions, documents and guarantees given."[142]

87.     Rocha responded on September 23, 2008 that the "term sheet only mentions the ISDA and confirmation as separate documents.  The Guaranty contains a series of items that have to be analyzed."[143]

88.     MLCS replied that "the confirmation you signed on May 13, 2008 (attached) contains the terms of the Guaranty: see page 5, item (iii) and pages 9-11.  Could this help speed up your analysis of the Guaranty?"[144]   Rocha then responded, "we have identified this document.

---

[137]  *Id.*

[138]  *Id.*

[139]  Da Silva Aff. ¶47; PX 85.

[140]  Da Silva Aff. ¶47; *Id.*

[141]  Da Silva Aff. ¶48; PX 86; Rocha Dep. Tr. 127:7-128:11; 128:22-192:1; 131:8-16.

[142]  Da Silva Aff. ¶48; *Id.*

[143]  PX 87.

[144]  PX 88; Rocha Dep. Tr. 132:7-133:17; 134:15-24.

The lawyer has asked for one more hour.  Don't worry, you will receive the documents today."[145]

89.     On that same day, Rocha separately received an email from Possari's assistant attaching Itamarati's Board meeting minutes approving Itamarati's guaranty of UISA Finance's obligations under the September 10, 2007 $25 million loan from MLCP.[146]

90.     Later that day, MLCS emailed Rocha again, requesting that the documentation be completed that day.[147]  Rocha responded, "I have already told Fabio that we believed that ISDA would be sufficient.  I am pressing lawyers to speed this up."[148]

91.     Itamarati signed and delivered the Guaranty and the Legal Opinion from its in-house counsel on September 23, 2008.[149]

92.     If at any time Itamarati indicated that it would not provide the Guaranty, MLCS could and would have terminated the Swap, and its Loss would have been far less than it ultimately was.[150]   For example, as of September 23, 2008. the mark-to-market value of the Swap was $23,904,353 against UISA Finance.[151]

---

[145]  PX 90.

[146]  PX 89; Coutinho Dep. Tr. 172: 23-24 ("Q. Who is Tonia Georgetti? A. It is Mr. Ernesto Possari's assistant.").

[147]  PX 91.

[148]  *Id.*

[149]  PX92.

[150]  Da Silva Aff. ¶58.

[151]  PX93.

93.     The Guaranty was signed by Rocha, Itamarati's Finance Director, and Morales, who had a power of attorney for Itamarati.[152]

94.     The Guaranty provided that Itamarati "unconditionally guarantee[d] to [MLCS] the due and punctual payment of any and all amounts payable by UISA Finance" under the ISDA Master Agreement. The Guaranty also "certifi[ed] and warrant[ed] that this Guarantee constitutes the valid obligation of Guarantor, complies with all applicable laws, and is enforceable against the Guarantor in accordance with its terms."[153]

95.     The Legal Opinion was signed by Marcio Antonio Marques de Moraes, an internal lawyer for Itamarati.  Moraes signed the Legal Opinion after he was contacted by Rocha and discussed it with him.[154]   It stated that counsel had "examined originals or copies, certified or otherwise identified to my satisfaction, of such documents, corporate records, certificates of public officials and other instruments and have conducted such other investigations of fact and law as I have deemed necessary or appropriate for purposes of this opinion" and represented that the Guaranty (i) had been "duly authorized" and (ii) "constitutes the valid and legally binding obligation of Guarantor enforceable in accordance with its terms."[155]

96.     The second paragraph of the Legal Opinion states:

> The Guarantee has been duly authorized (in accordance with the terms of the [Board of Directors/Officers/Shareholders] resolution dated [09/04/2007]), executed and delivered by Guarantor and constitutes the valid and legally binding obligation of

---

[152] Coutinho Dep. Tr. 143:16-20  ("Q. Mr. Coutinho, what was Mr. Christiano Morales's position at Usinas Itamarati? … A: He was financial operations officer, and he was also an attorney in fact.").

[153] PX2.

[154] Oliveira Dep. Tr. 309:18-21 ("Marques had said that Alexandre had contacted him and had discussions with him, which resulted in this letter to Merrill Lynch."

[155] PX3.

Guarantor enforceable in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.[156]

### F.  Itamarati's Knowledge Of The Guaranty

97.    As mentioned above, the fact that the Guaranty would be required was communicated on numerous occasions to Itamarati's senior management, including via multiple draft confirmations and term sheets.[157]

98.    As also mentioned above, Rocha was Finance Director at all relevant times and he believed he was authorized to sign the confirmations containing guarantees and the Guaranty on behalf of Itamarati.[158]

99.    The Guaranty was reviewed and analyzed by Itamarati's counsel prior to its execution.[159]

100.    Possari, Itamarati's Legal Director, signed the ISDA Master Agreement (which provided for the Guaranty) on behalf of UISA Finance.[160]  He also signed various trade confirmations on behalf of UISA Finance and on behalf of Itamarati as guarantor of UISA

---

[156]  *Id.*

[157]  Da Silva Aff. ¶¶16-26; PX32; PX33; PX35; PX41; PX45.

[158]  Rocha Tr. at 85:4-87:11 ("Q. When you signed that guaranty, did you believe you were authorized to sign it? … A. At that point I believed so. … Q. Mr. Rocha, did there come a time that you learned that there was some question as to whether or not you were authorized to execute a guaranty of UISA Finance's obligations under the derivative transaction with a Merrill Lynch affiliate? A. Yes, there was. Q. Was that before or after you left the employment of Usinas Itamarati? … A. As I can remember, after.").

[159]  PX87; PX90; Rocha Tr. at 134:21-134:24, 197:19-197:25.

[160]  PX1.

Finance's obligations under the Swap.[161]   Possari believed he was authorized to sign these documents.[162]

101.    Moraes, the in-house counsel at Itamarati who signed the Legal Opinion, was a lawyer with 25 years of legal experience and is fluent in the English language.[163]   He obtained his law degree in 1986 from the Universidade Candido Mendes, a respected law school in Brazil.[164]

102.    Itamarati claims that the guaranty was not known or approved by Edezio Oliveira, Ana Claudia Tamer, or Itamarati's Board of Directors.

103.    A formal resolution signed by Itamarati's board of directors authorizing the Guaranty has not been produced.   There is, however, some question whether board approval was required.[165]   Moreover, given Itamarati's witnesses' testimony that the Swap was a continuation

---

[161]  PX1; PX4; PX5; PX6.

[162]  Possari Tr. at 44:23-45:2 ("Q. Have you ever signed a document on behalf of Usinas Itamarati that you weren't authorized to sign? … A. No.").

[163]  PX189.

[164]  PX189; Brancher Tr. at 186:14-186:21 ("Q. This reflects that he got his bachelor degree in law from the Universidade Candido Mendes. Is that a law school that you are familiar with? A. I know the name. It's in Rio de Janiero. Q. Is it a reputable law school? A. I think so.").

[165]  Itamarati's assertion that the Guaranty required board authorization is based principally on Article 22, XI (b) of Itamarati's by-laws, which states that "It is the Board of Directors' responsibility to, within its legal and statutory authority: (…) XI. authorize the Board to: (…) (b) (…) provide any guarantee in favor of *third parties*."   PX21, Article 22, XI (b) (emphasis added).   UISA Finance, however, is related to Itamarati – as noted above it was established as a special purpose vehicle to carry out financing transactions for Itamarati.   Itamarati's own corporate designee testified that as an affiliate with a common owner, UISA Finance is not a "third party" (or "terceiro," as the term is written in Portuguese in Article 22, XI (b) of the Brazilian statute) with respect to Itamarati.   Coutinho Tr. at 72:2-8 ("Q. Let me reask the question. How would you describe two companies that have a common owner, but one does not own the other? How would you describe that in Portuguese? A. Autonomous. Q. But not terciras? A. Not terciras.").

of the November Loan, there is also a question whether the prior board resolution and certificate

of incumbency provided in connection with the November Loan would suffice to meet any

requirement for specific Board authorization.[166]  Further, as noted above the board did not serve

any meaningful role in the management of the company.  Itamarati's board did not hold meetings

as a board,[167] Ana Claudia Tamer would generally approve matters recommended to her by

Oliveira[168] without input from the other two board members.[169]  Indeed, obtaining a board

---

[166] In connection with the November Loan, Itamarati's provided a resolution authorizing the
guaranty of UISA Finance's obligations.  PX14.  Moreover, Itamarati provided a certificate
of incumbency and authority providing that Ernesto Possari was, and would continue to be,
authorized to, *inter alia*, take any action required or permitted to be taken, done, signed or
executed under the November Loan or any other agreement or instrument to which MLCP
and Itamarati may be parties. PX12.  While the Swap was executed with MLCS rather than
MLCP, Defendants have argued that they did not recognize the different Merrill Lynch
entities were legally indistinguishable.

[167] Tamer Tr. at 15:16-16:22, 19:20-19:25, 39:10-40:14 ("Q. My question is does the Board
meet regularly every month, every quarter, once a year? A. Well, we get together, yes. We
meet. Not always to talk about the Usinas, because it is about a family. Q. My question
though, meeting as a Board of Directors to discuss the business of Usinas Itamarati, how
often do you meet as a Board of Directors to discuss the business of Usinas Itamarati? A. No.
They do not discuss the companies' issues with me. It's very rare for that to happen. Q. Do
you ever have formal Board meetings where the three of you either sit down or get on the
phone and say we are meeting as the Board of Directors of Usinas Itamarati? A. It is Edezio
who does that. All of these companies, negotiations and meetings are done by Edezio. Then
he comes to me and discuss things, discusses these things with me. And I go to Spinelli and
discuss them with Spinelli. Q. Does Mr. Oliveira ever come to you with an issue and then
you go and meet with Julio Tamer and Linda Tamer to discuss it and come to a decision? A.
No.").

[168] Tamer Tr. at 73-74 ("Q. You trusted Mr. Oliveira's judgement? A. I did. Q. If he had brought
the derivative transaction to your attention at the time that they did it, in April, would you
have approved it? … A. If there had been a meeting with Edezio and Spinelli and Spinelli
would have said yes, yes."); *Id*. at 39:16-40:14 ("Q. My question though, meeting as a Board
of Directors to discuss the business of Usinas Itamarati, how often do you meet as a Board of
Directors to discuss the business of Usinas Itamarati? A. No. They do not discuss the
companies' issues with me. It's very rare for that to happen. Q. Do you ever have formal
Board meetings where the three of you either sit down or get on the phone and say we are
meeting as the Board of Directors of Usinas Itamarati? A. It is Edezio who does that. All of
these companies,  negotiations and meetings are done by Edezio. Then he comes to me and

resolution was a mere formality.[170]  Itamarati's board of directors was dissolved in May of 2009,

and the company has since functioned without a board of directors.[171]

104.    All that said, the Court does not credit the contention that Oliveira was not aware

of the guaranty.   He has admitted that he was aware of the Swap at all times.[172]  It was viewed

---

discuss things, discusses these things with me. And I go to Spinelli and discuss them with
Spinelli. Q. Does Mr. Oliveira ever come to you with an issue and then you go and meet with
Julio Tamer and Linda Tamer to discuss it and come to a decision? A. No.").

[169] Tamer Tr. at 16:2-16:22 39:10-40:14 ("Q. What is your relationship with Julio Tamer? A.
My ex-husband and my ex-mother-in-law. Q. Ms. Linda Tamer is your former mother-in-
law? A. Yes. Q. When you said they do not take part effectively in the Board, what did you
mean? A. They are people of trust in the family, but they do not participate in the Board
because we have this trust policy. Q. By trust policy do you mean the other members of the
Board of Directors, Mr. Julio Tamer and Linda Tamer trust you to make decisions on behalf
of Usinas Itamarati? A. They do. Q. Do they make any decisions on behalf of Usinas
Itamarati? A. No.").

[170] Tamer Tr. at 45-46 ("Q. I am talking about approval by you, Julio Tamer and Linda Tamer.
Were there times when there was a decision that needed, you know, a signature by all three
of you? A. Yes. Q. How would that process work? A. In that case Edezio or Spinelli would
get in touch with me on an issue that would call for our signature. And we would make a
decision if we would sign it or not. But it would depend on the type of business if it would
call for our signature or not. Q. Who made the decision whether it was the type of business
that required your signature or not; is that something you decided or did you rely on Mr.
Oliveira or Mr. Spinelli for that? A. The Legal Department of the company would be always
the one who would come and say if that would require or not a signature. Q. And if there was
a decision that required the signatures of yourself, Julio Tamer and Linda Tamer, who would
obtain those signatures; would you all get together and sign together or would somebody
from legal get your signature and then get signatures from the other two people? A. In some
cases if Julio was home we would sign the document together. In other cases, if not, the
Legal Department would collect the signatures.").

[171] Possari Tr. at 78:11-78:17 ("Q. And in May of 2009, Usinas Itamarati's Board was
dissolved? A. It was dissolved in May of 2009. Q. Why was the Board of Usinas Itamarati
dissolved in 2009? A. It was dissolved because we wanted to make it less red tape and to
simplify the bylaws.").

[172] Oliveira Tr. at 38:12-24 ("Q. Could you turn to your declaration, sir? Would you look at
paragraph  please? You say, in English, 'As an integral part of the discussions regarding the
$125 million loan, Merrill Lynch marketed a derivative product it told Itamarati would
reduce the cost of financing the loan. Merrill Lynch also noted that the derivative product
was a feature similar to the dual currency component that had been contemplated but not

as a continuation of the November Loan in which he knew that Itamarati was guarantor.[173]

Given that UISA Finance was a thinly-capitalized special purpose entity established by and

inserted in the transaction by Itamarati for its own corporate purposes, Oliveira certainly knew

that MLCS would require a guaranty.[174]   Oliveira received numerous documents reflecting that

Itamarati would guaranty UISA Finance's obligations under the Swap[175] and he signed several

---

implemented as part of the $125 million loan.' Do you see that, sir? Do you see that? A.
Yes.").

[173] Oliveira Tr. at 88:13-22 ("Q. And did you discuss with Ms. Tamer the fact that under the
$125 million loan, Usinas Itamarati would be guarantying the obligations of UISA Finance?
… A. Yes. In the transaction we discussed with UISA Finance that there was -- there would
be a guaranty from Usinas Itamarati, and if I'm not mistaken, from other companies as
well."); *Id*. at 41:15-42:16 ("Q. My question is, what was the purpose -- what was UISA
Finance's purpose in entering into the swap? Why did it enter into the swap? ... Q. And if you
need to read your declaration first, that is fine. Just let us know. A. I am rereading paragraph
12. Q. But my question is, can you answer the question without looking at paragraph 12? A. I
will answer the question. If he has any questions or any doubts, he can ask me again. As I
understand paragraph 12, that at the moment of the $125 million loan, Merrill Lynch had
offered a derivative transaction to UISA Finance. At that time, at that exact time or
opportunity, the operation that was executed was a loan transaction. And at that specific time,
the swap transaction had not been executed. Q. What was the purpose of the swap
transaction? Why did UISA Finance enter into it? ... A. The swap transaction had been
executed after the loan. It had as an objective to reduce the loan's related costs and it had
been agreed upon between UISA Finance and Merrill Lynch."); Rocha Tr. 89:14-90:2 ("Q.
Why was UISA Finance the counter party in the derivative transaction as opposed to Usinas
Itamarati?  A. When I returned to the company, it was already set up to be that way, and as I
understood at the time, due to the fact that it was a continuation of a loan transaction.  Q.
Why did Usinas Itamarati agree to guarantee the obligations of UISA Finance in the
derivative transaction? . . . A. Again, as I remember, because it would be a continuation of
the loan transaction."); Possari Tr. 105:25-106:5 ("Q. When you signed this document [May
13, 2008 confirmation], did you have any understanding what it related to?  A. That it was a
continuation to the principal agreement [November Loan]. It was in addition to the main or
the principal contract that was the $125 million contract.").

[174] Oliveira Tr. at 152:4-12 ("Is it your testimony that the reason why -- is it your testimony that
you don't  understand that the reason why Merrill Lynch Capital Products requested a
guaranty from Usinas Itamarati and the other companies was because UISA Finance did not
have assets of its own to repay the $125 million loan? … A. Yes, I can assume so.").

[175] PX32; PX33; PX35; PX41; PX45.

trade confirmations in which it was clear from the document and from the signature block immediately below his name that Itamarati was acting as guarantor.[176]  As noted above, Oliveira admitted that he knew when he signed the amended trade confirmations in September 2008 that Itamarati was also signing those trade confirmations as guarantor.[177]  By that time, the transaction had moved against UISA Finance in a material way.[178]  If Oliveira had first learned of Itamarati's guaranty at this time, and that it was not authorized, it could be expected that he would have raised some concern inside and outside of Itamarati.   Yet, he took no action.

105.    The Court also concludes that, while Ana Claudia Tamer might not recall it today,[179] it is likely that Oliveira discussed the derivative, including Itamarati's Guaranty obligation, with Tamer.  Oliveira regularly met with Tamer to apprise her of important issues

---

[176] PX4; PX5; PX6.

[177] 2/25/2011 Oliveira Tr. at 287:22-288:22 ("Q. Okay. My question, though, sir, is -- first, take a look at page 17810. On that page you signed this confirmation on behalf of UISA Finance; correct? A. Yes. Q. And Mr. Possari similarly signed on behalf of UISA Finance on the same page; right? A. Yes. Q. And directly below your signature and that of Mr. Possari's are the words "Usinas Itamarati S.A. as guarantor" correct? Do you see that? A. Yes. Correct. Q. If you turn to the next page, page 811, you see that Mr. Rocha and Mr. Possari signed on behalf of Usinas Itamarati S.A. as guarantor; correct? A. Correct. Q. And you knew in September when you signed this that Mr. Rocha and Mr. Possari were signing on behalf of Usinas Itamarati as guarantor; correct? A. Within this time frame, that's correct.").

[178] 2/25/2011 Oliveira Tr at 275:18-23 ("Q. When did the swap transaction turn negative in a substantial way to your company, to the best of your recollection? A. Specifically in, especially when the crisis in the economy started in September of 2008.").

[179] Tamer's deposition testimony reflects that she was generally not concerned with the details of her businesses.  *E.g*., Tamer Tr. at 23:12-22 ("Q. Do you own the shares of Usinas Itamarati directly or do you own it through another company? A. I do not know this design. Who does that it is Sergio Spinelli.  Q. And just so I understand, you know that you're the sole shareholder of Usinas Itamarati but you don't know whether you own that directly or through another company you might own. Do I understand you correctly? A. Correct.").

regarding Itamarati's business.[180]   Tamer relied on Oliveira's advice in making decisions with

respect to Itamarati.[181]  Oliveira discussed with her the November Loan and Itamarati's guaranty

of UISA Finance's obligations under that November Loan.[182]   Oliveira admitted that he

informed Tamer as early as September 2008 about the Swap transaction.[183] In any event, Tamer

acknowledged that she likely would have approved the Swap and the Guaranty.[184]

---

[180]  Oliveira Tr. at 55:5-24("Q. Even if her approval was not necessary, did you generally keep
Ms. Tamer informed of important transactions involving Usinas Itamarati and UISA Finance
that you were involved in? … A. Regarding UISA Finance, I have the authority to perform
transactions. When it comes to Usinas Itamarati, any transactions that had limitations and
that required approval by the Board of Directors I had always obtained. When there were
transactions by Usinas Itamarati needing specific approval by Ana Claudia or through
companies where she needed to provide her personal authorization or through the Board of
Directors, yes. Besides -- and on a monthly basis or every two weeks or so, I provide Ana
Claudia information about the companies I have been hired to consult her about."); Tamer Tr.
at 29:23-30:6 ("Q. Do you talk to Edezio regularly? I think you said you speak to him every
15 days or every two weeks?  A. I talk to Edezio by phone constantly. But if there is any
decision to make, I meet with him about once a week or every two weeks. I do not talk to
him on a daily basis. But, if necessary, I talk to him.").

[181]  Tamer Tr. at 30:22-31:23 ("Q. I understand that. My question is a simple one. Do you know
who makes decisions on behalf of UISA Finance? A. Like I've already answered, if UISA
Finance is inside the Usinas structure, like I said, it is me and Edezio. Q. Do you rely on Mr.
Oliveira to keep you informed of all the important information concerning Usinas Itamarati
and its related companies? A. Totally. Q. And do you believe that he does keep you informed
of all the important issues concerning Usinas Itamarati and its related companies? A. I do.").

[182]  Oliveira Tr. at 88:13-22 ("Q. And did you discuss with Ms. Tamer the fact that under the
$125 million loan, Usinas Itamarati would be guarantying the obligations of UISA Finance?
… A. Yes. In the transaction we discussed with UISA Finance that there was -- there would
be a guaranty from Usinas Itamarati, and if I'm not mistaken, from other companies as
well.").

[183]  2/25/2011 Oliveira Tr. at 279:9-279:21 ("Q. Again, I would like to be as precise as we can.
You received on September the 11th, Exhibit 14, an email or couple of emails that relate to
the derivative with Merrill Lynch having turned very negative to your company. Did you
promptly tell Ms. Tamer about that? A. Yes. Q. Was that the first time you ever discussed
with Ms. Tamer the derivative transaction with Merrill Lynch? A. It was during that period
of time."); Tamer Tr. at 20:8-20:17 ("Q. We will talk about the loan transaction in a little bit.
I am talking about the derivative or swap transaction in April 2008. MR. WERDER: The
question is were you aware in April of 2008 of the swap transaction? A. I only became aware
of the derivatives after the crisis, after the 2008 crisis happened."); *Id*. at 68:3-68:12 ("Q. My

106.    Neither Oliveira, Tamer, nor anyone else ever told MLCS before the commencement of this lawsuit that the guaranty was unauthorized.[185]

107.    Itamarati never took any action against, disciplined or criticized Oliveira, Rocha, Possari, Morales, Moraes or anyone else at Itamarati for their roles in connection with the confirmations, including Itamarati's signing as guarantor, the Guaranty and/or the Legal Opinion.[186]

---

question though is did you ever learn that Usinas Itamarati signed a written guarantee of the obligations of the company that entered into the derivative transaction? … A. Yes. Q. When did you learn that? A. After the crisis of 2007, 2008.").

[184] Tamer Tr. at 74:10-19 ("Q. If you had been told it involved a guarantee by Usinas Itamarati would you have approved that? … A. We would have sat and discussed the matter. And I would have consulted with Spinelli. And we would reach a consensus. They are of extreme trust to me. So the answer is yes [ERRATA: if Edezio and Mr. Spinelli had recommended it].").

[185] 2/25/2011 Oliveira Tr. at 291:22-292:7 ("Q. Whether it was necessary or not, you don't recall any conversation with anyone from Merrill Lynch in which you ever told them that the signatures in the confirmations executed with Merrill Lynch that were done on behalf of Usinas Itamarati as guarantor were, in your view, without authority; correct? … A. I don't remember, but I probably did not."); Id. at 312:13-313:6 ("Q. Okay. At any point in time did you or anybody else from your company ever tell Merrill Lynch that Mr. Marques de Moraes was not authorized to send such letters? A. When I saw the letter it had already been terminated, the debt had already been defaulted. Whatever had to be done had to be done through the law. If I had seen it on the date certainly a few different measures would have been made. Q. But as far as you know, though, sir, no one from Itamarati or UISA Finance ever told anyone from Merrill Lynch about any limitations on the authority of this attorney in the Itamarati Legal Department; right? … A. Yes.").

[186] Rocha Tr. at 124-125 ("Q. Were you ever criticized for signing documents that -- specifically, for signing documents that provided for a guaranty by Usinas Itamarati of UISA Finance's obligations under the derivative transaction? … A. No, I don't remember. Q. I'm sorry. Just to be clear, you don't remember that happening? A. I don't remember it happening, yes."); Possari Tr. at 110-111 ("Q. Has anyone ever criticized you for signing this document? A. No. Q. Has anyone ever told you, Mr. Possari, you had no authority to sign this document? …A. No."); Tamer Tr. at 32 ("Q. Have you criticized or complained to Mr. Oliveira about the fact that he hadn't told you about the derivative transaction earlier? A. I was very concerned, but I don't think he did it in bad faith. Q. But have you criticized or complained to him for not bringing it to your attention earlier? A. No. I talked to him. He

108.     Defendants did not assert any purported lack of authorization at any time before the commencement of this litigation.[187]  The first time Itamarati asserted that the Guaranty was not validly authorized was in its Answer and Counterclaims filed on April 22, 2009,[188] in which Itamarati alleged that the Guaranty was not enforceable because Itamarati's board of directors had not passed a resolution authorizing Itamarati to guarantee obligations of UISA Finance under the Swap.[189]

### F.     Itamarati's Acts In Ratification

109.     As the mark-to-market value of the Swap began to turn against UISA Finance and Itamarati, MLCS demanded that they post collateral as required under the ISDA Agreement.[190] Once MLCS began making margin calls in September 2008, Itamarati ratified its obligations under the Guaranty by posting collateral and offering to post additional collateral to satisfy UISA Finance's obligations under the Swap.[191]

110.     Alexandre Rocha, Itamarati's Finance Director, acknowledged internally that Itamarati had an obligation to cover the margin calls.  In an email dated September 11, 2008, he advised Edezio Oliveira, Sergio Spinelli and Roberto Haaland that he anticipated an upcoming

---

tried to explain to me what derivatives are. And until today I do not understand what derivatives are.").

[187]  Da Silva Aff. ¶80.

[188]  Answer and Counterclaims ¶96.

[189]  *Id*.

[190]  Da Silva Aff. ¶60; PX60; PX75; PX79; PX80; PX93; PX105; PX121; PX133; PX143; PX150.

[191]  Da Silva Aff. ¶¶69-81.

margin call and that Itamarati "will have to lay out US$8 million just to cover the margin."[192]

Rocha further advised that "if a margin call is issued, we won't be able to afford it and we'll do

into default.  If this happens, we'll have to negotiate with Merrill to keep this off the books."[193]

111.    That same day, Itamarati posted $1.7 million in cash as collateral under the

Swap.[194]  Subsequently, on September 17, 2008, Itamarati posted an additional $266,000 as

collateral.[195]  Itamarati provided MLCS with copies of the wire transfers for these amounts

which reflect that Itamarati made the transfers.[196]  Ultimately, Itamarati posted $5,824,235 in

cash as collateral in response to MLCS's margin calls on UISA Finance.[197]

112.    Itamarati also offered to post its own trade receivables as collateral.  On

September 11, 2008, Rocha offered as collateral a sugar export contract valued at approximately

$40 million between Itamarati and C. Czarnikow Sugar Limited.[198]  MLCS replied on September

15, 2008 that its collateral management group could not accept the contract because it could only

accept "cash, treasuries, securities (investment grade – with haircut) and/or letter of credit (from

---

[192]  PX63.

[193]  *Id*.

[194]  PX61.

[195]  PX69; PX76.

[196]  PX61; PX69; PX76.

[197]  Da Silva Aff. ¶72; PX19; PX166; 2/25/2011 Oliveira Tr. at 295 ("Q. Do you recall that several million dollars in cash was posted as margin following requests by Merrill Lynch in relation to this swap transaction? A. I remember that a few million were posted."); *Id*. at 299 ("Q. First, did Itamarati provide cash to meet the margin calls that Merrill Lynch made starting in September of 2008? … A. I already answered that question. I said yes.").

[198]  PX64; PX65.

a few first line issuers)."[199]

113.    Later that day, Rocha emailed Oliveira asking whether it was "possible for you [Oliveira] to issue a letter of credit to UISA through the ACMT [Ana Claudia Moraes Tamer] relationship".[200]  Oliveira replied that he had an alternate proposal for MLCS.[201]

114.    This alternate proposal involved offering security on Itamarati's sugar and ethanol inventory.[202]  On September 17, 2008, Itamarati proposed to MLCS that "as an alternative to cash, [MLCS] accept WA/CDA of sugar/alcohol" as collateral.[203]  Itamarati explained that it was making this proposal because "we [Itamarati] have a large volume [of sugar and alcohol] in stock and therefore less cash availability."[204]  Itamarati's documents make clear[205] and its witnesses have admitted that the sugar and ethanol stocks it offered MLCS as collateral were owned by Itamarati, not UISA Finance or any other entity.[206]

---

[199]  PX65.

[200]  PX66.

[201]  *Id.*

[202]  Da Silva Aff. ¶75.

[203]  PX69 (WA refers to Agricultural Warrants and CDA refers to Agricultural Certificates of Deposit).

[204]  *Id.*

[205]  PX71.

[206]  2/25/2011 Oliveira Tr. At 303:15-304:8 ("Q. Thank you. Did Itamarati also propose posting stocks of ethanol and sugar to satisfy the margin calls that Merrill Lynch was making under the swap? … A. Within the situation I described previously, UISA Finance consulted or discussed with Itamarati the possibility. Q. And Itamarati and UISA Finance also discussed the possibility with Merrill Lynch; correct? A. UISA Finance and possibly Itamarati was involved as well. Yes. Q. And the ethanol and sugar that were being discussed were Usinas Itamarati's ethanol and sugar; correct? … A. Correct."); Possari Tr. at 160:7-160:17 ("Q. What are these two documents, Mr. Possari? A. Offering ethanol as collateral on behalf of Merrill Lynch as guaranty. Q. Offering ethanol as collateral on behalf of a Merrill Lynch

115.    Anticipating an additional margin call of over $7 million, Itamarati emailed

MLCS on September 24, 2008 with an additional proposal whereby Itamarati would (1) post an

additional $1 million in cash that day, (2) pledge over $6 million in sugar and alcohol inventory,

(3) post another $500,000 by the end of that week and (4) transfer certain additional trade

receivables to MLCS as collateral.[207]   That same day, Itamarati forwarded MLCS two letters

from Itamarati to Control Union Warrants (the entity having custody of Itamarati's inventory)

certifying that Itamarati had 6,500 square meters of hydrated alcohol and 3,800 of anhydrous

alcohol "pledged to [MLCS] as collateral."[208]   Each letter was signed by Possari and Morales.[209]

116.    MLCS drafted a series of agreements, all of which were shared with Itamarati, in

order to facilitate Itamarati's proposed pledge of sugar and alcohol to MLCS as collateral.[210]

These agreements explicitly provided that the pledge of sugar and alcohol as collateral was being

---

entity? A. Bank. Merrill Lynch Bank. Q. And who owned the alcohol that is referred to in
these two documents? … A. Usinas Itamarati."); Rocha Tr. at 178:6-179:22 ("Q. Mr. Rocha,
you mentioned that there came a time when Merrill Lynch Capital Services requested that
additional margin, that margin be posted because of the mark-to-market values of the
derivative transaction. Do you recall that? ... A. Yes, they were requiring additional margins
for this transaction. Q. What type of assets were provided as margin? A. In the beginning,
money, and later additional assets were offered such as ethanol stocks. I'm not sure if sugar
stocks as well. And land, eventually, after that. Q. Who owned the ethanol stocks? Was that
owned by UISA Finance or Usinas Itamarati? A. I cannot tell you for sure who the owner
was, but I can tell you that the producer was Usinas Itamarati. Q. And when you say
"producer," what do you mean? A. Producer, I mean the company that owned the ethanol
manufacturer. Q. Do you have an understanding that Usinas Itamarati was also the company
that owned the sugar stocks? A. I cannot tell you for sure who was the owner of the sugar
stocks, but I can tell you that it was the sugar manufacturer. Q. And as far as you are aware,
UISA Finance had no ethanol or sugar operations; is that correct? A. As far as I knew, it did
not.").

[207]  PX95.

[208]  PX96.

[209]  *Id.*

[210]  Da Silva Aff. ¶78; PX114; PX127; PX128.

made pursuant to Itamarati's April 24, 2008 Guaranty under the Swap.[211]

117.   At no point prior to the commencement of this litigation did Itamarati suggest that its posting of cash and/or its offers of inventory to MLCS were not pursuant to Itamarati's Guaranty.[212]

118.   Itamarati offered other trade receivables to MLCS as collateral.  On October 3, 2008, Oliveira forwarded to MLCS a contract between Itamarati and Petrobras Distributora S.A. valued at approximately $1.5 million and explained that Itamarati would forward that amount to MLCS once it was received by Itamarati.[213]

119.   After the Swap was terminated on October 28, 2008, Itamarati continued to ratify the Guaranty by participating in negotiations about a possible restructuring of Defendants' obligations, including the Swap.[214]  Itamarati proposed restructuring its obligations to MLCS and MLCP under the Swap and the Loan.[215]  Indeed, after Itamarati's default under the Swap, the parties engaged in months of negotiations concerning the proposed restructuring of the Swap and the November Loan.[216]  These discussions did not result in an agreement.

120.   Itamarati's internal documents during this period reflect its understanding that the Guaranty was valid and enforceable.  On November 13, 2008, Edezio Oliveira forwarded to Alexandre Rocha a "Request for Waiver under the Loan and Guaranty Agreement" to be

---

[211]  Da Silva Aff. ¶78; PX127 at UISA_030534.

[212]  Da Silva Aff. ¶79.

[213]  PX125; PX126.

[214]  PX177.

[215]  Da Silva Aff. ¶83.

[216]  *Id*.

executed by UISA Finance and delivered to MLCP.[217]  Among UISA Finance's requests to

MLCP in this document was that "[a] waiver be granted for the Event of Default that occurred

under section 6.01(d) of the Loan and Guaranty Agreement on October 28, 2008, when the

Borrower received a default notice pursuant to a default to post collateral under a derivative

entered into under the ISDA Master Agreement, dated as of April 24, 2008, entered into between

UISA Finance ("UISA") and *guaranteed by Usinas Itamarati, S.A.*, Grupo Itamarati

Empreendimentos e Participacoes S.A. and Companhia Itamarati de Investimentos (together, the

"Guarantors") and Merrill Lynch Capital Services, Inc. ("MLCS")".[218]

### H.  Damages

121.  The ISDA Master Agreement specifies how damages should be calculated in the

event of an Early Termination of the agreement:

- Part 1, paragraph (f) of the Schedule to the Master Agreement provides that the "Market Quotation" and "Second Method of determining Payments for Early Termination will be used in the first instance."[219]

- Section 6(e)(i)(3) of the Master Agreement specifies that where the Market Quotation and Second Method apply, the Early Termination Amount payable is the Settlement Amount (as defined) due to MLCS as the non-defaulting party, less any amount owed to UISA Finance as the defaulting party.[220]

- The Settlement Amount is an amount determined by market quotations, if available, from three or more leading dealers in the market for the amount MLCS would have to pay to enter into a transaction that would provide MLCS the

---

[217]  PX176.

[218]  *Id.* (emphasis added).

[219]  PX1, Schedule Part 1(f).

[220]  *Id.* § 6(e)(i)(3).

economic benefits of the terminated transactions.[221]  Where market quotations are unavailable, the Settlement Amount is MLCS's Loss (as defined).[222]

- ▪ "Loss" is the amount the non-defaulting party "reasonably determines in good faith to be its losses and costs . . . including any loss of bargain, cost of funding, or . . . loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or rated trading position."[223]

122.    MLCS sought quotations from four qualified dealers – Deutsche Bank,[224] JP Morgan,[225] Dresdner[226] and Royal Bank of Scotland ("RBS").[227]  MLCS asked each dealer to provide a "quotation for the amount that would be paid to Merrill Lynch (expressed as a negative number) or paid by Merrill Lynch (expressed as a positive number), in consideration of an agreement between Merrill Lynch (guarantied by Merrill Lynch & Co., Inc. and subject to a mark-to-market agreement) and yourself that would have the effect of preserving for Merrill Lynch the economic equivalent of the payments or deliveries in respect of such transaction after 28 October 2008."[228]

123.    MLCS did not receive the required three quotations.[229]  It was not surprising that fewer than three quotations were obtained as a result of MLCS's request in October 2008 as this

---

[221]  PX1 § 14 (Definitions of "Settlement Amount" and "Market Quotation").

[222]  *Id.*

[223]  *Id.* (Definition of "Loss").

[224]  Jhamb Aff. ¶21; PX153.

[225]  Jhamb Aff. ¶21; PX154.

[226]  Jhamb Aff. ¶21; PX155.

[227]  Jhamb Aff. ¶21; PX156.

[228]  PX153; PX154, PX155; PX156.

[229]  Jhamb Aff. ¶24.

was a particularly volatile and stressful period for financial markets.[230]  Dealers were interested in reducing their exposure to market movements rather than quoting for transactions that would increase this exposure.[231]  Even in normal market conditions it is not uncommon for fewer than three quotes to be obtained as a result of the request.[232]

124.    MLCS thus calculated its Loss pursuant to the Master Agreement.

125.    MLCS calculated the value of the Swap to be $151,403,865.[233]  This amount consisted of two components.

126.    The first component represented the present value to MLCS of the net expected cash flows under the Swap if it was not terminated early; in other words, the net amount UISA Finance would have to pay MLCS through the end of the Swap on a present value basis.  This represents the lost benefit of the bargain to MLCS.   MLCS calculated this amount to be $138,750,243 by inputting objective market data for the BRL/USD exchange rate, the Dollar interest rate curve, and the volatility of the currency exchange rate into its Black-Scholes valuation model which is the standard model for valuing options.  The market data consisted of exchange rates published on the Chicago Mercantile Exchange and interest rate data published on the Bolsa de Mercadorios e Futuros, both of which were available on Bloomberg, and exchange rate volatility data provided by the broker BGC Partners, and affiliate of Cantor Fitzgerald.[234]

---

[230]  Hull Aff. ¶41.

[231]  *Id.*

[232]  *Id.*

[233]  Jhamb Aff. ¶27.

[234]  Jhamb Aff. ¶28.

127.    The second component was a bid/offer spread to reflect the cost to MLCS of reestablishing a short position in Brazilian reais equivalent to the effective short position MLCS had under the Swap.  MLCS calculated this amount to be $12,653,622.[235]

128.    Each of these components represents an amount that MLCS was required to pay as a result of the termination of the Swap.[236]

129.    Using the same methodology, MLCS calculated its Loss with respect to the two Currency Options that remained open with UISA Finance.  MLCS calculated its Loss with respect to the first Currency Option (the Knock-In US $80 million put option) to be $159,779. MLCS calculated its Loss with respect to the second Currency Option (the Knock-In US $200 million put option) to be $399,447.  In total, MLCS calculated its Loss with respect to the Currency Options to be $559,226.[237]

130.    The total value of the Swap and the Currency Options was $151,963,091.[238]

131.    MLCS then deducted $5,824,235 – the amount MLCS already held as collateral – from the total of $151,963,091 and reached the Early Termination Amount of $146,138,856.[239]

132.    By letter dated October 29, 2008, MLCS provided UISA Finance, care of Itamarati, with MLCS's calculation of the Early Termination Amount payable by UISA Finance

---

[235]  Jhamb Aff. ¶29.

[236]  Jhamb Aff. ¶35-39.

[237]  Jhamb Aff. ¶30.

[238]  Jhamb Aff. ¶31.

[239]  Jhamb Aff. ¶32; PX19; PX166.

to MLCS under the Master Agreement.[240]  Demand for payment under the Guaranty was made

on Itamarati on November 6, 2008.[241]

133.    On November 4, 2008, Deutsche Bank provided a quote for the amount of $164.4

million.[242]  Although MLCS received this quote after it had already calculated the Early

Termination Value using the Loss method, the Deutsche Bank quote indicates that MLCS's

calculation was reasonable.

134.    Itamarati retained a financial advisory firm called Capitania in the fall of 2008 to

review MLCS's calculations of the mark-to-market value of the Swap.[243]  MLCS provided

Itamarati, as well as Capitania, with the market data and calculations in connection with its

calculation of the Early Termination Amount.[244]

135.    At no point has Itamarati offered an alternative calculation of the Early

Termination Amount,[245] nor has Capitania offered an alternative calculation of the Early

Termination Amount on Itamarati's behalf.[246]

---

[240]  PX19.

[241]  PX20.

[242]  PX175.

[243]  PX123; PX124; Coutinho Tr. at 197:7-198:16 ("Q. Are you familiar with the firm Capitania? A. Yes. Q. Were they retained by UISA Finance or Usinas Itamarati in connection with the swap? ... A. Yes. Q. When were they first retained? A. I don't have the precise date. Q. Do you know generally? A. I'm going to tell you approximately. I believe it was around September, end of August going into September, I think. I'm not definitely sure about it. … Q. What was it generally Capitania was retained to do? A. The company had been retained by Edezio Quintal Oliveira and Alexandre, with direct involvement by Mattos Filho, who directly suggested the retaining of this company regarding our work. Q. To do what? A. To evaluate the numbers provided by Merrill Lynch to Alexandre. In other words, how large was our debt.").

[244]  Da Silva Aff. ¶85; PX167; PX168; PX169; PX170.

[245]  Da Silva Aff. ¶86.

136.     Professor John C. Hull is recognized as one of the world's leading experts in the field of derivatives.[247]  Professor Hull has assessed MLCS's calculation of the Early Termination Amount and concluded it was reasonably made as required by the Master Agreement.[248]

137.     Defendants have offered no evidence, expert of otherwise, that MLCS' calculation of its Loss was not done reasonably and in good faith.[249]

138.     [At his deposition, Defendants' damages expert, Andrew Smith, said he reviewed Professor Hull's March 4, 2011 expert report and wrote a report based on a number of areas in which he disagreed with Hull.[250]  Smith took no issue, however, with Professor Hull's opinion on the reasonableness of the Early Termination Amount calculation.251  Indeed, Smith had

---

[246]  *Id*.

[247]  Smith Tr. at 70:5-70:14 ("Q. Are you aware of any treatises or books that are authoritative on the subject of derivatives? A. Yes. Q. Which texts are those authoritative? A. I believe Professor Hull has one with Professor White on derivatives. Q. And you consider that to be the authority on derivative  transactions? A. One of.").

[248]  Jhamb Aff. ¶56.

[249]  The next several paragraphs are bracketed as they relate to the opinion of Andrew Smith, which is the subject of Plaintiff's motion *in limine*.

[250]  Smith Tr. at 74:23-75:7 ("Q. How did you prepare your March 15th report? A. I read Mr. Hull's report, Professor Hull's report. Q. And then? A. And then looked at it, analyzed it, parts I agreed with and parts I didn't agree with and then with Quinn's assistance put together our rebuttal.").

[251]  Smith Tr. at 78:25-80:8 ("Q. I ask you to turn to paragraph 32. This is the section of Professor Hull's report where he values the swap transaction between MLCS and UISA Finance? A. Yes. Q. And this starts at paragraph 32 and continues to paragraph 46? A. Yes. Q. And you reviewed these paragraphs before submitting your report? A. That is correct. Q. Do you have an opinion with respect to these paragraphs of Professor Hull's report? ... A. I think it was very thorough and comprehensive. His analysis. Q. Do you recall agree with Professor Hull's result in these paragraphs? ... A. As a practitioner we would be looking at the methodology that looks at the delta component of the matching on the Black-Scholes, the delta equivalents in the barrier option, and that is very similar to the model that we have at Broad Street.").

previously calculated the mark-to-market value of the Swap as of November 19, 2008 to be $141 million in MLCS's favor.][252]

139.    [Andrew Smith offered an opinion that MLCS failed to make a reasonable effort to obtain market quotations because two of the dealers it contacted – RBS and Dresdner – were not as large or experienced as other dealers that MLCS could have potentially contacted.[253] However, there is no requirement in the language of the ISDA Master Agreement that MLCS contact the three or four of the largest dealers.]

140.    [Smith also opined that MLCS should have had no difficulty obtaining quotations because, although Dealers may have been interested in reducing their exposure to market movements rather than quoting for transactions that would increase their exposure in October 2008, MLCS was not seeking an actual market quotation for purposes of executing a trade but rather was only establishing a valuation.[254] However, the MLCS's requests for market quotations

---

[252] 7/3/2009 Declaration of Andrew Smith ¶7.

[253] 3/15/2011 Report of Andrew Smith ¶22 ("First, I believe that MLCS did not select the dealers that were most likely to be able to provide accurate and competitive quotations. For example, MLCS did not ask Credit Suisse, Goldman Sachs or UBS to provide a quotation, instead limiting its requests to JPMorgan, Deutsche Bank, RBS and Dresdner, dealers that, in my opinion, do not have as much experience in Latin American derivative trading as Credit Suisse, UBS and Goldman Sachs, and were therefore far less capable of providing accurate and competitive quotations."); Smith Tr. at 161:20-163:6 ("Q. What you're saying in paragraph 22 is simply that they weren't as big as Credit Suisse, Goldman Sachs and UBS; is that correct? A. Leaving JP Morgan and Deutsche Bank on the side and focusing on RBS and Dresdner, they weren't as big nor did they have the size of the currency book or derivative book than these particular players did in the dollar/Brazilian Real market. Q. When you say leaving JP Morgan and Deutsche Bank aside, why do you say that? A. Because Deutsche Bank and JP Morgan have very substantial balance sheets and substantial ability to take positions on their desk. … Q. So I understand you're saying here [in paragraph 22 of your report] JP Morgan, Deutsche Bank, RBS and Dresdner do not have as much experience as Credit Suisse and UBS and Goldman Sachs, what you really meant is RBS and Dresdner do not have as much experience? A. Correct. Q. So effectively we could cross out JP Morgan and Deutsche Bank from this paragraph? A. That is correct.").

[254] Id. ¶¶19-20.

were made for the purpose of executing actual trades.[255]  Smith concedes that the turmoil that was occurring in the financial markets in October 2008 would have prevented dealers from providing actual quotes.][256]

141.    [Finally, the Court notes that it seems apparent that the purpose of obtaining market quotations is to use market evidence of recoverable damages in order to avoid disputes as to the reasonableness of Loss calculations by one side to a derivatives transaction.  Here, there is no evidence, and hence no genuine dispute, as to the reasonableness of MLCS' Loss calculation.]

---

[255]  Jhamb Aff. ¶39.

[256]  Smith Tr. at 158:22-159:25 ("Q. You can set Miss Wang's testimony aside and go back to your March 15th report which is Exhibit 2 and I will ask you to look at paragraph 24. You're describing here the turmoil in the market described by the collapse of Bear Stearns. Can you tell me about what turmoil is going on at that time? A. In October or September? Q. In October of 2008. A. Sure, the world was going to hell in a hand basket. There was a systemic risk created by the ability of banks not to accept each other as counterparties in the marketplace. Which meant that banks had to seek their funding from central banks as opposed to the interbank market. Q. So banks were preoccupied with dealing with this turmoil; is that correct? A. Yes, absolutely. Q. You think this preoccupation with the turmoil would have affected their willingness to provide a quote? A. Not an indicative quote, no. Q. Would the turmoil have affected dealers willingness to provide a quote – to provide an actual quote? A. To provide a live trading quote, yes, but not an indicative quote.").

III.    **Conclusions of Law**

A.    **DAMAGES RECOVERABLE BY MLCS**

1.    As previously noted, this Court has previously granted MLCS summary judgment on liability on its claim against UISA Finance for breach of the ISDA Master Agreement.

2.    MLCS now seeks an award of damages in the amount of $146,138,856 as the Early Termination Amount it alleges is due and owing under the ISDA Master Agreement, together with pre- and post-judgment interest and its reasonable out of pocket expenses, including legal fees, incurred in this lawsuit.[257]

3.    As noted above, the ISDA Master Agreement specifies the method in which such Early Termination Amount should be calculated.   In brief:

- Part 1, paragraph (f) of the Schedule to the ISDA Master Agreement provides that the "Market Quotation" and "Second Method of determining Payments for Early Termination will be used in the first instance."[258]

- Section 6(e)(i)(3) of the Master Agreement specifies that where the Market Quotation and Second Method apply, the Early Termination Amount payable is the Settlement Amount (as defined) due to MLCS as the non-defaulting party, less any amount owed to UISA Finance as the defaulting party.[259]

- The Settlement Amount is an amount determined by market quotations, if available, from three or more leading dealers, for the amount MLCS would have to pay to enter into a transaction that would provide MLCS the economic benefits of the terminated transactions.[260]

---

[257] DX1 ¶38.

[258] PX1, Schedule Part 1(f).

[259] *Id.* § 6(e)(i)(3).

[260] *Id.* § 14 (Definitions of "Settlement Amount" and "Market Quotation").

- Where market quotations are unavailable (or would not, in MLCS's reasonable belief, produce a commercially reasonable result), the Settlement Amount is MLCS's Loss (as defined).[261]

- "Loss" is the amount the non-defaulting party "reasonably determines in good faith to be its losses and costs . . . including any loss of bargain, cost of funding, or . . . loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or rated trading position."[262]

4.      Section 4(h) of the Schedule to the Master Agreement provides that the ISDA

Master Agreement "will be governed by and construed in accordance with the laws of the State

of New York without reference to choice of law doctrine."[263]

5.      A damages provision of a contract is enforceable under New York Law as "[i]t

has long been established in New York that a breaching party is liable for all direct and

proximate damages which result from the breach." *Tractebel Energy Marketing v. AEP Power

Marketing*, 487 F.3d 89, 110 (2d Cir. 2007).   Indeed, New York courts have specifically upheld

damages provisions in ISDA Master Agreements.  *See, e.g.*, *J.P. Morgan Chase Bank v.

Controladora Comercial Mexicana S.A.B. DE*, C.V. No. 603215/08, 2010 WL 4868142, at *6,

*17.  (Sup. Ct. N.Y. County Mar. 16, 2010) (holding that under an ISDA agreement governed by

New York law, the plaintiff was required to "calculate[e] the Termination Amount" pursuant to

the damages provisions of the ISDA agreement).

---

[261]   *Id.*

[262]   *Id.* (Definition of "Loss").

[263]   PX1, Schedule to the Master Agreement, Part 4 (h).  *See Globalnet Financial.com, Inc. v. Frank Crystal and Co., Inc.*, 449 F.3d 377, 382 (2d Cir. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487 (1941)) (holding that a federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state.); *J.P. Morgan Chase Bank v. Controladora Comercial Mexicana S.A.B. DE C.V.*, No. 603215/08, 2010 WL 4868142, at *6 (N.Y. Sup. Ct. Mar. 16, 2010) (applying New York contract law in a dispute with a Mexican company where "the ISDA agreement specifically provides that it is governed by New York law").

6.      In this case, following UISA Finance's default and the Early Termination of the ISDA Master Agreement, as required by the ISDA Master Agreement MLCS sought quotes from four leading derivatives dealers, but did not obtain the required three quotes.

7.      MLCS thus properly turned to calculating its Loss and the Early Termination Amount, as prescribed by the ISDA Master Agreement.   The Court finds that MLCS' calculation of Loss was done reasonably and in good faith.

8.      The Court notes that shortly after calculating its Loss and making demand for payment to UISA Finance, MLCS provided Itamarati and its advisor, Capitania Asset and Management, with the objective market data for the BRL/USD exchange rate, the Dollar interest rate curve, and the volatility of the currency exchange rate that MLCS used for its own calculations.[264]  Neither the Defendants nor their advisor has ever offered any alternative calculation of MLCS' Loss or of the Early Termination Amount due under the ISDA Master Agreement.

9.      At trial, MLCS offered the expert testimony of Professor John C. Hull, a leading authority in the field of derivatives.[265]  Professor Hull considered  MLCS's calculation of the Early Termination Amount and concluded it was reasonably made as required by the ISDA Master Agreement.[266]  Professor Hull used three different valuation methods and his lowest and most conservative calculation came to $153.20 million.[267]  This is less than 1% different from

---

[264]  PX168, PX170.

[265]  Smith Tr. at 70:5-70:14 ("Q. Are you aware of any treatises or books that are authoritative on the subject of derivatives? A. Yes. Q. Which texts are those authoritative? A. I believe Professor Hull has one with Professor White on derivatives. Q. And you consider that to be the authority on derivative transactions? A. One of.").

[266]  Hull Aff. ¶56.

[267]  *Id*.

MLCS's estimate of $151.96 million, and which is therefore reasonable.[268]  The other valuation methods yielded Loss calculations of $171.81 million and $162.94 million, respectively.[269]

10.     Defendants have not offered any alternative calculation, nor have they adduced any expert evidence to critique either MLCS' or Professor Hull's calculations.

11.     Defendants' criticism focuses on whether or not MLCS properly sought market quotes, before resorting to a Loss calculation.  In essence, the Defendants contend:

- ▪ MLCS failed to make a reasonable effort to obtain market quotations because two of the dealers it contacted – RBS and Dresdner – were not as large or experienced as other dealers that MLCS could have potentially contacted.

- ▪ MLCS should have had no difficulty obtaining quotations because, although Dealers may have been interested in reducing their exposure to market movements rather than quoting for transactions that would increase their exposure in October 2008, MLCS was not seeking an actual market quotation for purposes of executing a trade but rather was only establishing a valuation.

142.     There is no requirement in the language of the ISDA Master Agreement, however, that MLCS contact the three or four of the largest dealers.  MLCS selected Deutsche Bank, JP Morgan, Dresdner and RBS because they were leading dealers with respect to Latin American foreign exchange derivatives.[270]  Indeed, Professor Hull has testified that these four dealers are "leading derivatives dealers with respect to foreign exchange derivatives."[271]  All four were very active in the inter-dealer market and were frequent counterparties on other MLCS trades.[272]

---

[268]  *Id.*

[269]  Hull Aff. ¶¶53, 55.

[270]  Jhamb Aff. ¶22.

[271]  Hull. Aff. ¶37.

[272]  Jhamb Aff. ¶22.

MLCS representatives also had personal contacts at each of these four dealers, making it more likely that MLCS would receive a quote.[273]

143.    Moreover, the record reflects that MLCS was seeking actual market quotations.[274] In any event, there is no question that requests were made, yet the required three quotes were not received.

144.    Finally, the Court notes that it seems apparent from the terms and structure of the ISDA Master Agreement that the purpose of obtaining market quotations is to use market evidence of recoverable damages to avoid potential disputes as to the reasonableness of Loss calculations by one side to a derivatives transaction. Here, there is no evidence, and hence no genuine dispute, as to the reasonableness of MLCS' Loss calculation.[275]

12.    For all of the foregoing reasons, the Court concludes that MLCS has established that it is entitled to recover as its damages for breach of the ISDA Master Agreement the Early Termination Amount of $146,138,856.

13.    MLCS is also entitled to pre- and post- judgment interest on this amount, with pre-judgement interest running from October 29, 2008.  Such pre- and post-judgment interest

---

[273]  *Id.*

[274]  Hull. Aff. ¶39; PX155; PX157; PX160.

[275]  *See High Risk Opportunities HUB Fund Ltd. v. Credit Lyonnais*, No. 600229/00 (Sup. Ct. N.Y. County July 7, 2005) (unpublished opinion).  In *High Risk*, the court held that notwithstanding that the non-defaulting party to an ISDA Master Agreement "failed to obtain adequate market quotations in good faith pursuant to section 14 of the Master Agreement because it interfered with the Market-makers' independence in valuing the NDFs as of the termination date," the Loss method applied because an insufficient number of market quotations were obtained.

shall be computed at the rate of 9% per annum as prescribed by N.Y. Civil Practice Law & Rules § 5004.[276]

14.     The ISDA Master Agreement provides for MLCS to recover its reasonable out-of-pocket expenses, including legal fees, incurred in the prosecution of this lawsuit.[277]   The Court directs counsel to for MLCS to submit its application to establish the amount so due to MLCS by motion on notice to the Defendants.

### B.     ITAMARATI'S GUARANTY

#### a.     Introduction

15.     While admitting that its employees signed the Guaranty as well as several confirmations including similar guarantees of UISA Finance's obligations under the Swap transaction, Itamarati contends that the Guaranty was not authorized by Itamarati's board and, on that basis, is not enforceable against Itamarati.

16.     Itamarati's assertion as to the lack of proper authorization is in the nature of an affirmative defense on which Itamarati bears the burden of proof.[278]

---

[276] *Adrian v. Town of Yorktown*, 620 F.3d 104, 107 (2d Cir. 2010) ("Because that claim was brought under New York State law, and because prejudgment interest is a matter of substantive law, the New York interest rate applies to the interest sought."); *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008) ("In a diversity case, state law governs the award of prejudgment interest."); *Korea Life Ins. Co., Ltd. v. Morgan Guaranty Trust Co. of New York*, 2004 WL 1858314 at *11 (S.D.N.Y. 2004) (applying New York's 9% prejudgment interest rate to a breach of ISDA Master Agreement case).

[277] PX1 §11; *Brookfield Asset Management, Inc. v. AIG Financial Products Corp.*, No. 09 Civ. 8285(PGG), 2010 WL 3910590, at *15-18 (S.D.N.Y. Sept. 29, 2010) (damages provisions in ISDA Master Agreements are enforceable under New York law).

[278] Although Defendants have not pleaded their lack of authority argument as an affirmative defense, it should be so treated.  An affirmative defense is "[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true."  *Saks v. Franklin Covey Co.*, 316 F.3d 337 (2d Cir. 2003) (quoting Black's Law Dictionary 430 (7th ed. 1999)).  Here, Defendants are not disputing that executed ISDA documentation, including Itamarati's Guaranty, exists, or that

17.     The Court finds that Itamarati has failed to meet its burden of proof and, for the reasons set forth below, the Court finds that the Guaranty is enforceable against Itamarati on principles of apparent authority and ratification.   This result obtains whether Brazilian law (the place of Itamarati's incorporation) or New York law (the law of the contract) is applied.

18.     Preliminarily, the Court observes that while both sides have drawn issue on the question of whether the Guaranty is enforceable on the basis of apparent, rather than actual authority, there is at least some question whether the Guaranty was actually authorized.

19.     Itamarati argues that the Guaranty required board authorization principally based on Article 22, XI (b) of Itamarati's bylaws.

20.     That provision of Itamarati's bylaws provides that "It is the Board of Directors' responsibility to, within its legal and statutory authority: (…) XI. authorize the Board to: (…) (b) (…) provide any guarantee in favor of third parties."[279]

21.     Itamarati further argues that the granting of a guaranty in favor of third parties without board authorization violates Brazilian Corporate Law Article 142(VIII), which provides that "[t]he board of directors is empowered to: (…) VIII – unless the bylaws provide otherwise, authorize . . . the granting of guarantees of liabilities of third parties."

---

Itamarati's chief financial officer and another officer signed the Guaranty, but that the Guaranty is not enforceable because of a *new* fact or argument – that such Guaranty was allegedly unauthorized.  Indeed, courts have held that a defendant's claim that an individual was not authorized to enter into a contract is an affirmative defense.  *See*, *e.g. Branding Iron Club v. Riggs*, 207 F.2d 720 (10th Cir. 1953) ("The defense of want of authority is an affirmative defense and must be specifically pleaded.").  The burden of proof for affirmative defenses rests with the party making the defense.  *See, e.g.*, *Hayes v. White Oaks Group,* LLC, 800 N.Y.S.2d 347 (N.Y. Just. Ct. 2005) ("[A] party pleading an affirmative defense has the burden of proving that defense.").

[279]  PX21, Article 22, XI (b).

22.     The term "third party" is in the context of Itamarati's bylaws or Brazilian corporate law does not appear to be defined in any Brazilian statute, case or other authority.

23.     It seems questionable whether a special purpose vehicle, like UISA Finance, set up by Itamarati to carry out a financial transaction, is a "third party" within the meaning of the foregoing bylaw and statute.[280]

24.     Indeed, Itamarati's corporate designee testified that an affiliate with a common owner, such as UISA Finance, is not a "third party" (or "terceiro," as the term in Portuguese appears in Itamarati's bylaws and Article 142 of the Brazilian Corporate Law.)[281]

25.     As a consequence of this fundamental ambiguity we cannot rule that the Guaranty was not actually authorized.[282]

---

[280] Brancher Tr. at 127:15-128:5 ("Q. Are you aware of any court decisions applying Brazilian law that considered whether the granting of a guaranty to a separate, to a legally separate but shell special purpose entity, is the granting of a guaranty for the liabilities of third parties within the meaning of section 142 (VIII) of the Brazil corporate law? ... A. I am not aware of any kind of decision so specifically regarding this, this matter."); *Id.* at 128:19-129:3 ("Q. Okay, I understand that's your opinion. I'm asking, sir, is there, can you point us to a court decision, a treatise or anything else, other than your own opinion, that says that a special purpose entity is a third party, for purposes of section 142 (VIII) of the Brazil corporate law? A. No.").

[281] Coutinho Tr. at 72:2-8 ("Q. Let me reask the question. How would you describe two companies that have a common owner, but one does not own the other? How would you describe that in Portuguese? A. Autonomous. Q. But not terciras? A. Not terciras."). Notably, Itamarati's corporate witness described Itamarati's bylaws as unclear, vague and indirect with respect to the requirement of board approval. Coutinho Tr. at 156-157.

[282] Itamarati has cited two other provisions in its bylaws as support for their position that board authorization was required for the Guaranty.  PX21, Article 22, XI, (e) (relating to obligations of more than 2 million Brazilian reais individually or 6 million Brazilian reais in aggregate during a single 3-month period) and (f) (relating to investments of more than 500,000 Brazilian reais individually or 1.5 million Brazilian reais in aggregate during a single 3-month period).  It is unclear that board authorization was required under these provisions since there has been no showing that at the time the Swap was entered into (and when the Guaranty was agreed to as part of credit conditions of the Swap), the monetary thresholds in Article 22, XI, (e) or (f) of Itamarati's bylaws were exceeded.

26.     There is a further question as to whether, even if specific board authorization was required, the resolutions passed by Itamarati's board authorizing guaranties of UISA Finance's obligations under prior loans with affiliates of MLCS did not suffice.  Itamarati's witnesses have testified that they viewed the Swap as a continuation of the November Loan.  While the Swap was executed with MLCS rather than MLCP, Defendants have contended in this litigation that they did not recognize the different Merrill Lynch as separate entities, but instead viewed them all as "Merrill Lynch."

### b.     Itamarati's Guaranty Is Enforceable Under Brazilian Law

#### i.  Sources of Brazil law

27.     The Court has received testimony on the subject of Brazilian law from each side.[283]  MLCS's Brazilian law expert, Rene Medrado, is a litigation partner of the Brazilian law firm of Pinheiro Neto Advogados specializing in civil, commercial and economic law.  Defendants' Brazilian law expert, Paulo Brancher, is a professor of international law at the Sao Paulo Catholic University School of Law.

28.     Both experts agree that, as a civil law jurisdiction, statutes are the main source of law.  Doctrinal work (such as treatises and academic work) and case law are also sources of law in Brazil, although case law is not generally binding upon courts.  However, the standardization of Brazilian law is an important aspect in civil appeals and thus is often taken into account by Brazilian courts in reaching their decisions.

29.     The Court has reviewed the testimony of each side's expert witnesses, the translations of the statutes, secondary material and cases provided and, on the basis of the

---

[283]  The law of a foreign country is a fact which must be proved.  *Walton v. Arabian American Oil Company*, 233 F.2d 541, 543-44 (2d Cir. 1956) (citing FRCP 43(a), 28 U.S.C.A.).

testimony and materials provided,  the Court makes the following conslusions regarding the law of Brazil and its application to this case.

      ii.   The Guaranty Is Enforceable Under Brazilian Law Pursuant To The Objective Good Faith Principle

30.     Objective good faith (*bona fide*) is a fundamental principle of Brazilian contract law.  Parties to contracts must act in accordance with the objective good faith principle in the execution and performance of any contract.[284]

31.     Under this principle of objective good faith, Brazilian courts recognize the validity and enforceability of a contract, such as a guaranty, where the party relying on the guaranty proceeded with "standard diligence."[285]

32.     Here, MLCS acted in good faith and with standard diligence in connection with the Guaranty.  MLCS' good-faith and exercise of standard diligence is demonstrated by the fact that it acted on the parties' expectation and intention that Itamarati would act as guarantor, and that it requested and followed-up with Itamarati with respect to the execution of the definitive ISDA agreements, Guaranty and Legal Opinion until they were ultimately signed and delivered. MLCS did not rest in pursuing a complete set of the documents formalizing the parties' transaction, including the execution of the ISDA agreements and Guaranty as well as the issuance of a Legal Opinion attesting that Itamarati's internal corporate requirements were taken.

33.     MLCS also exercised standard diligence by obtaining a legal opinion issued by an internal lawyer at Itamarati providing that the signatories were authorized to sign the Guaranty.[286]

---

[284]  Affidavit of Rene Medrado ("Medrado Aff.") ¶34.

[285]  Medrado Aff. ¶37.

[286]  Medrado Aff. ¶¶49-50.

34.    Itamarati compares the diligence and documentation that MCLS's affiliate, MLCP, obtained when it made loans to UISA Finance, which were guarantied by Itamarati.   As Itamarati correctly observes, MLCP sought and obtained more in the way of evidence of authority than did MLCS, including obtaining in connection with the November Loan a copy of a resolution of Itamarati's board, approving the guaranty.

35.    However, the Court has not seen any evidence that Brazil law requires any particular conduct to satisfy standard diligence.   And MLCS has explained that the documentation of derivatives transactions is done somewhat differently than loans.  This is due at least in part to the fact that when a loan is made there is instant credit exposure, whereas credit exposure on a derivative transaction will depend on movement in the relevant markets over time. Moreover, the documentation for derivative transactions is somewhat standardized around an ISDA master agreement and ancillary documents, such as were used by the parties here.

36.    The exercise of standard diligence satisfied MLCS's duty of good faith under Brazil law.

37.    It should be noted that the diligence and good faith that is pertinent here is that which relates to seeking evidence of authority for the Guaranty and invitation into the conduct of the parties during the course of their relationship. [287]

38.    The evidence reflects that Defendants, however, have not always acted in good faith in relation to the Guaranty.  Even if it is true that senior management of Itamarati was at first unaware that Itamarati officers had agreed to and were signing guaranties (and as noted

---

[287]  Medrado Aff. ¶39.  In any event, the Court has previously rejected the Defendants' claims and defenses based on allegations that MLCS and other "Merrill Lynch" entities breached fiduciary and other duties allegedly owing to the Defendants, on the basis that those claims and defenses were belied by the parties' agreement, which disclaimed any such fiduciary and other duties.  *See* June 18, 2010 Order.

above in the Findings of Fact, the Court questions whether that was ever so), by September and

October 2008, Itamarati's Edezio Oliveira was by his own admission aware that Itamarati's other

senior executives were signing guaranties in favor of MLCS, yet neither he nor anyone else at

Itamarati ever told MLCS that these guaranties were not authorized.   There is little doubt that

the board resolution that Itamarati asserts was not passed was no more than a formality and that

Itamarati could have obtained such a board resolution after the fact, if it discovered that board

approval had not yet been received.   Moreover, the record reflects that in October Itamarati

purposefully refrained from providing MLCS with any further signed documentation as to

several transactions with MLCS even though the underlying transactions had been agreed to.

> iii.   The Guaranty Is Enforceable Under Brazilian Law Pursuant To The
> Apparent Authority Theory

39.      As an extension of the objective good faith principle, Brazilian law recognizes the

theory of apparent authority in upholding the validity and enforceability of contracts where

someone represented an entity or ratified its acts without proper powers or authorization.[288]

Brazilian courts uphold the enforceability of agreements under the apparent authority theory

where, as here, one of the parties is regularly represented from an outside perspective (by its

president, a director, a partner or a legal representative), despite specific requirements in its by-

laws regarding powers to represent the entity.[289]

40.      Under Brazilian law, the apparent authority theory applies where the following

circumstances are present: (i) excusable error on the part of the creditor with regard to the proper

representation of the debtor/obligor; (ii) the debtor/obligor accrued benefits from the

contract/obligation; (iii) the debtor/obligor ratified the act; and (iv) the act had effects on counter

---

[288]  Medrado Aff. ¶39.

[289]  Medrado Aff. ¶43.

/ third parties that acted with good faith.[290]  Circumstance (i) should be present in conjunction with at least one of circumstances (ii), (iii) or (iv).[291]  Here, all four elements existed.

41.     The Court finds that MLCS's belief that the Guaranty was authorized, and its related reliance on the Legal Opinion, was an "excusable error."

42.     Itamarati's senior officers received documents reflecting, and were aware of, the terms of the Swap including that Itamarati guaranty UISA Finance's obligation.  Senior officers also executed trade confirmations, the Guaranty and other documents in connection with the Swap.  Yet, no one from Itamarati ever suggested that the Guaranty was not authorized.  Quite to the contrary, Itamarati's in-house counsel provided a legal opinion attesting to the due authorization and enforceability of the Guaranty.

43.     Edezio Oliveira, who acted as Itamarati's chief executive officer and Alexandre Rocha, Itamarati's chief financial officer, among other senior Itamarati officers, were directly involved in negotiating the Swap with MLCS and approved its terms.[292]

44.     Rocha and Ernesto Possari, Itamarati's chief legal officer, signed multiple confirmations on behalf of Itamarati as guarantor of UISA Finance's obligations.[293]  These confirmations each contained guaranties of UISA Finance's obligations under the Swap.[294]

45.     The confirmations also stated that MLCS was not required to inquire into the authority of the officers signing on Itamarati's behalf.[295]

---

[290]  Medrado Aff. ¶40.

[291]  *Id.*

[292]  Da Silva Aff. ¶15.

[293]  PX 4; PX 5; PX 6.

[294]  *Id.*

46.     Rocha and Christiano Morales (another Itamarati officer) signed the Guaranty which expressly represented that Itamarati was authorized to provide the Guaranty.[296]

47.     Itamarati provided the opinion of its in-house lawyer, Marcio de Moraes, confirming authority.[297]

48.     No one at Itamarati ever told MLCS that either Rocha or Morales was not authorized to sign the Guaranty or that Moraes was not authorized to sign the Legal Opinion.  At no point before this lawsuit did Itamarati claim that its Guaranty or the Legal Opinion was not properly authorized or that either document was invalid or ineffective for any other reason.[298]

49.     Itamarati has never taken any action against its officers and employees that signed the Guaranty and Legal Opinion, and there is no evidence that Itamarati has ever suggested to these officers that they should not have provided the Guaranty or the Legal Opinion to MLCS.[299]

50.     The Legal Opinion, signed by Itamarati's in-house counsel,  Mr. Moraes, stated that counsel had "examined originals or copies, certified or otherwise identified to my

---

[295]  PX51 at ITA0018882; PX11 §7.09.

[296]  PX2.

[297]  PX 2; PX 3.

[298]  Da Silva Aff. ¶57.

[299]  Rocha Tr. at 124-125 ("Q. Were you ever criticized for signing documents that -- specifically, for signing documents that provided for a guaranty by Usinas Itamarati of UISA Finance's obligations under the derivative transaction? … A. No, I don't remember. Q. I'm sorry. Just to be clear, you don't remember that happening? A. I don't remember it happening, yes."); Possari Tr. at 110-111 ("Q. Has anyone ever criticized you for signing this document? A. No. Q. Has anyone ever told you, Mr. Possari, you had no authority to sign this document? …A. No."); Tamer Tr. at 32 ("Q. Have you criticized or complained to Mr. Oliveira about the fact that he hadn't told you about the derivative transaction earlier? A. I was very concerned, but I don't think he did it in bad faith. Q. But have you criticized or complained to him for not bringing it to your attention earlier? A. No. I talked to him. He tried to explain to me what derivatives are. And until today I do not understand what derivatives are.").

satisfaction, of such documents, corporate records, certificates of public officials and other instruments and have conducted such other investigations of fact and law as I have deemed necessary or appropriate for purposes of this opinion" and represented that the Guaranty (i) had been "duly authorized" and (ii) "constitutes the valid and legally binding obligation of Guarantor enforceable in accordance with its terms."[300]

51.     Itamarati says that the Legal Opinion does not satisfy the obligation of standard diligence or render any neglect by MLCS excusable because (a) the Legal Opinion was provided by an internal counsel at Itamarati and (b) the Legal Opinion contains brackets that render it incomplete.

52.     However, the Court determines that under Brazilian law, a legal opinion is not rendered unreliable because it was issued by a company's internal lawyer.[301]

53.     Mr. Moraes was an attorney duly enrolled before the Brazilian Bar Association.[302]

54.     Itamarati has never claimed that the internal lawyer who signed the Legal Opinion did not have permission or authorization to sign the Legal Opinion.  The Court also not aware of any evidence that Itamarati took any disciplinary actions against the internal legal counsel, to evidence that he acted beyond (or without) the powers entrusted to him.[303]  This provides additional support that, under Brazilian law, Itamarati is liable for the acts of such internal legal counsel, because it hired him (*culpa in eligendo*) and — allegedly — failed to monitor his acts (*culpa in vigilando*).

---

[300]  PX3.

[301]  Medrado Aff. ¶49.

[302]  Medrado Aff. ¶50.

[303]  *See* Possari Tr. at 151:11-152:10; Oliveira Tr. at 307:14-308:3.

55.     Although some text in the Legal Opinion appears in brackets, the Court has not been made aware of anything in Brazilian case law, scholarly work, or other authority that holds that the fact that certain text in a document is bracketed invalidates that document.[304]

56.     Finally, although the date shown in the Legal Opinion for the authorizing act is September 4, 2007, months before the Swap was executed, it would have been entirely possible that Itamarati passed a resolution generally authorizing its officers to grant guaranties for the obligations of UISA Finance.  This is particularly true because it was around this time when UISA Finance first became a counterparty in a loan transaction with MLCP.[305]

57.     The Court also finds that the Defendants accrued benefits from the Guaranty because it allowed them to potentially reduce the cost of financing the November Loan.[306]

58.     MLCS would not have entered into the Swap without the Guaranty from Itamarati.[307]

59.     Itamarati executed the Guaranty in connection with entering into the Swap.[308]

60.     In determining the question of benefit, it does not matter whether the transaction ultimately turned out to be favorable for UISA Finance or Itamarati.[309]

61.     Next, and as is discussed in greater detail below, Itamarati ratified the Guaranty based on subsequent acts of partial performance of the Guaranty.

---

[304]  Medrado Aff. ¶52.

[305]  Weinstein Aff. ¶9.

[306]  Da Silva Aff. ¶17, Hull Aff. ¶16.

[307]  Da Silva Aff. ¶14.

[308]  PX2.

[309]  Medrado Aff. ¶41.

62.     Finally, the Swap (and the Guaranty that was necessary for its execution) implicated the rights of counterparties and/or third parties, including MLCS, which acted in good faith, as discussed above.[310]

63.     In sum, the Court finds that the apparent authority theory applies and that the Guaranty is therefore valid and enforceable, notwithstanding whether Itamarati's signatories required or obtained board authorization.

> iv.   The Guaranty Is Enforceable Under Brazilian Law Pursuant To The Principle Of Ratification

64.     Under Brazilian law, voidable acts (such as the entering into an unauthorized guaranty) may be ratified by parties.[311]  Ratification may be express or implicit.[312]

65.     The Court finds that Itamarati's material acts of performance under the Guaranty confirmed the validity and enforceability of the Guaranty under Brazilian law.[313]

66.     Under Brazilian law, ratification does not require any specific form.[314]  In other words, it is not necessary that the act of ratification be made by any specific administrative body of the company.[315]

67.     Here, Itamarati's witnesses have acknowledged that Itamarati posted cash collateral in response to margin calls to UISA Finance.[316]

---

[310] *Id.*

[311] Medrado Aff. ¶54.

[312] *Id.*

[313] Medrado Aff. ¶¶60-64.

[314] Medrado Aff. ¶58.

[315] *Id.*

68.     Itamarati also offered its sugar and ethanol stocks in response to MLCS's margin calls on UISA Finance.[316]

69.     UISA Finance and Itamarati executed and delivered amended trade confirmations after the parties entered into the Swap and, in particular, Itamarati executed and delivered an amended trade confirmation on September 24, 2008, after the Guaranty was executed and delivered to MLCS.[318]

70.     These above are all acts of ratification that render the Guaranty valid and enforceable as a matter of Brazilian law.

---

[316] 2/25/2011 Oliveira Tr. At 303:15-304:8 ("Q. Thank you. Did Itamarati also propose posting stocks of ethanol and sugar to satisfy the margin calls that Merrill Lynch was making under the swap? … A. Within the situation I described previously, UISA Finance consulted or discussed with Itamarati the possibility. Q. And Itamarati and UISA Finance also discussed the possibility with Merrill Lynch; correct? A. UISA Finance and possibly Itamarati was involved as well. Yes. Q. And the ethanol and sugar that were being discussed were Usinas Itamarati's ethanol and sugar; correct? … A. Correct."); Possari Tr. at 160:7-160:17 ("Q. What are these two documents, Mr. Possari? A. Offering ethanol as collateral on behalf of Merrill Lynch as guaranty. Q. Offering ethanol as collateral on behalf of a Merrill Lynch entity? A. Bank. Merrill Lynch Bank. Q. And who owned the alcohol that is referred to in these two documents? … A. Usinas Itamarati."); Rocha Tr. at 178:6-179:22 ("Q. Mr. Rocha, you mentioned that there came a time when Merrill Lynch Capital Services requested that additional margin, that margin be posted because of the mark-to-market values of the derivative transaction. Do you recall that? ... A. Yes, they were requiring additional margins for this transaction. Q. What type of assets were provided as margin? A. In the beginning, money, and later additional assets were offered such as ethanol stocks. I'm not sure if sugar stocks as well. And land, eventually, after that. Q. Who owned the ethanol stocks? Was that owned by UISA Finance or Usinas Itamarati? A. I cannot tell you for sure who the owner was, but I can tell you that the producer was Usinas Itamarati. Q. And when you say "producer," what do you mean? A. Producer, I mean the company that owned the ethanol manufacturer. Q. Do you have an understanding that Usinas Itamarati was also the company that owned the sugar stocks? A. I cannot tell you for sure who was the owner of the sugar stocks, but I can tell you that it was the sugar manufacturer. Q. And as far as you are aware, UISA Finance had no ethanol or sugar operations; is that correct? A. As far as I knew, it did not.").

[317] *See supra*, Proposed Findings of Fact ¶¶111-119.

[318] PX6.

v.   Itamarati Cannot Deny The Enforceability Of The Guaranty Based On
Itamarati's Own Inconsistent Behavior

71.     The Court also finds that the Brazilian law prohibition of *venire contra factum*
*proprium* prevents Itamarati from denying the enforceability of the Guaranty.  This principle
states that a party that acted in one manner – in some cases even creating a deceptive situation
when it was convenient to that party – is not entitled to claim the lack of validity of the same
situation afterwards.[319]  The prohibition aims to prevent contradictory behavior by contracting
parties.[320]

72.     Itamarati's board of directors did not hold meetings as a Board.[321]  Indeed, the
evidence indicates that two of its three members did not take any meaningful part in decisions on
behalf of Itamarati.[322]  Instead, when requested, Ana Claudia Tamer would generally approve

---

[319]  Medrado Aff. ¶92.

[320]  *Id.*

[321]  Tamer Tr. at 15:16-16:22, 19:20-19:25, 39:10-40:14 ("Q. My question is does the Board
meet regularly every month, every quarter, once a year? A. Well, we get together, yes. We
meet. Not always to talk about the Usinas, because it is about a family. Q. My question
though, meeting as a Board of Directors to discuss the business of Usinas Itamarati, how
often do you meet as a Board of Directors to discuss the business of Usinas Itamarati? A. No.
They do not discuss the companies' issues with me. It's very rare for that to happen. Q. Do
you ever have formal Board meetings where the three of you either sit down or get on the
phone and say we are meeting as the Board of Directors of Usinas Itamarati? A. It is Edezio
who does that. All of these companies, negotiations and meetings are done by Edezio. Then
he comes to me and discuss things, discusses these things with me. And I go to Spinelli and
discuss them with Spinelli. Q. Does Mr. Oliveira ever come to you with an issue and then
you go and meet with Julio Tamer and Linda Tamer to discuss it and come to a decision? A.
No.").

[322]  Tamer Tr. at 16:2-16:22 39:10-40:14 ("Q. What is your relationship with Julio Tamer? A.
My ex-husband and my ex-mother-in-law. Q. Ms. Linda Tamer is your former mother-in-
law? A. Yes. Q. When you said they do not take part effectively in the Board, what did you
mean? A. They are people of trust in the family, but they do not participate in the Board
because we have this trust policy. Q. By trust policy do you mean the other members of the
Board of Directors, Mr. Julio Tamer and Linda Tamer trust you to make decisions on behalf

matters recommended to her by Edezio Oliveira, occasionally with the advice of Sergio Spinelli, an outside lawyer.[323]  Obtaining a board resolution from Itamarati's board of directors was therefore a mere formality as board members would effectively sign any resolution presented to them by Ana Claudia Tamer or the executive committee.[324]

73.     Itamarati's board of directors was so obsolete that it was dissolved in May of 2009, and the company has since functioned without a board of directors.[325]

---

of Usinas Itamarati? A. They do. Q. Do they make any decisions on behalf of Usinas Itamarati? A. No.").

[323] Tamer Tr. at 73-74 ("Q. You trusted Mr. Oliveira's judgement? A. I did. Q. If he had brought the derivative transaction to your attention at the time that they did it, in April, would you have approved it? … A. If there had been a meeting with Edezio and Spinelli and Spinelli would have said yes, yes."); *Id*. at 39:16-40:14 ("Q. My question though, meeting as a Board of Directors to discuss the business of Usinas Itamarati, how often do you meet as a Board of Directors to discuss the business of Usinas Itamarati? A. No. They do not discuss the companies' issues with me. It's very rare for that to happen. Q. Do you ever have formal Board meetings where the three of you either sit down or get on the phone and say we are meeting as the Board of Directors of Usinas Itamarati? A. It is Edezio who does that. All of these companies,  negotiations and meetings are done by Edezio. Then he comes to me and discuss things, discusses these things with me. And I go to Spinelli and discuss them with Spinelli. Q. Does Mr. Oliveira ever come to you with an issue and then you go and meet with Julio Tamer and Linda Tamer to discuss it and come to a decision? A. No.").

[324] Tamer Tr. at 45-46 ("Q. I am talking about approval by you, Julio Tamer and Linda Tamer. Were there times when there was a decision that needed, you know, a signature by all three of you? A. Yes. Q. How would that process work? A. In that case Edezio or Spinelli would get in touch with me on an issue that would call for our signature. And we would make a decision if we would sign it or not. But it would depend on the type of business if it would call for our signature or not. Q. Who made the decision whether it was the type of business that required your signature or not; is that something you decided or did you rely on Mr. Oliveira or Mr. Spinelli for that? A. The Legal Department of the company would be always the one who would come and say if that would require or not a signature. Q. And if there was a decision that required the signatures of yourself, Julio Tamer and Linda Tamer, who would obtain those signatures; would you all get together and sign together or would somebody from legal get your signature and then get signatures from the other two people? A. In some cases if Julio was home we would sign the document together. In other cases, if not, the Legal Department would collect the signatures.").

[325] Possari Tr. at 78:11-78:17 ("Q. And in May of 2009, Usinas Itamarati's Board was dissolved? A. It was dissolved in May of 2009. Q. Why was the Board of Usinas Itamarati

74.     In light of the fact that Itamarati's board of directors did not hold meetings as a board and did not otherwise act as an independent decision-making body, Itamarati cannot now turn to the absence of such meetings or formal board approval to claim that the lack of such meetings or approvals should render the Guaranty voidable.[326]

75.     Under Brazilian law, a party is protected from the other party's claim that an agreement is invalid when that claim is based on the second party's own misleading conduct.[327] The prohibition of *venire contra factum proprium* applies here and prevents Itamarati from claiming that the Guaranty would be invalid because of a lack of approval of the Guaranty by Itamarati's board of directors.[328]

vi.   Principles of Nullity Do Not Apply

76.     Defendants have argued that, under Brazilian law, a guaranty provided without board authorization is "null and void" on the basis that board approval is a mandatory legal requirement.  Accordingly, Defendants argue that such a guaranty cannot be remedied by good faith, apparent authority or ratification.

77.     The Court holds, however, under Brazilian law an unauthorized guaranty is at most "voidable" rather than "void."  Brazilian corporate law sets forth a special set of rules (Law No. 6404/76) pertaining to the invalidity of corporate acts which prevails over the more general rules of the Brazilian Civil Code.[329]  Specifically, Law No. 6404/76 provides that unauthorized

---

dissolved in 2009? A. It was dissolved because we wanted to make it less red tape and to simplify the bylaws.").

[326] Medrado Aff. ¶91.

[327] Medrado Aff. ¶93.

[328] Medrado Aff. ¶¶91-94.

[329] Medrado Aff. ¶¶82-83.

corporate acts are, except in very rare cases not applicable here, voidable rather than void.[330]

78.     In any event, board approval is not a "mandatory legal requirement" under the relevant statutes.[331]  There is nothing in any statute that affirmatively requires that a company board approve third party guaranties.  To the contrary, the very statute relied on by Defendants allows for the by-laws of a company to dispense with the need for the board to act on such matters.[332]  Tellingly, Defendants point to no case in which any Brazilian court has ever held that the requirement of a board resolution for a third party guaranty is a mandatory legal requirement so as to implicate the null and void regime.  As Mr. Medrado explains, this kind of requirement implicates purely private interests that are subject to Brazilian voidability principles.[333]

79.     Finally, the Court notes that its conclusion is reinforced in this case by the further fact that, under Brazilian law, boards of directors of closely-held family-owned corporations such as Itamarati are simply not required or expected to adhere to rigid corporate formalities and, indeed, are not even required.[334]

        c.      The Guaranty Is Enforceable Under New York Law

                i.  Introduction

80.     As noted above, Plaintiff and Defendants have submitted expert testimony on the subject whether the Guaranty is enforceable as matter or Brazilian law.   There is some authority,

---

[330] Medrado Aff. ¶85.

[331] *See, e.g.*, Medrado Aff. ¶¶67-70.

[332] Medrado Aff. ¶66.

[333] Medrado Aff. ¶69.

[334] Medrado Aff. ¶¶73-81.

however, for the application of New York law to the question of whether Itamarati's guaranty was authorized.[335]

    ii.  The Guaranty Is Enforceable Under New York Law Pursuant To The Theory Of Apparent Authority

81.    Under New York law, an agent has "apparent authority" to act on behalf of the principal where a "principal causes his agent to have apparent authority by conduct which, reasonably interpreted, causes third persons to believe that the principal consents to have an act done on his behalf." *First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda- Permanent Mission,* 877 F.2d 193 (2d Cir. 1989) (citing *Restatement (Second) of Agency § 27*).

82.    Apparent authority is determined based on a two-prong factual inquiry that examines whether (1) the principal "was responsible for the appearance of authority in the agent to conduct the transaction in question," and (2) the third party reasonably relied on the representations of the agent. *Herbert Const. Co. v. Continental Ins. Co.,* 931 F.2d 989 (S.D.N.Y. 1991) (internal citations omitted).

83.    Under the first prong of the apparent authority analysis, New York law recognizes that the appointment of a person to a position whose title carries with it generally recognized

---

[335] *See IRB-Brazil Resseguros, S.A. v. Inepar Investments, S.A.*, 2011 WL 1544527, at *1 (N.Y. App. Div. 1 Dept. Apr. 26, 2011) (holding that New York law applies to the question of the enforceability of a guaranty signed by officers of a Brazilian company who lacked authority under Brazilian law because the guaranty contained a New York choice of law clause); *Indosuez International Finance B.V. v. National Reserve Bank*, 98 N.Y.2d 238, 245 (holding that New York law applied to the question of whether ISDA Master Agreements signed by an officer of a foreign party lacking authority were enforceable because "the essence of the contract is an exchange pegged to the value of the U.S. dollar, the parties agreed that any payment was to be made in U.S. dollars" and "the parties' choice of New York law in 10 of the 14 confirmations and choice of the New York forum in at least six of the confirmations, reflects their reliance on this state's experience with and ability to ensure orderly dollar currency transactions."); *but see, e.g., Lehman Bros., Inc. v. Tutelar CIA Financiera*, S.A., 1997 WL 403463 *3 n.4 (S.D.N.Y. 1997): "Because the issue of the actual authority of the Individual Defendants to bind Tutelar turns on Tutelar's internal corporate organization, however, the law of the place of incorporation, here Argentina, would govern."

duties creates apparent authority.  For example, the appointment of an individual to the position of chief financial officer lends apparent authority to that person.  *See Schlueter v. East 45th Development LLC*, 2005 WL 2171204, at *9 (N.Y. Civ. Ct. Sept. 7, 2005) (holding that the "LLC's CFO had apparent authority to bind [the LLC]" to the agreement at issue); *Goettel v. Wallace*, 162 A.D.2d 166, 167-68 (N.Y. App. Div. 1990) (holding the corporation's CFO had apparent authority by virtue of his title and "[t]he risk of loss from an unauthorized act of a dishonest employee falls on the corporation which appointed him to act on its behalf and not on the party who relies on his apparent authority." (internal citation omitted);  *see also*, *Goldston v. Bandwidth Tech. Corp,* 859 N.Y.S.2d 651, 653 (N.Y. App. Div. 2008) (defendants were bound by an agreement signed by their president because he had "at least apparent authority to enter into the agreement" even though he did not have actual authority to do so because board approval was required and "[t]he president or other general officer of a corporation has power, *prima facie*, to do any act which the directors could authorize or ratify . . . The true test of his authority to bind the corporation is . . . whether, at the time, he is engaged in the discharge of the general duties of his office, and in the business of the corporation . . . the law imposes no duty on a third party who deals with the corporation to inquire into its employee's actual authority.").

84.     Additionally, where a company accepts payment into its bank account after confirmations to a transaction were signed by a high-ranking representative of the corporation, "*such conduct alone* constitutes an implied representation that the [agent] had the authority to bind the" corporation. *Indosuez International Finance B.V. v. National Reserve Bank*, 774 N.E.2d 696, 700–01 (N.Y. 2002) (emphasis added).

85.     As noted above, Mr. Rocha, who acted as Itamarati's chief financial officer,[336] and Mr. Possari, Itamarati's chief legal officer, signed multiple confirmations on behalf of Itamarati as Guarantor of UISA Finance's obligations.[337] Mr. Rocha and Mr. Morales signed the Guaranty.

86.     Additionally, Itamarati accepted financial benefits from the Swap transaction.   As noted above, in the month of May 2008, Itamarati effectively received a reduction of $2.7 million in the interest that was otherwise payable on the November Loan.

87.     Moreover, Itamarati provided the Legal Opinion attesting to the authorization of the Guaranty.

88.     By these and the many other actions of its officers discussed above, Itamarati principal "was responsible for the appearance of authority in the agent to conduct the transaction in question." *Herbert Const. Co. v. Continental Ins. Co.,* 931 F.2d at 997.

89.     Under the second prong of the apparent authority analysis, the reliance by the third-party on the representations of the agent must have been reasonable.  *Herbert Const. Co.*, 931 F.2d at 995-96.

90.     Reliance is reasonable when no duty of inquiry arises.  A duty of inquiry for apparent authority when (1) the facts and circumstances are such as to "put the third party on inquiry", (2) the transaction at issue is "extraordinary," or (3) the novelty of the transaction alerts the third party to a danger of fraud.  *F.D.I.C. v. Providence College*, 115 F.3d 136, 140-41 (2d Cir. 1997) (quoting *Herbert Const. Co. v. Continental Ins. Co.*, 931 F.2d 989, 995-96 (S.D.N.Y. 1991) (holding that a transaction was "novel and extraordinary" where, among other things, the

---

[336]  Da Silva Aff. ¶15.

[337]  PX 4; PX 5; PX 6.

signatory's employer had no ownership or equity interest in the borrower-company to justify the guaranty).

91.     Reliance on apparent authority is reasonable (and no duty of inquiry arises) where, for example, the senior executives of a corporation negotiate, draft, and sign a contract with another sophisticated entity, even where there is "no dispute that [Defendant's] Board of Directors expressly limited the power of [its] officers to commit the corporation to [such a contract,] reserving the right to enter such contracts to the Board itself." *Chiat/Day Direct Marketing, Inc. v. National Car Rental System, Inc.*, No 93 Civ. 2717 (JFK), 1994 WL 524982, at*3–4 (S.D.N.Y Sept. 27, 1994) (holding that, despite express provisions of corporate by-laws denying officers actual authority to enter such a contract, "no reasonable jury could find that [the plaintiff] was not entitled to rely upon the apparent authority of [defendant's] Chariman, who negotiated the contract, its in-house counsel, who drafted the contract, or its senior Vice-President, who signed the contract" under New York law).

92.     Likewise, a party to an agreement can rely on the apparent authority of the opposing party's legal counsel, where "defendant communicated to plaintiffs that defendant's . . . attorney was authorized to determine which documents [and other steps] were necessary" to complete the agreement. *See M.P. Development v. Malone Economic Decelopment Corporation*, 657 N.Y.S.2d 531 (N.Y. App. Div. 1997).

93.     Courts have also held that "fail[ing] to raise an issue of authority in the course of performance" is a factor that demonstrates the reasonability of a plaintiff's reliance. *See Indosuarez Int'l Finance*, 774 N.E.2d at 701.

94.     Here, MLCS relied on Itamarati's Guaranty as it would not have entered the transaction without such a Guaranty.[338]

95.     MLCS's reliance on the Itamarati's Guaranty was reasonable.  There was nothing else to put MLCS on inquiry notice.  The Swap transaction was discussed with most of the senior officers of Itamarati and documents reflecting that the Guaranty would be given we sent to such officers on multiple occasions.  The Guaranty was signed by Mr. Rocha, Itamarati's chief financial officer, who had also signed several trade confirmations on behalf of Itamarati as guarantor of UISA Finance's obligations.[339]  Itamarati's chief legal officer, Mr. Possari, and another Itamarati manager, Mr. Morales, also signed documents on behalf of Itamarati as guarantor of the Swap.   Itamarati's chief executive signed three separate confirmations for the Swap, each of which reflected, directly below his signature, that  Itamarati would also be signing as guarantor.  MLCS' Fabio Da Silva was told that the board had considered the various derivatives proposal that had been under discussion with Itamarati since November 2007 and that the board had approved the Swap.   MLCS was also told that Itamarati's legal counsel was reviewing the Guaranty and shortly thereafter received the Legal Opinion.  In short, Itamarati's execution and delivery of the Guaranty had all the objective indications of an ordinary course, proper and valid corporate action.

96.     There was nothing novel or extraordinary about Itamarati guarantying UISA obligations.  Itamarati guarantied two prior loans from MLCS's affiliate, MLCP.[340]  MLCP required a guaranty because UISA Finance was a non-operating shell company with little or no

---

[338]  Da Silva Aff. ¶¶14, 35.

[339] PX 2; PX 4; PX 5; PX 6.

[340]  PX11; PX26; Weinstein Aff. ¶¶10, 12.

assets that had been inserted in the transaction at Itamarati's request.[341]  So did MLCS with respect to the Swap.  Fabio Da Silva expressly informed Itamarati that the same credit support needed for the November Loan was needed for the Swap, which included a guaranty.[342]   And as Itamarati has acknowledged, the November Loan and the Swap were closely related.[343]

97.     Moreover, Itamarati's Guaranty served Itamarati's corporate purposes – *i.e.*, to potentially reduce the cost of a Loan taken out for its benefit – and was consistent with Itamarati's prior conduct in guarantying the Loan.[344]

98.     Because the elements for the apparent authority theory are present, the Guaranty is valid and enforceable under New York law.

      iii.   The Guaranty Is Enforceable Under New York Law Pursuant To The Ratification Doctrine

99.     Under New York law, a party may ratify a contract, thereby rendering the contract binding upon itself, even when the contract was not initially binding on that party.  *RLI Ins. Co. v. Athan Contracting Corp.*, 667 F.Supp.2d 229, 235 (E.D.N.Y. 2009).

---

[341]   Weinstein Aff. ¶9; Coutinho Tr. at 118:5-118:24 ("Q. Did you have an understanding that Merrill Lynch Credit Products would not loan money to UISA Finance without a guaranty by Usinas Itamarati because UISA Finance had no assets? … A. I believe, actually, I can tell you for sure that the reason – UISA Finance equities were no more than 50,000 reals. Q. Is it your understanding that that is why it was a condition of the $125 million loan to UISA Finance that Usinas Itamarati guaranty UISA Finance's obligations? … A. Yes.").

[342]   Da Silva Aff. ¶19-25.

[343]   Declaration of E. Oliveira ¶12 ("As an integral part of the discussions regarding the $125 million loan, Merrill Lynch marketed a derivative product it told Itamarati would reduce the cost of financing the loan."); Possari Tr. at 105:18-106:5 ("Q. When you signed this document that is part of Exhibit 6 [May 13, 2008 trade confirmation for the Swap], did you understand that it related to a derivative or swap transaction between Merrill Lynch Capital Services and UISA Finance? ... A. No. Q. When you signed this document, did you have any understanding what it related to? A. That it was a continuation to the principal agreement. It was in addition to the main or the principal contract that was the $125 million contract.").

[344]   PX33; PX35; PX36; PX38; PX40; PX42.

100.    A party may ratify the acts of its agents where, as here, it "retains the benefits of those acts for corporate purposes."  *Zanoni v. 855 Holding Co., Inc.*, 465 N.Y.S.2d 763, 764 (N.Y. App. Div. 1983); s*ee Indosuez International Finance B.V. v. National Reserve Bank*, 774 N.E.2d 696, 701-702 (N.Y. 2002) (holding that where the party failed to raise the issue of authority in the course of performance under 14 ISDA currency exchange agreements, having accepted payment on six of the option transactions, the agreement was ratified, and the party could not disavow the agreements once, after the value of the ruble declined, making the agreements disadvantageous to the party); *Goldston v. Bandwidth Tech. Corp,* 859 N.Y.S.2d 651, 655 (N.Y. App. Div. 2008) (holding in part that because defendants accepted the benefits of the work performed by plaintiffs, that they were bound by the agreement entered into by the company's president, "whether they authorized it or not," and therefore did not need to take into account the company practice to have "two principals sign all approved corporate contracts"); *IRB-Brazil Resseguros, S.A. v. Inepar Investments, S.A.*, 2011 WL 1544527, at *2 (N.Y. App. Div. 1 Dept. Apr. 26, 2011) (not yet reported) (holding the "acceptance of benefits flowing from an agreement that [the defendant] now asserts was unauthorized when executed, constitutes an affirmance of the agreement giving rise to a ratification."); *Wright v. Eastman Kodak Co.*, 445 F.Supp.2d 314, 319 (W.D.N.Y. 2006) (holding that  "[p]laintiffs cannot have it both ways: enjoying…the benefits [of the contract], but then asking that they be excused from living up to their end of the bargain").

101.    Itamarati ratified the Guaranty by accepting the benefits thereof.   The benefits came in the form of a potential reduction in the interest rate on the November Loan,  which the

provided.[345]  MLCS would not enter into the Swap without the Guaranty because UISA Finance

was merely a shell company with no assets of its own. [346]  Having accepted those benefits,

Itamarati "cannot have it both ways." *Wright v. Eastman Kodak Co.*, 445 F.Supp.2d 314, 319

(W.D.N.Y. 2006).  In other words, Itamarati may not, after having accepted the benefits of the

contract, later repudiate the contract in an attempt to "be excused from living up to their end of

the bargain."  *Wright v. Eastman Kodak Co.*, 445 F.Supp.2d 314, 319 (W.D.N.Y. 2006), *see*

*Indosuez*, at 702.[347]

---

[345] PX 63; Rocha Tr. at 146:18-147:7 ("Q. And when the derivative transaction was first executed back in April of 2008, initially it made money for UISA Finance; is that correct? … A. I would say that in the beginning it had reached its goal to reduce the disbursement with interest rates, yes. Q. And that saved UISA Finance money, right? A. Yes, that's correct. Q. And if the real had remained strong against the dollar and volatility had remained low, the derivative would have continued to save UISA Finance money; is that correct? A. Probably."); 2/25/2011 Oliveira Tr. at 264:6-19 (6 Q. It's true, is it not, as a result of the closing of the swap transaction between UISA Finance and Merrill Lynch, that Usinas Itamarati was able to record a financial benefit on its financial statements; correct? A. Directly related to UISA Finance's gains -- earnings. Q. Okay. But related to those 14 earnings it -- withdrawn.  Is it fair to say that any financial benefit under the swap transaction with Merrill Lynch was effectively passed through to Usinas Itamarati? A. Yes. That is correct.").

[346] Da Silva Aff. ¶35; Weinstein Aff. ¶13; PX 25; Coutinho Tr. at 118:5-118:24 ("Q. Did you have an understanding that Merrill Lynch Credit Products would not loan money to UISA Finance without a guaranty by Usinas Itamarati because UISA Finance had no assets? … A. I believe, actually, I can tell you for sure that the reason – UISA Finance equities were no more than 50,000 reals. Q. Is it your understanding that that is why it was a condition of the $125 million loan to UISA Finance that Usinas Itamarati guaranty UISA Finance's obligations? … A. Yes.").

[347] A principal may ratify a contract formed by its agents even without knowledge of the material facts where, as here, it has knowledge that the contract exists and reason to believe it does not know all the material facts, and accepts the benefits thereof without qualification or investigation.  *Cologne Life Reinsurance Co. v. Zurich Reinsurance (North America)*, 730 N.Y.S.2d 61 (N.Y. App. Div. 2001), citing RESTATEMENT (SECOND) OF AGENCY § 91 cmt. e (1958) ("if, learning that one who had no authority acted for him, [the principal] affirms without qualification and without investigation, when he has reason to believe that he does not know all the facts, it may be inferred that he is willing to assume the risks of facts of which he has no knowledge").  Here, the senior officers of Itamarati and Ms. Tamer, the sole shareholder, knew or should have known from the time of its execution that Itamarati of the

102.     A party may also ratify a contract that was previously unenforceable by acting

upon, performing under, or affirmatively acknowledging the contract.  *See Niosi v. Niosi*, 641

N.Y.S.2d 93, 94 (N.Y. App. Div. 1996) (holding that payment of maintenance pursuant to the

agreement for a period of six years least five years ratified the agreement); *Mulitex USA, Inc. v.

Marvin Knitting Mills, Inc.*, 784 N.Y.S.2d 506, 507 (N.Y. App. Div. 2004) (holding that partial

payment of invoices pursuant to the agreement ratified the agreement); *Cooper v. Greenberg*,

542 N.Y.S.2d 631, 631 (N.Y. App. Div. 1989) (holding that delivery of eight scheduled

payments on a note, totaling $90,000, ratified the note).

103.     Itamarati ratified the Guaranty by acting upon and performing under the

Guaranty, namely by posting collateral as required.[348]  Moreover, as discussed above, Itamarati

offered its sugar and ethanol stocks in response to MLCS's margin calls on UISA Finance.  At

no time prior to the commencement of this lawsuit did Itamarati suggest that its posting of

collateral and offers to post additional collateral were not pursuant to its obligations under the

Guaranty.  To the contrary, at all times Itamarati's conduct was consistent with its obligations

under the Guaranty.

### d.     Conclusion

104.     For the foregoing reasons, the Court finds that the Guaranty is enforceable and

that Itamarati is obligated, as UISA Finance's guarantor, to pay the Early Termination Amount

and all other amounts owing to MLCS under the ISDA Master Agreement.

---

Swap and that Itamarati was guarantying UISA's obligations.  Yet, even after Ms. Tamer and
Mr. Oliveira admittedly knew of the Swap and the Guaranty, neither they nor anyone at
Itamarati attempted to cancel the transactions or asserted that the Guaranty was unauthorized.

[348] *See supra*, Proposed Findings of Fact ¶¶111-119.

Respectfully Submitted

SIMPSON THACHER & BARTLETT LLP

By:

 /s/ Thomas C. Rice

Thomas C. Rice
William T. Russell, Jr.
Paul J. Sirkis
425 Lexington Ave.
New York, NY 10016
Tel. (212) 455-2000
Fax (212) 455-2502
trice@stblaw.com
wrussell@stblaw.com
psirkis@stblaw.com

*Attorneys for Plaintiff Merrill Lynch Capital Services, Inc.*