16l1mlc1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MERRILL LYNCH CAPITAL SERVICES, INC.,

                 Plaintiff,

           v.                    09 Civ. 2324 RJS

UISA FINANCE, et al.,

               Defendants.

------------------------------x

                           New York, N.Y.
                           June 21, 2011
                           9:05 a.m.

Before:

                HON. RICHARD J. SULLIVAN,

                           District Judge

                      APPEARANCES

SIMPSON THACHER & BARTLETT, LLP (NY)
      Attorneys for plaintiff
BY:  THOMAS C. RICE, Esq.
      PAUL JACOB SIRKIS, Esq.
      WILLIAM THOMAS RUSSELL, JR., Esq.
          Of counsel

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      Attorneys for defendants
BY:  RICHARD IRVING WERDER, JR., Esq.
      R. BRIAN TIMMONS, Esq.
      ADAM SETH CASHMAN, Esq.
          Of counsel

1611mlc1

1          (In open court)

2          (Trial resumed)

3          THE COURT:  Anything we need to discuss before we put

4     the next witness on?

5          MR. RICE:  No, your Honor.  Not from plaintiff.

6          MR. WERDER:  No.

7          THE COURT:  All right.  Then we'll proceed.

8          Okay.  We're going to go with Ms. Wang, Wang?

9          MR. RUSSELL:  Ms. Wang, your Honor.

10         THE COURT:  Wang?  Okay.  Great.  Why don't we bring

11    her in.

12         (Pause)

13         THE COURT:  All right.  I'd ask the witness to stand.

14    Raise your right hand.

15         (Witness sworn)

16         THE COURT:  All right.  Have a seat.

17         THE WITNESS:  Thank you.

18         THE COURT:  If you could state your name and spell

19    your name, first and last, for the record.

20         THE WITNESS:  My name is Liquiao Wang, spelled as

21    L-I-Q-I-A-O.  Last name is Wang, W-A-N-G.

22         THE COURT:  All right.  Ms. Wang, good morning.  Just

23    keep your voice up.  The attorney will ask you questions -- the

24    attorneys will ask you questions, and speak directly to them

25    and talk into the microphone.  About that distance is perfect.

16l1mlc1

1          All right.  You may proceed.

2          MR. RUSSELL:  Thank you, your Honor.  Before I do

3   proceed, your Honor, if it would be useful to the court, I have

4   a copy of her affidavit with copies of all the exhibits

5   referred to therein.

6          THE COURT:  Probably, if you have an extra copy, yeah,

7   I guess that's good.  Thank you.

8          MR. RUSSELL:  May I approach?

9          THE COURT:  Yes.  Thanks.  The affidavit I've got, but

10  the exhibits, it's just probably a little easier than fishing

11  around in the boxes, so -- thanks.

12         MR. RUSSELL:  Secondly, your Honor, there's only one

13  exhibit to which Ms. Wang refers in her affidavit to which

14  defendants have objected.  And that's Plaintiff's Exhibit 157

15  that Ms. Wang addresses in paragraph 14 on page 4 of her

16  affidavit.  And --

17         THE COURT:  157.

18         MR. RUSSELL:  Yes.  Your Honor, as your Honor may

19  recall, Ms. Wang is the individual who actually contacted the

20  four dealers.

21         THE COURT:  Yes.

22         MR. RUSSELL:  Defendants have not objected to the four

23  e-mails she sent to the dealers asking them for market

24  quotations.  Exhibit 157 is a response she received from a

25  Jonathan Powell at Dresdner Bank.  They've objected on hearsay

16l1mlc1

```
 1    grounds, presumably to the top e-mail, not the second e-mail.
 2    So I'm not quite sure what the hearsay objection is, nor did
 3    they object to the subsequent Bloomberg chat between Mr. Powell
 4    and Ms. Wang.  One, I think it provides important context
 5    between Exhibit 155, which is Ms. Wang's e-mail to Mr. Powell,
 6    and the portion of Exhibit 60 reflecting the subsequent
 7    Bloomberg chat.
 8              THE COURT:  Okay.  Mr. Werder, or --
 9              MR. CASHMAN:  Yes, your Honor.  No objection to that.
10              THE COURT:  No objection.  Okay.  Good.  I think it's
11    not hearsay, so it's coming in.  All right.  So 157 is received
12    and everything else is received as I already stated.  Okay.
13              (Plaintiff's Exhibit 157 received in evidence)
14              MR. RUSSELL:  Then I would just like to correct two
15    typographical errors in her affidavit, your Honor.
16              THE COURT:  All right.  With me or through the
17    witness?
18              MR. RUSSELL:  You know, rather than doing it through
19    the witness, I think it's simpler just to point them out to
20    your Honor.  I've pointed them out to defense counsel as well.
21              The first one is very minor.  Paragraph 4 of the
22    affidavit states that Ms. Wang worked at Merrill Lynch, Pierce,
23    Fenner & Smith from -- in 2007, 2008, and the correct dates
24    really should be 2008 to 2009.
25              THE COURT:  Is that correct, Ms. Wang?
```

16l1mlc1

| | |
|---|---|
| 1 | THE WITNESS:  That's correct.  That is correct. |
| 2 | THE COURT:  All right. |
| 3 | MR. RUSSELL:  And then the second typographical error, |
| 4 | your Honor, appears in paragraph 16 on page 5.  There's a |
| 5 | reference to Plaintiff's Exhibit 175.  That's an error.  The |
| 6 | correct exhibit referenced should be Plaintiff's Exhibit 158. |
| 7 | THE COURT:  Okay. |
| 8 | MR. RUSSELL:  That is an exhibit to which defendants |
| 9 | have not objected. |
| 10 | THE COURT:  All right.  You agree with that, Ms. Wang? |
| 11 | THE WITNESS:  Yes, I agree. |
| 12 | MR. RUSSELL:  May I approach the witness, your Honor? |
| 13 | THE COURT:  You may, yes. |
| 14 | LIQIAO WANG, |
| 15 | called as a witness by the Plaintiff, |
| 16 | having been duly sworn, testified as follows: |
| 17 | DIRECT EXAMINATION |
| 18 | BY MR. RUSSELL: |
| 19 | Q.  Ms. Wang, I've handed you a copy of the affidavit that you |
| 20 | signed in connection with the trial of this case.  Is that your |
| 21 | affidavit? |
| 22 | A.  Yes, it is. |
| 23 | Q.  With the exception of the two typographical errors I just |
| 24 | mentioned to the court, was it -- did you believe it to be true |
| 25 | and accurate when you signed it? |

1    A.  Yes, I did.

2    Q.  Do you believe it to be true and accurate as you sit here

3    today?

4    A.  Yes.

5         MR. RUSSELL:  Your Honor, those were all the

6    preliminary questions I had.  I turn the witness over to

7    defense counsel.

8         THE COURT:  Yes.

9         MR. RUSSELL:  Thank you.

10        MR. CASHMAN:  Your Honor, Adam Cashman from Quinn

11   Emanuel.

12        THE COURT:  Yes.  You may proceed.

13   CROSS-EXAMINATION

14   BY MR. CASHMAN:

15   Q.  Good morning, Ms. Wang.

16   A.  Good morning.

17   Q.  Ms. Wang, you were an employee of Merrill Lynch, Pierce,

18   Fenner & Smith?

19   A.  Yes.

20   Q.  I take it you believe you were authorized to trade on

21   behalf of Merrill Lynch Capital Services; am I correct?

22   A.  Right, yes.

23   Q.  And no one ever told you specifically that you had that

24   authorization to trade on behalf of MLCS, did they?

25   A.  Well, we have a legal department and that's a -- that's a

1611mlc1                          Wang - cross

1    given, you know, we trade on behalf of MLCS.

2    Q.  I take it you believe it's a given, but my question is:

3    Did anybody ever tell you specifically that you were authorized

4    to trade on behalf of MLCS?

5    A.  I don't remember.

6    Q.  You have no recollection of that?

7    A.  No.

8           THE COURT:  Would you trade on behalf of other

9    entities?

10          THE WITNESS:  Yes.  We also trade on behalf of other

11   entities.

12          THE COURT:  Other Merrill entities?

13          THE WITNESS:  Other Merrill entities.

14          THE COURT:  And nonMerrill entities too, I imagine.

15          THE WITNESS:  What?

16          THE COURT:  And nonMerrill entities also?

17          THE WITNESS:  No.

18          THE COURT:  Just Merrill entities.

19          THE WITNESS:  Just Merrill entities.

20          THE COURT:  Okay.

21   BY MR. CASHMAN:

22   Q.  And Ms. Wang, did you have an employment agreement with

23   Merrill Lynch, Pierce, Fenner & Smith?

24   A.  What do you mean by employment agreement?

25   Q.  For instance, a contract?

16l1mlc1                          Wang - cross

1              THE COURT:  Written document?

2              MR. CASHMAN:  Yes, written contract.  Thank you, your

3      Honor.

4      A.  Yes.

5      Q.  You did.  And did that written contract authorize you to

6      trade on behalf of MLCS, to your knowledge?

7      A.  The written contract is more in terms of you're employed by

8      Merrill Lynch, Pierce, Fenner & Smith, and I don't recall it

9      has any further details in the contract.

10     Q.  Okay.  Thank you.  So during 2008 and 2009 when you were

11     employed by Merrill Lynch, I'll just say for the moment, at all

12     times you were employed by Merrill Lynch, Pierce, Fenner &

13     Smith; correct?

14     A.  Yes.

15     Q.  Okay.  Now specifically with reference to the derivative

16     transaction with UISA Finance and Itamarati, you were the

17     person at Merrill Lynch that was responsible for obtaining

18     quotations from market dealers; am I correct?

19     A.  I was under the supervision of my supervisor that to get --

20     to asking for e-mail for dealers to -- for the quotation, yes,

21     and the under the supervision of my supervisor.

22     Q.  But you were the one that sent the e-mail?

23     A.  That's correct.

24     Q.  And you sent e-mails to JPMorgan?

25     A.  Yes.

1    Q.  And to Deutsche Bank?

2    A.  Yes.

3    Q.  Also to Dresdner Bank?

4    A.  Yes.

5    Q.  And to RBS; am I correct?

6    A.  That's correct.

7    Q.  All right.  Those were the four dealers that you sent

8    e-mails to requesting quotations in connection with the

9    derivative transaction with UISA Finance?

10   A.  Yes.

11   Q.  And you didn't select any of those dealers, did you?

12   A.  I was -- no, I did not.

13   Q.  And you actually didn't have a relationship with anybody at

14   any of those four financial institutions, did you, ma'am?

15   A.  Yes, that's correct.

16   Q.  No relationship.

17   A.  No relationship.

18   Q.  You had never worked with any of those people and you

19   didn't know them; am I right?

20   A.  No, I used to work at JPMorgan.

21   Q.  Did you know any of the individuals that you e-mailed at

22   JPMorgan requesting a market quotation?

23   A.  I don't remember who the particular person I e-mailed to at

24   JPMorgan.

25   Q.  Okay.  I believe that your counsel handed you a number of

1611mlc1                          Wang - cross

1    exhibits, and if you have those in front of you --

2              MR. CASHMAN:  Oh, I apologize.  Excuse me one moment.

3              Your Honor, may I approach the witness with some

4    exhibits?

5              THE COURT:  Yes.  You don't have to ask.  You guys can

6    go back and forth to the witness.  I don't want anyone camping

7    out up here unless you're literally reviewing a document or

8    pointing to something on the document.  So questions you can do

9    from there, but you can approach to hand things without asking.

10             MR. CASHMAN:  Thank you, your Honor.

11             THE COURT:  Which number are you going to show her?

12             MR. CASHMAN:  I'm going to show her -- I have PX153,

13   154, 155, and 156.

14             THE COURT:  Okay.

15             MR. CASHMAN:  And the court already has the copies.

16             THE COURT:  Yes.  Multiple.

17   BY MR. CASHMAN:

18   Q.  Ms. Wang, specifically with reference to Exhibit 154 --

19   A.  Yes.

20   Q.  -- is that an e-mail that you sent to individuals from

21   JPMorgan?

22   A.  Yes, from the record you have given me here.

23   Q.  And if you see on the To line, do you know whether you had

24   a relationship with any of the individuals to whom you sent

25   this e-mail?

1611mlc1                        Wang – cross

1    A.  No, I absolutely -- I don't know them at the time I was

2    working at JPMorgan and I don't know them now.

3    Q.  Okay.  And aside from the four dealers that we've been

4    discussing, you didn't contact any other dealers seeking a

5    market quotation in connection with this derivative transaction

6    with UISA Finance, did you?

7    A.  Yes, that is correct, I did not contact.

8    Q.  Okay.  And you followed up with one of the four dealers; am

9    I correct?

10   A.  Yes.

11   Q.  Okay.  But you didn't follow up with any of the other

12   three, did you?

13   A.  No, I did not.

14   Q.  Thank you.  Now, Ms. Wang, you were the person at Merrill

15   Lynch primarily responsible for calculating the closeout amount

16   of the transaction with UISA Finance; correct?

17   A.  What do you mean by responsible for, primarily responsible

18   for?

19   Q.  Well, did you perform any calculations in connection with

20   the derivative transaction with UISA Finance?

21   A.  Yes, I did, but under supervision of my supervisor.

22   Q.  Okay.  But you were the person responsible for performing

23   those calculations in the first place, in the first instance?

24   A.  That's correct.

25          THE COURT:  Can I interrupt just for a second.

16l1mlc1                          Wang - cross

1           THE WITNESS:  Sure.

2           THE COURT:  Why did you not follow up with three of

3    the four?  You sent an e-mail and they did not respond?

4           THE WITNESS:  Because some of my coworkers followed up

5    with the other three.

6           THE COURT:  All right.

7    BY MR. CASHMAN:

8    Q.  And Ms. Wang, the calculations that you performed were --

9    were done pursuant to the same methodology as the calculations

10   of the mark-to-market value of the transaction on a daily

11   basis; am I correct?

12   A.  Can you repeat?

13   Q.  Sure.  I'll try to rephrase.  While the transaction, the

14   derivative transaction was open, there were mark-to-market

15   calculations made on a daily basis; correct?

16   A.  That is correct.

17   Q.  Okay.  And the -- when it came time to calculate the

18   closeout amount, the closeout amount was calculated using the

19   same methodology as the mark-to-market calculations; correct?

20   A.  Mark-to-market calculation of in-house with management

21   software, yes.

22   Q.  And ultimately, I take it, you calculated the value of the

23   swap, the derivative transaction to be approximately

24   $151 million; correct?

25   A.  That is correct.

1611mlc1                           Wang - cross

1   Q.  All right.  And there were two components --

2   A.  Yes.

3   Q.  -- to that -- to that number?

4   A.  Yes.

5   Q.  All right.  Now focusing on the second component for a

6   moment, you refer in your affidavit to the bid offer spread,

7   and I'm looking specifically at paragraph 19.  Do you see that,

8   ma'am?

9            (Discussion off the record)

10  Q.  Do you see that, Ms. Wang?

11  A.  Yes.

12           THE COURT:  19 in her affidavit?

13           MR. CASHMAN:  Correct.

14  A.  Yes.

15  Q.  Okay.  And is this what you refer to in your deposition as

16  buying vols and buying spot?

17  A.  What do you mean buy vols, buy spots?  Can you clarify?

18  Q.  Is that a phrase that you're familiar with?

19  A.  Yes, it is.

20  Q.  Okay.  And when you talk about the bid offer spread, is

21  that what you -- is that what you mean when you say buying vols

22  and buying spots?

23  A.  Well, that's not a total cost of buying vols; it's just the

24  cost from average of the bid to offer.

25  Q.  I see.  So did you actually go out into the market to buy

1    vols and buy a spot in connection with this particular

2    transaction, ma'am?

3    A.   No, I did not.

4    Q.   Okay.  And you don't know who did, do you?

5    A.   I don't know.

6    Q.   You don't know if in fact anyone ever went out into the

7    market to buy vols and buy spots, do you?

8    A.   I think in answer to your previous question, can you

9    clarify -- can you further clarify the question?  What's the

10   difference between this one and the previous one?

11   Q.   Well, I'm not sure which one you had in mind, but my

12   question is just:  You don't know if anyone in fact went out

13   into the market to buy vols and buy a spot, do you?

14   A.   I don't know.

15             MR. CASHMAN:  Okay.  Thank you.  Nothing further at

16   this time, your Honor.

17             THE COURT:  Okay.

18             MR. RUSSELL:  Very briefly, your Honor.

19             THE COURT:  Redirect?  Okay.

20   REDIRECT EXAMINATION

21   BY MR. RUSSELL:

22   Q.   Ms. Wang, you mentioned that when you were contacting the

23   four dealers to obtain market quotations and you -- when you

24   performed the calculation of the termination amount, you were

25   doing so under the supervision of your supervisor.  Do you

1611mlc1                          Wang - redirect

1    recall that testimony?

2    A.  Yes.

3    Q.  Who was your supervisor?

4    A.  Pankaj Jhamb.

5    Q.  Mr. Cashman asked you questions about whether or not you

6    selected the four particular dealers that you contacted.  Do

7    you know who did select those dealers?

8    A.  I was -- I was told by my supervisor as well.

9    Q.  Was that Mr. Jhamb?

10   A.  Yes.

11   Q.  And then finally, Mr. Cashman asked you about the

12   calculation of -- the calculation you did of the termination

13   amount, and he asked you if you used the same methodology as

14   the mark-to-market calculations you'd done on daily basis.  Do

15   you recall that?

16   A.  Yes.

17   Q.  Did you do anything other than just take the mark-to-market

18   value or did you do something else in addition to that in order

19   to come up with the $151 million figure?

20   A.  We looked at the market -- market information at that

21   moment, at that time, which -- for taking information from

22   broker screen for bid offer in terms of vols, volatilities, and

23   where at that spot is at that point, and where interest rate

24   are for dollar interest rates and Brazil interest rates, and

25   we're using those to obtain market data and to calculate.

1          MR. RUSSELL:  Nothing further, your Honor.

2          THE COURT:  Okay.  I have a quick question.

3          THE WITNESS:  Sure.

4          THE COURT:  You make a reference in paragraph 20 to a

5   knock-in $80 million put option.  What is a knock-in put

6   option?

7          THE WITNESS:  It's -- knock-in means relative to a

8   barrier, so let's say if you knock into a certain level, then

9   you can sell -- you can get -- you basically getting to a put

10  option.  So it's a precondition before you can enter into a put

11  option.

12         THE COURT:  So a "currency option (a knock-in

13  $80 million put option)," what does that mean in plain English?

14         THE WITNESS:  If I can give an example, if I used

15  Brazil as a --

16         (Reporter interrupted for clarification)

17         THE WITNESS:  If I use, you know, Merrill Lynch stock

18  as an example, stock trades today at 50, and you -- if you

19  believe that Merrill Lynch stock is going to go down to 30, for

20  example, and you want to have an option to sell Merrill Lynch

21  stock at 50, then that's called a put option -- put Merrill

22  Lynch stock at 50 to the market when Merrill Lynch stock is at

23  30.  Therefore, you make money.  However, the put option is

24  very expensive, so what you -- what you can say is, "I believe

25  Merrill Lynch stock can go to 55 in a week time," so it can add

1    a precondition before the put option to cheapen this, to make

2    it a put option cheaper.  The put option cost you $5, and if

3    you add a precondition, which means only the put option is

4    valid if Merrill Lynch stock in a week time goes to 55 first,

5    therefore, the put option will be worth only $2.  So it's a lot

6    cheaper to you to get into a put option, which is worth $5.

7            THE COURT:  I see.  Okay.  Thank you.  And you talked

8    about vol?

9            THE WITNESS:  Yes.

10           THE COURT:  What do you mean by that?

11           THE WITNESS:  Volatility is standard deviation

12   movements of certain financial instruments, and if you have

13   vol, you can say, okay, what is expected range for the price to

14   fall within a year, for example.  Yeah.

15           THE COURT:  All right.  So that's what you were

16   referring to, the expected volatility of a particular stock.

17           THE WITNESS:  Yeah, what expected price range will

18   move, yes.

19           THE COURT:  All right.  Okay.  Any other recross based

20   on either what I said or what was said on redirect?

21           MR. CASHMAN:  Nothing further.

22           THE COURT:  No?  All right.  Ms. Wang, thank you very

23   much.  You may step down.  Have a good day.

24           (Witness excused)

25           THE COURT:  Okay.  Next witness?

16l1mlc1                      Weinstein - direct

1            MR. RUSSELL:  Your Honor, the plaintiff now calls

2     Mr. Brian Weinstein.

3            THE COURT:  Okay.

4            (Witness sworn)

5            THE COURT:  State your name, first and last, and spell

6     it, first and last.

7            THE WITNESS:  My name is Brian Weinstein, spelled

8     B-R-I-A-N, last name W-E-I-N-S-T-E-I-N.

9            THE COURT:  Okay.  Mr. Weinstein, good morning.  Keep

10    your voice up, don't talk too fast, which everyone has a

11    tendency to do, myself included, once we get going.

12            All right.  You may proceed.

13            MR. RUSSELL:  Again, your Honor, I understand you

14    probably have multiple copies of his declaration, but you --

15            THE COURT:  Yes.  If you can hand it up, that would be

16    great.  Thank you.

17            MR. RUSSELL:  Would you like his declaration or just

18    the exhibits?

19            THE COURT:  I mean, I have the declaration that I've

20    already marked up so I don't think I need it.  Well, give me

21    that too, just because it's useful as something to just clip so

22    I know what I've got.

23            MR. RUSSELL:  Thank you.

24            Your Honor, just a very brief direct examination just

25    to clarify a couple of -- not every point but a couple of the

1    points where the defendants have objected to portions of

2    Mr. Weinstein's testimony.

3              THE COURT:  All right.

4     BRIAN WEINSTEIN,

5          called as a witness by the Plaintiff,

6          having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. RUSSELL:

9    Q.  Mr. Weinstein, first of all, is this a copy of the

10   declaration you signed in connection with this case?

11   A.  Yes, it is.

12   Q.  And when you signed it, did you believe the contents of

13   that declaration to be true and accurate?

14   A.  That's correct.

15   Q.  And do you still believe they're true and accurate?

16   A.  That's correct.

17   Q.  I'd like to draw your attention to paragraph 13 of your

18   declaration, sir, on the bottom of page 3.

19   A.  Okay.

20   Q.  And do you see where you note your understanding that --

21   I'm sorry.

22              MR. TIMMONS:  Your Honor, perhaps we can speed things

23   along.  We'll withdraw the objection to all paragraphs in

24   Mr. Weinstein's affidavit except for paragraphs 28, 29, and 30.

25              THE COURT:  28, 29, 30?  Okay.  That should do it.

1611mlc1                        Weinstein - direct

1    That should speed things up.

2              MR. RUSSELL:  Yes, it does, your Honor.  I would like

3    to ask a couple of questions about paragraph 25, because while

4    they apparently are withdrawing their hearsay objection to his

5    testimony, they have objected to the document referred to in

6    paragraph 25 on hearsay grounds.

7              THE COURT:  All right.  Are you still objecting to

8    document 109?

9              MR. TIMMONS:  May I have just one moment, your Honor?

10             THE COURT:  Sure.

11             MR. TIMMONS:  No objection, your Honor.

12             THE COURT:  Okay.

13             MR. RUSSELL:  Then it will be even briefer, your

14   Honor.

15             Your Honor, with that, I'd like to offer Plaintiff's

16   Exhibit 109 at this point in time, then.

17             THE COURT:  Okay.  So since the objection is waived,

18   then 109 is received.

19             (Plaintiff's Exhibit 109 received in evidence)

20             MR. RUSSELL:  Your Honor, just to clarify for my own

21   purposes, we don't need to officially offer the documents to

22   which there's been no objection, I believe the court has

23   indicated earlier?

24             THE COURT:  Yes.  That's the way I want to do this.

25   What I will do at the end is I'll have an exhibit that lists

16l1mlc1                    Weinstein - direct

1   all the exhibits that are received so that, you know, if this

2   goes to the Court of Appeals, they know what's in the record.

3            MR. RUSSELL:  Great.

4            THE COURT:  And then when I issue my ruling, I will

5   refer to the exhibits and testimony that I thought were

6   particularly salient on any given point so there will be no

7   hiding the ball.  But I think that's the way I want to do it.

8   So 109 will be among the elite that made the cut.  Okay?

9            MR. RUSSELL:  Thank you for the clarification, your

10  Honor.

11  BY MR. RUSSELL:

12  Q.  Mr. Weinstein, Mr. Timmons mentioned paragraphs 28 and 29

13  of your declaration.  Will you take a minute to look at those

14  two paragraphs, please.

15  A.  Yes.

16  Q.  Just for context, in those two paragraphs, are you

17  discussing continued negotiations with Itamarati after the

18  derivative transaction had been terminated?

19  A.  That is correct.

20  Q.  Very briefly, what was the substance of those discussions?

21  What did they concern?

22  A.  The discussions primarily focused on the amount of

23  repayment.  There was never a discussion about the guaranty

24  itself.  It was just finding a way for Itamarati to repay its

25  obligation.

1611mlc1                        Weinstein - direct

1          THE COURT:  When did these negotiations take place;

2     over what time period?

3          THE WITNESS:  They began -- I mean, my initial contact

4     began when the -- prior to the derivative being terminated and

5     these negotiations began probably around October of 2008.

6          THE COURT:  All right.  So you've got three paragraphs

7     here.  So you're talking about, "I began to negotiate with

8     Itamarati the amount of money we would be willing to take to

9     satisfy UISA Finance's and Itamarati's obligation."

10          THE WITNESS:  This was probably between October 2008

11     and beginning of 2009.

12          THE COURT:  In the second paragraph, 29, you talk

13     about communications with Ana Claudia Tamer, Edezio Oliveira,

14     and others.  That's in that same time period?

15          THE WITNESS:  That's correct.

16     BY MR. RUSSELL:

17     Q.  Mr. Weinstein, during these conversations did anyone ever

18     take the position on behalf of Itamarati that it was not

19     obligated to satisfy UISA Finance's obligation?

20     A.  No, they did not.

21          MR. TIMMONS:  Your Honor, we object to these

22     paragraphs specifically and to this testimony as being subject

23     to Rule 408, and if I could, I'd like to take the witness on

24     voir dire.  I have some documents I'd like --

25          THE COURT:  No.  Look, we'll get there on cross.

1             MR. TIMMONS:  Fair enough.  Thank you, your Honor.

2             MR. RUSSELL:  Your Honor, those are all the questions

3    I have for this witness.  I asked those questions obviously to

4    deal with the Rule 408 objection, I don't believe that this is

5    subject to Rule 408.  As your Honor knows, Rule 408 says,

6    "Evidence of the following is not admissible on behalf of any

7    party when offered to prove liability for, invalidity of, or

8    amount of the claim that is disputed as to validity or amount."

9    And here, there was no dispute as to validity.  There was never

10   a dispute between the parties before this lawsuit was filed

11   that Itamarati was in fact obligated to MLCS.  The discussions

12   between the parties were really limited to, you know, what

13   types of collateral would be provided to satisfy the margin and

14   then after the termination to satisfy the obligations and how

15   much.  We're not offering it to prove a specific amount or the

16   specific collateral that had to be provided.  We're offering it

17   simply to show that there was an absence of discussion, whether

18   Itamarati was in fact obligated.

19            THE COURT:  Yeah, I'm not inclined to keep it out

20   under 408.

21            MR. TIMMONS:  Your Honor, may I please --

22            THE COURT:  Do you want to do this in front of the

23   witness or do you want to cross the witness?

24            MR. TIMMONS:  I'd like to examine the witness on a

25   couple of documents that relate to these discussions and then

16l1mlc1                          Weinstein - cross

 1    make my objection, if I could, please.

 2               THE COURT:  Okay.

 3               MR. RUSSELL:  Your Honor, I have no further questions.

 4               THE COURT:  All right.  Thank you.

 5    CROSS-EXAMINATION

 6    BY MR. TIMMONS:

 7    Q.  Good morning, Mr. Weinstein.

 8    A.  Good morning.

 9               MR. TIMMONS:  Your Honor, I do have a couple of

10    exhibits that I'd like to show the witness and your Honor for

11    purposes of this preliminary examination.

12               THE COURT:  Sure.  They're defense or plaintiff's

13    exhibits or both?

14               MR. TIMMONS:  They are Defendant's Exhibits 274 and

15    279.

16               THE COURT:  Okay.  Good.  Thank you.

17    BY MR. TIMMONS:

18    Q.  Mr. Weinstein, referring very briefly to the meetings that

19    you were just talking about with counsel that took place in the

20    October-February -- October 2008-February 2009 time frame, do

21    you recall that testimony?

22    A.  Yes, I do.

23               THE COURT:  Wait.  Can you just tell me, the testimony

24    that we had this morning or testimony that's in the affidavit?

25               MR. TIMMONS:  Testimony that we just had this morning,

1   your Honor.

2              THE COURT:  All right.  Counsel.  You're talking about

3   conversations with counsel; is that what you said?

4              MR. TIMMONS:  No, your Honor.

5              THE COURT:  Maybe I misheard you.

6              MR. TIMMONS:  Questions from counsel.

7              THE COURT:  Oh, I'm sorry.  Okay.

8   BY MR. TIMMONS:

9   Q.  Mr. Weinstein, do you recall having a meeting that took

10  place --

11             THE COURT:  Could we stop for a second?  My LiveNote

12  is now down.

13             (Discussion off the record)

14  Q.  Do you recall, Mr. Weinstein, you had a meeting in Brazil

15  with Mr. Edezio Quintal Oliveira and other representatives from

16  UISA Finance and Itamarati; correct?

17  A.  That's correct.

18  Q.  And that meeting took place on or about October 28th of

19  2008; correct?

20  A.  That is correct.

21  Q.  I've handed you an exhibit that's been marked as

22  Defendant's Exhibit 274.  Do you see that in front of you?

23  A.  Yes, I do.

24  Q.  Is this an e-mail that you received?

25  A.  Yes, it is.

1  Q.  And it was sent from a gentleman by the name of Sergio

2  Spinelli Silva, Jr.  Do you see that?

3  A.  Yes.

4  Q.  Do you know who Mr. Spinelli was?

5  A.  He was legal counsel for Itamarati.

6  Q.  And the first line of this letter -- of this e-mail says,

7  "Brian, to be clear, tomorrow's discussion is without prejudice

8  and for settlement purposes only.  Please confirm."  Do you see

9  that?

10  A.  Yes, I do.

11  Q.  Now this was the meeting that you were referring to earlier

12  and that you referred to in your trial affidavit as having

13  taken place in October of 2008; correct?

14  A.  That's correct.

15  Q.  Mr. Spinelli was a lawyer for the law firm of Mattos Filho;

16  correct?

17  A.  That's correct.

18  Q.  And do you have an understanding of who Mattos Filho

19  represented at this particular time?

20  A.  It represented the shareholder and company.

21  Q.  By shareholder, you mean?

22  A.  Ana Claudia.

23  Q.  And by company, you mean UISA Finance and Itamarati?

24  A.  The Itamarati Group.

25  Q.  I'd also like you to look at Exhibit 279, if I could,

1    please.  Do you have that in front of you, sir?

2    A.  Yes, I do.

3    Q.  Now this appears to be an e-mail from you dated

4    December 12th of 2008; is that correct?

5    A.  That is correct.

6    Q.  This is a summary of meetings that you had had with

7    representatives of Itamarati and UISA Finance during the

8    October, November, and December time frame; is that right?

9    A.  Give me one second to read this.

10        This was following a meeting with the company in

11   Toronto.

12   Q.  Okay.  And who attended the meeting in Toronto from -- on

13   behalf of the company?

14   A.  Richard Rainer, who was representing the company; there was

15   another fellow there -- I don't recall his name -- and I

16   believe that was it.

17   Q.  Looking at the very first paragraph of this summary e-mail,

18   about midway through the paragraph, I believe it's the third

19   sentence begins with the phrase, "After many back-and-forth

20   discussions with lawyers, Itamarati believes they can get the

21   certificate."  Do you see that sentence?

22   A.  Yes.

23   Q.  There were other meetings that took place between yourself

24   and representatives of Itamarati where Mr. Spinelli was

25   present; correct?

1611mlc1                          Weinstein - cross

1   A.  It could be with Mr. Spinelli or some people that worked

2   for Mr. Spinelli.

3   Q.  Other lawyers from the Mattos Filho firm?

4   A.  Yes, and it also includes either myself or people from my

5   team.

6   Q.  Now I'd just like to call your attention -- do you still

7   have your trial affidavit in front of you?

8   A.  Yes, I do.

9   Q.  Will you please take a look at paragraph 30.

10  A.  Okay.

11  Q.  Paragraph 30, you say, "Ultimately no settlement was

12  reached between Itamarati and MLCS or MLCP."  Is that correct?

13  A.  That is correct.

14          MR. TIMMONS:  Your Honor, on the basis of this

15  testimony, again, I would object to these paragraphs as being

16  exactly the sort of evidence that Rule 408 was designed to

17  preclude.  These were clearly in the context -- there was

18  clearly anticipation of litigation here.  Lawyers were present.

19  There were multiple meetings, there were multiple discussions

20  about ways to perhaps reach some settlement or compromise in

21  the dispute between the parties.  This is exactly what Rule 408

22  was designed to prevent.

23          THE COURT:  Well, when you refer to settlement, what

24  are you referring to?

25          THE WITNESS:  Well, I think it was to reach an

1    agreement in terms of how we deal with the derivative claim.  I

2    think, again, I'll repeat, there was never a discussion about

3    the guaranty, it was always what form of collateral they can

4    provide us to satisfy the obligation, whether it was collateral

5    from Itamarati or at some point the shareholder to provide

6    collateral that she held elsewhere.  So no agreement was

7    reached.  At some point they -- the discussions centered on the

8    obligation to MLCS, and then at some point they introduced the

9    obligation to MLCP into this.  So no agreement was reached in

10   2008, 2009, and still here today.

11          THE COURT:  All right.  Did you want to be heard,

12   Mr. Russell?

13          MR. RUSSELL:  Yes, your Honor.  I'd like to respond

14   briefly to Mr. Timmons' argument that, again, I think what

15   Mr. Timmons' questions and the witness' testimony has shown is

16   that these discussions the parties were having, particularly

17   after the termination of the derivative transaction, didn't

18   relate to whether or not Itamarati was in fact obligated to

19   provide collateral but really the form of the collateral and

20   the amount.  Again, we're not offering these conversations to

21   establish the amount of the collateral that needed to be posted

22   or the amount that was owed by Itamarati, but simply we're

23   offering them to show that at no time during the discussions

24   did Itamarati contest that it was obligated to provide this

25   collateral on behalf of UISA Finance.

1          THE COURT:  Well, it seems to me, I guess you're

2     offering it for that, and I guess you're also offering it to

3     establish ratification of some kind; correct?

4          MR. RUSSELL:  That's correct.

5          THE COURT:  As it related to your client.  So I'm not

6     sure that 408, which allows the use for other purposes, would

7     preclude the use of negotiations in order to establish the

8     ratification by one party for the obligations of another.  So

9     I'm going to overrule it.

10          MR. RUSSELL:  Thank you, your Honor.

11          THE COURT:  Overrule the objection.

12          All right.  You have other cross you want to do;

13     right, Mr. Timmons?

14          MR. TIMMONS:  Yes, your Honor.

15          THE COURT:  Yes.

16          MR. TIMMONS:  May I have a moment, your Honor?  I'm

17     going to hand the witness the exhibits we'd like to use during

18     cross.

19          THE COURT:  Yes, go ahead and do that, and I'll just

20     elaborate on the record.  There's no jury here, so there's not

21     any prejudice that would potentially accompany the disclosure

22     of settlement discussions.  It's much less pronounced during a

23     bench trial.  I understand the limited purpose for which this

24     evidence, this testimony would be admissible and relied upon by

25     the fact finder, so I'm not too worried about losing my mind

1   over this.

2          Thank you.

3   BY MR. TIMMONS:

4   Q.   Okay.  Mr. Weinstein, would you take a look at paragraph 4

5   from your trial affidavit.

6   A.   Yes.

7   Q.   It says there that you were a managing director of Merrill

8   Lynch, Pierce, Fenner & Smith.  Is that true for the period

9   2007, 2008?

10  A.   That is correct.

11  Q.   And your background and experience is comprised mostly of

12  bond trading; isn't that right?

13  A.   It's comprised of -- I started my career as a -- as a

14  corporate analyst, at a commercial bank, and then I went to

15  bond trading.

16  Q.   And most of the time at Merrill Lynch you spent trading

17  bonds; isn't that right?

18  A.   Among other things.

19  Q.   Now there are many corporate entities within the family of

20  Merrill Lynch bearing the name Merrill Lynch.  What does MLPF&S

21  do?

22  A.   Merrill Lynch, Pierce, Fenner & Smith is the broker-dealer

23  arm of the Merrill Lynch Group.

24  Q.   And during the 2 -- during the 2007, 2008 time period, was

25  Merrill Lynch, Pierce, Fenner & Smith owned, either directly or

16l1mlc1                    Weinstein - cross

1   indirectly, by Merrill Lynch & Company?

2   A.  That is correct.

3   Q.  Now your trial affidavit also indicates that you were the

4   vice president of Merrill Lynch Credit Products; is that

5   correct?

6   A.  That is correct.

7   Q.  And Merrill Lynch or MLCP loans money as a form of

8   investment for Merrill Lynch; isn't that right?

9   A.  Merrill Lynch Credit Products was an unregulated entity

10  that bought, traded, and originated loans, which were

11  considered nonsecurities.

12  Q.  And when making a loan or buying a bond, the key element in

13  the decision-making process is credit risk; isn't that right?

14  A.  Among others.

15  Q.  What's your understanding of credit risk?

16  A.  The risk of -- of a particular counterparty.  So loans

17  typically are illiquid, so it's a longer time period from which

18  you own it.  Bond trading you don't necessarily have to like

19  the credit risk.  If you buy something and you sell it within

20  an instant, it's very little credit risk -- counterparty risk.

21  Q.  But in analyzing the decision about whether to purchase a

22  bond or not, you often look at credit risk of the counterparty;

23  correct?

24  A.  We do.

25  Q.  And credit risk is -- when you -- you said the risk of the

1    counterparty, but it's really the risk of not getting paid by

2    the counterparty; correct?

3    A.   It depends what part of the transaction -- if you're a

4    broker and you're sitting between two buyers -- a buyer and a

5    seller, you're taking counterparty risk on either side.  You're

6    not necessarily concerned about the credit risk of the obligor.

7    If you're basically investing, you're concerned about credit

8    risk or counterparty risk.

9    Q.   And when you're investing in the form of making a loan,

10   you're concerned about the counterparty credit risk; is that

11   right?

12   A.   That's correct.

13   Q.   MLCP entered into a loan transaction with UISA Finance in

14   September of '07 for $25 million; isn't that right?

15   A.   That is correct.

16   Q.   Describe your role on behalf of MLCP in connection with

17   that loan transaction.

18   A.   I was managing a group of about 12 persons whose principal

19   business was to -- to invest in securities and nonsecurities

20   across Latin America, so I supervised the team.

21              THE COURT:  Hold on one second.

22              (Discussion off the record)

23   A.   So I supervised the team that was responsible for this

24   investment.

25   Q.   And Itamarati acted as a guarantor in that particular loan

16l1mlc1                    Weinstein - cross

1    transaction; is that right?

2    A.   In the September '07, that's correct.

3    Q.   Now do you recall, as you sit here today, Mr. Weinstein,

4    whether Itamarati executed the guaranty in connection with that

5    loan transaction on or before the date the loan closed?

6    A.   Well, the September '07, I was informed, going through this

7    testimony, that the -- there was no board resolution, I

8    believe, authorizing the guaranty, which I was quite surprised,

9    but normally we would have everything exercised prior to

10   transacting.

11   Q.   Normally you require signatures on all the closing

12   documents before you close; correct?

13   A.   Well, for loans, that is the market practice.

14   Q.   And --

15            THE COURT:  Wait.  The market practice.  Who decides

16   the market practice?

17            THE WITNESS:  It's general.  It's something that's

18   been established over years.  You're extending credit to a

19   company, you're actually -- money is going out the door, so

20   until they sign all the -- all the dotted lines and they

21   provide all the conditions precedent to a loan, you typically

22   do not lend money.

23            THE COURT:  But Merrill Lynch has internal procedures

24   in place?

25            THE WITNESS:  Merrill Lynch, JPMorgan, Citibank,

1611mlc1                           Weinstein - cross

1     what's considered market -- good market practice.

2                   THE COURT:  All right.  And you're familiar with that

3     as a result of your experience at Merrill Lynch, Pierce, Fenner

4     & Smith?

5                   THE WITNESS:  At Merrill Lynch, at NatWest, working

6     for different commercial banks as well.

7                   THE COURT:  Okay.

8     BY MR. TIMMONS:

9     Q.  If you could just turn to the exhibit that's in the binder

10    marked PX27.

11    A.  Okay.

12    Q.  If you look on the first page of the e-mail sent from Carla

13    Jatahy to a number of individuals from Merrill Lynch, and it

14    looks like you're copied on the cc line.  Do you see that?

15    A.  Yes, I do.

16                  (Discussion off the record)

17                  THE COURT:  Who is Carla Jatahy, J-A-T-A-H-Y?

18                  THE WITNESS:  She was the finance director at

19    Itamarati.

20    Q.  PX27 appears to attach execution copies of the -- sorry --

21    the schedules and attachments in connection with the

22    $25 million September loan; correct?

23    A.  Yes.

24    Q.  And Ms. -- if you look toward the back of PX27, you'll see

25    guarantys signed.  Do you see that it was signed there by

16l1mlc1                    Weinstein - cross

1    Ms. Jatahy and Mr. Possari?

2              THE COURT:  What page are you looking here, bottom

3    right?

4              MR. TIMMONS:  It's the last page of Exhibit PX27.

5              THE COURT:  Okay.  019850, the Bates number; is that

6    right?

7              MR. TIMMONS:  Actually, I believe their signatures are

8    on the preceding page.

9              THE COURT:  Okay.  Second to last page.  Yes.  Okay.

10             THE WITNESS:  Second to last?

11             THE COURT:  19849 is the Bates number.  Do you have

12   it?  Second to last page of the exhibit.

13             I'm not sure you're in the right spot.

14             MR. TIMMONS:  Can I give him a hand, your Honor?

15             THE COURT:  Yeah, sure.

16             THE WITNESS:  It will make it easier.  Sorry.

17             THE COURT:  Defense 27 -- or Plaintiff's 27; right?

18             (Pause)

19   BY MR. TIMMONS:

20   Q.  Do you have that now in front of you, sir?

21   A.  I do.

22   Q.  And you see the guaranty was in fact signed by Ms. Jatahy

23   and Mr. Possari?

24   A.  That's correct.

25   Q.  Now you understood at the time that this loan transaction

1611mlc1                        Weinstein - cross

1    and guaranty were executed that an agreement by a corporate

2    entity must be signed by someone authorized by the corporation

3    to do so, otherwise, it may not be binding; correct?

4    A.  Well, that's my understanding.  We had -- for these

5    particular matters, it was usually handled by our internal

6    counsel and our external counsel that managed what was required

7    for -- for guaranties.

8    Q.  But you had that understanding at the time that that was

9    the reason the -- there were certain standards that had to be

10   followed in place to ensure yourself that those signing on

11   behalf of the corporation were in fact authorized to do so.

12   A.  That's correct.

13   Q.  And in fact, MLCP took certain steps to assure itself that

14   Ms. Jatahy and Mr. Possari had the requisite corporate

15   authority to sign the guaranty on behalf of Itamarati; correct?

16   A.  Again, that's the market practice, to do this before you

17   actually advance the loan.

18              THE COURT:  Right.  But you knew that.

19              THE WITNESS:  Yes.

20   Q.  And one of those -- one of those steps, one of the first

21   steps that you take is you examine the bylaws of the

22   corporation; correct?

23   A.  That is correct.

24   Q.  And in this case that took place; correct?

25   A.  I believe our lawyers took care of it.

1            THE COURT:  You didn't do that.

2            THE WITNESS:  I didn't do that myself.

3   Q.  But somebody did that on your behalf.

4   A.  That's correct.

5   Q.  Now in addition to examining the bylaws, you also obtained

6   something called certificates of incumbency and authority;

7   correct?

8   A.  That's correct.

9   Q.  And if you look again back to PX Exhibit 27, which is in

10  front of you, the Bates numbered page is 19847.  Is that the

11  certificate of incumbency and authority that was executed in

12  connection with the September loan?

13  A.  That is correct.

14  Q.  And this -- this certificate of incumbency and authority in

15  fact relates to the guaranties that were provided by Itamarati

16  in this transaction; correct?

17  A.  That is correct.

18  Q.  What's your understanding, Mr. Weinstein, of the purpose

19  served by a certificate of incumbency and authority?

20  A.  Oh, it was to ensure that the signatures and the

21  authorities for the people signing the documents is valid.

22  Q.  Now in addition to obtaining the certificates of incumbency

23  and authority, MLCP also sought and obtained a legal opinion

24  from an outside law firm in connection with this transaction;

25  is that right?

1    A.  I believe so.

2    Q.  If you look at the binder in front of you at PX Exhibit 28,

3    that's in fact a copy of the legal opinion you obtained from

4    the Mattos Filho law firm in connection with the $25 million

5    loan transaction that closed in September of 2007; correct?

6    A.  That is correct.

7    Q.  Now looking at the legal opinion, it's addressed to you;

8    correct?

9    A.  Yes, it is.

10   Q.  And this legal opinion was from a Brazilian law firm;

11   correct?

12   A.  That is correct.

13   Q.  And it reflected the independent analysis and scrutiny of

14   that law firm; correct?

15   A.  I believe so.

16   Q.  And what was the purpose of this legal opinion, sir?

17   A.  Well, the legal opinion is to review everything that was

18   prepared to make sure it's valid and enforceable in Brazil.

19   Q.  To make sure what's valid and enforceable in Brazil?

20   A.  All the transaction documents related to the loan.

21   Q.  And that would include the guaranty on behalf of Itamarati;

22   correct?

23   A.  It includes that and all parts of the transaction

24   documents.

25   Q.  And it also includes the assurance that those signing on

1611mlc1                              Weinstein - cross

1    behalf of the guarantor were in fact authorized by the

2    corporation to do so; correct?

3    A.  Yes, that's one of the things that the lawyers would

4    review.

5    Q.  And if you look at Exhibit 28, there are no brackets in

6    here, are there, sir?

7    A.  What do you mean by brackets?

8    Q.  Well, there's no indication that there are -- there's no

9    indication that there is -- are blank spaces or areas where

10   text might be missing.

11   A.  I'd have to review the whole document to answer that,

12   but --

13              THE COURT:  It's not a form document, is it?

14              THE WITNESS:  Typically not.

15   Q.  This was -- your understanding at the time was this was a

16   complete and final document; correct?

17   A.  Yes, but the judge's point, this is not a form document.

18   Q.  I understand that.  My question to you is whether this --

19   at this particular time you understood this to be a complete

20   and final document.

21   A.  That's correct.

22   Q.  Now after the September loan --

23              THE COURT:  Can I ask a question?

24              MR. TIMMONS:  Sure.

25              THE COURT:  Is there a reference in this letter, if

1611mlc1                          Weinstein - cross

1   you know, to the bylaws of Itamarati?

2            If you know.  Do you know?  Without reading the whole

3   thing, do you know?

4            THE WITNESS:  I would have to read it, but I would --

5   you would assume that they would reference the bylaws if they

6   had reviewed them.

7            THE COURT:  Mr. Timmons, if you want to refer to a

8   particular --

9            MR. TIMMONS:  Sure.

10  BY MR. TIMMONS:

11  Q.  If you look at (iii), romanette (iii), one of the items

12  listed there in fact among those things that were examined by

13  the Mattos Filho law firm are copies of the respective bylaws

14  of each of the guarantors.  Do you see that, sir?

15  A.  Yes.

16  Q.  Okay.  Subsequent to the September loan, MLCP entered into

17  a loan, bringing the total amount of Merrill Lynch's exposure

18  to UISA Finance to $125 million; correct?

19  A.  That is correct.

20  Q.  And that was in -- closed roughly sometime in November of

21  2007.

22  A.  That's correct.

23  Q.  And in connection with the November loan you were again the

24  primary person responsible on behalf of MLCP in connection with

25  this loan?

16l1mlc1                          Weinstein – cross

1   A.   That is correct.

2   Q.   And again, Itamarati acted as a guarantor to the loan on --

3   in connection with its subsidiary UISA Finance; correct?

4   A.   That is correct.

5   Q.   Now the guaranty for the November loan was signed on the

6   same day the transaction closed, just like the September loan;

7   correct?

8   A.   I'm sorry.  Rephrase that question?

9   Q.   The guaranty for the November loan signed by Itamarati was

10  executed on the day the transaction closed, on or before the

11  date the transaction closed.

12  A.   I believe so.

13  Q.   And in fact, that was part of your standard practice, I

14  believe you testified.

15  A.   That is correct.

16  Q.   Again, the guaranty for the November loan was signed by

17  Ms. Jatahy and Mr. Possari; correct?

18  A.   Do I need to review that document to confirm?

19  Q.   If you look at Plaintiff's Exhibit 13.

20  A.   Yes, I see that signature.

21  Q.   Those are the same signatures -- those are the same

22  signatories that signed the guaranty for -- in connection with

23  the September loan; correct?

24  A.   That is correct.

25  Q.   Now even though those were the same signatories, you still

1611mlc1                          Weinstein - cross

1    went through the same process that we recently discussed with

2    respect to the September loan; that is to say, you obtained

3    certificates of incumbency in connection with these signatures,

4    didn't you?

5    A.  We should have, yes.

6    Q.  And you examined the bylaws again?

7    A.  Me personally, no, but my legal team would have.

8    Q.  And you also obtained another legal opinion from outside

9    counsel in connection with this transaction; correct?

10   A.  We should have, yes.

11   Q.  Well, if you look -- if you look at Plaintiff's Exhibit 15

12   in your binder in front of you.  Do you have that in front of

13   you?

14   A.  Yes, I do.

15   Q.  That's the legal opinion that you received again from the

16   law firm Mattos Filho dated November 13th in connection with

17   the November loan transaction; correct?

18   A.  That's correct.

19   Q.  And this legal opinion also addressed the subject of the

20   guaranty for that transaction; correct?

21   A.  Yes, it did.

22   Q.  And this legal opinion reflected the independent analysis

23   and conclusions of the outside law firm of Mattos Filho, is

24   that your understanding?

25   A.  It is supposed to be independent, yes.

1611mlc1                          Weinstein - cross

1    Q.  So for both the September and November loans MLCP took

2    diligent steps to examine the bylaws prior to closing, to --

3              THE COURT:  Well, wait.  I want to make sure I'm

4    clear.  Do you know whether Merrill examined the bylaws or its

5    attorneys examined the bylaws?

6              THE WITNESS:  It would have been our attorneys, so our

7    office of general counsel, we had a person dedicated to our

8    team and our outside counsel.

9              THE COURT:  All right.  Did you ever see the bylaws?

10             THE WITNESS:  No, I did not.

11             THE COURT:  Did you ever see a resolution from the

12   board of directors --

13             THE WITNESS:  I did not.

14             THE COURT:  -- from any of these companies?

15             All right.  Go ahead.

16   BY MR. TIMMONS:

17   Q.  If you hadn't -- if your legal team had not been able to

18   satisfy itself with respect to its examination of the bylaws,

19   you would have known about it before the transaction closed,

20   wouldn't you?

21   A.  That is correct.

22   Q.  So for both the September loan and the November loan, you

23   or somebody acting on your behalf examined the bylaws of

24   Itamarati as guarantor for those transactions; correct?

25   A.  That is correct.

1611mlc1                          Weinstein - cross

1   Q.  And you obtained signatures either on or before the closing

2   date for those transactions; is that correct?

3   A.  Again, that is the market practice, that's correct.

4   Q.  And you obtained board resolutions with respect to the

5   signatures on behalf of the guarantors for those transactions

6   as well; correct?

7   A.  That is correct.

8               THE COURT:  You did?

9               THE WITNESS:  I didn't personally but Merrill Lynch as

10  an entity did -- Merrill Lynch Credit Products.

11              THE COURT:  Well, how do you know that?

12              THE WITNESS:  The -- because as part of each loan we

13  have conditions precedent, and I had -- my team, unless we --

14  all those conditions precedent are met, would not advance the

15  loan.  So between my office of general counsel and my team,

16  they would have reviewed everything to make sure it was in

17  order before we lent the money.

18  BY MR. TIMMONS:

19  Q.  In addition to the resolutions and the bylaws, you also

20  obtained certificates of authority and incumbency for both

21  transactions; correct?

22  A.  We should have.

23  Q.  Well, we -- I showed you the exhibits.  You did; right?

24  A.  The guarantor -- yes.  I didn't review for each -- each

25  guarantor.  You showed me a specific guarantor, but there were

1611mlc1                      Weinstein - cross

1    four different guarantors.

2    Q.  You're right.  Thank you for correcting me.  With respect

3    to the guarantor Itamarati, you know that you obtained

4    certificates of incumbency and authority for those --

5    A.  Yes.

6    Q.  -- entities; correct?  And you also obtained an outside

7    legal opinion in connection with both the September and

8    November loan transactions; correct?

9    A.  That's correct.

10   Q.  You testified that these are market practices; correct?

11   A.  That's correct.

12   Q.  That's the same thing as standard practices in your -- in

13   your role, correct?

14   A.  That is correct.

15            THE COURT:  For --

16            THE WITNESS:  For loan transactions.

17            THE COURT:  For loan transactions.  All right.  Can

18   you speak to other transactions?  Do you do other transactions?

19            THE WITNESS:  We do other transactions.  I wouldn't

20   qualify as an expert, but we do many types of transactions.  We

21   do bond trade, which has its own practice; we do loan trading,

22   which has its practice; and during the trial I'm now familiar

23   with derivatives.

24            THE COURT:  What we're talking about now is not loan

25   trading; this is loan originating.

16l1mlc1                          Weinstein - cross

1          THE WITNESS:  Loan originating, yes.

2          THE COURT:  Is there a particular practice for loan

3    trading?  Is there such a thing as loan trading?

4          THE WITNESS:  Yes, there is.

5          THE COURT:  Is there a different practice?

6          THE WITNESS:  There is a practice.  There's an LST

7    organization that creates standards and there are -- there are

8    caselaw and there are rules about how you trade loans.

9    BY MR. TIMMONS:

10   Q.  And in connection with trading loans, loans where you have

11   credit risk, you undertake to make sure that -- you take some

12   steps to make sure that the loan documentation that was

13   executed by the issuer was -- is in fact -- was authorized,

14   properly authorized; correct?

15   A.  For loan trading, loan trading can be subject to

16   documentation, so you would -- before you close a trade, you

17   would review it, typically.

18   Q.  And in the process of reviewing it, you would undertake

19   steps similar to those we've talked about here today; correct?

20   A.  Not necessarily.  We would review -- we wouldn't

21   necessarily originate and get outside counsel, but we would

22   review what other people had done.

23   Q.  But you would -- you would take steps to assure yourself

24   that the transaction documents were properly authorized;

25   correct?

1   A.  That's correct.

2            THE COURT:  But you wouldn't get an outside counsel

3   then.

4            THE WITNESS:  We would not.  We would review someone

5   else's outside counsel opinion, if we were trading loans.

6            THE COURT:  All right.  Someone else's meaning the --

7            THE WITNESS:  So if Citibank originated that deal and

8   they had a different law firm provide an opinion of counsel, we

9   would review that document.

10           THE COURT:  All right.

11  BY MR. TIMMONS:

12  Q.  Now you took these standard steps with respect to the

13  November loan and the September loan, but MLCP also entered

14  into two prior loans with UISA Finance; correct?

15  A.  That's not correct.  We entered into two loans with

16  Itamarati.

17  Q.  Thank you.  You entered into two loans prior, in the year

18  2007, with other entities within the Itamarati group; correct?

19  A.  We entered with Itamarati directly, which did not require a

20  guaranty, since they were the ultimate operating company.

21  Q.  And when you entered into those loans with Itamarati, you

22  also undertook these same steps, even though there was no

23  guaranty involved; correct?

24  A.  Yes, we should have.

25  Q.  And one of those loans that took place in March, I believe

1   it was, of 2007 was for -- in the amount of $5 million;

2   correct?

3   A.   I believe March was 20 million and then we added 5 million

4   later.

5   Q.   Sorry.  Thank you for correcting me.  Yes.  The first loan

6   was for $20 million, and then a few months later you executed

7   another loan for $5 million; correct?

8   A.   Yeah, we made an amendment to the existing agreement.

9   Q.   And in the course of each of those loan transactions, even

10  though there was no guaranty involved, you undertook the same

11  steps you just described here today in your testimony to make

12  sure that the signatures that were executed by Itamarati in

13  connection with those loans were properly authorized; correct?

14  A.   For the 20 million, I would say yes.  For the 5 million,

15  I'm not entirely clear what steps we would have taken.  Being

16  that it's such a small amount, it was soon after we did the

17  first loan.

18  Q.   Well, let's take a look at Defendant's Exhibit 35 in the

19  binder in front of you.  Does Exhibit 35 relate to the June

20  $5 million loan?

21  A.   This is page 130 you're referring to?  13130?

22  Q.   Well, I'm just looking at the whole exhibit for now.  The

23  first page is 13125.  It appears to be an e-mail sent

24  June 27th.

25  A.   Yeah.

1611mlc1                    Weinstein - cross

1   Q.  And you again were copied on this e-mail?

2   A.  Yes.

3   Q.  And this relates to the closing of the June loan with --

4   directly with Itamarati for $5 million; correct?

5   A.  That's correct.

6   Q.  And toward the back of Exhibit 30 --

7           THE COURT:  Where did it say Mr. Weinstein there?

8   You're on page 13125?

9           THE WITNESS:  Yes.  I don't see my name there.

10          THE COURT:  I don't either, but maybe I'm missing

11  something.

12          THE WITNESS:  This is also in Portuguese.  I don't

13  understand Portuguese.

14          MR. TIMMONS:  I may have misspoke, your Honor, about

15  Mr. Weinstein being cc'd.

16  BY MR. TIMMONS:

17  Q.  Mr. Weinstein, do you -- do you recognize the certificate

18  of incumbency and authority that's four pages back, Bates

19  number 13131?  That document's in English; correct?

20  A.  That's correct.

21  Q.  And does this certificate of incumbency relate to the loan

22  transaction that closed in June of 2007?

23  A.  That's correct.

24  Q.  Does this refresh your recollection of undertaking at least

25  that step in connection with assuring yourself that the folks

1   who signed on behalf of Itamarati were authorized by the

2   corporation to do so?

3   A.  It appears that my team took this step, correct.

4          THE COURT:  Well, "this step" being what?

5          THE WITNESS:  To get the certificate of incumbency and

6   the authorizations for the $5 million additional lending.

7   Q.  If you look on the preceding page of Exhibit -- Defendant's

8   Exhibit 36 *[sic]*, you see also what appears to be a board

9   resolution; correct?

10         THE COURT:  What page?

11         MR. TIMMONS:  The preceding page of Exhibit 35, your

12  Honor.  It's Bates labeled 13130.

13         THE COURT:  Okay.  I have it.  What's the question?

14  A.  Is it a board resolution?  I don't speak Portuguese, but I

15  assume it's a board resolution.

16         THE COURT:  Why do you assume that?

17  A.  It says (speaking Portuguese).  The board resolution.

18  Q.  And you became somewhat acquainted with some of these

19  Portuguese documents in the course of closing a number of these

20  loan transactions with Itamarati; correct?

21  A.  I would say Portuguese documents -- I understand some

22  Portuguese.

23  Q.  Do you recognize this to be a board resolution?

24  A.  Well, it is a board resolution.  I can't tell you what it

25  says, but it is a board resolution.

1  Q.  And do you have any doubt, sir, that you undertook these

2  same diligent steps with respect to the preceding $20 million

3  loan?

4  A.  Well, diligence in which respect?  From a financial and

5  credit diligence, we probably would have not conducted

6  additional diligence.  From a closing mechanism, it would have

7  been probably a condition precedent.  We would have gone

8  through the same steps to make sure they were authorized to

9  close this -- this -- this transaction.

10 Q.  Even though -- even though the signatories on the

11 transaction were the same signatories that may have executed

12 the loan transaction two or three months prior.

13 A.  Again, that is the standard practice.

14 Q.  If you can turn to Defendant's Exhibit 48 in your binder.

15         THE COURT:  48, you said?

16         MR. TIMMONS:  Yes, your Honor.

17 A.  Yes.

18 Q.  48's a credit memo that you and your team drafted to submit

19 to Merrill Lynch's credit risk management group; is that right?

20 A.  That is correct.

21 Q.  And what was the purpose of this memo?

22 A.  This was for approval for the lending transaction.

23 Q.  Now in your trial affidavit in -- at paragraph 6, you say

24 that you first became acquainted with Itamarati in 2007;

25 correct?

1611mlc1                    Weinstein - cross

1   A.   That is correct.

2   Q.   But other folks from Merrill Lynch on the investment

3   banking team had actually known the Itamarati group of

4   companies for some time prior to that; correct?

5   A.   This transaction was actually introduced to us from the

6   banking team, so I was not aware of their prior relationship,

7   how long that lasted.

8   Q.   Well, if you look at, again, at Exhibit 48, Defendant's

9   Exhibit 48, this was a memo that you were primarily responsible

10  for drafting; correct?

11  A.   I would -- I never drafted it.  I was responsible for

12  reviewing it and making sure that I was satisfied with it.

13  Q.   And you made sure that there was nothing in this memo that

14  was inaccurate or misleading; correct?

15  A.   That's correct.

16  Q.   And if you look at the top of the second page of the memo

17  under Transaction Overview --

18  A.   Okay.

19  Q.   -- it says, "Merrill Lynch has been working with USINAS

20  Itamarati for the past two years when it was mandated to act as

21  book runner in the company's $100 million bond issuance."  Do

22  you see that?

23  A.   That's correct.

24  Q.   Was that accurate at the time?

25  A.   Again, that is accurate.  That was a different group than

16l1mlc1                          Weinstein - cross

1    mine that was working on that.

2              THE COURT:  Wait.  I'm lost.  What page are you on?

3    What exhibit?

4              MR. TIMMONS:  We're looking at Defendant's Exhibit 48,

5    your Honor.

6              THE COURT:  Defendant's 48.

7              MR. TIMMONS:  Sorry.

8              THE COURT:  All right.  Go ahead.  Okay.  What page?

9              MR. TIMMONS:  Second page of the memo.

10             THE COURT:  Yes.  All right.

11             MR. TIMMONS:  Under Transaction Overview, first

12   sentence.

13             THE COURT:  So I had thought you said PX.  So I was

14   looking at PX48.  But it's DX48.  All right.

15   BY MR. TIMMONS:

16   Q.  Is it your understanding, Mr. Weinstein, that in fact your

17   investment banking colleagues from Merrill Lynch had been

18   working with Itamarati for two years prior to this August 2007

19   memo?

20   A.  That appears so.

21             THE COURT:  Well, were you familiar with this fact or

22   not familiar with this fact?

23             THE WITNESS:  I was -- well, I was -- I was not aware,

24   up until the time they introduced the transaction to us in

25   2007, that there was a prior relationship.

1611mlc1                          Weinstein - cross

1          THE COURT:  But you got this memo.

2          THE WITNESS:  Yes.

3          THE COURT:  Right.

4   Q.  And in connection with -- first of all, you said you were

5   introduced to this client by somebody who was the relationship

6   manager?

7   A.  That is correct.

8   Q.  What is a relationship manager?

9   A.  Relationship manager is someone who's responsible for the

10  relationship with the client.

11  Q.  So it implies the fact that there was a preceding

12  relationship between Merrill Lynch and Itamarati; correct?

13  A.  That is correct.

14  Q.  And Merrill Lynch was in fact advising Itamarati in

15  connection with either a bond issuance or an IPO; correct?

16  A.  At the time I was not aware of these discussions, but

17  that's my understanding.

18  Q.  In the course of preparing Itamarati for a bond offering,

19  the investment banking team from Merrill Lynch would have

20  become familiar with Itamarati's bylaws; correct?

21  A.  I can't answer that.  I don't know.

22          THE COURT:  Who was the relationship manager?

23          THE WITNESS:  Richard Rainer, who was the head of

24  investment banking in Brazil.

25          THE COURT:  He was located in Brazil?

16l1mlc1                          Weinstein - cross

1              THE WITNESS:  He was located in Brazil.  So when you

2       do a bond offering, it depends where it went -- I don't think

3       this transaction was ever launched so I don't think they would

4       have gone through the steps of reviewing organic documents.

5       BY MR. TIMMONS:

6       Q.  And by organic documents, you refer -- you're referring to

7       bylaws of the corporation; correct?

8       A.  That's correct.

9       Q.  If you look back at Defendant's -- at the first page of

10      Exhibit 48, it refers to IKB Brazil, Richard Rainer, Enrico

11      Carbone and Marco Iglesias.  Do you see those names?

12      A.  Yes.

13      Q.  Who were those individuals?

14      A.  Again, Richard Rainer was the head of the investment

15      banking group, and I believe Enrico Carbone was responsible for

16      all companies in the sugar/ethanol industry, and Marco Iglesias

17      was an associate on that team.

18      Q.  And isn't it true, sir, that many of the investment bankers

19      that worked for Merrill Lynch worked for the same entity you

20      did at Merrill Lynch, Pierce, Fenner & Smith?

21      A.  I do not know that.  The people that worked directly in

22      Brazil worked for a different legal entity.

23      Q.  Well, even though they worked for a different legal entity,

24      they were part of your -- some of them were part of your --

25      your group, the -- I believe it was known as EMI at the time;

1    is that right?

2    A.   LCPI, Latin American Corporate Principal Investments.   So

3    there were three people on my team in Brazil at the time that

4    worked for a different legal entity than Merrill Lynch, Pierce,

5    Fenner & Smith.

6             THE COURT:  Were they investment banking people?

7             THE WITNESS:  No.  Three people on my team were on the

8    trading part of the firm.  They weren't investment bankers.

9    Q.   Some of them that were on your team had investment banking

10   backgrounds, though; right?

11   A.   Mostly everyone on my team had research or investment

12   banking experience.

13            MR. TIMMONS:  Thank you.  I have no further questions

14   at this time, your Honor.

15            THE COURT:  Okay.  Redirect?

16            MR. RUSSELL:  Brief redirect, your Honor.

17            THE COURT:  That's fine.

18   REDIRECT EXAMINATION

19   BY MR. RUSSELL:

20   Q.   Mr. Weinstein, Mr. Timmons asked you a number of questions

21   about market practices with respect to documentation of loan

22   transactions.  Do you recall that?

23   A.   Yes, I do.

24   Q.   And you mentioned that you also worked on other kinds of

25   transactions other than originating commercial loans; is that

1  right?

2  A.  That's correct.

3  Q.  Do you -- the market practices you were discussing with

4  respect to loan originations, do those same practices apply to

5  every kind of transaction that any Merrill Lynch affiliate

6  enters into?

7  A.  Each product has a different set of rules and market

8  practice, depending on the nature of the transaction.

9  Q.  And I believe you mentioned that through the course of this

10 litigation you've become at least somewhat familiar with the

11 practices with respect to derivative transactions; is that

12 correct?

13 A.  Yes, that's correct.

14 Q.  To your understanding do derivative transactions and

15 commercial loan origination follow the same market practices?

16         MR. TIMMONS:  Objection, your Honor.  This calls for

17 hearsay.  The witness has testified he only learned of this

18 through the course of this case.  I don't think --

19         THE COURT:  I don't remember him saying that, in the

20 course of this case.  During the course of his dealings in the

21 transactions that were the subject of the case.

22         MR. TIMMONS:  In the course of this litigation, he

23 testified that he became familiar with the practices involved.

24         THE COURT:  Let me ask him that.

25         You're familiar with the market practices in

16l1mlc1                          Weinstein - redirect

1     derivative transactions?

2               THE WITNESS:  I'm not an expert, but I am familiar.

3               THE COURT:  All right.  And how did you come to be

4     familiar with these?

5               THE WITNESS:  As a result -- as -- of this litigation,

6     I became aware of all the facts of how a derivative gets

7     transacted and documented.

8               THE COURT:  Oh, so this is all stuff you learned as a

9     result of preparing for your testimony?

10              THE WITNESS:  Well, as a result of the litigation

11    that's been going on for three years, not just the testimony.

12              THE COURT:  All right.  That's fine.

13    BY MR. RUSSELL:

14    Q.  Mr. Weinstein, I think you also mentioned -- Mr. Timmons

15    showed you some documents regarding the June 2007 amendment to

16    the loan to Itamarati.

17    A.  Yes, that's correct.

18    Q.  And I believe you testified that you may have followed

19    different procedures because the amount was only $5 million.

20    Do you recall that?

21    A.  That's correct.

22    Q.  Is it the case when a -- dealing with the origination of

23    commercial loans, if they involve a lower amount or lower

24    exposure, sometimes different procedures are followed?

25    A.  It's not typical but sometimes we do.  In this case, since

16l1mlc1                          Weinstein - redirect

1    we just lent 20 million and we had a guaranty on the

2    20 million, it's very unlikely that if we lent them an

3    additional 5 million, that you'll have an issue.

4    Q.  And why is it that you might follow different practices if

5    there's a lower amount at risk?

6    A.  It's a -- it's just a comfort level in the risk you're

7    undertaking.  So this is a company we had a guaranty, and an

8    additional 5 million was not an incremental risk that we were

9    concerned about.

10   Q.  Now --

11          THE COURT:  But you got a new guaranty and a new

12   certificate of incumbency and a new board resolution for the

13   relatively minor incremental amount of the loan.

14          THE WITNESS:  Yes, right.

15          THE COURT:  All right.

16   Q.  Now Mr. Timmons showed you the certificates of incumbency

17   for the September 2007 loan to UISA Finance.  Do you recall

18   that?

19   A.  That's correct.

20          MR. RUSSELL:  Your Honor, I'm going to show the

21   witness Plaintiff's Exhibit 34.  I have a copy for the court.

22          THE COURT:  Okay.

23   Q.  Mr. Timmons, you have Plaintiff's Exhibit 34, which you

24   also referred to in your trial declaration and encloses some of

25   the closing documents with respect to the November 2007 loan.

1611mlc1                          Weinstein – redirect

1    Do you see that?

2    A.   Yes.

3    Q.   Would you turn to the page with the Bates stamp UISA

4    015681.

5    A.   Okay.

6    Q.   Is this a certificate of incumbency and authority for the

7    individuals who were signing on behalf of USINAS Itamarati's

8    guarantor?

9    A.   Yes, it is.

10   Q.   And was it your understanding that as the lender you were

11   entitled to rely on this document?

12   A.   That is correct.

13   Q.   Would you look -- and it lists, under A, B, and C, what

14   specifically the signers are authorized to do.  Do you see

15   that?

16   A.   Yes, I do.

17   Q.   Could you read for us what A says.

18   A.   "Sign on behalf of the guarantor loan agreement any of the

19   transaction documents and any other documents related thereto."

20              (Continued on next page)

21

22

23

24

25

1   BY MR. RUSSELL:

2   Q.  So, the authority was not limited to the loan agreement

3   itself but any transactions -- any documents related to

4   transactions related to the loan agreement.  Is that your

5   understanding?

6   A.  That's correct.

7   Q.  Do you have Plaintiff's Exhibit 28 in front of you which I

8   believe Mr. Timmons showed you?  It's the Mattos Filho opinion

9   letter for the September 2007 loan?

10  A.  Yes, I have it.

11          THE COURT:  What is the number?

12          THE WITNESS:  28.

13          THE COURT:  28?  Plaintiff's?

14          THE WITNESS:  Plaintiff.

15  Q.  And I believe Mr. Timmons and the court asked you whether

16  there is a reference in that document to the bylaws.  Do you

17  recall that?

18  A.  Yes.

19  Q.  If you received in a legal opinion from a lawyer attesting

20  to the due authorization of his client to enter into a

21  transaction, do you assume that that lawyer would have examined

22  the bylaws?

23  A.  That is correct.

24  Q.  Finally, Mr. Weinstein, Mr. Timmons asked you a number of

25  questions about a potential IPO or bond offering that certain

16L7MLC2                     Weinstein - redirect

1    investment bankers with the Merrill Lynch affiliate of Brazil

2    may have worked with on Itamarati?  Do you recall that

3    testimony?

4    A.  Yes, I do.

5    Q.  Did you have anything to do with those efforts?

6    A.  I did not.

7    Q.  Did anyone on your team negotiating working on the loans on

8    behalf of MLCP have anything to do with those efforts?

9    A.  No, they did not.

10            MR. RUSSELL:  Nothing further, your Honor.

11            MR. TIMMONS:  Just a few questions.

12            THE COURT:  All right.

13   RECROSS EXAMINATION

14   BY MR. TIMMONS:

15   Q.  Mr. Weinstein, you testified I believe on response to my

16   questions or questions from his Honor that you were told there

17   was no board resolution, that it was executed in connection

18   with the September loan transaction.  Do you recall that

19   testimony?

20   A.  Yes.

21            MR. TIMMONS:  Your Honor, may I approach?

22            THE COURT:  Yes.  You don't have to ask.  That's fine.

23   Q.  DX-282 and DX-282A.  Mr. Weinstein, I just handed you what

24   has been marked as Defendant's Exhibit 282 and 282A.  282

25   appears to be a board resolution executed in connection with

 1   the September loan transaction, and 282A I believe is a

 2   certified translation of that.

 3            THE COURT:  Wait, September 2008?

 4            MR. TIMMONS:  Sorry, your Honor, 2007.

 5            THE COURT:  All right.  The date on the e-mail is

 6   2008, right?  I just wanted to make sure I'm not missing

 7   something.

 8            MR. TIMMONS:  That is correct, your Honor.

 9            THE COURT:  All right.  Go ahead.  Ask your questions.

10   Q.  Mr. Weinstein, that is in fact the board resolution

11   executed in connection with the 2007 -- September 2007 loan

12   transaction, correct?

13   A.  Yes, it is.

14   Q.  Who told you that no board resolution had been executed in

15   connection with that transaction?

16   A.  In review of the transaction documents we did not see it.

17            THE COURT:  All right.  Well, do you recall receiving

18   this document ever?

19            THE WITNESS:  Again, I was head of a team, so when we

20   close a loan I would get confirmation that certain things were

21   received.  I would not necessarily review any of these

22   documents personally.

23            THE COURT:  Well, do you know any of the people whose

24   names are on the top portion of the e-mail, the first page?

25            THE WITNESS:  Well, the Alexandre Eucartem Rocha was

16L7MLC2                    Weinstein - recross

1   the CFO at the time of Itamarati.

2              THE COURT:  OK.

3   Q.  Now, Mr. Weinstein, you testified previously that credit

4   risk was the risk of default by the counterparty, is that

5   right?

6   A.  That is correct.

7   Q.  And just to be --

8   A.  Well, it's not necessarily the risk of default, it's the

9   risk of a counterparty, not necessarily a default.

10  Q.  Well, the risk of what act by the counterparty?  The act of

11  nonpayment, correct?

12  A.  Yes, there is different degrees of risk, yes, but not

13  necessarily default.  You are risky borrowers that are rated

14  single A and other borrowers that are rated BBB.  So, it's a

15  grade of how you risk your rate counterparties.  It doesn't

16  necessarily mean they go into default.

17  Q.  Understood.  But there are various gradations of risk but

18  all of the risk is attempting to measure the risk of

19  nonpayment, correct?

20  A.  That is correct.

21  Q.  And you testified that there are different market practices

22  with respect to different loan products that you are familiar

23  with, correct?

24  A.  That's correct.

25  Q.  But with respect to derivative transactions you never

16L7MLC2                    Weinstein - recross

 1  traded derivatives, have you?

 2  A.  That's correct.

 3  Q.  And you didn't have any direct involvement in executing the

 4  derivative that is the subject of this lawsuit, correct?

 5  A.  That is correct.

 6  Q.  And you didn't have any formal position or informal

 7  position with MLCS, is that correct?

 8  A.  That is correct.

 9  Q.  Now, if a Merrill Lynch client has a potential future

10  obligation to pay Merrill Lynch money as a result of a loan,

11  Merrill Lynch has credit exposure to that client, correct?

12  A.  That is correct.

13  Q.  And if a Merrill Lynch client has a potential future

14  obligation to pay Merrill Lynch money as a result of some other

15  contractual obligation such as a margin requirement, Merrill

16  Lynch has exposure to that client, correct?

17  A.  Merrill Lynch has potential exposure.

18  Q.  Credit exposure, correct?

19  A.  Potential credit exposure.

20  Q.  And potential credit exposure and potential credit exposure

21  is the same regardless of the product involved, correct?

22          THE COURT:  Wait a minute, I don't understand the

23  question.  Potential --

24  A.  There is two different things.  There is actual credit

25  exposure in that you lend money and money goes out the door,

1    and there is potential credit exposure which is exposure based

2    on market movements.  The exposure can be in the favor of a

3    client, it could be in favor of a bank, so that the exposure

4    can go either way.

5    Q.   Correct.  Do you have an understanding of this particular

6    transaction, the swap that's at issue in this case?  Do you

7    have an understanding as to whether it could have gone either

8    way?

9    A.   Yes, it could have gone either way.

10   Q.   That's your understanding.

11   A.   For which part?  For the derivative or for the loan?

12   Q.   For the derivative transaction.

13   A.   Well, the derivative, again it's potential exposure, so if

14   the rials strengthened, then all of a sudden Itamarati would be

15   a creditor to the bank as opposed to the other way around.

16   Q.   Well, in fact isn't it the case that Merrill Lynch ended up

17   having credit exposure to Itamarati as a result of the

18   derivative in this case?

19   A.   Well, that is a result of the transaction when the rials

20   weakened, and that created exposure to Itamarati.

21   Q.   And credit exposure is credit exposure regardless of the

22   nature of the product involved, correct?

23   A.   Again, there is a big difference between potential exposure

24   and actual credit exposure.

25   Q.   Understood.

1              No further questions, your Honor.

2              THE COURT:  I have a quick question.  You referred to

3    Plaintiff's Exhibit 34.  Do you have it in front of you?  I

4    think it was --

5              THE WITNESS:  The corporate resolution?

6              THE COURT:  It's this one.

7              THE WITNESS:  Yes.

8              THE COURT:  All right.  I can give you mine if you

9    want.

10             THE WITNESS:  I have it.

11             THE COURT:  You were asked a question about the

12   certificate of incumbency that's Bates number 15681.  Do you

13   see that?

14             THE WITNESS:  Yes, I do.

15             THE COURT:  And there is a subparagraph A that

16   basically authorized the officers who are listed below to, A,

17   sign on behalf of the guarantor the loan agreement, any of the

18   transactions documents and any other documents related is

19   thereto.  Do you remember you were asked about that?

20             THE WITNESS:  Yes.

21             THE COURT:  Did you consider the interest rate swap,

22   the derivative transaction, to be related to the loan that was

23   executed in November of 2007?

24             THE WITNESS:  The loan was executed in November 2007.

25   At that time there was no derivative transaction.  The

16L7MLC2                    Weinstein - recross

1    derivative transaction was not executed until April of 2008.

2              THE COURT:  And that's my question to you.  The

3    derivative transaction that eventually was decided upon, did

4    you consider that to be related to the loan transaction in

5    November such that this certificate of incumbency would cover

6    that transaction?

7              THE WITNESS:  Again, I was not involved with

8    derivatives nor legal representative of MLCS, so this was

9    completely separate from the derivative.

10             THE COURT:  OK.  All right.

11             Any other questions in light of -- well, any

12   reredirect in light of what was the recross or in light of what

13   I just asked?

14             MR. RUSSELL:  No re-redirect.

15             MR. TIMMONS:  We have nothing further.

16             THE COURT:  Whenever I ask a question, I will always

17   give you a chance to ask follow-ups in light of a anything I

18   might have opened the door to.

19             Fine, you may step down, Mr. Weinstein.  Thanks very

20   much.

21             You can just leave all that stuff there.

22             THE COURT:  Next witness?

23             MR. RICE:  Yes, your Honor.  We call Rene Medrado as

24   our next witness.

25             THE COURT:  And this is going to be in English or with

1    an interpreter?

2              MR. RICE:  This would be in English.

3              MR. WERDER:  Would the court indulge a five minute

4    nature break?

5              THE COURT:  Sure.

6              (Recess)

7              THE COURT:  Ready?

8              MR. RICE:  Yes, your Honor.

9              THE COURT:  Let me ask the witness to stand.

10    RENE MEDRADO,

11         called as a witness by the plaintiff,

12         having been duly sworn, testified as follows:

13              THE COURT:  Have a seat.  State your name.

14              THE WITNESS:  My name is Rene, R-e-n-e, Medrado,

15    M-e-d-r-a-d-o.

16              THE COURT:  Mr. Medrado, I'm not going to be able to

17    pronounce you name as well as you do, but don't take it

18    personally.  You may proceed, Mr. Rice.

19    DIRECT EXAMINATION

20    BY MR. RICE:

21    Q.  Good morning.  Just for the court and for the record, are

22    you a citizen of Brazil?

23    A.  Yes, I am a citizen of Brazil.

24    Q.  And what's your native language, sir?

25    A.  My native language is Portuguese.

16L7MLC2                         Medrado - direct

1    Q.  And do you consider yourself fluent in the English

2    language?

3    A.  Yes, I do.

4    Q.  I placed on the ledge your declaration.  Is that in fact

5    the declaration that you prepared and signed in this case?

6    A.  It is.

7    Q.  And have you had a chance to review it?

8    A.  Yes, I have.

9    Q.  And are the matters therein still true to the best of your

10   knowledge, information and belief?

11   A.  Yes, it reflects my --

12   Q.  And with respect to the matters of Brazilian law about

13   which you testified in your declaration, are your opinions

14   opinions you hold to a reasonable degree of certainty?

15   A.  Yes.

16   Q.  Have you had the chance since you signed that to read the

17   declaration that was filed in this case by professor Brancher?

18   A.  Yes, I have.

19   Q.  Is there anything in that that has caused you to change or

20   rethink any of the opinions that you have given?

21   A.  No, he brings no additional evidence that would cause me to

22   change my views.

23   Q.  Thank you.

24           No further questions, your Honor.

25           THE COURT:  All right.  Cross examination, Mr. Werder.

1          MR. WERDER:  Yes, your Honor.

2    CROSS EXAMINATION

3    BY MR. WERDER:

4    Q.  Good mornings, Mr. Medrado.

5    A.  Good morning.

6    Q.  You were here this morning for Mr. Weinstein's testimony,

7    were you not?

8    A.  I was.

9    Q.  And you heard Mr. Weinstein testify to the types of

10   diligence or to the steps that were taken by Merrill Lynch

11   Credit Products in connection with the various loans that were

12   extended to Itamarati and UISA Finance, did you not?

13   A.  Yes, I did hear that.

14   Q.  And you heard the testimony with respect to the guarantees

15   of the loans that were extended in September and November of

16   2007, correct?

17   A.  Yes.

18   Q.  Mr. Weinstein testified, if my notes are correct -- and

19   obviously the other people's notes will reflect -- but he

20   testified that each product has a different set of "rules and

21   market practices".  Do you recall that testimony?

22   A.  I do recall.

23   Q.  And in connection with your work here, you were retained

24   to -- were you retained by Merrill Lynch or by Merrill Lynch's

25   law firm?

16L7MLC2                           Medrado - cross

1   A.  I was retained by -- I am retained by Merrill Lynch but my

2   contacts have been made with respect to this litigation with

3   Simpson Thatcher.

4   Q.  In connection with your work for Merrill Lynch or the law

5   firm here, your work on this case, have you received from

6   Merrill Lynch a copy of any written guidelines that Merrill

7   Lynch has prepared that set forth the different rules and

8   market guidelines for different products?

9   A.  No, I have not.

10  Q.  Have you seen any documents in the course of your work on

11  this case that set forth different rules and market practices

12  for different products in the Merrill Lynch galaxy of products?

13  A.  I have not received that.

14          THE COURT:  In the whole galaxy of products?  Go

15  ahead.

16          MR. WERDER:  Is universe smaller than galaxy?

17          THE COURT:  No, that's bigger.  The solar system of

18  products.

19          MR. WERDER:  There are many products.

20  Q.  Have you had the opportunity, sir, to talk to anybody who

21  works in Merrill Lynch's documentation group concerning what

22  rules, to use Mr. Weinstein's term, they have for the

23  documentation of loan transactions?

24  A.  I have not had the opportunity to discuss that with anyone

25  in Merrill Lynch.

1    Q.  And have you had the opportunity to discuss with anybody

2    who works in Merrill Lynch's documentation group the rules that

3    they apply to the documentation of derivative transactions?

4    A.  I have not discussed with them about the rules that they

5    would use.  What I have done is to review the documentation

6    that was produced in the litigation with respect to derivative

7    transactions.

8    Q.  And that transaction, am I correct -- withdrawn.

9            That documentation, sir, related specifically to

10   transactions that occurred between I will use Merrill Lynch and

11   the Itamarati group, correct?

12   A.  Merrill Lynch Credit Services and the Itamarati group, yes.

13   Q.  And so in the course of your work on this case Merrill

14   Lynch didn't provide you with documentation that related to

15   transactions that it had entered into with other

16   counterparties, did it, sir?

17   A.  Involving derivative transactions?

18   Q.  Correct, sir.

19   A.  No, they have not.

20   Q.  OK.  So, in performing your work on this case, and in

21   analyzing Merrill Lynch's what you call standard diligence --

22   that's a phrase you used, correct?

23   A.  Standard diligence used for purpose of examining apparent

24   authority, you mean?

25   Q.  Yes.

1    A.  Yes.

2    Q.  One of the topics of your report and of your testimony and

3    of your various earlier documents is the issue of standard

4    diligence, correct, sir?

5    A.  Correct.

6    Q.  OK.  And you have provided opinions with respect to

7    standard diligence based upon your review of certain documents

8    in this case, haven't you, sir?

9    A.  I have.

10   Q.  And the documents that you have reviewed have related

11   solely to the transactions that occurred between Merrill Lynch

12   on the one hand and the Itamarati group on the other hand,

13   correct?

14   A.  Correct.

15   Q.  You have not reviewed documents that relate to transactions

16   between Merrill Lynch on the one hand and counterparties other

17   than the Itamarati group on the other hand, have you, sir?

18   A.  I have not, that's correct.

19   Q.  All right.  So, the materials that you have been --

20   withdrawn.

21         The materials that you reviewed were provided to you

22   by Merrill Lynch and its counsel, were they not, sir?

23   A.  Yes.

24   Q.  And the materials that were provided to you by Merrill

25   Lynch and its counsel did not provide you with an opportunity

1   to compare what kind of diligence was done in the transactions

2   with Itamarati group as a counterparty to what kind of

3   diligence was done in transactions with other counterparties,

4   did it, sir?

5   A.   Correct, it did not.

6   Q.   All right.  So any opinions that you have offered in this

7   case with respect to standard diligence have not been based on

8   a review of what Merrill Lynch has done in any set of

9   transactions with any counterparties other than the Itamarati

10  group, am I right, sir?

11  A.   You're right.

12  Q.   And moving from Merrill Lynch more generally, you haven't

13  had the opportunity in your work in this case to review

14  documentation that financial institutions other than Merrill

15  Lynch have the rules and market practices that they've followed

16  in documenting their derivative transactions, have you, sir?

17  A.   I have not.

18  Q.   So, any opinions that you have offered in this case

19  concerning what you call standard diligence haven't involved,

20  have they, sir, a comparison of what was done in these

21  transactions to what was done by Merrill Lynch or any other

22  financial institution in any other transaction, am I right?

23  A.   That I have to explain.

24  Q.   Is that correct, sir?

25  A.   What we are --

1   Q.  Am I right, sir?

2              THE COURT:  Let him speak.

3   A.  Not totally correct.  We are talking about matters of

4   representation.  We are talking about matters of whether what

5   would be necessary for a counterparty to verify whether the

6   party representing a company was duly representing that company

7   and whether there were other steps needed within the

8   corporation's structure to have that contract formalized.  So,

9   that's a matter of general commercial corporate law and,

10  therefore, I'm using not only what I have seen; I'm using other

11  experiences in other litigation cases pertaining to those

12  issues to come to my conclusions here.

13  Q.  OK, I understand that, sir.  But in terms of derivative

14  transactions specifically, you haven't had the opportunity to

15  compare the procedures, the diligence that was used in

16  connection with the derivative transaction at issue here to the

17  procedures and the diligence that were used in connection with

18  any other derivative transaction involving any financial

19  institution, have you, sir?

20  A.  I have not.  I do not claim to be a derivatives expert, as

21  I have indicated in my declaration.

22  Q.  OK.  Let me switch gears just slightly on you.  Do you have

23  your trial affidavit in front of you, sir?

24  A.  I do.

25  Q.  And your trial affidavit at paragraph 7 refers to your

1   being a partner in the Pinheiro Neto law firm, is that correct?

2   A.  That's correct.

3   Q.  Is that pronunciation OK generally?

4   A.  Yes.

5   Q.  And it says in I think it's the third sentence that you are

6   one of 28 partners in the litigation sector of the firm, "where

7   I have been practicing law in Brazil since 1988 in the areas of

8   civil, commercial and economic law."  Do you see that?

9   A.  May I correct?  1998.

10  Q.  The 1988 is not correct, is it?

11  A.  No, it's not correct.  It's 1998, just to make sure.

12  Q.  And in fact you graduated from law school in 1997, correct?

13  A.  '97, that's correct.

14  Q.  OK.  And then the paragraph says "where I have been

15  practicing law in Brazil since 1998."

16  A.  Correct.

17  Q.  We will take that correction.  Now, you were first admitted

18  to the bar in 1998, am I right?

19  A.  You are correct.

20  Q.  OK.  Then did you join the Pinheiro Neto law firm right

21  after?  You actually had joined them before you were admitted

22  to the bar?

23  A.  I joined Pinheiro in 1995 as a trainee.  We in Brazil go to

24  law school, and as soon as you are in the law school you can be

25  hired as a trainee.  So, I was hired in 1995.  Then I was

1   already in the labor litigation.  In six months I went to civil

2   and commercial and economic litigation.  Then in 1997 I was

3   invited to and became an associate.  In 1998 I passed the bar

4   and was admitted to the bar.

5   Q.  OK.  And then after you passed the bar there came a time

6   when you left Brazil and came to New York to get an LLM,

7   correct?

8   A.  That's correct.

9   Q.  And that occurred in 2002, right?

10  A.  Yes.

11  Q.  And you actually got the LLM in 2003, right?

12  A.  That's correct.

13  Q.  And then after you got your LL -- and you weren't

14  practicing law in Brazil while you were pursuing your LLM here,

15  were you, sir?

16  A.  That's correct, that would be probably too much work I

17  would think.

18  Q.  That would be a little too much.  And then after you got

19  the LLM you went to Washington D.C. and worked as a trade

20  advisor for a large law firm there, didn't you, sir?

21  A.  Yes.  I finished my LLM, and then I studied for the New

22  York bar, which I took in end of July 2002.  Then I went to

23  Washington D.C. to work in a larger law firm in D.C.

24  Q.  OK.  And you were in that large law firm in D.C. in 2003

25  and 2004, were you not, sir?

16L7MLC2                         Medrado - cross

1   A.  I was from September 2003 to July 2004.

2   Q.  And you weren't practicing law in Brazil while you were

3   working as a trade advisor for that large law firm in

4   Washington, were you, sir?

5   A.  I was not.

6   Q.  OK.  And then after you finished your service with the law

7   firm in Washington you took a position for some number of

8   months, complete 2004, in Geneva, Switzerland?

9   A.  Yes, I was with the rules division of the World Trade

10  Organization in Geneva, Switzerland.

11  Q.  You weren't practicing law in Brazil while you were

12  residing in Geneva, Switzerland and working for that World

13  Trade Organization, were you, sir?

14  A.  I was not.

15          THE COURT:  So, you weren't continuously practicing

16  since 1998, but you started practicing in Brazil in 1998.

17          THE WITNESS:  I started practicing 1998.  I had

18  substantial practice since 1995 to 1998 as assisting in the

19  cases, and in 1998 to 2002.  Then end of 2004, beginning of

20  2005 resumed to the same law firm, Pinheiro Neto, until today.

21  Q.  But there was about a three year period from 2002 to 2004

22  after 1998 where you were not practicing law in Brazil.

23  A.  Two years and a half, I would say.

24  Q.  Pardon?

25  A.  Two years and a half.

16L7MLC2                          Medrado - cross

1   Q.  Very good.  And you have been a partner at the Pinheiro

2   Neto law firm since when, sir?

3   A.  January 2009.

4   Q.  And it's true, is it not, that you have never been

5   identified or put forward to testify as an expert on Brazilian

6   law in any proceeding before this case.

7   A.  That's correct.

8   Q.  OK.  Let's talk a little bit -- I asked you who had

9   retained you, and I want to move from there.

10          Your law firm, Pinheiro Neto, actually has Merrill

11  Lynch as a client, do they not?

12  A.  It has.

13  Q.  And the law firm does quite a bit of work for Merrill Lynch

14  and its various entities, doesn't it, sir?

15  A.  It does.  Since the merger with Bank of America it's one of

16  the -- it's a client of the firm, sure.

17  Q.  And it's been a client of the firm since before the merger

18  with Bank of America, hasn't it?

19  A.  Yes.

20  Q.  OK.  And you are one of the lawyers that has routinely

21  personally provided service for Merrill Lynch entities,

22  correct, sir?

23  A.  I have been involved on this litigation, with the

24  litigation with Itamarati.

25  Q.  And in fact you are presently acting as Merrill Lynch's

16L7MLC2                     Medrado - cross

1   litigation counsel in Brazil in litigation involving UISA

2   Finance and Itamarati, are you not, sir?

3   A.  I am.

4   Q.  And you are acting for among other entities Merrill Lynch

5   Capital Services as lead counsel on that litigation, aren't

6   you, sir?

7   A.  Yes.

8   Q.  And you are the guy that goes to court and stands up and

9   makes the arguments on their behalf, correct?

10  A.  Yes.

11  Q.  OK.  And I just want to make sure we understand what lead

12  counsel means and whether it means the same thing.

13  A.  I signed the petitions on behalf of Merrill Lynch.  We have

14  had not an opportunity to argue the cases because the case is

15  still in the phase of Itamarati presenting a defense, so there

16  has not been any court hearing.  So, just clarifying and make

17  it correct the stage of the litigation in Brazil.

18  Q.  So, you signed the Brazilian equivalent of a complaint or

19  the papers initiating the lawsuit, is that correct?

20  A.  Yes, that's correct.

21  Q.  And when it comes time to have somebody stand up and

22  advocate as a lawyer for Merrill Lynch's position in that

23  litigation, you are going to be, based upon your present state

24  of knowledge, you are going to be the person that does that,

25  correct?

1   A.  Yes.

2   Q.  All right.  Your firm, Pinheiro Neto, actually advised

3   Merrill Lynch with respect to the various loan transactions

4   that have been discussed in this litigation, am I right?

5   A.  I understand that our corporate team has advised in some of

6   the law and transactions with the Itamarati group.

7   Q.  How did you get that understanding?

8   A.  I haven't discussed with my colleagues of what arose, but I

9   know they were involved, especially because when the matter

10  came into litigation they indicated that I should be

11  responsible for the case.  They indicated the client, and

12  Simpson Thatcher called me to talk about the matter.

13  Q.  And is that how you got identified to Merrill Lynch as the

14  expert for this case?

15  A.  Yes.

16  Q.  OK.  So, one of your corporate partners who had worked on

17  the transaction suggested to Merrill Lynch, to your knowledge,

18  that they ought to use you as an expert witness?

19  A.  No, not for the expert witness.  I was involved in

20  beginning of 2009.  So, after the default in the derivatives.

21  And we were discussing whether it would be possible to enforce

22  the law, and then we began the discussions with Simpson

23  Thatcher about this very case.

24          So, I was involved after the default.  I did not know

25  what happened to there in the case -- in the transactions.

1    Q.  And just in terms of timing, did you start working on the

2    Brazilian litigation before you were identified, before you

3    were retained as an expert witness for this litigation?  Or can

4    you elaborate on that at all?

5    A.  No, this came first, but I would have to see to be precise

6    with the court.  I wouldn't like to be misleading.  But this

7    came first, and especially as the receiver action there was

8    filed later.

9               THE COURT:  I'm confused.  What came first?

10              THE WITNESS:  This litigation and my involvement with

11   this litigation came first.

12              THE COURT:  Litigation in Brazil or the litigation in

13   New York?

14              THE WITNESS:  This one in New York.

15   Q.  So, your best recollection -- although you might want to

16   check it -- is that you were identified to be an expert witness

17   in this case before you started advising on litigation in

18   Brazil?

19   A.  We were discussing certain aspects of Brazilian law, and

20   then that became -- then we saw -- Simpson Thatcher said it

21   would be necessary to have an affidavit for this litigation.

22   So, we had a couple of discussions before about Brazilian law

23   and how it would be seen on the issues that would arise -- that

24   could arise in this litigation.  And then they would ask me to

25   make an affidavit for this matter.

1   Q.  To the best of your recollection as you sit here today,

2   that was before you were retained by Merrill Lynch to represent

3   their entities in bringing litigation in Brazil.

4   A.  Yes, yes.  And then discussions began also on the law and

5   transaction, but it was only filed later in time.  Later in

6   time I mean in the second semester of 2009, probably in

7   October, I would say.  October 2009 was when we filed the

8   action in Brazil.

9        So, the action in Brazil took much longer to be filed,

10  and our actual preparations for the action in Brazil took --

11  actually really took off by second semester of 2009 while these

12  took place in the first semester of 2009.

13  Q.  OK.  But since at least sometime in 2009 you have been

14  acting in Brazil as the advocate for Merrill Lynch and in this

15  proceeding as an expert witness for them at the same time,

16  correct?

17  A.  Well, the first declaration was made -- I would have to

18  look at it.

19  Q.  June of 2009, does that refresh your recollection?

20  A.  Sorry?

21  Q.  June of 2009?

22  A.  June of 2009.  And then the lawsuit was filed the end of

23  October 2009.

24  Q.  OK.  So, since sometime in 2009 you have been actively

25  working for Merrill Lynch in two different capacities, correct,

1  sir?

2  A.  Correct.

3  Q.  And one of those capacities is as their advocate on this

4  dispute in Brazil, and the other capacity is as an expert

5  witness in this case.

6  A.  Yes.

7  Q.  OK.  And I think you told me that your law firm had been

8  involved in the loan transaction.  It's true as well, isn't it,

9  sir, that your law firm was involved in advising Merrill Lynch

10  with respect to the derivative transaction?

11  A.  I'm not aware of that with respect to the derivatives.  I'm

12  not aware that they were involved.  Actually my information is

13  that they were not involved in the derivatives transaction.

14  Q.  Did you make any inquiry of that, sir?

15  A.  I did not ask my corporate partners whether they were, but

16  I have not seen documents mentioning or documents or e-mails

17  with respect to derivative transactions.  I haven't seen at all

18  any name of my firm involved.

19  Q.  So, am I understanding it correctly, sir, that when you

20  were asked to be an expert witness for this case you didn't

21  make any inquiry of your partners to determine whether your

22  partners had been involved in advising on the underlying

23  transaction?

24  A.  Oh, I have to be precise.  When I was asked, I did verify

25  whether they were involved in the derivative, and it was

1   indicated that they did not, so especially on the issues of

2   representation and the issues that are coming here.

3           So, just to -- I'm actually recalling making that and

4   making sure I was not going to give an opinion on something

5   that the law firm had work.

6   Q.  And would that be inappropriate to do, sir?

7   A.  I was -- I was -- for -- as this is -- it could not be

8   inappropriate because what I'm doing here is to provide what

9   the Brazilian law states and provide evidence of the Brazilian

10  law to this court.  So, it's not a matter of my opinion.  It's

11  a matter of whether I can provide evidence to this court about

12  what the Brazilian law states.

13          But for the derivatives transaction I remember -- I

14  don't -- I would have to -- I don't recall to whom I asked, but

15  I do recall that we did not work in the derivatives

16  transaction, and for me that was enough.

17  Q.  And did that inquiry include an inquiry on whether your

18  firm was involved in connection with the documentation of the

19  guarantee?

20          THE COURT:  The guarantee for the derivative?

21  Q.  The guarantee for the derivative transaction, yes, sir.

22  Sorry, your Honor.

23  A.  My firm was not involved in derivatives nor on the

24  guarantee agreement as well as part of that.

25  Q.  Have you reviewed Merrill Lynch's privilege log that they

1   provided in this case?

2   A.  No, I haven't.

3   Q.  OK.  But in any event your testimony is that you made some

4   inquiry to determine whether your firm was involved in the

5   derivative transaction, and you concluded that they were not,

6   is that right?

7   A.  That's correct, yes.

8   Q.  And who did you make that inquiry of?

9   A.  It was a partner of mine from the restructuring area,

10  because the issue was probably going to a restructuring issue

11  actually.  And I made an inquiry to them.

12  Q.  Well, was it the restructuring partners who were involved

13  in whatever involvement your firm had on the loan transaction?

14  A.  Restructuring, I'm talking about insolvency law,

15  bankruptcy.

16  Q.  I understand.  But it wouldn't have been restructuring

17  lawyers who advised Merrill Lynch on the loan transaction,

18  would it, sir?

19  A.  No, but as the case was leading to litigation, then more

20  practice were getting involved in examining all the potential

21  implications of the case.

22  Q.  Just so the record is complete, it wouldn't be

23  restructuring lawyers who were involved in advising -- if there

24  were lawyers involved in advising them on the derivatives

25  transaction -- it wouldn't be your restructuring group, would

1    it, sir?

2    A.   I talked to this colleague in the restructuring.  I also

3    talked to a partner, a partner of mine in the corporate that

4    usually works for Merrill Lynch.

5    Q.   OK.  And it's true, is it not, sir, that you haven't

6    reviewed any files that your law firm maintained concerning the

7    whatever transactions they were involved in that occurred

8    between Merrill Lynch on the one hand and the Itamarati group

9    on the other hand?

10   A.   I have not reviewed.  I have maintained -- I have reviewed

11   strictly the materials that were provided by Simpson Thatcher

12   for purposes of making these affidavits and declarations.

13   Q.   And in addition to not reviewing your law firm's files, you

14   haven't talked to the partners who had whatever involvement

15   your firm had in the relationship between Merrill Lynch and the

16   Itamarati group to determine what involvement they had and what

17   advice they may have given, correct, sir?

18   A.   That's correct.

19   Q.   All right.  We mentioned briefly the declaration that you

20   had submitted in June of 2000.  You have a binder in front of

21   you.  I just want to run through these quickly if we could.

22              I am only going to refer to a couple of them, your

23   Honor.  I am just going identify them for present purposes.

24              But Defendant's Exhibit 11 is the first declaration

25   that you filed in this case in June of 2009.  Am I right, sir?

1    A.   Yes.

2    Q.   OK.  And Defendant's Exhibit 12 was a reply declaration

3    that you filed in July of 2009, right?

4    A.   That's correct.

5    Q.   And then Defendant's Exhibit 13 is a supplemental reply

6    declaration that you also filed in July of 2009, right?

7    A.   That's correct.

8    Q.   Then there was a gap in time to Defendant's Exhibit 14 --

9    which is your March 2011 report in this case -- and Defendant's

10   Exhibit 15, which is your March 2011 rebuttal report in this

11   case, correct?

12   A.   That's correct.

13   Q.   So, prior to the writing that constitutes your trial

14   declaration, you have submitted five separate written reports

15   in this case, am I right?

16   A.   You're correct.

17   Q.   All right.  Now, let me direct your attention to your trial

18   affidavit, if I could, to page 5, footnote 2.  Have you had an

19   opportunity to review that, sir?

20   A.   Yes.

21   Q.   And that refers to the initial declaration that you filed

22   in June of 2009, am I right?

23   A.   You're correct.

24   Q.   OK.  And if you could just keep that page open for a

25   second.  Let me direct your attention to Defendant's Exhibit 11

1   at paragraph 9.

2   A.   OK.

3   Q.   OK.   And Defendant's Exhibit 11 at paragraph 9 in fact

4   contains the statement that you are referring to in footnote 2

5   of your trial declaration, correct?

6   A.   That's correct.

7   Q.   OK.   I want to direct your attention, if I could, to the

8   last sentence of -- paragraph 9 of Defendant's Exhibit 9 which

9   says, "In light of this, the guarantee agreement is subject to

10  article 22 of USINAS Itamarati's bylaws and thus required a

11  special authorization from its board of directors to become a

12  valid obligation."

13          And that is what you wrote in June of 2009 in support

14  of Merrill Lynch's summary judgment motion, correct, sir?

15  A.   That's correct.

16  Q.   And that was your opinion, was it not, sir?

17  A.   It was my opinion but I would like to explain to the court

18  if the court allows.

19          THE COURT:   That was your opinion, right?

20          THE WITNESS:   It was my opinion that was provided as a

21  premise for the discussion that was going in the next paragraph

22  and --

23  Q.   And --

24  A.   -- and that was my opinion that later, considering what

25  Mr. Brancher provided with respect to another provision of the

1    board of directors -- of the bylaws -- saying that it would be

2    actually an obligation because it would be a guarantee to a

3    third party.  So that gave me --

4              THE COURT:  Stop, stop, stop.  It's not a lecture, OK?

5    The question was:  That was your opinion?  Past tense.  That

6    was your opinion, yes?

7              THE WITNESS:  I wrote it, but I would like to explain.

8              THE COURT:  It was your opinion?  Yes or no?  At the

9    time you signed the document, was that your opinion?

10             THE WITNESS:  It was my opinion on a noncentral point

11   of my declaration.  And that I would like to explain,

12   especially because --

13             THE COURT:  Well, I'm going to step off.  You can

14   explain all you want, but I run the courtroom; you don't.  Do

15   you understand that?

16             THE WITNESS:  I understand.

17             THE COURT:  You are familiar with American law.  You

18   are a member of the New York State bar.

19             THE WITNESS:  Yes.

20             THE COURT:  You don't take over and decide what you

21   want to answer and how you want to answer it, even though I

22   told you to answer the question.  OK?

23             THE WITNESS:  Understood.

24             THE COURT:  All right.

25   Q.  So to follow up, sir, your opinion as stated in paragraph

1   9, of Defendant's Exhibit 9, was not qualified in any way, was

2   it, sir?

3   A.   It was not qualified in this declaration.

4   Q.   And the previous language in paragraph 9 explained the

5   basis for the opinion as your reading of the relevant article

6   of Itamarati's bylaws, correct?

7   A.   Correct.

8   Q.   OK.

9   A.   I --

10  Q.   Then in the four subsequent documents that you wrote in

11  this case before you got to your trial testimony, you never

12  came back to that point and disputed it, did you, sir?

13  A.   May I take a moment just to review?

14  Q.   Sure.

15  A.   In my reply declaration, item 17, there is a footnote,

16  number 3, and there I'm explaining about the guarantee cannot

17  be qualified -- if I may.

18         THE COURT:  You may, but that's responsive to the

19  question.

20  Q.   You are in which document, sir?

21  A.   Reply declaration.

22         THE COURT:  DX-12?

23         THE WITNESS:  DX-12.  It is item 17, and it says, "The

24  guarantee agreement in this case cannot be clarified as a null

25  and void act; it could only be clarified at maximum as

16L7MLC2                         Medrado - cross

1    voidable, because Itamarati by law as a private act by its

2    nature provides in Article 22-11 that subspecial business acts

3    such as the granting of guarantees to third-party obligations

4    must be authorized by the board of directors.  Then I add a

5    footnote, and I say the specific provision inside the mentioned

6    article of the bylaws will not impact on the conclusions

7    regarding the proper authorization for the execution of the

8    guarantee agreement herein discussed."

9            If I may explain why I inserted the footnote.

10           THE COURT:  No, that's not the question.

11           The question was you didn't clarify or qualify what

12   was in your declaration in any of the subsequent documents.

13   And you said, no, that's not true, and you referred to this

14   document.

15           So, next question.

16           Your lawyer will get a chance to ask you questions on

17   redirect.

18   Q.  Sir, I have handed you a copy of your deposition in this

19   case which was taken in March of 2011.  You remember that, do

20   you not?

21   A.  Yes, I do.

22   Q.  I direct your attention to page 94.  Let me know when

23   you're there.

24           THE COURT:  Page 94?

25           MR. WERDER:  Page 94, your Honor.

1   A.  94?

2   Q.  94, nine-four.

3        Are you with me?

4   A.  OK.

5   Q.  And at page 94 I ask you:

6   "Q.  The question was a little narrower than that though, and

7   that is:  Are there any words on the page of any of your four

8   subsequent declarations or reports that suggest that there is a

9   dispute or that the proposition is disputable that the bylaws

10  of Itamarati required a special authorization from the board of

11  directors for this particular guarantee?"

12        Your answer:  "I don't get back to this issue later

13  on."

14        Do you recall that testimony, sir?

15        MR. RICE:  I think the answer continues on page 95.

16        THE COURT:  Well, I think it does.

17        THE WITNESS:  Can you give me the specific line so

18  that I can follow?

19  Q.  Yes, is it was line 14 through line 25.  I read that

20  correctly, did I not, sir?  Let me know when you're ready, sir.

21        THE COURT:  The question is simply did he read it

22  correctly.

23        THE WITNESS:  Yes, he is reading correct.  I don't

24  know if I can make a reference to the trial, to the very

25  footnote that you have mentioned initially, so it makes an

16L7MLC2                    Medrado - cross

1   indication that there was a question of whether there was a

2   need for a specific board authorization for the guarantee.  And

3   the question is, if I may approach that point, that in

4   preparing the first declaration there was a written exposure on

5   behalf of Itamarati of a very specific amount, over $100

6   million, and that could go into the requirements of those

7   specific provisions that laid out minimum amounts of debt.

8            So, that's why I made the reference at that point, but

9   I was not elaborating on those points.  But understanding now

10  through the trial about the nature and the structure of a

11  derivatives transaction I understand that the exposure only

12  came later.  So, at the time that the transaction was done, the

13  derivatives contract was -- or the term sheet was signed, there

14  was no exposure.  So, I would say that that would also be a

15  question of whether that specific provision would trigger under

16  the bylaws.

17           THE COURT:  All right.  Let's go back to your

18  question.

19  Q.  Now, in your trial declaration, footnote 2, you say you did

20  not -- are you with me?

21  A.  I am.

22  Q.  OK.  It says, "I did not mean to suggest that I was

23  offering an actual legal opinion on that issue, and I

24  understand that there is some question as to whether a specific

25  board authorization was required per the guarantee."

16L7MLC2                              Medrado - cross

 1           There certainly isn't anything in your June report

 2      that suggests that the statement was not an actual legal

 3      opinion, is there, sir?

 4      A.  I --

 5           THE COURT:  Nothing in the report you are referring

 6      to.

 7      A.  Nothing to report, but in my view my declaration should be

 8      taken as a whole.  I was not giving an opinion on that exact

 9      issue but actually on other issues of representation and

10      application of the apparent authority theory.  So that specific

11      point was to indicate a premise for the follow-up discussion.

12      I did not elaborate on that part.

13           THE COURT:  The question is:  In your report -- which

14      is Defendant's Exhibit 14 -- there is nothing that indicates

15      that the statement you made about article 22 previously was not

16      a legal opinion, right?  Nothing about that in your report.

17           THE WITNESS:  If I may just take a look.

18           THE COURT:  Yes.

19           That was your question, right, Mr. Werder?

20           MR. WERDER:  Yes, it was, your Honor.

21           I will withdraw the question in the interest of time,

22      your Honor.

23      Q.  Let me ask you, Mr. Medrado, to look back to Defendant's

24      Exhibit 11, your initial report, to paragraph 8.

25           THE COURT:  Well, it's a declaration.

1            MR. WERDER:  The declaration, yes.

2            THE COURT:  So, do you refer to that as an initial

3    report?

4            MR. WERDER:  I will refer to it as the declaration.

5    That's the proper term.

6            THE WITNESS:  OK.

7    Q.  And in paragraph 8 you say, "The grounds on which USINAS

8    Itamarati bases its lack of authority argument represent a

9    direct breach of the duty of good faith.  That is because on

10   April 24, 2008 MLCS received a legal opinion issued by USINAS

11   Itamarati (the legal opinion) stating that..." and then you go

12   on to quote the legal opinion.

13           And it's true, is it not, sir -- well, that is an

14   incorrect statement, isn't it, sir?

15           THE COURT:  What is an incorrect statement?  The

16   entire?

17   Q.  The statement that Merrill Lynch received a legal opinion

18   on April 24th of 2008 is an incorrect statement, is it not,

19   sir?

20   A.  As of now, after the discovery phase, we have learned that

21   the legal opinion was received later.  But I have written this

22   at the time for purposes of the motion for summary judgment,

23   and we did not have -- I did not review at that time all of the

24   evidence that was produced and how the derivatives transaction

25   allows the parties to follow up with the documents.

1   Q.  OK.  And then in paragraph 9, sir, of the declaration, in

2   the first sentence of paragraph 9 you've got some words there

3   that suggest that the legal opinion was received prior to the

4   guarantee agreement.  And you now know that that's also not

5   correct, am I right, sir?

6   A.  Yes, you're correct, after the discovery phase we learned

7   that the legal opinion was provided after the execution of

8   the -- after the term sheet and the execution of the ISDA and

9   the exception.

10  Q.  OK.  And then in paragraph 10 you recite various facts

11  which you enumerate as 1, 2 and 3, and then you say -- and I

12  just want to read Roman 3.  "Only after these two first two

13  steps were taken did MLCS enter into the guarantee agreement

14  which in turn made possible the execution of the derivative

15  master agreement."

16          Do you see that?

17  A.  I do.

18          THE COURT:  What paragraph is this?

19          MR. WERDER:  I'm in paragraph 10 of the initial

20  declaration.

21          THE COURT:  I see.

22          MR. WERDER:  Are you with me?

23          THE COURT:  Yes.

24  Q.  In fact, sir, you now know that the guarantee agreement

25  wasn't signed until after the master agreement was signed,

1   correct?

2   A.   That's correct, as indicated in my reports after the

3   decision on summary judgment.

4   Q.   Let me -- I want to-- so, the facts that you had for your

5   initial declaration, a number of them turned out to be

6   incorrect, am I right?

7   A.   The facts, they turned out to be different than the -- I

8   received then only -- I received the documents signed with the

9   legal opinion dated in the same date, so there was an

10  indication that they would have gotten the same, in the same

11  day.  Discovery has shown differently.  I have indicated in the

12  report that that difference would not change my conclusions on

13  the standard diligence that was taken by USINAS Itamarati and

14  the I would like to elaborate on why I did not maintain my

15  reasons -- I maintain my reasons.

16  Q.   I understand your opinion didn't change, but it is true, is

17  it not, sir, that the premise of the opinion that you expressed

18  in your initial declaration was that the guarantee was

19  enforceable because the guarantee had been signed before

20  Merrill Lynch entered into the transaction with Itamarati.

21  That was the premise, is that correct, sir?

22  A.   Can you repeat?

23  Q.   The premise of your opinion expressed in your first

24  declaration in this case was that the guarantee was enforceable

25  because it had been entered into prior to the consummation of

1    the transaction in April of 2008.  That was your premise,

2    right, sir?

3    A.  I think you -- you are confusing what is written.

4           The examination or what were the steps that were taken

5    by Merrill Lynch that was obtained that it could rely on the

6    authority on those that signed the documents of the

7    transaction -- of the guarantee specifically.  And based on the

8    legal opinion it was saying that all of the requirements,

9    corporate requirements of the Itamarati were taken, and

10   therefore it could rely on that to sign -- to have that as a

11   proper document.

12   Q.  But, sir, your assumption, which turned out to be incorrect

13   at the time that you wrote your first declaration, was that the

14   opinion letter that you referred to was provided before the

15   guarantee was signed, correct?

16   A.  Before the same time, yes.

17   Q.  And your assumption was that the guarantee was signed and

18   delivered before the master agreement was entered into,

19   correct?

20   A.  Yes, the master agreement was signed later, although with

21   the date of April 2004, and that's relevant for the Brazilian

22   law, the date of the obligations.

23   Q.  Let's turn to a different topic, sir, which is the

24   objective good faith principle.  And I want to direct your

25   attention to paragraph 34 of your trial affidavit.

1           THE COURT:  34?

2           MR. WERDER:  34, your Honor.  Yes.

3  Q.  Paragraph 34 you say, "Objective good faith bone fides is a

4  general and fundamental principal of Brazilian contract law.

5  Parties to contracts must act in accordance with the objective

6  good faith principle in the execution and performance of any

7  contract."  And that is a correct statement of Brazilian law,

8  is it not, sir?

9  A.  It is.

10  Q.  And am I right, sir, that one of the elements of the

11  objective good faith under Brazilian law is a concept of

12  actions based on mutual loyalty?

13  A.  It is one of the elements that characterize good faith.

14  Good faith, it is a general principle of law that instructs

15  civil and commercial acts and provides that the parties must

16  abide on ethical principles of behavior towards the other

17  parties in the contract so that the results of the agreement,

18  the contract, can be achieved.

19  Q.  And an additional element beyond mutual loyalty is mutual

20  disclosure, correct, sir?

21  A.  It could be another element, but that will vary according

22  to the specific institute that would have to be examined.  What

23  I mean by that, if I may, is that the good faith principle, it

24  is a principle from which the apparent authority theory

25  derives.  So, in the situation here the good faith principle is

16L7MLC2                              Medrado - cross

important, but what is determinant is the apparent authority

theory as laid out in the reports.

Q.   And am I right, sir, that under Brazilian law a party who

wants to enforce a contract based on objective good faith needs

to demonstrate that it itself acted with objective good faith?

A.   It depends on the -- yes, it would have to I wouldn't say

demonstrate, but you have to actually provide the evidence

beforehand that you acted in good faith, and that's not the

case.  It would be for the other party to show that they acted

in bad faith.  So, I wouldn't put too much emphasis on this.

For this specific case it is a principle that informs and from

which the principle of apparent authority derived.

Q.   And it's true, is it not, sir, that it hasn't been part of

your assignment and therefore you haven't made any

determination concerning whether in structuring and negotiating

the derivative transaction Merrill Lynch acted in objective

good faith.  That wasn't part of your work, correct?

A.   It was not part of my work, that's correct.

Q.   And similarly it wasn't part of your work to make any

assessment concerning whether Merrill Lynch acted with

objective good faith in administering the derivative

transaction, am I right?

A.   You are correct, I did not make a determination on those

points.

Q.   And you haven't made -- you haven't been asked to make any

1    determination, and you haven't made any determination

2    concerning the extent to which if at all the swap transaction

3    favored one party or the other economically by late September

4    of 2008, am I right?

5    A.   I have not made that analysis, but I have indicated in my

6    declarations and report that there is a court decision in

7    Brazil which I made reference to saying that that would not be

8    relevant for derivative transactions.

9    Q.   I understand your argument on relevance.  I just want to

10   make sure the record is clear on what you did and didn't do.

11          And you didn't try, did you, sir, as part of your

12   assignment to figure out what Merrill Lynch Capital Services'

13   internal assessment of the likely economics of the transaction

14   were as of August and September of 2008.  You didn't do that,

15   did you?

16   A.   I haven't.  No, I did not do that.

17   Q.   OK.  And you didn't make any investigation to determine the

18   extent to which Merrill Lynch Capital Services communicated to

19   Itamarati all of the facts at its disposal concerning the

20   likely economics of the transaction in August and September of

21   2008, am I right?

22   A.   No, I did not.  I focused my analysis on the issue of

23   standard diligence with respect to the apparent authority

24   theory and with respect to the formalization of the agreements.

25   Q.   So, you are not offering any opinion with respect to

16L7MLC2                    Medrado - cross

1    whether Merrill Lynch Capital Services acted with objective

2    good faith in connection with negotiating structuring,

3    implementing, administering or communicating with Itamarati

4    concerning the swap transaction.  That's just not part of your

5    work, am I right?

6    A.  That was not part of my work.

7    Q.  All right.  Let's turn to the subject of the standard

8    diligence then.

9          You would agree with me, would you not, sir, that a

10   conclusion that Merrill Lynch Capital Services engaged in

11   standard diligence is essential to your apparent authority

12   opinion under Brazilian law?

13   A.  Yes.

14   Q.  If Merrill Lynch did not engage in standard diligence then

15   Merrill Lynch cannot claim the benefit of the apparent

16   authority doctrine as you understand it under Brazilian law, am

17   I right?

18   A.  Yes.

19   Q.  OK.  So, in order to accept a conclusion that the apparent

20   authority doctrine as you understand it under Brazilian law

21   applies here, the court must necessarily first find that

22   whatever diligence MLCS engaged in was standard diligence.  Am

23   I right, sir?

24   A.  I will have to explain.

25   Q.  Well, can you answer yes or no first before you explain?

16L7MLC2                    Medrado - cross

A.   I have to explain how the courts, how they construe the

legal standards, and I think --

Q.   I will withdraw the question then and let me just ask the

question.

          THE COURT:  Let me ask the question.

          Is it your expert opinion that Brazilian law requires

a determination that in this case Merrill Lynch Capital

Services provided standard diligence or exercised standard

diligence before they could prevail on the theory that you have

been talking about?  Is that a prerequisite?  Is that an

element?

          THE WITNESS:  Yes, that's an element, yes.

          THE COURT:  OK.  So, next question.

Q.   And it's true, is it not, sir, that you in your Brazilian

legal practice haven't performed diligence on loan transactions

like the loan transaction that Merrill Lynch credit products

did with UISA Finance?

A.   I am not a transactional lawyer; I am a litigator.  I am

not engaged in due diligence of transactions, if that's what

you mean.

Q.   That was exactly my question, sir.  And the follow-up

question to that, which I think the answer will be apparent,

but I will make it for the record:  You haven't engaged in your

Brazilian legal practice in due diligence with respect to

derivative transactions either, have you, sir?

16L7MLC2                     Medrado - cross

1    A.  I have not.

2    Q.  And you are not an expert on what constitutes the usual or

3    typical due diligence that parties perform in either loan

4    transactions or derivative transactions, are you, sir?

5    A.  I'm not a transactional lawyer, so I'm not engaged in the

6    documents.  What I have indicated is that I have litigated

7    cases before involving these very same facts -- not the

8    facts -- issues before Brazilian courts.

9    Q.  And in performing your work on this case, you haven't

10   sought to make any determination, have you, sir, concerning

11   whether Merrill Lynch credit products due diligence on the

12   loans with UISA and Itamarati was standard diligence?

13   A.  I haven't investigated.  I have seen comments on that from

14   Mr. Brancher's declaration.

15   Q.  OK.  And have you received any information from Merrill

16   Lynch concerning what percentages, what percent of guarantees

17   that they have in their Brazilian practice for which they

18   didn't get a board resolution?

19   A.  A percentage of --

20   Q.  Yeah.  Well I think I asked the question in an unclear way.

21        If I were interested in statistical information, you

22   know, what percentage of Merrill Lynch transactions have X or Y

23   or Z, have you received any information along those lines?

24   A.  Regarding which requirement?

25   Q.  Well, for example, do you have any information on the

1    percentage of derivative transactions involving guarantees that

2    MLCS has entered into with a Brazilian counterparty where they

3    didn't obtain a board resolution indicating that that guarantee

4    was authorized?

5    A.  That would not be relevant to determine --

6    Q.  So, you don't have that.

7    A.  I don't have, because they never asked me.  It would not be

8    relevant.

9    Q.  Do you have any information concerning the percentage of

10   transactions that any Merrill Lynch entity entered into

11   involving a loan or a derivative with a Brazilian counterparty

12   where Merrill Lynch did not get a certificate of authority?

13   A.  What do you mean by certificate of authority?

14   Q.  Well, have you seen a certificate of incumbency and

15   authority?

16   A.  Oh, certificate of incumbency.  But that's relevant for the

17   loan or for the derivatives?

18   Q.  Well, a certificate of incumbency is a general purpose

19   document frequently used in Brazilian deal practice, is it not,

20   sir?

21   A.  Not a certificate of incumbency.

22   Q.  What is the certificate indicating that the signers have

23   authority that's typically used in Brazilian deal practice,

24   sir?

25   A.  If it is -- and this is an important point you make -- for

1    purposes of a Brazilian corporation the Brazilian corporation

2    is represented by the officers.  So, if it is required under

3    the bylaws that two officers present, sign a contract, the

4    company, the corporation will be duly represented, and that's

5    enough for purposes of verifying whether it was properly

6    represented, and then the obligation becomes valid.

7            Getting back to your question on the board resolution,

8    it would not be necessary actually for a buyer to request a

9    copy of the board of directors resolution because the

10   corporation was already well represented.

11           If I may proceed, relating to --

12   Q.  With all respect, sir, you are not answering my question.

13           THE COURT:  Let's get back to the question.

14   Q.  My question is:  You have seen evidence, have you not, sir,

15   in connection with the loan transactions Merrill Lynch Credit

16   Products obtained board resolutions that authorized those

17   transactions and board resolutions that authorized the related

18   guarantees, correct?

19   A.  I heard -- I have seen from the declaration that it

20   requested.  I haven't seen the actual document of them

21   requesting, just to make clear for the record.

22   Q.  Thank you.  Let me direct your attention, if I could, to --

23   I think I'm going to skip that.

24           Let's talk about ratification for just a moment and

25   direct your attention to your trial affidavit, paragraph 57.

1    A.  OK.

2    Q.  And paragraph 57 discusses the extent to which ratification

3    needs to be performed by the board of directors as opposed to

4    some other persons or entity, correct, sir?

5    A.  Correct.

6    Q.  OK.  And it appears that you and Mr. Brancher have some

7    disagreement under Brazilian law concerning whether acts that

8    would ratify a transaction that needed to be authorized by the

9    board needed to be taken by the board, correct?

10   A.  Correct.

11   Q.  OK.  And I don't want to actually ask you --

12   A.  I'm sorry.  Getting back, it's not correct to say that

13   action that needed to be taken by the board.  And that's the

14   very point of our controversy, because he says that the board

15   of directors should take an action; I say that the corporation

16   should take an action.  Just to qualify my answer.

17   Q.  I understand.  And in terms of the actions that you have

18   reviewed that are asserted to constitute ratifying acts, it's

19   true, is it not, sir, that those were not actions that were

20   taken by the board of Itamarati?

21   A.  They were actions taken by the corporation.

22   Q.  They were not actions that were taken by the board of

23   Itamarati, were they, sir?

24   A.  I cannot say that they were not taken by the board, because

25   the action that we are referring to, just to get into the

1    specifics, is the offering of sugar and the offering of

2    ethanol, they were provided to guarantee the obligations, and

3    also cash payments that were made by USINAS Itamarati to

4    Merrill Lynch.  So, those actions were taken by the

5    corporation, and it's not relevant whether the board of

6    directors had approved or was aware of those actions taken.

7    Q.  And because it's not relevant it wasn't part of your work

8    to determine whether the actions that are asserted to be

9    ratifying actions were in fact actions taken or approved by the

10   board, correct?

11   A.  I did take into consideration in my analysis the fact that

12   high management in USINAS Itamarati was aware already for quite

13   sometime since January 2008 about that USINAS Itamarati was a

14   guarantor in the obligations and that it was aware especially

15   by the chief legal officer and also by the CEO that all of

16   these high level managers in the corporation had knowledge of

17   that.  So, I could not doubt that the board of directors would

18   not know that they were offering sugar and ethanol to comply

19   with the obligations and also making payments for the purpose

20   of complying with the obligations assumed.

21   Q.  And you just haven't seen any evidence of that one way or

22   the other.  You said you could not -- there is no evidence that

23   you have seen that constitutes a board authorization of any of

24   the acts you point to.

25   A.  You mean the sugar and ethanol offering?

1   Q.   Yes, sir.

2   A.   And the cash payment?  I haven't seen a written document by

3   the board of directors to that effect authorizing that.  But,

4   as I indicated, it would not be necessary, the board of

5   director's action, to consider those actions as ratification

6   acts.  And I have pointed out to case law in Brazil that agrees

7   with that statement.

8           MR. WERDER:  May I have a moment, your Honor?

9           I have no further questions at this time, your Honor.

10   Thank you.

11          THE COURT:  OK.  Mr. Rice, are you going to do any

12   redirect?

13          MR. RICE:  Yes, your Honor.

14   REDIRECT EXAMINATION

15   BY MR. RICE:

16   Q.   Mr. Medrado, you talked with Mr. Werder about standard

17   diligence.  What does the word standard mean under Brazilian

18   law in relation to that diligence?

19   A.   I would define as certain pattern of actions taken by a

20   party under certain circumstances to ensure that the party that

21   is representing a corporation -- to ensure that it can rely on

22   the appearance, on the apparent authority of someone that is

23   representing a corporation.  It is something to be discussed on

24   a case-by-case basis.  It is an analysis that needs to be made

25   according to the circumstances of every case.

1            THE COURT:  You said a pattern of actions, right?

2            THE WITNESS:  Yes.

3            THE COURT:  I think we should just correct that.  It's

4    a pattern of actions taken by a party under certain

5    circumstances to ensure that the party -- well, it goes on.  I

6    just want to make sure the record is correct.

7    Q.  Let me see if I can help with that.

8            Are you saying by pattern or otherwise that in order

9    to determine whether or not a party exercised standard

10   diligence you need to look at what that party did in other

11   circumstances or other parties did in similar transactions?  Or

12   is it something different than that?

13   A.  It has to look at what the party did in that specific case.

14   Q.  OK.  All right.  And have you looked at, sir, the evidence

15   in this case as to what the specific party, MLCS, did in this

16   case?

17   A.  Yes, I have.

18   Q.  OK.  And did you reach a conclusion with respect to whether

19   or not what MLCS did in this particular case with respect to

20   the guarantee satisfied under Brazilian law the standard of

21   standard diligence?

22   A.  Yes, I have reviewed, and I concluded that it has satisfied

23   the standard diligence requirement.

24   Q.  Now, I know you have spent some time in your report

25   outlining the facts, but could you just tell us, tell the

court, if you can, you know, what are the facts or the

principal facts that led you to the conclusion that MLCS

exercised standard diligence in connection with the guarantee

transaction, the guarantee from Itamarati?

A.  First of all, it was intended by the parties that

Itamarati, USINAS Itamarati would be the guarantor of the

obligations under the derivatives transaction.  And since the

beginning and then on the documentation that was made beginning

with the term sheet and then with the ISDA agreement it was

laid out that Itamarati was going to be the guarantor for the

obligations of UISA Finance.

        Then as I understand -- and I am not a derivatives

expert -- but as I understand from the record of the case, in a

derivatives transaction it is possible to make the term sheet,

which would be for the parties to agree on the basic elements

of the derivatives transaction and then to follow up on the

documentation that is needed to have the documents complete.

        So, MLCS took steps to guarantee that first the

documents were signed, it repeatedly asked that the documents

were signed.  Then it received -- in April 24 the term sheet

was agreed, and then April 28 it received a copy of it signed.

Then May 13 the ISDA agreement was signed and also signed on

behalf of USINAS Itamarati as guarantor.  And then later on

there were e-mails by the MLCS team requesting that certain

documents be provided.  In the documents that were required

16L7MLC2                        Medrado - redirect

1    under the ISDA there was an indication that there was a need

2    for the credit supporter, provider, would provide a guarantee.

3    And the credit support provider is USINAS Itamarati.

4            Therefore, after May and June and July, there is

5    evidence that Merrill Lynch provided -- sent e-mails requesting

6    not only the guarantee but also requesting legal opinion

7    asserting whether -- that the requirements had been taken with

8    respect to the corporate requirements for the transaction to be

9    made, and it also repeatedly requested that those documents

10   should be provided until getting them in September 23.

11           So, September 22 and 23 -- 22 was by e-mail, 23 the

12   actual documents -- Merrill Lynch obtained the document signed,

13   the ISDA.  It also received the guarantee duly signed by USINAS

14   Itamarati and also received the legal opinion, which in that

15   case was an internal legal opinion provided by USINAS Itamarati

16   counsel, and then it provided 30 more days for USINAS Itamarati

17   to provide an external legal opinion for the case.

18           So, it is possible to see from the e-mails that MLCS

19   always sought and went after the documents formalizing the

20   transaction, and it went until September 23 to get those

21   documents.  And from what I have seen from the record, it is

22   normal practice under derivatives transactions for the

23   documents to come after the parties have agreed in the

24   beginning on the terms of the transaction.

25           THE COURT:  So, when was the agreement executed, in

1   your opinion?  April?  May?  September?

2           THE WITNESS:  That's an important point.  They were

3   physically signed in -- the guarantee, you mean, your Honor?

4   The guarantee?

5           THE COURT:  Yes.

6           THE WITNESS:  It was signed physically in September,

7   but its date is April 24.  So, for purposes of the Brazilian

8   law the document, its date is April 24 unless one of the

9   parties go to a court and ask a judge to say that the date was

10  another one.  But until that happens, the actual date is April

11  24 for purposes of the Brazilian law.

12  Q.  So, are you saying that under Brazilian law that the law

13  would give effect to the "as of" date in the guarantee?

14  A.  Yes.

15  Q.  You mentioned the May 13 document, and I think you said

16  ISDA.  Were you referring to a May 13 confirmation?

17  A.  Yes.

18  Q.  And that confirmation, what significance does that play in

19  your analysis under Brazilian law of whether there was apparent

20  authority for the guarantee that was signed in September of

21  2008?

22          MR. WERDER:  I'm going to object.  This is beyond the

23  scope.

24          THE COURT:  I am going to allow it.

25  A.  On May 13, all of the documents were signed by the parties

1    and especially USINAS Itamarati, also with high management

2    signing documents, so that provided to Merrill Lynch further

3    assurance that it was a firm commitment by USINAS Itamarati

4    that the transaction was formal on the part of USINAS

5    Itamarati.  So, that was another step, another element of

6    reliance that there was no suspicion that the agreements or the

7    guarantee would not be valid within USINAS Itamarati.

8              THE COURT:  And so the confirmation is binding, or

9    it's indicative of apparent authority?  I am not sure I am

10   understanding you.  Do you think that the confirmation signed

11   in May constituted a binding agreement between Itamarati and

12   Merrill Lynch?

13             THE WITNESS:  The May 13 document itself is a binding

14   agreement in my declaration for the trial.

15             THE COURT:  What is the exhibit, the May 13

16   confirmation?  Does anybody have it handy?

17             MR. RICE:  It is PX-4.

18             THE COURT:  Plaintiff's 4?

19             THE WITNESS:  4?

20             MR. RICE:  If I may hand the witness PX-4 so he has it

21   in front of him as well.

22             THE COURT:  Yes.

23   Q.  I think the judge had asked you is under Brazil law, is

24   this something that's binding?  And I think we are focusing on

25   the guarantees that's contained in it.  Is it binding or is it

16L7MLC2                    Medrado - redirect

1   further evidence of authority that is helpful for the September

2   23 document, or what?

3   A.  No, as we can see, it has been signed by USINAS Itamarati

4   as guarantor.  So, we have a signature by Mr. Rocha as chief

5   financial officer and also by Mr. Valdomir Possari which is the

6   legal counsel for USINAS Itamarati.

7           And it specifies that Itamarati would be a guarantor

8   as in page 35.  It indicates that Itamarati would be a party B

9   credit support, and it's important to indicate that this

10  specific provision says that USINAS Itamarati guarantees the

11  partial payment when due by any amount owed by party B to party

12  A, and with language waiving the right of not being prosecuted

13  after the actual party, the actual -- after UISA Finance.  And

14  it also says it is a complete and binding agreement between you

15  and us as to the terms of the transaction to which this

16  confirmation relates.  So, it is also a binding document.  It

17  is a binding contract, and it gave further assurance that it

18  was -- further assurance to rely on the obligations that were

19  being taken by USINAS Itamarati.

20          (Continued on next page)

21

22

23

24

25

1611mlc3                          Medrado - direct

1    BY MR. RICE:

2    Q.  I understand the further assurance part.  With regard to

3    your testimony just now that this is binding, is there some

4    case under Brazilian law that looks at a -- let me back up.

5    This was signed by two directors, I take it, on behalf of

6    Itamarati as guarantor; correct?

7    A.  Mm-hmm.

8    Q.  Correct?  Are you familiar with a case called *Ferronorte*?

9            MR. WERDER:  Your Honor, this is completely beyond the

10   direct.

11           THE COURT:  Well, look, that's all right.

12           MR. WERDER:  I'll withdraw that.

13           THE COURT:  I mean --

14           MR. WERDER:  It's fine.

15           THE COURT:  A trial of this nature, you know, there

16   are certain things we're not going to get on cross that I still

17   may want to know about, so I certainly do want to know about

18   this.  I want to know what the parties understand this document

19   to be, whether this is a binding contract, or whether it's just

20   some evidence that supports apparent authority for what is a

21   different binding contract that was executed in September.  I'm

22   still unclear on that.

23           MR. RICE:  So certainly, Judge, we're arguing the

24   first of those things, but --

25           THE COURT:  You're arguing this is a binding contract?

1          MR. RICE:  No.  The first thing we're certainly

2     arguing is that it goes to sort of the apparent authority for

3     the later document.  I'm just -- I'm asking the witness.

4          THE COURT:  He just said that this is a binding

5     contract, so I want to --

6          MR. RICE:  He just said it, and I'm asking:

7     BY MR. RICE:

8     Q.  On what basis do you say, sir, that this is also a binding

9     contract?  And talking with respect to Itamarati as guarantor,

10    not UISA Finance.  With regard to Itamarati as guarantor.

11         THE COURT:  He's asking what authority you cite for

12    that position.

13    A.  We have seen that USINAS Itamarati would be a -- would be

14    bound by the signature of two officers or one officer and a

15    proxy holder or two proxy holders.  That's for -- Itamarati is

16    a corporation.  It is -- it is a corporation, and under the law

17    of the corporations, which is Law 6404 of 76 Article 138, a

18    corporation is represented by the officers.  The bylaws said

19    that it would be represented by one officer and one proxy

20    holder.  So we have one officer, which is --

21         THE COURT:  One officer or one director?

22         THE WITNESS:  I'm talking about the officer.

23    Q.  Is a director the same thing as an officer for these

24    purposes?

25    A.  I'm considering -- I'm translating here, so to be clear,

1    officer -- a director would be a member of the board of

2    directors, under my -- under my statement here, okay?

3              MR. RICE:  But we know that Mr. Possari, who is listed

4    as director here, was not on the board of directors; right?

5              THE WITNESS:  Yes.

6    Q.  So what does director mean in this document, as you

7    understand it?

8    A.  I understand that he signed as a legal counsel, so we have

9    to see whether he had power to sign as -- as a proxy holder.

10   So attorney would be attorney in fact.  So we have Mr. Eucartem

11   as an officer signing as USINAS Itamarati, on behalf of USINAS

12   Itamarati, page 9, and on page 10, there is Mr. Ernesto Possari

13   as legal counsel.  So if he is the proxy holder, then this

14   would be -- this could be a binding document on USINAS

15   Itamarati because they were two signatures, according to the --

16   to each of the bylaws, and that would be enough for legal --

17   legal representation under Brazilian law.

18   Q.  And what legal -- what can you point the court to in terms

19   of Brazilian law for that -- that would support that

20   conclusion.

21   A.  Sure.  It is -- it is the *Ferronorte* case.  It indicates

22   that when -- when two officers are representing the company,

23   that that's sufficient for proper representation, and so I -- I

24   refer to that case.

25   Q.  Okay.  Now putting aside the question of the May 13th

1611mlc3                         Medrado - direct

1    document as an enforceable guaranty, is the signing -- just to

2    be absolutely clear, does the signing of this document by

3    senior officers of Itamarati, does that enter into the analysis

4    as to whether or not it was apparent authority for the ISDA

5    guaranty that was signed in September?

6    A.   Yes.   It is an additional element that attorney was able to

7    consider to say that the party was entitled to rely on all of

8    the circumstances to say that there was apparent authority

9    here.

10   Q.   All right.   Mr. Werder asked you about board resolutions

11   and what you knew about what was signed, etc.   Was obtaining a

12   board resolution authorizing the signing of the guaranty, the

13   one with the ISDA agreement, the one dated as of April 24th,

14   2008, was that in your opinion necessary in order to satisfy

15   the requirements of standard diligence under Brazilian law?

16   A.   It would not be necessary considering that the party

17   obtained a legal opinion saying that all of the requirements

18   had been taken to ensure -- well, a legal opinion stating that

19   the requirements, internal requirements of USINAS Itamarati

20   were obtained, and this is as -- the board resolution, a board

21   approval, is a matter of internal coparties, internal coparties

22   issue.   It's an internal issue of the corporation.   Then MLCS

23   should not -- should not -- should not be implicated or have

24   any implications deriving from any lack or failure of the

25   corporation to pass eventually board resolutions.

1611mlc3                          Medrado - direct

1   Q.  Okay.  Would you take a look at your witness statement, the

2   declaration you signed for this trial, and specifically to

3   paragraph 40, which starts on page 12, carries over to page 13.

4   Going on to page 13 -- this is in the section where you're

5   talking about apparent authority -- there is a -- in the second

6   sentence it talks about third parties that acted in good faith

7   with respect to the question of authority.

8   A.  I'm sorry.  Which item?

9   Q.  Paragraph 40, the part that carries forward onto page 13,

10  under romanette (iv) on the second line there.

11  A.  Okay.

12  Q.  It refers to third parties that acted in good faith with

13  respect to the question of authority.  You talked to Mr. Werder

14  about -- or he asked you questions about, you know, good faith

15  and why it is or the fact that you didn't inquire into the

16  facts and circumstances related to the structuring of the

17  transaction or the administration of the derivative

18  transaction.  Is any of that stuff relevant under Brazilian law

19  as to whether or not the standard diligence and apparent

20  authority apply?

21  A.  For -- for a question of whether the parties were duly

22  represented and whether the party would be entitled to a -- to

23  the apparent authority theory, it would not be relevant.

24  Q.  So what good faith is relevant to the question of authority

25  in connection with the execution of a guaranty?

1    A.   Good faith in providing -- if I were to direct the case,

2    good faith in providing the documents needed for the

3    formalization of the case -- of the -- of the transaction.  And

4    at some point in October, Merrill Lynch was continually

5    requesting some of the documents needed and USINAS Itamarati

6    refrained or stopped -- it stopped providing the information,

7    and there is evidence that they were saying, "Well, as you

8    know, we are negotiating and therefore we are -- we have

9    stopped to providing documents relating to the transaction."

10   So that -- that would actually bring a question of whether --

11   whether at that point they were acting with good faith in

12   providing all the documents needed to formalize the

13   transaction.

14   Q.   But let's focus on the Merrill Lynch side of it, Merrill

15   Lynch Capital Services.  In what respect did Merrill Lynch

16   Capital Services need to act with good faith in connection with

17   getting the benefits of the good faith apparent authority

18   concept in relation to the guaranty?  Do you look at the

19   entirety of the relationship or something else?

20   A.   It would answer the -- show to -- provide to Itamarati any

21   documents that -- documents showing that they're

22   representatives on behalf of Merrill Lynch or were authorized

23   or they were properly -- providing USINAS Itamarati the

24   assurance that the people with whom they were doing had powers

25   to deal with that at that moment.  That's for -- that's for

1  Merrill Lynch.

2  Q.  You were asked early on in your cross-examination about

3  things that -- "Did you see copies of policies?" and things

4  like that.  Was there anything in this case that you wanted to

5  see that -- in terms of documents relating to the transaction

6  or Merrill Lynch Capital Services or anything else, that you

7  were -- did not receive?

8  A.  That I did not receive?

9  Q.  Right.  Is there anything that you wanted to see that we

10 didn't supply?

11 A.  No.  I actually received the documents from -- from -- that

12 were made in discovery, and I made my -- my assessment from the

13 documents that were produced in the discovery phase.

14 Q.  Okay.  And you were asked about your firm's relationship

15 with Merrill Lynch.  Could you just give us a sense of the size

16 or significance of that relationship.

17 A.  Yes.  I have -- I did review that, and Merrill Lynch is

18 less than 1 percent of our global revenue.

19         MR. RICE:  That's all I have, your Honor.

20         THE COURT:  All right.  I have a couple questions.

21 If -- this is hypothetical.  If Merrill Lynch Capital Services

22 understood that Itamarati's bylaws required board approval

23 before they could enter into a transaction, would relying on

24 the signatures of two officers nevertheless be standard

25 diligence, in your opinion?

1      THE WITNESS:  Because they requested a legal opinion,

2  it is understood that it is, yes.

3      THE COURT:  All right.  Even if they knew that the

4  bylaws required board authorization, it would be standard

5  diligence to proceed without such a board resolution because

6  there was a legal opinion; is that your testimony?

7      THE WITNESS:  Your Honor, that goes into the

8  discussion that we had before about the requirements, and I

9  don't want to repeat what I told before, but the bylaws,

10  they -- they are confusing with whether it would be required, a

11  board resolution.  So receiving the legal opinion would cover

12  the Merrill Lynch from discussing and having to discuss whether

13  a board resolution was necessary or not, especially because,

14  if -- even if requested the copy of the board resolution, let's

15  say was passed one week before, it would have no guaranty that

16  another board resolution was passed between the first one and

17  the execution of the documents revoking the -- that -- that

18  approval.  So for a third party receiving the legal opinion, we

19  will make sure that all of the internal issues we think USINAS

20  Itamarati were done, and for that effect, it would be -- it

21  would be enough.

22      THE COURT:  All right.  I think you said the bylaws

23  are confusing.  Can we look at the bylaws?  Do we have that?

24  What exhibit is that?

25      MR. RICE:  It's Plaintiff's Exhibit 21, but let me

 1   make sure, your Honor.

 2              MR. WERDER:  DX25A is the bylaws.

 3              MR. RICE:  Either one would be fine.

 4              THE COURT:  PX21?

 5              MR. RICE:  21.

 6              THE COURT:  Okay.  Can you give a copy to the witness.

 7              MR. RICE:  And your Honor, first, the beginning of it

 8   is in Portuguese, but the English translation is at the end of

 9   the exhibit.

10              THE COURT:  Right.  That's what I'm looking at, which

11   maybe that won't accurately reflect the confusion that the

12   witness referred to, but the court should be able to go with

13   the translation, which has been certified as an accurate

14   translation.

15              MR. WERDER:  Just for the record, this is one of the

16   few exhibits where there are competing translations of the

17   document, your Honor.

18              THE COURT:  All right.

19              MR. WERDER:  DX25A, just for the record -- you can

20   look at their version for now, but DX25A is also a certified

21   translation.

22              THE COURT:  I'm not sure how I'm going to resolve that

23   dispute.  We talked about that.  So unless I'm going to get to

24   examine credibility issues with respect to the translators, I

25   don't know how I'm going to know whose translation is off.  I'm

1611mlc3                        Medrado - direct

1     not sure how it gets resolved that way.

2              So -- all right.  Looking at Plaintiff's Exhibit 21,

3     we're going to what article?  What are we going to?  Article --

4              MR. RICE:  I'm sorry, your Honor.  I'm not sure the

5     witness has 21.

6              THE COURT:  I'm sorry.

7              MR. RICE:  That's my fault.

8              THE COURT:  Thank you.

9              THE COURT:  22 I think is what we've been talking

10    about; right?

11             MR. WERDER:  That's correct, your Honor.

12             THE COURT:  The provisions that I should be focused on

13    are what, E and F?  Or D?  What?

14             THE WITNESS:  I indicated in the first document --

15    declaration, that would be -- yes, I indicated item XI, saying

16    that to authorize the officers to make obligations that

17    represent amount higher than 2 million alone or 6 million

18    aggregated period of three months.

19             THE COURT:  What are you referring to?  Paragraph XI

20    of what?

21             THE WITNESS:  Of Article 22 of the bylaws.  And then

22    paragraph XI.

23             THE COURT:  All right.  XI?

24             THE WITNESS:  XI.

25             THE COURT:  Roman XI, and then what subchapter or

1611mlc3                      Medrado - direct

1    subsection?

2             THE WITNESS:  If you go on my -- please refer to Roman

3    II in item IX of my first declaration.  It is -- it makes

4    reference to item C under XI.

5             THE COURT:  Item C?

6             THE WITNESS:  Yeah.  Okay.  Okay.  That would be --

7    that would be F.  That would be F.  So Roman I would be E.  So

8    what I said was, "The following two types of X that businesses

9    are deemed relevant for the purposes of Article 22 of the

10   bylaws."  So I -- between -- I was not deciding which one of

11   them was actually the one to apply.  And they refer to item E.

12   So to assume obligations or -- I'm now making the translation

13   on my own -- or financing for the corporation are the contract

14   obligations or financing existing in amounts superior to

15   2 million high individually by X or 6 million in the aggregate

16   of individual X in the period of three months.

17            And then come item F, which would be -- which was

18   replicated in my report at item IX, Roman II, indicating

19   investments in amount higher than 500,000 individually by X or

20   1.5 million in the aggregate in three months.

21            So that was what I made reference to.

22            THE COURT:  Do you think that the guaranty at issue

23   here could be deemed the making of an investment?

24            THE WITNESS:  My -- as I learned more about the

25   structure of the -- of a derivatives transaction, I actually do

1611mlc3                              Medrado - direct

1   not, your Honor, and that was my point when I -- I said that my

2   opinion was not -- was not an essential -- was not an opinion

3   on the essence of -- of the issue, was not a definite opinion.

4   And when I saw Mr. Brancher's declaration, he actually points

5   out to a different one, and if I can make reference to his

6   declaration, I think he points out to dealings with third

7   parties, and so I'm trying -- I'm trying to find which one

8   would be here.

9          MR. RICE:  If I can help, your Honor, it's pretty

10  clear Mr. Brancher says 11B.

11         THE WITNESS:  11B.  So it's to renounce -- to write --

12  to commit and leave guaranty or any other guaranty in favor of

13  third parties, and the point here would be -- well, would UISA

14  Finance here be a sort of party because it was an entity that

15  was made for the purpose of this transaction, and it is hold by

16  the same shareholders of UISA Itamarati.  So it could -- it

17  could also be argued on -- on this specific point in Brazil, a

18  judge would consider first, there is a separation of the legal

19  entities, so a more formal aspect would say that this would

20  apply on B, but a judge could say, well, considering that

21  this -- this company is hold by the same -- by the same

22  shareholder, then this would not be a third party, so a judge

23  considering could eventually consider that in a more flexible

24  way, especially because USINAS Itamarati is a close held

25  corporation, and I have indicated in my report that the highest

1    nonconstitutional court in Brazil considers that close held

2    corporations should be -- should be applied in lower standard

3    of rigorousness with respect to formal aspects of corporate

4    law.  So -- so it could be disputed.  And that's the point,

5    that the -- that the bylaws is not -- is not clear.

6            THE COURT:  I want to see the defense translation --

7            MR. WERDER:  Your Honor, I would just note --

8            THE COURT:  -- because I really don't know what it

9    means that it's the responsibility of the board to authorize

10   the board to do stuff.

11           MR. RICE:  Your Honor, to me I think that's probably a

12   mistake in the translation because I think it really means the

13   directors, which mean officers.  And so I think --

14           THE COURT:  All right.  That's your translation.  So I

15   want to take a look at the defense translation.

16           MR. RICE:  I understand, your Honor.

17           THE COURT:  25A?

18           Same thing.  The board of director's responsibility to

19   authorize the board.  Anybody find that to be just silly?

20           THE WITNESS:  It is -- it is a matter of translation

21   that -- it is generally confusing whether a director in Brazil

22   is *diretor*.  So that generally makes confusion in the

23   translation.

24           THE COURT:  Okay.  All right.  I have nothing further.

25   If anybody has any other questions in light of what I asked, or

1    Mr. Werder, you had some recross?

2              MR. WERDER:  I have some brief recross, your Honor,

3    yes.

4              THE COURT:  All right.

5    RECROSS EXAMINATION

6    BY MR. WERDER:

7    Q.  Mr. Rice had asked you some questions about paragraph 40 of

8    your trial affidavit.  Do you have that in front of you, sir?

9    A.  Yes.

10   Q.  And in particular he asked you at the top of -- about the

11   phrase on the top of page 13 about good faith, "with respect to

12   the question of authority."  Do you recall those questions?

13   A.  I do.

14   Q.  All right.  Keep that with you, if you would, and then take

15   a look at -- Exhibit DX11 is your initial declaration.

16   A.  Okay.

17   Q.  Paragraph 13.

18   A.  Yes.

19   Q.  Paragraph 13 of your original declaration is quite similar

20   to paragraph 40 of your trial declaration, is it not, sir?

21   A.  Yes, it is.

22   Q.  And if we look at Roman -- Roman IV on the -- on

23   paragraph 13 of Exhibit Defendant's 11, it says, "The act had

24   effects on counter/third parties that acted with good faith,"

25   does it not, sir?

161lmlc3                         Medrado - cross

1   A.  Yes, it does.

2   Q.  And then in your trial declaration you added some words to

3   what you had previously put in your sworn testimony, didn't

4   you, sir?

5   A.  Yes, I added with respect to the question of authority.

6   Q.  And that was done after your deposition -- that was done

7   after your deposition was taken at which we pointed out, among

8   other things, that you didn't have any basis to opine as to

9   whether Merrill Lynch had overall acted in good faith; am I

10  right, sir?

11  A.  If you just allow me to look at my other documents, please.

12  Q.  The only question, sir, is whether the trial declaration

13  was written after your deposition.  Wasn't it, sir?

14  A.  It was.

15  Q.  And you recall me asking you questions similar to the ones

16  that I asked you earlier this morning in your deposition about

17  whether you had done any work to satisfy yourself that Merrill

18  Lynch acted with good faith in connection with the overall

19  transaction?

20  A.  Yes, the --

21  Q.  Very good.

22  A.  Can you repeat -- can you repeat, please?

23  Q.  Yeah.  You recall, you filed -- you did your trial

24  declaration, your trial declaration after your deposition;

25  correct, sir?

1    A.   Yeah.

2    Q.   And you added some words to what you had previously set

3    forth as your -- as the description of the relevant doctrinal

4    work in paragraph 13 of your original declaration; didn't you,

5    sir?

6    A.   Yes.

7    Q.   Those words were added with full knowledge that I had

8    questioned your ability to offer an opinion as to whether

9    Merrill Lynch had acted in good faith with respect to the

10   overall relationship with the Itamarati Group; correct?

11   A.   I wouldn't draw a direct consequence of your questioning

12   and then my adding those words, but I was trying to be as clear

13   as possible to -- to this court, especially because my action

14   here, my participation here is with respect to representation

15   and authority.  So that's why it must have been refined here.

16   Q.   I see.  Mr. Rice asked you some questions about the

17   confirmation and the court asked you some questions about the

18   confirmation as well.  And we're talking about the confirmation

19   from May of 2008.  And you testified about this in your

20   deposition, didn't you, sir?

21   A.   I did.

22   Q.   And you testified in your deposition, didn't you, that you

23   weren't suggesting that the confirmation is the guaranty that

24   Merrill Lynch is seeking to enforce or entitled to enforce in

25   this case; am I right, sir?

 1    A.  Can you repeat.

 2    Q.  Let me just direct your attention, if I could --

 3    A.  What is the --

 4    Q.  -- to your deposition.  Do you still have that in front of

 5    you?

 6    A.  Yeah, I do.

 7    Q.  Page 184 and 185.

 8    A.  Okay.  Yes.

 9    Q.  All right.  And I want to ask you about that last question

10    on page 184 that continues over to 185.  But before I do that,

11    do you see where there's the reference there to paragraph 19?

12    A.  Okay.

13    Q.  Okay.  We're discussing paragraph 19 of your expert report

14    from March of 2011.  Why don't you get that in front of you.

15    It's DX -- DX14.

16              THE COURT:  What paragraph?

17              MR. WERDER:  19, your Honor.

18    Q.  And for the record, paragraph 19 of your report said, "The

19    evidence mentioned above demonstrates that the confirmation

20    dated May 13th, 2008 constituted a binding and complete

21    agreement in which not only did Itamarati guaranty UISA's

22    obligations under the swap but also expressly allowed, as I

23    understand is customary in derivative transactions, the

24    definitive ISDA agreements to be formulated later."

25              Now I want to direct your attention to your

deposition.  So at the -- at page 184 and 185, I asked you,

"Let me direct your attention to paragraph 19.  You're not

suggesting here, are you, that -- that the confirmation is the

guaranty that Merrill Lynch is seeking to enforce in this case

and is entitled to enforce in this case, are you, sir?"  And

Mr. Russell objected to the form.  And your answer was, "No,

I'm not.  No, I'm not."  That was your testimony, wasn't it,

sir?

A.  It was my testimony.

Q.  And that testimony is completely contrary to what you

testified here today, isn't it, sir?

A.  What -- what I have seen the claim, that the claim -- and

for that I may be -- I can be wrong on that, but -- but the

claim had as an attachment the guaranty, so that's a matter of

how Merrill Lynch decides how to take -- how to conduct the

case, the case in this case, so it was -- it was obtained, it

is enforcing the guaranty, and we are discussing the guaranty.

But that does not preclude an analysis of what the May 13

constitutes, and that was my question -- that was my answer at

that time.

            THE COURT:  Certainly the question I asked was

different than the questions you asked at the deposition.  One

was about Merrill Lynch's claims, the other is about whether in

his opinion the May 13th confirmation is a binding contract.

So --

1            MR. WERDER:  Well, I also asked whether it was

2    entitled to enforce it in this case, your Honor.

3            THE COURT:  Well, that's, again, asking about the

4    claim asserted by Merrill Lynch.  It seems to me your

5    question -- you can read it again if you want.

6            MR. WERDER:  That's okay.  You have the question.

7    That's fine.  No further questions.

8            THE COURT:  All right.

9            MR. RICE:  Your Honor, just very briefly.

10   REDIRECT EXAMINATION

11   BY MR. RICE:

12   Q.  Would you, sir, get out Defendant's Exhibit 11 again, sir.

13   That is your declaration, the original declaration that you

14   issued in June of 2009.  And Mr. Werder asked you about

15   paragraph 13, do you remember that, and the addition of some

16   words after "third parties had acted with good faith"?

17   A.  Yes.

18   Q.  Would you take a look at paragraph 12 and specifically the

19   last sentence that starts on page 5 and continues onto page 6.

20   Do you see that?

21   A.  Yes.

22   Q.  Would you -- that says, does it not, "The majority of the

23   doctrinal work examining the apparent authority theory favors

24   upholding the validity of a contract when the parties demanding

25   the performance of the contract had acted with good faith with

1   respect to the question of authority when entering into the

2   contract"?  That's what your testimony is.

3   A.  Yes, that's my testimony, and I wanted to be precise on

4   what it was, testimony, and making sure I direct to -- into

5   those boundaries.

6           MR. RICE:  Thank you.  No more questions, your Honor.

7           THE COURT:  All right.  You may step down,

8   Mr. Medrado.  Thank you.

9           (Witness excused)

10          THE COURT:  All right.  We have 20 minutes or so.

11  Next witness?

12          MR. RUSSELL:  Your Honor, our next witness is

13  Professor John Hull, but could I beg the court's indulgence for

14  literally two minutes for a bathroom break?  Thank you.

15          (Recess)

16          (In open court)

17          (Witness sworn)

18          THE COURT:  Okay.  Have a seat.  If you could state

19  your name and spell your name, first and last, for the record.

20          THE WITNESS:  My name is John Hull, J-O-H-N, H-U-L-L.

21          THE COURT:  All right.  Mr. Hull, good afternoon.

22  Keep your voice up.  Maybe just pull that mic a little closer,

23  perhaps.  That's great.

24          And you can proceed, Mr. Russell.

25          MR. RUSSELL:  May I approach?

1                THE COURT:  Yes.  You don't have to ask, I told you.

2                MR. RUSSELL:  I apologize, your Honor.  I forgot.

3                THE COURT:  You don't have to apologize, either.

4                MR. RUSSELL:  And I will not apologize for

5      apologizing, your Honor.

6                Before we proceed, your Honor, I'd like to just

7      correct one typographical error.

8                Mr. Hull, turn to page 21 of your affidavit.  I'm

9      sorry.  Page 6, paragraph 21.

10               THE COURT:  Paragraph 21.

11               MR. RUSSELL:  A number towards the bottom of the page

12     says in the middle -- it's 237,500,000, and it's missing a

13     zero.

14               THE COURT:  All right.  That's correct, Mr. Hull?

15               THE WITNESS:  That's correct, yes.

16      JOHN C. HULL,

17          called as a witness by the Plaintiff,

18          having been duly sworn, testified as follows:

19     DIRECT EXAMINATION

20     BY MR. RUSSELL:

21     Q.  Mr. Hull, I've handed you the affidavit you signed in

22     connection with -- under oath in connection with this trial.

23     When you signed it, with the exception of the typographical

24     error, did you believe it to be true and accurate?

25     A.  I do.

1611mlc3                           Hull - direct

1    Q.  As you sit here today, with the exception of that typo, do

2    you believe that your affidavit is true and accurate?

3    A.  I do.

4              MR. RUSSELL:  Your Honor, just a couple items that we

5    may have resolved.  In paragraph 58, Professor Hull refers to

6    Plaintiff Exhibits 182 to 187 and identifies them as worksheets

7    that he prepared containing the calculations and the data he

8    used to arrive at his calculations here.

9              THE COURT:  Yes.

10             MR. RUSSELL:  There have been objections on the

11   grounds of hearsay and lack of authentication.  If they're

12   still asserting those objections, I can walk him through

13   document by document and have him identify them, but I think

14   he's actually identified them sufficiently in his affidavit.

15             MR. TIMMONS:  We have no objection, your Honor.

16             THE COURT:  All right.  So 182 through 187 are

17   therefore received.  The objections are withdrawn.  All right.

18             (Plaintiff's Exhibits 182 through 187 received in

19   evidence)

20             MR. RUSSELL:  Secondly, your Honor, in paragraph 24 --

21             THE COURT:  24?

22             MR. RUSSELL:  Yes.  There's a reference to Plaintiff

23   Exhibit 81.

24             THE COURT:  Yes.

25             MR. RUSSELL:  Your Honor may recall that there was a

1    hearsay objection to that exhibit, so yesterday my partner

2    Mr. Rice replaced it and the court admitted into evidence

3    Plaintiff's Exhibit 81A --

4            THE COURT:  All right.  Yes.

5            MR. RUSSELL:  -- and removed the offending purported

6    hearsay, so we would also just like to amend the affidavit to

7    refer to Plaintiff's Exhibit 81A in evidence instead of

8    Plaintiff's Exhibit 81.

9            THE COURT:  All right.  Good.

10           MR. RUSSELL:  Skipping ahead, your Honor --

11           THE COURT:  Do you agree with that -- is it Professor

12    or Doctor?  Which do you prefer?

13           THE WITNESS:  Doctor will be fine.  Yes, I agree with

14    that.

15           MR. RUSSELL:  Your Honor, in paragraph 45 there's a

16    reference in a footnote -- two footnotes actually -- to

17    Plaintiff's Exhibit 164, which is market data concerning the

18    Brazilian *real*/US dollar exchange rate on which Professor Hull

19    relied.  There's been a hearsay objection to that document, and

20    I think it would fall squarely within rule of evidence 803(17),

21    which provides expressly that the market reports containing

22    market data on which people rely is admissible.

23           MR. TIMMONS:  We have no objection, your Honor.

24           THE COURT:  Okay.  Exhibit 164, is that --

25           MR. RUSSELL:  That's correct, your Honor.

1            THE COURT:  Yes.

2            (Plaintiff's Exhibit 164 received in evidence)

3            MR. RUSSELL:  And then the last item of housekeeping,

4    your Honor, in paragraph 40 of Professor Hull's affidavit

5    refers to Plaintiff's Exhibit 175.

6            THE COURT:  Yes.

7            MR. RUSSELL:  This was the market quotation provided

8    in early November from Deutsche Bank.  There had been an

9    objection on the grounds of hearsay.  I don't know if that

10   objection is withdrawn or not.

11           THE COURT:  Okay.  Are you still objecting to 175?

12           MR. TIMMONS:  Your Honor, may I have just one moment,

13   please?

14           THE COURT:  Sure.

15           (Pause)

16           MR. TIMMONS:  Your Honor, this -- this exhibit appears

17   to be another internal e-mail from Merrill Lynch.  There's

18   no -- there's not going to be any foundation from this witness

19   as to the purpose or nature of this document, and it's being

20   offered for the truth.  I don't think that it's an appropriate

21   use of this document with this expert witness, and we would

22   continue to object on hearsay grounds.

23           MR. RUSSELL:  Your Honor, the top e-mail is a internal

24   Merrill Lynch e-mail but the portion we care about is the

25   forwarding e-mail received from an individual at Deutsche Bank

1    that provided a market quotation.  So we'd be happy to, you

2    know, not rely on the top portion of the e-mail, which was an

3    internal communication within Merrill Lynch, but we would like

4    to rely on the communication between Merrill Lynch and Deutsche

5    Bank.

6              THE COURT:  Well, you're offering it as a business

7    record; right?

8              MR. RUSSELL:  Yes, your Honor.

9              THE COURT:  All right.  And so the basis for it being

10   a business record is what?  I'm not sure what testimony there

11   has been or what is in the affidavits concerning the

12   recordkeeping policy with respect to those kinds of e-mails.

13             MR. RUSSELL:  I think the -- the basis for it being a

14   business record is the way in which people seek market

15   quotations and conduct trades often is via e-mail or Bloomberg

16   Chat.  In this situation, it's an e-mail, regarding --

17             THE COURT:  I don't think it couldn't be.  I'm just

18   not sure --

19             MR. RUSSELL:  So that is the basis for making it a

20   business record.

21             THE COURT:  Well, I mean, you're referring to

22   testimony or you're referring to --

23             MR. RUSSELL:  I'm referring to the fact just evidence

24   from the face of the document, your Honor.

25             THE COURT:  Well, I mean, it's in my other binder.

1    Let me --

2              What about the face of the document?

3              MR. RUSSELL:  If you look down, they're communications

4    between Robert Finn at Deutsche Bank and Jill Cahill at Merrill

5    Lynch, where this is basically a continuation of the e-mails

6    that we covered with Ms. Wang this morning, where Deutsche

7    Bank, a couple days later, did get back to Merrill Lynch with a

8    quote, a market quotation transaction.

9              THE COURT:  Right.  But I mean, I don't know what the

10   testimony is with respect to whether this is something that is

11   kept in the ordinary course at Merrill Lynch or not.  I assume

12   it is.  Frankly, I'm not sure why we're spending this much time

13   even debating it.

14             MR. RUSSELL:  Fair enough, your Honor.  I don't want

15   to waste this court's time.

16             THE COURT:  I'm not blaming you; I'm blaming them.

17             Do you really think this is not coming in?

18             MR. TIMMONS:  Your Honor, there's a double hearsay

19   problem.  There's been no testimony at all from anybody at

20   Deutsche Bank with respect to what their recordkeeping policies

21   are.

22             THE COURT:  It's not Deutsche Bank's business; it's

23   Merrill Lynch's business.

24             MR. TIMMONS:  It's also -- they're offering it not for

25   the purposes of Merrill Lynch's business records but for the

1    information that's contained in the e-mail.

2              THE COURT:  They're not offering it for the purpose of

3    a business record; they're offering it for what's contained in

4    this.  But they're offering it as a business record exception

5    to the hearsay rule.

6              MR. TIMMONS:  That's correct.  That's correct, your

7    Honor, but it doesn't -- I don't think there's been any

8    evidence to establish that it meets the requirements of the

9    business records exception.

10             THE COURT:  Well, I assume Mr. Jhamb is going to be

11   able to fix that pretty quickly.  I don't recall what's in all

12   the affidavits concerning the business records, so you can do

13   it or we can deal with it later.  I just think there's no doubt

14   that it would be pretty easy to authenticate this and to

15   demonstrate that this is in fact a business record.  I just

16   don't know that it's happened yet.

17             So Mr. Jhamb is going to testify; right?

18             MR. RUSSELL:  Mr. Jhamb is going to testify first

19   thing Thursday morning, your Honor.

20             THE COURT:  So I think we're going to get there.

21             MR. RUSSELL:  And if --

22             THE COURT:  All right.  So 175 is objected to.  We'll

23   deal with it when we have the witness or when you can point to

24   me something that's already in the affidavit that would get it

25   in, but I don't think we need to hold up poor Professor Hull at

16l1mlc3                              Hull - direct

1    this point.

2              MR. RUSSELL:  No, your Honor.  We will seek to

3    introduce it in evidence through the testimony of Mr. Jhamb.

4              I would like to note, though, that they have also

5    objected to Professor Hull's testimony concerning the document

6    as hearsay.  I think that objection should be overruled because

7    as an expert, he's allowed to rely --

8              MR. TIMMONS:  We withdraw that objection, your Honor.

9              MR. RUSSELL:  All right.  Your Honor, I will stop

10   talking and turn the witness over to Mr. Timmons.

11             THE COURT:  Okay.  Who's doing -- Mr. Timmons, you're

12   doing this one?

13             MR. TIMMONS:  Yes, I am, your Honor.

14             THE COURT:  All right.

15   CROSS-EXAMINATION

16   BY MR. TIMMONS:

17   Q.  Good afternoon, Professor Hull.

18   A.  Good afternoon.

19   Q.  Do you have your -- a copy of your trial affidavit in front

20   of you, sir?

21   A.  I do.

22   Q.  Would you mind just referring to paragraph 33 for me.  Do

23   you have that in front of you?

24   A.  I do.

25   Q.  Paragraph 33, you state that you believe that it's quite

1611mlc3                      Hull - cross

1    common and normally the case for documentation to be signed

2    after closing in a derivative transaction; is that correct?

3    A.   That's correct.

4    Q.   But you've never negotiated an ISDA transaction before,

5    have you?

6    A.   I've never negotiated an ISDA transaction, no.

7    Q.   In fact, you have no personal experience trading

8    derivatives, do you?

9    A.   I do not.

10   Q.   You're an academic and not a practitioner in the

11   marketplace; isn't that right?

12   A.   I would characterize -- I would characterize --

13   characterize myself as an academic but somebody who's of the,

14   shall we say, practitioner end of the spectrum as far as the

15   population of academics is concerned.

16   Q.   But you've never participated in active derivatives trading

17   on a day-to-day basis, have you?

18   A.   I have not.

19   Q.   And you've never negotiated an ISDA document yourself, have

20   you?

21   A.   I have not.

22        THE COURT:  What's the basis for your statement at

23   paragraph 33, your understanding that a trade confirmation,

24   that it's quite common for those documents to be done later?

25        THE WITNESS:  Well, your Honor, I've been working in

1     the over-the-counter derivatives markets for 25, 30 years now,

2     I've done a lot of consulting, I've talked to a lot of

3     practitioners, I've reviewed a lot of confirmations as part of

4     my -- as part of my consulting, and this is a general

5     background knowledge that I've picked up.

6           For example, one of the big new derivative products is

7     known as a credit default swap.  A few years ago, there was --

8     in all the trade journals, there was a lot of discussion about

9     the fact that the documentation associated with credit default

10    swaps is really backed up.  People were doing all these deals

11    but the confirmations were -- were several months later after

12    the deals, and I recall discussing this with some market

13    practitioners.  The credit default swaps is an area I do

14    research in.

15          THE COURT:  All right.  Go ahead.

16    Q.  In spite of that testimony, sir, and in spite of that

17    background and experience, you don't -- you've never undertaken

18    a study to determine probability distributions for when

19    documents are signed relative to when the derivatives

20    transactions close, have you?

21    A.  No, I have not.  As far as I know, that data doesn't exist.

22    Q.  And in this particular case you know that the guaranty

23    document which is the subject of this lawsuit was not signed

24    until some five months after the derivative transaction closed;

25    correct?

1    A.  That's my understanding, yes.

2    Q.  And you can't say whether a five-month delay is unusual in

3    the documentation of a derivative transaction without guessing,

4    can you?

5    A.  I cannot.

6    Q.  I'd like to turn to another subject very briefly.  You were

7    in the courtroom earlier today when there was some testimony

8    from Mr. Weinstein on behalf of Merrill Lynch over the subject

9    of credit risk; weren't you?

10   A.  I was.

11   Q.  Credit risk arises from the possibility that borrowers and

12   counterparties in transactions might default; correct?

13   A.  Correct.

14   Q.  In fact, that's the definition you use in your textbook,

15   isn't it, sir?

16   A.  I expect so, yes.

17   Q.  And you've heard Mr. Weinstein testify earlier today that

18   transactions, loan transactions always involve credit risk from

19   the moment they're executed; correct?

20   A.  Correct.

21   Q.  Would you agree with that, sir?

22   A.  I guess if I wanted to be picky, I would say from the

23   moment the money is advanced, which may or may not be from the

24   moment the deal is executed, but --

25   Q.  In fact, some credit agreements contemplate a draw-down of

1    money over some period of time and would not really expose the

2    financial institution to credit risk until that -- those funds

3    are transferred; correct?

4    A.  Correct.

5    Q.  You also heard Mr. Weinstein testify that other types of

6    transactions can involve potential credit risk; correct?

7    A.  Correct.

8    Q.  Would you agree with that?

9    A.  I would agree with that, yes.

10   Q.  Would you agree that derivative transactions are such

11   transactions?

12   A.  I would.

13   Q.  Now you've examined the derivative that is the subject of

14   this lawsuit; correct?

15   A.  I have.

16   Q.  If you could turn again to your trial affidavit,

17   paragraph 18.  This is a summary of the nature of the

18   derivative that was the subject -- that is the subject of this

19   lawsuit; correct?

20   A.  Correct.

21   Q.  And MLCS essentially purchased a series of down-and-in put

22   options, or barrier options from UISA Finance; correct?

23   A.  Yes.  They can be called down-and-in put options or

24   up-and-in call options.  It's the same thing.  And indeed, to

25   pick up on some earlier testimony, they can also be called

1611mlc3                          Hull - cross

1    knock-in options.

2    Q.  In fact, you're referring to testimony earlier today of

3    Ms. Wang; correct?

4    A.  Correct.

5    Q.  Yes.  So to keep it consistent with that explanation that I

6    think was very helpful that she provided to the court regarding

7    an explanation of a knock-in option, I think it would be

8    helpful for purposes of your testimony to focus on the

9    perspective of this derivative transaction as a -- as a

10   down-and-in put option.  Is that -- is that okay with you,

11   Professor Hull?

12   A.  Okay.

13   Q.  Now in effect ML -- MLCS was paying UISA Finance a premium

14   for this option or series of options that it purchased -- that

15   it was purchasing -- correct?

16   A.  Yeah.

17   Q.  And that -- that premium was to be reflected in the form of

18   a discount on the interest payments in connection with the loan

19   transaction that UISA Finance had with Merrill Lynch; correct?

20   A.  Yes.  Initially the interest rate was reduced for LIBOR

21   plus 6 percent to LIBOR plus 1.6 percent.

22   Q.  And that was a reflection of the reduction in interest rate

23   associated with the premium that UISA Finance received from

24   Merrill Lynch for having purchased this option; correct?

25   A.  Correct.

1611mlc3                          Hull - cross

1   Q.  Now if the foreign exchange rate moved against UISA Finance

2   in connection with this derivative transaction such that it

3   triggered the options that MLCS had purchased, UISA Finance

4   would be obligated to pay money to MLCS; correct?

5   A.  Yes.

6   Q.  And so this derivative transaction had potential credit

7   exposure from the moment it was executed.  Would you agree with

8   that, sir?

9   A.  It had potential credit exposure to Merrill Lynch, and if

10  the exchange rate had moved the other way, it would have a

11  potential credit exposure to Itamarati.

12  Q.  But only to the extent of the reduction in the interest

13  payments on the loan that Itamarati had -- UISA Finance had

14  with -- with MLCS; correct?

15  A.  Correct.

16  Q.  And in fact, we know from the -- what's transpired in the

17  case that MLCS did in fact have credit exposure to UISA Finance

18  as a result of this derivative transaction; correct?

19  A.  It did, yes.

20          THE COURT:  And that was in May?

21          THE WITNESS:  Well, the exchange rate really started

22  to move heavily against UISA in September, October time.

23          THE COURT:  Did it ever move the other way for a time?

24          THE WITNESS:  I'm not a hundred percent certain about

25  that, but I don't think so.

1    Q.  I'd like to move to another topic, Professor Hull.  If you

2    can, turn to paragraph 35 of your trial affidavit.  At the top

3    of that paragraph under the first bullet point, you state there

4    that the ISDA master agreement governing this derivative

5    transaction requires the parties to follow the market quotation

6    methodology to determine the termination amount under the swap.

7    Do you see that?

8    A.  I do.

9    Q.  And that's your testimony here today, sir?

10   A.  The first method that the parties were required to use was

11   a market quotation.

12   Q.  And only when the market quotation method was unavailable

13   are the parties allowed to resort to the other methodology for

14   determining the termination amount; isn't that right?

15   A.  I believe I would put it the parties are required to use

16   the other method when the market quotation method doesn't work.

17   Q.  But they're required to try the market quotation method --

18   the market quotation method first; correct?

19   A.  That's correct.

20   Q.  Now you understand the difference between a quotation and

21   an indication?

22   A.  I do.

23   Q.  Would you please explain that to the court.

24   A.  A quotation, which is also referred to as a live quote, is

25   where one party is asking another party for a quote, which

1    is -- which is a transaction that might lead to a deal.  So if

2    I ask you for a quote and you give me a quote I like, I will

3    say, okay, done, and that would be a deal.

4              THE COURT:  It would be binding.

5              THE WITNESS:  Yeah, binding.

6    A.   Whereas an indication is just, "Can you tell me where you

7    would be if I were to ask you for a market quote on this deal."

8    Q.   Is it fair -- is it fair to describe an indication as a

9    hypothetical bid?

10   A.   I think that's fairly accurate, yes.

11   Q.   Now in your opinion merely seeking an indication would not

12   meet the requirements of the market quotation method required

13   under the ISDA documents; isn't that right?

14   A.   My understanding is that you should ask for a quotation.

15             THE COURT:  But if somebody's not willing to even give

16   you an indication, do you think there's any likelihood they're

17   going to give you a quotation?

18             THE WITNESS:  No, your Honor, I don't.

19             THE COURT:  Okay.  So an indication might be a prelude

20   to a quotation.

21             THE WITNESS:  It could be.

22             THE COURT:  All right.

23   Q.   I'd like to now turn to another topic and have you look at

24   paragraphs 59 and 60 of your trial affidavit.  Do you have that

25   in front of you, Mr. Hull?

 1           MR. RUSSELL:  Your Honor, I object only in that I

 2      think your ruling on the *in limine* motion with respect to

 3      defense expert was that you didn't want to hear from experts on

 4      the hedging issues, and Mr. Cashman essentially I think argued

 5      to your Honor, what's sauce for the goose is sauce for the

 6      gander, and his understanding was that, you know, that would

 7      not come in from Professor Hull either.  So in light of your

 8      Honor's ruling, unless the defendants seek to continue to

 9      adduce that testimony from Mr. Smith, despite your Honor's

10      ruling, we would not seek to offer these paragraphs from

11      Professor Hull's affidavit.  I don't know if that

12      short-circuits this.

13           THE COURT:  59 and 60?  I mean, I'm not sure where

14      Mr. Timmons is going with these questions, but --

15           MR. TIMMONS:  The original objection was paragraphs 59

16      through 62, your Honor, and let -- give me just one moment, if

17      I could, your Honor.

18           THE COURT:  Let me hear some questions, and then I

19      will entertain objections.  I mean, we're going to wrap this up

20      pretty quickly, though, because I have another trial at 1:30.

21      BY MR. TIMMONS:

22      Q.  Well, let me just ask you, Professor Hull, you say in

23      paragraph 60, referring to market practices of financial

24      institutions to enter into hedging transactions to offset their

25      exposure, that it is therefore likely that MLCS entered into

1   other transactions that offset its exposure to UISA Finance.

2   Do you see that?

3   A.   I do.

4   Q.   Now you can't -- you haven't seen any documents in this

5   case demonstrating that MLCS in fact entered into any hedging

6   transactions to offset this particular derivative transaction,

7   have you?

8   A.   No.  One complication here is that the derivatives dealer

9   doesn't hedge individual transactions.  It groups all its

10  transactions together for the purpose of hedging so all of

11  those transactions which would relate to Brazilian *real* would

12  be hedged together.

13  Q.   But you haven't seen any transactions even on a portfolio

14  basis that would indicate any effort on the part of MLCS to

15  hedge or offset its exposure as a result of this particular

16  derivative transaction, have you?

17  A.   I have not.

18          MR. TIMMONS:  Thank you, your Honor.  I have nothing

19  further.

20          MR. RUSSELL:  I have no redirect, your Honor.

21          THE COURT:  All right.  That's perfect.  We'll break

22  for the day.

23          Dr. Hull, thank you very much.

24          THE WITNESS:  Thank you, your Honor.

25          THE COURT:  You can just leave all those items there.

16l1mlc3

```
 1              (Witness excused)
 2              THE COURT:  Very quickly, so tomorrow we're going to
 3    pick up with whom?
 4              MR. RICE:  Tomorrow, on the plaintiff's case, all
 5    that's left is really Mr. Jhamb, in terms of live testimony,
 6    who's coming on Thursday.
 7              THE COURT:  He's not available before then.
 8              MR. RICE:  He's not available before then.  I'm sorry.
 9              THE COURT:  All right.
10              MR. RICE:  We, you know, we do have deposition
11    designations to talk to your Honor about, and I want to just be
12    sure we're home on exhibits other than the things that would
13    come through on Mr. Jhamb's -- but that's it, in terms of our
14    case.
15              THE COURT:  So no other witnesses other than Jhamb.
16              MR. RICE:  Correct.
17              THE COURT:  So the defense case will then start
18    tomorrow.  So who are we going to hear from, Mr. Werder?
19              MR. WERDER:  Ms. Tamer will be the first witness, your
20    Honor, and then Mr. Possari and then Mr. Oliveira.
21              THE COURT:  Okay.  All right.
22              MR. WERDER:  Are they going to rest, your Honor,
23    before -- subject to calling Mr. Jhamb out of turn, rest the
24    plaintiff's case?
25              THE COURT:  I mean, I wasn't going to make them do
```

16l1mlc3

```
1    that just because, it's their case, so I want to see how it
2    comes in, but I don't want any surprises and you don't either.
3              So you're not planning to call anybody else; right?
4              MR. RICE:  No, your Honor, I'm not.
5              THE COURT:  Maybe on a rebuttal case, but after you
6    hear from the defense witnesses, and then we'll see.  But I
7    think it's fair to assume that Jhamb is the only live witness
8    left.
9              MR. WERDER:  Thank you.
10             THE COURT:  And there's a lot of other evidence that's
11   in.
12             MR. WERDER:  Of course.
13             THE COURT:  And we can talk tomorrow morning about
14   what disputes still exist over it.  Okay?
15             MR. WERDER:  Thank you, your Honor.
16             THE COURT:  Okay.  So let's do that then.  I'll see
17   you tomorrow at 9.  Thank you.  Have a good day.
18             ALL COUNSEL:  Thank you, your Honor.
19             (Adjourned to June 22, 2011, at 9:00 a.m.)
20
21
22
23
24
25
```

INDEX OF EXAMINATION

Examination of:                              Page

LIQIAO WANG

Direct By Mr. Russell . . . . . . . . . . . . 150

Cross By Mr. Cashman . . . . . . . . . . . . . 151

Redirect By Mr. Russell . . . . . . . . . . 159

BRIAN WEINSTEIN

Direct By Mr. Russell . . . . . . . . . . . . 164

Cross By Mr. Timmons . . . . . . . . . . . . . 169

Redirect By Mr. Russell . . . . . . . . . . 202

Recross By Mr. Timmons . . . . . . . . . . . . 208

RENE MEDRADO

Direct By Mr. Rice . . . . . . . . . . . . . . 215

Cross By Mr. Werder  . . . . . . . . . . . . . 217

Redirect By Mr. Rice . . . . . . . . . . . . . 257

Recross By Mr. Werder  . . . . . . . . . . . . 277

Redirect By Mr. Rice . . . . . . . . . . . . . 282

JOHN C. HULL

Direct By Mr. Russell  . . . . . . . . . . . . 284

Cross By Mr. Timmons . . . . . . . . . . . . . 291

1                          PLAINTIFF EXHIBITS

2      Exhibit No.                                    Received

3      157    . . . . . . . . . . . . . . . . . 149

4      109    . . . . . . . . . . . . . . . . . 165

5      182 through 187   . . . . . . . . . . . . 285

6      164    . . . . . . . . . . . . . . . . 287

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25