16m1mlc1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MERRILL LYNCH CAPITAL SERVICES, INC.,

4                    Plaintiff,

5            v.                          09 Civ. 2324 RJS

6    UISA FINANCE, et al.,

7                    Defendants.

8    ------------------------------x
                                        New York, N.Y.
9                                       June 22, 2011
                                        9:05 a.m.
10

11

12   Before:

13                    HON. RICHARD J. SULLIVAN,

14                                       District Judge

15

16                        APPEARANCES

17

     SIMPSON THACHER & BARTLETT, LLP (NY)
18        Attorneys for plaintiff
     BY:  THOMAS C. RICE, Esq.
19        PAUL JACOB SIRKIS, Esq.
          WILLIAM THOMAS RUSSELL, JR., Esq.
20             Of counsel

21   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
          Attorneys for defendants
22   BY:  RICHARD IRVING WERDER, JR., Esq.
          R. BRIAN TIMMONS, Esq.
23        ADAM SETH CASHMAN, Esq.
               Of counsel

24

25   ALSO PRESENT:  CRAIG PETERSON, Interpreter

16m1mlc1

1              (Trial resumed)

2              (In open court)

3              THE COURT:  All right.  I got the e-mail from

4       defendants and then Mr. Rice's follow-up concerning

5       Mr. Oliveira, so he's out.  I'll disregard everything I've ever

6       read about him -- well, from him.

7              So what are we then going to proceed with today;

8       Ms. Tamer?

9              MR. RICE:  I was going to say -- yes, your Honor.  We

10      have some deposition designations and documents and stuff, but

11      we thought, since the witnesses were here, we'd just proceed

12      with the defendant's case, if that was all right.

13             THE COURT:  Okay.  Mr. Werder, are you ready to go?

14             MR. WERDER:  Yes.  We are ready to go.  I'm not sure

15      if this is the right time or not, but just for purposes of the

16      record, I want to preserve our Rule 52(c) motion.

17             THE COURT:  Yes.  I mean, I guess this is not really

18      the time because they haven't rested yet; right?

19             MR. WERDER:  Well, they have one more witness, so I

20      just want to make sure that, despite the fact that we were

21      starting to put on our case, that we weren't giving up that.

22             THE COURT:  Certainly you're not giving that up.

23             MR. WERDER:  Thank you, your Honor.

24             THE COURT:  Anything else we should handle

25      preliminarily?

16m1mlc1

1          MR. WERDER:  Not from our perspective, your Honor.

2          THE COURT:  All right.  Then I guess let's bring in

3    the witness.

4          MR. WERDER:  We call Ana Claudia de Moraes Tamer.

5          THE COURT:  Okay.

6          MR. WERDER:  I guess preliminarily, your Honor, what I

7    should note is that both Ms. Tamer and Mr. Possari, as we've

8    mentioned, are native Portuguese speakers.  Ms. Tamer actually

9    does speak some conversational English, but she was deposed in

10   Portuguese, and for a matter of this importance, we thought it

11   would be best for her to testify in Portuguese, and her

12   translator is here.

13         THE COURT:  Bring the translator up and put the

14   translator right here.

15         MR. WERDER:  Mr. Possari doesn't speak any English at

16   all, so we'll use the translator for him.

17         THE COURT:  We'll bring the translator up here.

18         I'm going to first ask the translator to state his

19   appearance, state and spell his name, and then I'll administer

20   an oath to him.

21         THE INTERPRETER:  Craig Peterson, C-R-A-I-G,

22   P-E-T-E-R-S-O-N.

23         THE COURT:  All right.  Mr. Peterson, good morning.

24   Are you a court-certified interpreter?

25         THE INTERPRETER:  I am not court certified.

16m1mlc1

1              THE COURT:  But have you acted as an interpreter,

2     English into Portuguese and Portuguese into English?

3              THE INTERPRETER:  Yes, your Honor.

4              THE COURT:  In court proceedings?

5              THE INTERPRETER:  No, your Honor.

6              THE COURT:  In depositions?

7              THE INTERPRETER:  Yes, your Honor.

8              THE COURT:  For how long have you been doing that?

9              THE INTERPRETER:  In Portuguese to English, two and a

10    half years, your Honor.

11             THE COURT:  Okay.  And vice versa.

12             THE INTERPRETER:  Yes.

13             THE COURT:  All right.  Raise your right hand.

14             (Interpreter sworn)

15             THE COURT:  All right.  Okay.  And if you could raise

16    your right hand.

17             (Witness sworn)

18             THE COURT:  All right.  Great.  You can have a seat.

19    If you could just state your name and spell your name for the

20    record.

21             THE WITNESS:  Ana Claudia de Moraes Tamer.

22             THE COURT:  Could you spell it.

23             THE WITNESS:  Ana Claudia de Moraes --

24             THE INTERPRETER:  Interpreter clarification.

25             THE COURT:  Yes.

16m1mlc1

 1            THE WITNESS:  Ana Claudia de Moraes.  A-N-A,

 2    C-L-A-U-D-I-A, D-E, M-O-R-E-A-E-S.

 3            THE COURT:  E-A?

 4            THE INTERPRETER:  M-O-R-A-E-S.

 5            THE COURT:  And Tamer?

 6            THE WITNESS:  T-A-M-E-R.

 7            THE COURT:  All right.  Okay.  Good morning.  Should I

 8    refer to you as Ms. Tamer or as Ms. de Moraes?

 9            THE WITNESS:  Tamer.

10            THE COURT:  Tamer.  Tamer?  All right.  Okay.

11    Ms. Tamer, good morning.  We're going to proceed this morning

12    with the lawyers asking you questions, so just speak directly

13    to the lawyers.  Keep your voice up, speak into the microphone,

14    and Mr. Peterson, let me ask you, of course, to keep your voice

15    up, but you're doing fine.

16            So let's proceed.  Mr. Werder?

17            MR. WERDER:  Thank you, your Honor.

18     ANA CLAUDIA DE MORAES TAMER,

19        called as a witness by the Defendants,

20        having been duly sworn, testified as follows:

21    DIRECT EXAMINATION

22    BY MR. WERDER:

23    Q.  Ms. Tamer, I've handed you a document.  Is that your

24    affidavit of your trial testimony?

25    A.  It is.

16m1mlc1                    Tamer - direct

1   Q.  And was that -- were the statements made in there true and

2   correct, to the best of your knowledge?

3   A.  Yes, they were.

4   Q.  In paragraph 2 of the document you referred to yourself as

5   being the controlling shareholder of USINAS Itamarati.  Can you

6   briefly explain how you came to be the controlling shareholder.

7   A.  I was there because of my father, who worked there 30 years

8   in Matarais (ph) and Terras (ph), Mato Grosso.

9   Q.  And did your father pass the business to you?

10  A.  Yes.

11  Q.  And can you just briefly describe your personal educational

12  background.

13  A.  Yes.  I studied up until the second year of veterinary

14  school, then I got married, and I stopped the school.

15          MR. WERDER:  I have no further questions at this time,

16  your Honor.

17          THE COURT:  Okay.  Mr. Russell, you're going to do the

18  cross?

19          MR. RUSSELL:  Yes, your Honor.  With your permission.

20          THE COURT:  Good.

21  CROSS-EXAMINATION

22  BY MR. RUSSELL:

23  Q.  Good morning, Ms. Tamer.

24  A.  Good morning.

25  Q.  You told us this morning that you're the controlling

1   shareholder of USINAS Itamarati.  Were you the controlling

2   shareholder of USINAS Itamarati in 2007, 2008 as well?

3   A.  Yes.

4   Q.  What does it mean to be the controlling shareholder?

5   A.  It means a lot of responsibility, means goodwill, and it

6   means worries.

7   Q.  Does anyone else other than yourself have an ownership

8   interest in USINAS Itamarati?

9   A.  No.

10  Q.  Do you own the shares of USINAS Itamarati directly yourself

11  or through some other company or entity?

12  A.  I believe that the principal company is through Itamarati

13  and that there exists other entities under that, but the lawyer

14  could explain that better to you.

15  Q.  Do you know whether you own the shares of Itamarati, USINAS

16  Itamarati directly or through this other company that you just

17  mentioned?

18  A.  Through the -- the other companies that are inside this

19  one.

20  Q.  Through what companies?  What are their names?

21  A.  No, I do not know the names of all of them and how they are

22  composed.  I know the two principal ones, but after that, I

23  don't know the composition of the rest and I'm not capable of

24  explaining them.

25  Q.  Are those details you rely on Mr. Sergio Spinelli for?

1          THE INTERPRETER:  Interpreter would ask for that to be

2    repeated.

3          MR. RUSSELL:  Sure.

4    Q.  Are those details the types of things you rely on

5    Mr. Sergio Spinelli for?

6    A.  Yes.

7    Q.  And he's a partner of the firm of Mattos Filho?

8    A.  Yes.

9    Q.  And they are the outside law firm for USINAS Itamarati and

10   the other companies you control?

11   A.  He's my complete and total lawyer.

12   Q.  Now let's talk for a minute about the company called UISA

13   Finance.  You mentioned UISA Finance in your affidavit; is that

14   right?

15   A.  That's true.

16   Q.  Do you have an ownership interest in UISA Finance?

17   A.  I don't know the composition of the other companies.  What

18   I do know about UISA Finance is that they made an agreement

19   with Merrill Lynch and Itamarati to make a loan, but I don't

20   know the details.

21   Q.  Do you know who the direct owner of UISA Finance is?

22   A.  No.

23   Q.  Do you know if it's owned by USINAS Itamarati or some other

24   company?

25   A.  No.

16m1mlc1                          Tamer - cross

1   Q.  You don't know?

2   A.  No.

3   Q.  What is the business of UISA Finance?

4   A.  As I said before, I don't know the details of UISA Finance.

5   I really don't know.

6           THE COURT:  Who does?

7           THE WITNESS:  Mr. Possari maybe, the lawyer.

8   Q.  Do you know if UISA Finance engages in any business?

9   A.  No, I don't know.

10  Q.  Do you know if UISA Finance has any assets?

11  A.  No, I don't know.

12  Q.  And I think a few minutes ago you mentioned that you do

13  know that UISA Finance entered into some loans involving

14  Itamarati and Merrill Lynch; is that correct?

15  A.  Yes.

16  Q.  Do you know, has UISA Finance entered into, ever, any other

17  transactions with anyone else?

18  A.  No, I don't know.

19  Q.  You told us Mr. Possari would know more about UISA Finance.

20  Do you know who makes decisions on behalf of UISA Finance?

21  A.  No.  That should be talked about with Mr. Possari.

22  Q.  Let's get back to USINAS Itamarati for a minute.  With

23  respect to USINAS Itamarati, it's you, Mr. Edezio Oliveira, and

24  Mr. Sergio Spinelli who make the decisions on behalf of USINAS

25  Itamarati; is that correct?

1            MR. WERDER:  I'm going to object.  It lacks

2      specificity on the time period here, your Honor.

3            THE COURT:  All right.  Sustained.  Rephrase the

4      question.

5            MR. RUSSELL:  Sure.

6      Q.  Ms. Tamer, at the current time, today, it's you, Mr. Edezio

7      Oliveira, and Mr. Sergio Spinelli, who make decisions on behalf

8      of USINAS Itamarati; right?

9      A.  I always have the custom of speaking with Edezio or Sergio

10     or sometimes my father if I need help in making decisions.

11     Q.  But when it comes time to actually making the decisions on

12     behalf of USINAS Itamarati, it's you, Mr. Oliveira, and

13     Mr. Spinelli; is that correct?

14     A.  Yes, I trade ideas with them before making the decision.

15     Q.  And this was true in 2007, 2008 as well; isn't that right?

16     A.  Yes.

17     Q.  And you told us Mr. Spinelli is your lawyer, but you also

18     rely on him for business advice as well as legal advice; right?

19     A.  Yes, it's true.  We do talk about business.  We talk about

20     like the price of sugar or what could happen in the market.

21     Q.  And as to Mr. Oliveira, you rely on Mr. Oliveira to keep

22     you informed of important information concerning USINAS

23     Itamarati; right?

24     A.  That's true.

25     Q.  And Mr. Oliveira functions as the CEO of USINAS Itamarati,

16m1mlc1                         Tamer - cross

1    doesn't he?

2    A.   Yes, the counselor.

3    Q.   He is in fact the CEO; is that right?

4    A.   I don't really know the difference between the CEO and an

5    adviser.  I would say that in my case he's really more an

6    adviser to me.

7    Q.   Ms. Tamer, do you recall back in February of this year I

8    took your deposition?

9    A.   Yes, of course.

10   Q.   In Mr. Werder's offices here in New York?

11   A.   Yes, of course.

12   Q.   And you understood that your testimony was under oath?

13   A.   Yes, of course.

14   Q.   And you answered the questions truthfully and to the best

15   of your ability?

16   A.   Yes.

17             MR. RUSSELL:  Your Honor, I've got a copy of her

18   transcript for your Honor and for the witness.  May I approach?

19             THE COURT:  Yes.

20   Q.   Ms. Tamer, would you turn to page 32 of the transcript to

21   your deposition.  And I'd like you to focus starting on

22   line 18.

23   A.   Help me here because -- page 32?

24   Q.   Yes, ma'am.

25   A.   18.

1   Q.  Ms. Tamer, it's -- the page numbers there are I think four

2   pages of transcript on each page of the document, and it would

3   be the page number in the upper right-hand corner of each of

4   the small pages on the physical page.

5   A.  Okay.  I'm sorry.

6   Q.  Are you on page 32?

7   A.  Mm-hmm.

8   Q.  And do you see line 18?  Do you recall being asked this

9   question and giving this answer:

10         "Q.  What is Mr. Oliveira's title or position at

11  USINAS Itamarati?

12         "A.  He is USINAS's CEO.  He is the one who does all

13  the things at USINAS."

14         Do you recall giving that answer?

15  A.  Yes.

16  Q.  And it was true at the time?

17  A.  Yes.

18  Q.  And it's true today?

19  A.  I would like to say that I have difficulty in choosing

20  CEOs, officers, or directors between English and Portuguese,

21  and this has been a little difficult as regards to my

22  testimony.

23  Q.  But you believe your testimony at the time was correct; is

24  that right?

25  A.  Yes, of course.

1    Q.  Now you, Mr. Oliveira, and Mr. Spinelli act as what you

2    called an executive committee; is that right?

3          MR. WERDER:  Objection to lack of specificity on time.

4    Are you talking currently, Mr. Russell?

5          THE COURT:  Time period.

6    Q.  Ms. Tamer, at the present time do you, Mr. Oliveira, and

7    Mr. Spinelli act as what you had called an executive committee;

8    is that right?

9    A.  What I don't understand is "executive committee."

10   Q.  Sure.  Ms. Tamer, do you still have your deposition in

11   front of you?

12   A.  Yes, mm-hmm.

13   Q.  Would you turn to page 41 and 42.  And starting on line 23

14   on page 41, do you recall being asked this question and giving

15   this answer:

16          "Q.  Sure.  My question was whether the board met in

17   person, and I think you said, 'No, but if there's an important

18   document to be signed, they call me.'  Who calls you if there's

19   an important document to be signed?

20          "A.  When you talk about board of directors, I'm

21   getting confused, because there are two.  I don't know if

22   you're talking about the board of directors whose people are

23   Sergio, I, and Edezio, or are you talking about board of

24   directors, I, Julio and Linda."

25          And you actually made a change to the transcript and

1    replaced the "board of directors" in line 7 with the phrase

2    "executive committee."  Do you see that?

3    A.   Mm-hmm.  You were asking about the name, like if I talk

4    with Edezio and Spinelli, if it's an executive committee?

5    Q.   My question is:  Do you recall giving that testimony under

6    oath back in February, Ms. Tamer?

7    A.   Yes, yes.

8    Q.   And do you recall after that making a change to your

9    transcript to refer to yourself, Mr. Spinelli, and Mr. Oliveira

10   as the executive committee?

11   A.   Yesterday, conversing with Rick, my lawyer, I discovered

12   that I have a great difficulty with distinguishing between

13   "executive committee" or "committee of directors," and that

14   could have been the reason of my confusion, not because of

15   speaking with bad faith but because of really being confused.

16   Q.   Ms. Tamer, my question, though, is:  You gave this

17   testimony in February and then you had an opportunity to

18   correct your transcript, and you corrected your transcript --

19   this is something you did -- to refer to yourself,

20   Mr. Oliveira, and Mr. Spinelli as an executive committee; is

21   that correct?

22   A.   True.

23   Q.   And this arrangement has functioned with Mr. Spinelli,

24   Mr. Oliveira -- the three of you functioned in this way in 2007

25   and 2008 as well; is that right?

1    A.  Yes.

2    Q.  And when the three of you on the executive committee made a

3    decision, who would then communicate that decision to the

4    management of USINAS Itamarati?

5    A.  Edezio.

6    Q.  That's Mr. Oliveira?

7    A.  Yes, uh-huh, yes.

8    Q.  That's not something you would do yourself?

9    A.  No.  Not necessarily.

10   Q.  Generally you dealt with Mr. Oliveira and Mr. Oliveira

11   would deal with the rest of the management at USINAS Itamarati?

12   A.  Yes.

13   Q.  Now let's talk for a moment about the board of directors of

14   USINAS Itamarati.  Back in 2007 and 2008 USINAS Itamarati

15   officially had a board of directors; am I right?

16   A.  True.

17   Q.  And you were a member of the board?

18   A.  Yes.

19   Q.  And you were actually chair of the board; is that right?

20   A.  Yes.

21   Q.  And one of the other board members was Mr. Julio Tamer; is

22   that right?

23   A.  Yes.  True.

24   Q.  And he's your former husband; am I right?

25   A.  Yes.

16m1mlc1                          Tamer - cross

1   Q.  And then the last member of the board in 2007 and 2008 was

2   Ms. Linda Bogosian Tamer; is that right?

3        THE INTERPRETER:  Excuse me.  Could the interpreter

4   have the name repeated, please.

5        MR. RUSSELL:  Sure.  Linda Bogosian Tamer.

6   A.  Mm-hmm, right.

7   Q.  And she's Julio Tamer's mother; right?

8   A.  Yes.

9   Q.  So your former mother-in-law?

10  A.  Mm-hmm.

11       THE COURT:  You have to say yes.  You can't say

12  mm-hmm.  The court reporter can't get it.

13  A.  Yes.

14       MR. RUSSELL:  Thank you.

15  Q.  And Julio Tamer and Linda Bogosian Tamer, they were not

16  involved in the day-to-day business or operations of USINAS

17  Itamarati, were they?

18  A.  True.

19  Q.  Correct that they weren't; right?

20  A.  True.  From day to day, no.

21  Q.  And this board of directors did not actually hold formal,

22  in-person meetings, did it?

23  A.  Formal, no, but every time my mother-in-law, who is 66

24  years of age, had to sign a document, it was explained to her

25  so that she could understand the risk involved.  It was

16m1mlc1                          Tamer - cross

1    explained to her.

2    Q.   Explained to her by you or Mr. Oliveira or someone else?

3    A.   By me.

4    Q.   Now but when you met with Mr. Julio Tamer and your former

5    mother-in-law Ms. Linda Bogosian Tamer, you talked about family

6    issues, not business; right?

7    A.   Yes, we talked about family matters, but if there was a

8    document that she had to sign that she needed to be clarified,

9    we would clarify it for her.

10   Q.   But in terms of actually discussing business issues and

11   making decisions, that's something that you did in consultation

12   with Mr. Oliveira and Mr. Spinelli; right?

13   A.   Yes.

14   Q.   And after you reached a decision with Mr. Oliveira and

15   Mr. Spinelli, you wouldn't then go actually discuss that

16   decision with Julio Tamer and Linda Tamer and make a decision

17   with the two of them, would you?

18   A.   True.  Not in all business matters, but if there was

19   something that had to be signed, yes.  Sometimes yes, sometimes

20   no.  At times.

21   Q.   Did -- Ms. Tamer, could you turn to page 39 of your

22   deposition transcript.  Do you recall being asked these

23   questions and giving these answers, and I'm starting on line 4:

24          "Q.   Let me clarify.  When I refer to the board of

25   directors, I'm referring to the board of directors of USINAS

16m1mlc1                          Tamer - cross

1   Itamarati, which I think you told us consists of you, Julio

2   Tamer, and Linda Tamer.

3             "A.  Yes.

4             "Q.  My question is:  Does the board meet regularly

5   every month, every quarter, once a year?

6             "A.  Well, we get together, yes.  We meet.  Not always

7   to talk about USINAS because it is about family."

8   A.  Yes.

9   Q.  "Q.  My question then, meeting as a board of directors to

10  discuss the business of USINAS Itamarati, how often do you meet

11  as a board of directors to discuss the business of USINAS

12  Itamarati?

13            "A.  No, they do not discuss the company's issues with

14  me.  It's very rare for that to happen.

15            "Q.  Do you ever have formal board meetings where the

16  three of you either sit down or get on the phone and say, 'We

17  are meeting as a board of directors of USINAS Itamarati'?

18            "A.  It is Edezio who does all that.  All these

19  companies, negotiations, and meetings are done by Edezio.  Then

20  he comes to me and discuss things -- discusses things with me,

21  and I go to Spinelli and discuss them with Spinelli.

22            "Q.  Does Mr. Oliveira ever come to you with an issue

23  and then you go and meet with Julio Tamer and Linda Tamer to

24  discuss it and come to a decision?

25            "A.  No."

16m1mlc1                         Tamer - cross

1          That testimony was correct when you gave it?

2   A.  Yes.

3   Q.  Now you mentioned that sometimes your former mother-in-law

4   or your former husband needed to sign documents.  If there was

5   a formal document that needed to be signed by the board, is it

6   correct that you wouldn't have a real meeting, somebody from

7   the legal department would sign the draft authorization and you

8   and the other board members would just sign it; is that right?

9   A.  I didn't understand.

10  Q.  Sure.  You mentioned before there were times when you

11  needed to get your mother-in-law to sign the document as a

12  member of the board.  Do you recall that testimony?

13  A.  Yes.

14  Q.  And when that happened, somebody from the USINAS Itamarati

15  legal department would draft up an authorization and you and

16  your former husband and former mother-in-law would just sign

17  it; is that right?

18  A.  Yes, and if my mother-in-law had any questions, how should

19  she write this or that, that was rare, but I would clarify it

20  for her.

21  Q.  She didn't really have to write anything to do the

22  authorization, she just had to sign it; is that right?

23  A.  Yes.

24  Q.  Now the board of directors of USINAS Itamarati actually was

25  dissolved in May of 2009; right?

1   A.  Yes.

2   Q.  Who made the decision to dissolve the board of directors?

3   A.  Mr. Edezio.

4   Q.  Do you know why Mr. Edezio decided to dissolve the board of

5   directors?

6           THE COURT:  Mr. Edezio is Oliveira; right?

7           MR. RUSSELL:  That's my understanding, yes, your

8   Honor.

9           THE COURT:  Right.  Let's use the proper name.

10          THE INTERPRETER:  Judge, just so the interpreter can

11  clarify, by proper name, meaning last name?

12          THE COURT:  Yes.

13  Q.  I'm sorry.  Do you know why Mr. Oliveira decided to

14  dissolve the board of directors of USINAS Itamarati?

15  A.  He said it was just bureaucratic reasons; that's all.

16  Q.  So now that there's no board, you, Mr. Oliveira, and

17  Mr. Spinelli continue to make decisions for USINAS Itamarati;

18  is that right?

19  A.  I do get counsel from Mr. Oliveira and Mr. Spinelli, but

20  the final decisions are mine.

21  Q.  Now in your testimony earlier and in your affidavit you

22  mentioned certain loan transactions between Merrill Lynch and

23  UISA Finance.  Do you recall that?

24  A.  Right.

25  Q.  You don't know, do you, whether USINAS Itamarati guaranteed

1   UISA Finance's obligations to Merrill Lynch under those loans,

2   do you?

3   A.  Yes, yes.  I know that the loan that we received from

4   Merrill Lynch has a guaranty to be paid.

5   Q.  But my question is:  You didn't understand that there was a

6   guaranty from USINAS Itamarati, did you?

7   A.  Yes.  Again, I'm confused again with the word "guaranty"

8   and "collateral," but I understand better now.  The words in

9   English, they kind of mess me up a little bit.

10  Q.  Well, isn't it true that Mr. Oliveira discussed these loans

11  with you but he never told you that Itamarati was providing a

12  guaranty of the obligations of UISA Finance?

13  A.  Speak slowly, please.

14      He talked to me about the loans, yes.  He talked to me

15  about the loans, but my understanding of "guaranty" and

16  "collateral" in your language was difficult.  Now it has been

17  clarified.  So there was no collateral but there was a

18  guaranty.

19  Q.  Okay.  Ms. Tamer, could you turn back to your deposition

20  transcript, please.

21      Starting on page 50, I'm going to start on line 9.  Do

22  you recall being asked these questions and giving these

23  answers:

24      "Q.  Let me rephrase the question.  Are you aware that

25  there were loans from a Merrill Lynch company to UISA Finance

1    as well?

2                "A.  Yes.  Sure.

3                "Q.  Why were some loans made to USINAS Itamarati and

4    others to UISA Finance?

5                "A.  I have no idea whatsoever.

6                "Q.  Do you recall which loans came first, the loans

7    to USINAS Itamarati or the loans to UISA Finance?

8                "A.  No.

9                "Q.  When the loans are made to UISA Finance, did

10   USINAS Itamarati guaranty UISA Finance's obligations?

11               "A.  I don't know.

12               "Q.  Did you ever -- did anyone ever discuss with you

13   the fact that USINAS Itamarati would have to guaranty UISA

14   Finance's obligations under a loan from a Merrill Lynch

15   company?

16               "A.  No.

17               "Q.  No one ever discussed that with you?

18               "A.  No."  Do you recall giving that testimony?

19   A.  Yes.  What changed from then until now is that back then I

20   had a complete difficulty understanding words like "guaranty,"

21   "loan," "collateral," "board of directors," in English.  From

22   then until now my understanding has been clarified.  I

23   understand better now.

24   Q.  Sure.  But you had an opportunity to correct your

25   transcript, and in fact we saw that in a previous section we

1   read, you corrected the phrase "board of directors" to put in

2   the phrase "executive committee."  Is that right?

3   A.  Yes.

4   Q.  And you didn't make any changes here, did you?

5   A.  Here where?  Which one?  This one?  This one?

6   Q.  The testimony I just read on pages 50 and 51, you didn't

7   make any changes there, did you?

8   A.  True.

9          MR. RUSSELL:  May I approach the witness, your Honor?

10         THE COURT:  Yes.

11  Q.  Ms. Tamer, I've handed you your errata sheet for your

12  deposition transcript.  Is that your signature at the bottom of

13  this page?

14  A.  Yes.

15  Q.  And when you signed this document in March, you understood

16  that these were changes you wanted to make to your deposition

17  transcript?

18  A.  True.

19  Q.  And if you look on page number 54, lines 12 and 17, you see

20  those columns on the left?

21  A.  Yes.

22  Q.  And those are two instances where you wanted to make the

23  change and did make the change of the word "guaranty" to the

24  word "collateral."  Is that right?

25  A.  True.          (Continued on next page)

1    BY MR. RUSSELL:

2    Q.  But you didn't make that change to Page 50 and 51, did you?

3    A.  I don't know what he's trying to say.  Excuse me.  I got

4    lost.

5    Q.  Sure.  We see from your errata sheet there were other

6    places in your deposition transcript where you made a

7    correction and changed the word "guaranty" to the word

8    "collateral."  Do you see that in your errata sheet?

9    A.  This right here?

10   Q.  Yes, ma'am.

11   A.  Yes.

12   Q.  My question then is:  But you did not make that change on

13   pages 50 or 51 of your deposition transcript, did you?

14   A.  Even if I made the changes, it doesn't mean that I still

15   don't have difficulty with some of those terms.  I still have

16   some difficulty with some of those terms.

17   Q.  Sure.  But you were able to make that correction in certain

18   parts of your transcript, but did not make it on 50 or 51.  Is

19   that correct?

20          MR. WERDER:  Objection; argumentative, your Honor.

21          THE COURT:  Overruled.

22   A.  I didn't understand.

23          MR. RUSSELL:  I'll move on?

24          THE COURT:  Please move on.

25   BY MR. RUSSELL:

 1   Q.  Now, getting back --

 2             THE COURT:  Let me ask you a question.  The question

 3   put to you in your deposition was:

 4   "Q  When were the loans were made to UISA Finance, guaranty

 5   UISA Finance's obligations?

 6             And you answered:  "I don't know."

 7             Are you saying today you did know?

 8             THE WITNESS:  I did not know.  I was informed later

 9   after this right here and now I know better.

10             THE COURT:  But at the time of the loan, did you know

11   that USINAS Itamarati was guaranteeing UISA Finance's

12   obligation?

13             THE WITNESS:  No, I did not know.

14             THE COURT:  All right.  Let's proceed.

15   BY MR. RUSSELL:

16   Q.  Getting back to the loans, Ms. Tamer, you never discussed

17   these loans with Julio Tamer or Linda Bogosian, did you?

18   A.  Sure.

19   Q.  And there was no board meetings where the three of you

20   actually approved the loans?

21   A.  No.

22   Q.  And no board meetings where the three of you actually

23   approved a guaranty under the loans, right?

24   A.  What was that?  Excuse me?  Could you repeat?

25   Q.  There was no board meeting where the three of you actually

1   approved the guaranty of the loans because you didn't even know

2   of the guaranty at the time, right?

3   A.  True.

4   Q.  Now, if Mr. Olivera actually had discussed with you the

5   fact that the loans from Merrill Lynch to UISA Finance would

6   require a guaranty by Itamarati, you would have agreed to that,

7   right?

8   A.  I would have wanted to know more details about the guaranty

9   and if we were in agreement, yes.

10  Q.  In your affidavit you also mentioned the derivative

11  transaction of Merrill Lynch.  Do you recall that?

12  A.  Yes.

13  Q.  Now, if Mr. Olivera and Mr. Spinelli had come to you and

14  told you about the derivative transaction and recommended to

15  you that you approve a guaranty for either USINAS Itamarati,

16  UISA Finance's obligations under the derivative, that is

17  something you would have agreed to, too, right?

18          MR. WERDER:  Objection, your Honor; hypothetical.

19          THE COURT:  Overruled.

20  A.  That's a difficult question to respond to because I would

21  have to be at that time at that moment in that situation.  If

22  it was something good for the company, maybe I would do it, but

23  it is difficult to respond now especially since I didn't even

24  know what derivitives were until today.

25  BY MR. RUSSELL:

1    Q.  But you didn't have a problem answering that question back

2    in February, did you, Ms. Tamer?

3    A.  Since I don't have it today, I just finished explaining it

4    to you.

5    Q.  Ms. Tamer, could you turn back to your deposition

6    transcript, and in particular Page 73, please, starting on Line

7    22 on Page 73, do you recall being asked these questions and

8    giving these answers:

9    "Q  You trusted Mr. Olivera's judgment?

10   "A  I did.

11   "Q  If he had brought the derivative transaction to your

12   attention at the time they did it in April, would you have

13   approved it?"

14           There was an objection Mr. Werder.

15   "A  If there had been a meeting with Edezio Spinelli, Spinelli

16   would have said yes, yes."

17           Then you actually made a change there and said, "and

18   Spinelli would have said yes, then yes."

19   "Q  If you had been told it involved a guaranty by Itamarati,

20   would you have approved that?"

21           Another objection from Mr. Werder.

22   "A  We would have sat and discussed the matter and I would have

23   consulted with Spinelli, and we would reach a consensus, they

24   extreme trust in me, so the answer is yes."

25           Again you had an opportunity to review your transcript

1   and you changed the answer, if the answer is yes if Edezio

2   Spinelli had recommended it."

3          Do you recall those questions, giving those answers

4   and subsequently making the corrections?

5   A.  Yes, but that's just what I finished saying to you that if

6   we came to an agreement and it was going to be something good

7   for the company, that I would have done it.  I thought that's

8   exactly what I told you.  I don't know.

9          MR. RUSSELL:  Your Honor, may I have one moment to

10  consult with co-counsel.  (Pause)  Your Honor, I have no

11  further questions.

12         THE COURT:  Mr. Werder, and then I'll have a couple of

13  questions.

14         MR. WERDER:  Did your Honor want to ask --

15         THE COURT:  No.  You can go first.

16  REDIRECT EXAMINATION

17  BY MR. WERDER:

18  Q.  Ms. Tamer, let me ask you to take a look at Paragraph 7 of

19  your trial affidavit.  Do you see there is a reference there to

20  a forward resolution?

21  A.  Ah-huh, yes.

22         MR. WERDER:  I've handed the witness, your Honor,

23  Exhibit DX 282.

24  BY MR. WERDER:

25  Q.  Can you tell me, Ms. Tamer, what Exhibit 282 is.  Let me

1    ask you if that is your signature on Exhibit 282?

2    A.  Just a moment.  I'm trying to read.

3    Q.  Thank you.

4    A.  (Pause)  Yes.  What exactly did you want to know?

5    Q.  Can you tell the court what this document is?

6    A.  It's a formal declaration for authority to guaranty the

7    authorized parties.

8    Q.  When did you sign that document, Ms. Tamer?

9    A.  In 2007.

10   Q.  Is there a particular date in 2007 that you signed it?

11   A.  Here it says September of 2007.  If I wasn't to read this,

12   I wouldn't remember the particular date, but reading it, it

13   says September 2007.

14           THE COURT:  Where is your signature?

15           THE WITNESS:  (Indicating)

16           THE COURT:  Are you talking about her affidavit or are

17   you talking about the exhibit?

18           MR. WERDER:  I am talking about exhibit.

19           THE COURT:  The witness is referring to her affidavit.

20   Point to the exhibit and ask her where her signature is on the

21   exhibit.  (Pause)  This is what you gave me.

22           MR. WERDER:  I am sorry.  I actually thought I handed

23   her the one that had her signature.  I am sorry.

24           THE COURT:  Are you handing her a different document?

25           MR. WERDER:  Yes, I'll hand her a different document.

16MJMLC2                        Tamer - redirect

1    BY MR. WERDER:

2    Q.  I am handing you Defendant's Exhibit 53, Ms. Tamer.

3    A.  Okay.

4    Q.  What does that document state?

5    A.  It is an act of the meeting of directors.

6    Q.  What meeting of directors is that?

7    A.  Authorization for the board to sign.

8            THE INTERPRETER:  Interpreter error?

9    A.  Authority for the director to sign the name of the company,

10   guaranteeing the obligations of UISA Finance, the loan and

11   guaranty agreement to be made with UISA Finance and Merrill

12   Lynch Credit Products.

13   Q.  Does your signature appear on that document, Ms. Tamer?

14   A.  Yes.

15   Q.  Is that your signature on the document?

16   A.  Yes.

17   Q.  When did you sign this document?

18   A.  9th of November 2007.

19           MR. WERDER:  No further questions, your Honor.

20           THE COURT:  I've got a couple.  A moment ago I asked

21   you whether you knew that Itamarati was asked to sign a

22   guaranty for the loan to UISA.  Do you recall that?

23           THE WITNESS:  Ah-huh.

24           THE COURT:  You do remember that?

25           THE WITNESS:  Yes, yes.

1           THE COURT:  And you said "no"?

2           THE WITNESS:  Yes.

3           THE COURT:  Is that correct, that was your testimony?

4           THE WITNESS:  Yes, but I confused "collateral" with

5   "guaranty."  That is why I said no, because I was confused.

6           THE COURT:  I didn't ask you that.  I asked you a

7   moment ago if you knew in 2007 that Itamarati was being asked

8   to sign a guaranty for the UISA loan.  Do you recall I asked

9   you that?

10          THE WITNESS:  I remember.

11          THE COURT:  And you said no, you did not know?

12          THE WITNESS:  Yes.

13          THE COURT:  That's correct, you didn't know in 2007

14  that Itamarati was being asked to sign a guaranty, correct?

15          THE WITNESS:  I didn't remember.  No, I didn't know.

16          THE COURT:  In your declaration, in your affidavit,

17  you stated, at Paragraph 7, "When Merrill Lynch lent funds to

18  UISA Finance in September 2007, I was informed that Merrill

19  Lynch would require Itamarati's board of directors to provide a

20  guaranty of UISA's Finance's obligations under the loan."

21          Do you see that?

22          THE WITNESS:  Yes.

23          THE COURT:  Do you not see the conflict between what

24  you answered to me a moment ago and what is in your affidavit?

25          THE WITNESS:  I see a conflict due to a confusion of

1    terms and understanding.

2           THE COURT:  Did you understand in September and then

3    again in November of 2007 that Itamarati was being asked to

4    sign a guaranty for the obligations of UISA under a loan

5    agreement?

6           THE WITNESS:  Yes, after I understood the term

7    "guaranty" because I had confused guaranty and collateral.

8           THE COURT:  I asked you "guaranty" about five minutes

9    ago and you answered no, you did not know.  So I want to know,

10   did you know or did you not know in 2007 that Itamarati was

11   being asked to sign a guaranty?

12          Translate that.

13          THE WITNESS:  No, I didn't know specifically what

14   guaranty, no.

15          THE COURT:  So why did you sign this affidavit which

16   is inconsistent with what you just testified to under oath?

17          THE WITNESS:  I don't remember.  That was in 2007 and

18   I trusted in the way that Edezio had taken care of things with

19   Merrill Lynch.

20          THE COURT:  Why did you sign this document that says

21   you knew, you were informed that Merrill Lynch would require

22   Itamarati's board of directors to provide a guaranty?

23          THE WITNESS:  Because I understood the difference

24   between collateral and guaranty later.  It was a confusion on

25   my part.  It wasn't said in bad faith.

16MJMLC2                       Tamer – redirect

1          THE COURT:  Did you discuss the loan and the guaranty

2     that was being asked with anyone in 2007, the Fall of 2007?

3          THE WITNESS:  Yes, I talked with Edezio, Spinelli and

4     Richard Rainer.

5          THE COURT:  What did they tell you about the guaranty

6     that was being required of Itamarati?

7          THE WITNESS:  Now I can respond clearly.  They told me

8     a guaranty was a vow, a promise with respect to the debt, but

9     it was not involving a collateral.  I didn't understand that

10    before.  I understand that now.

11         THE COURT:  What do you understand now?

12         THE WITNESS:  That it is a guaranty to a debt that has

13    to be paid but that it didn't have anything to do with

14    collateral.

15         THE COURT:  I didn't ask you anything about

16    collateral.  I am asking you about the guaranty.  You

17    understood or you didn't understand in the Fall of 2007 that

18    Itamarati was being asked to guaranty the obligations of UISA

19    Finance?

20         THE WITNESS:  I understood.

21         THE COURT:  Okay.  And so two minutes ago you told me

22    you didn't understand.  Now you tell me you understood?

23         THE WITNESS:  I didn't understand the terms, some of

24    the terms in English.  That's what I am trying to explain.

25         THE COURT:  That's your testimony under oath, subject

1    to the penalties for perjury, that is your testimony?

2              THE WITNESS:  Yes, I understood.  I don't know what to

3    say.

4              THE COURT:  A moment ago you said you didn't

5    understand.  I get to make credibility findings, Mr. Werder,

6    you understand that?  I am the finder of fact here?

7              MR. WERDER:  Understood, your Honor.

8              THE COURT:  Yes.  That is not a question for you.

9              Anything further?

10             MR. RUSSELL:  Not from me, your Honor.

11             MR. WERDER:  No, your Honor.

12             THE COURT:  You may step down.

13             (Witness excused)

14             THE COURT:  Your next witness, Mr. Werder?

15             MR. WERDER:  Your Honor, our next witness is going to

16   be Mr. Possari.  May we have a five-minute break before we have

17   him up?

18             THE COURT:  Yes.

19             MR. WERDER:  May we have a sidebar before Mr. Possari

20   comes?  I don't want to have him hear.

21             THE COURT:  Before or after the break?

22             MR. WERDER:  Before the break, your Honor.

23             (At the sidebar)

24             MR. WERDER:  I don't know if the translator can help

25   with this at all, but I will let Mr. Timmons explain there is a

1    translation difficulty, I believe, that may be having some

2    impact on this.

3              MR. TIMMONS:  Your Honor, word (Portuguese) in

4    Portuguese has two meanings.  One is guaranty and the other

5    meaning is collateral.

6              THE COURT:  You're going with this one?  This is what

7    you're going to do?  There are two things I won't tolerate in

8    my courtroom:  One is perjury and the other are lawyers who

9    basically draft a statement for somebody and have them sign the

10   way the board of directors did in this case, so think about it

11   and we can take this up again at the sidebar.  You're going to

12   try to tell me this is a translation problem!

13             (Recess)

14             THE COURT:  Have a seat.  Next witness.

15             MR. TIMMONS:  Your Honor, our next witness is

16   Mr. Ernesto Possari.

17             THE COURT:  All right.  Mr.

18    ERNESTO VALDOMIRO POSSARI,

19        called as a witness by the Defendant,

20        having been duly sworn, testified as follows:

21             THE COURT:  May we have the interpreter state and

22   spell her name, please.

23             THE INTERPRETER:  Maria, M A R I A, D E L I M A.

24             THE COURT:  Ms. Delima, good morning.

25             Ms. Delima, you are a court-certified interpreter?

16MJMLC2                          Possari - direct

1        THE INTERPRETER:  No, I am not.

2        THE COURT:  Have you interpreted in court before?

3        THE INTERPRETER:  Yes.

4        THE COURT:  On how many occasions?

5        THE INTERPRETER:  Two.

6        THE COURT:  Two?  Do you also provide translation

7    services and interpreting services in depositions and other

8    legal matters?

9        THE INTERPRETER:  In depositions.

10        THE COURT:  Okay.  We'll have you take an interpreter

11    oath to have you faithfully and truthfully interpret these

12    proceedings in Portuguese and English.

13        (The Portuguese Interpreter, Maria Delima, was duly

14    sworn)

15        THE COURT:  All right.  Okay.  Mr. Possari, is that

16    the spelling of your name?

17        THE WITNESS:  Yes.

18        THE COURT:  The last letter is I or E?

19        THE WITNESS:  E, Possari, E.

20        THE INTERPRETER:  E.

21        THE COURT:  E?

22        MR. TIMMONS:  Your Honor, E is I.  I believe it was a

23    translation error.

24        THE INTERPRETER:  Pardon me.

25        THE COURT:  Mr. Possari, just keep your voice up.

1    Actually, would you look below your seat, is there something

2    like this that fell off?

3              Never mind.  We'll find it.

4              THE INTERPRETER:  Here it is.

5              THE COURT:  The last witness brushed against it.

6              Keep your voice up.  Let me ask the interpreter to do

7    the same and just answer the questions put to you by the

8    lawyers.

9    DIRECT EXAMINATION

10   BY MR. TIMMONS:

11   Q.  Good morning, Mr. Possari.  What is your current position

12   with Itamarati?

13   A.  I'm a director -- officer.

14   Q.  What position did you hold at Itamarati during the to 2008

15   time period?

16   A.  I was a director of law.

17             MR. TIMMONS:  Your Honor, I am approaching the witness

18   with the trial affidavit.

19             THE COURT:  Yes.

20             (Pause)

21   BY MR. TIMMONS:

22   Q.  Mr. Possari, I've just handed you a document that is

23   entitled, "Affidavit of Ernesto Possari."  Do you have that

24   document in front of you?

25   A.  Yes, I do.

1   Q.  Would you turn to the last page of that document, please.

2   Is that your signature?

3   A.  Yes, it is.

4   Q.  Do you speak or understand any English, Mr. Possari?

5   A.  No, I do not.

6   Q.  Was your trial affidavit translated for you orally into

7   Portuguese before you signed it?

8   A.  Yes, it was.

9   Q.  In preparing to testify here today, did you ask one of your

10  co-workers to also prepare a written translation of this

11  document for you?

12  A.  Yes, I did.

13          MR. TIMMONS:  For the record, I have put that document

14  in front of the witness.  It has been marked as Defense Exhibit

15  300.  I have handed it up to your Honor and given one to

16  plaintiff's counsel.  We don't intend to offer it into

17  evidence.  I just wanted to mark it as an exhibit.

18          THE COURT:  All right.  Any objection to this coming

19  in as evidence?

20          MR. RICE:  Your Honor, it is not certified, but in all

21  honesty, I don't object.

22          THE COURT:  All right.  I'll take it, Defense Exhibit

23  300 is received.

24          (Defendant Exhibit 300 received in evidence)

25          MR. TIMMONS:  One other point, for the record, your

1    Honor, we noticed that there is a typo in Mr. Possari's

2    declaration.  In Paragraph 11 there is a reference to --

3            THE COURT:  Paragraph 12.

4            MR. TIMMONS:  Sorry, Paragraph 12 there is a reference

5    to Defendant's Exhibit 3, and that is supposed to be 4.  I can

6    either correct that with the witness --

7            THE COURT:  Make sure the witness agrees.  It is his

8    statement.

9    BY MR. TIMMONS:

10   Q.  Mr. Possari, calling your attention to Paragraph 12 of your

11   trial affidavit, do you see in the first sentence of that

12   paragraph that reads, "I understand there is a document that

13   was signed by Mr. Moraes that contains an opinion that a.

14   Certain guaranty is enforceable," and there is a reference to

15   the letters DX and the No. 3.  Do you see that?

16   A.  You are asking?

17   Q.  I am just asking if you see that reference?

18   A.  Yes.

19   Q.  I have also handed you a document that has been marked as

20   Defendant's Exhibit 4.  I ask you to take a quick look at that

21   document.

22   A.  Exhibit 4?

23   Q.  Yes.  Do you see, if you look over to the third page of

24   Exhibit 4, you see a signature that appears to be by the name

25   of a gentleman by the name of Mr. Moraes.  Do you see that?

16MJMLC2                        Possari - direct

1    A.  Yes.

2    Q.  Is this Exhibit 4 what you're referring to in Paragraph 12

3    of your trial affidavit?

4    A.  I didn't understand.

5    Q.  The first sentence of Paragraph 12 of your trial affidavit

6    says, "I understand there is a document that was signed by Mr.

7    Moraes that contains an opinion that a certain guaranty is

8    enforceable."?

9    A.  No.

10          MR. TIMMONS:  I might be able to speed this along if I

11   could work with the witness.

12   BY MR. TIMMONS:

13   Q.  Paragraph 12 of your trial affidavit, do you see the

14   reference in Paragraph 12 of your trial affidavit to this

15   statement?

16   A.  Si.

17   Q.  It is referring to DX 3, an opinion that was Mr. Moraes --

18   let me just read it for you.  I understand that there is a

19   document that was signed by Mr. Moraes that contains an opinion

20   that a certain guaranty is enforceable.

21          Is this exhibit, Defendant's Exhibit 4, that opinion

22   that was signed by Mr. Moraes that you're referring to in your

23   trial affidavit?

24   A.  The question is was it signed by --

25   Q.  The question is:  Is this the document you're referring to

1    in Paragraph 12 of your trial affidavit?

2    A.  Yes, it is.

3    Q.  Mr. Possari, are the facts and information reflected in

4    your trial affidavit true and accurate to the best of your

5    knowledge?

6    A.  Yes.

7            MR. TIMMONS:  Thank your Honor.  I have nothing

8    further.

9            THE COURT:  All right.  Cross-examination, Mr. Rice.

10           MR. RICE:  Thank your Honor.

11   CROSS EXAMINATION

12   BY MR. RICE:

13   Q.  Good morning, Mr. Possari.

14   A.  Good morning.

15   Q.  Mr. Possari, I'd like you to keep before you your affidavit

16   that you just were looking at with Mr. Timmons.  You signed

17   this affidavit, correct?

18   A.  This one here, yes, I did.

19   Q.  In submitting that signed declaration, you intended for the

20   court to rely on it in this case?

21   A.  Yes.

22   Q.  You would agree, wouldn't you, that it is reasonable for

23   the court and the parties to rely on what you've said in that

24   declaration?

25   A.  Yes.

1  Q.  It would be reasonable for the court and the parties to

2  rely on your signed declaration even though the declaration is

3  in the English language, correct?

4  A.  Yes.

5  Q.  You understand that this declaration is a serious document?

6  A.  Yes.

7  Q.  You're a serious person, are you not?

8  A.  Yes.

9  Q.  You're a careful person?

10  A.  Yes.

11  Q.  And you're an honest person?

12  A.  Yes.

13  Q.  How long have you worked for Itamarati, sir?

14  A.  I didn't understand.

15  Q.  Sir, isn't it true you have acted as Itamarati's lawyer for

16  more than 30 years?

17  A.  Yes.

18  Q.  Just to be clear, when I say "Itamarati" today, I'll be

19  referring to USINAS Itamarati?

20         THE INTERPRETER:  Can you clarify?

21  Q.  Today when I use the word "Itamarati," I mean to refer if

22  you signed as Itamarati S.A., okay?

23         THE COURT:  Not Moraes, Itamarati?

24         THE WITNESS:  Itamarati.

25         MR. RICE:  It is my accent.

16MJMLC2                        Possari - cross

1    BY MR. RICE:

2    Q.  Sir, you have been the senior -- withdrawn -- you have been

3    a lawyer at USINAS Itamarati for more than 30 years, right?

4    A.  Si.

5    Q.  You were the senior lawyer there in 2007 and 2008, right?

6    A.  Yes.

7    Q.  In your capacity as a lawyer for USINAS Itamarati, you

8    signed documents from time to time, correct?

9    A.  Yes.

10   Q.  You signed documents on behalf of USINAS Itamarati, right?

11   A.  Yes.

12   Q.  You signed contracts on behalf of UISA Finance?

13   A.  We finance?

14   Q.  Correct.

15   A.  Yes.

16   Q.  When you signed contracts on behalf of your employer, you

17   understood that the parties to the contract would be relying on

18   your signature.  Isn't that true?

19        THE INTERPRETER:  Can you repeat that?

20   Q.  When you signed contracts on behalf of USINAS Itamarati and

21   UISA Finance, you understood that the parties to those

22   contracts would be relying on your signature, isn't that right,

23   sir?

24        THE INTERPRETER:  He can't understand my

25   interpretation.

16MJMLC2                          Possari - cross

1    Q.  Let me try again.  You signed contracts for USINAS

2    Itamarati, right, sir?

3    A.  Yes, sir.

4    Q.  When you signed those contracts, people who saw your

5    signature were entitled to rely on your signature.  Isn't that

6    right?

7    A.  Yes.

8    Q.  Parties to contracts that you sign on behalf of Itamarati

9    were entitled to rely on your signature even though some of

10   those contracts were in English, right?

11   A.  Yes.

12   Q.  In fact, sir, isn't it true that you never signed a

13   document on behalf of USINAS Itamarati that you didn't believe

14   was within the scope of your authority?

15           THE INTERPRETER:  Can you repeat that?

16   Q.  I'll ask a different question.

17           Have you, Mr. Possari, ever signed a document on

18   behalf of USINAS Itamarati that you were not authorized to

19   sign?

20   A.  Sometimes I would, yes, sometimes I signed, and I got to

21   the conclusion that I should have not signed it.

22   Q.  So what you're saying is you signed documents, am I

23   correct, sir, that you signed documents on behalf of USINAS

24   Itamarati that you were not authorized to sign?  That is your

25   testimony here in court today?

1  A.  Yes.  I am not understanding.  Which company are you

2  talking about?

3          I don't have any doubts that all the documents I

4  signed were -- I don't have any doubt of the documents that I

5  have signed.

6  Q.  As to the documents you signed on behalf of USINAS

7  Itamarati, you don't have any doubt that you were authorized to

8  do that, correct?

9  A.  Yes.

10  Q.  One of the documents that you signed in the course of your

11  duties was an ISDA master agreement.

12          THE INTERPRETER:  Can you repeat that?

13  Q.  I'll ask a different question.

14          Did you sign an ISDA master agreement with a Merrill

15  Lynch entity in 2008?

16  A.  Yes, sir.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1   BY MR. RICE:

2   Q.  And you signed that document on behalf of UISA Finance.

3   A.  Yes.

4   Q.  And you understood that in signing on behalf of UISA

5   Finance, you were obligating UISA Finance to the term and

6   conditions of that ISDA master agreement.

7   A.  Yes.  I want to say one of the contracts needed to be

8   signed for the guaranties of 2008.

9   Q.  Let me just put before you some of these contracts so we

10  can be sure we're speaking about the same thing.  Would you

11  open to -- there are several tabs here, but the first one is

12  called PX1.

13  A.  QX1?

14  Q.  PX1.  Should be the first tab.  Do you have that before you

15  now, sir?

16  A.  Yes.

17  Q.  And is this an ISDA master agreement between UISA Finance

18  and Merrill Lynch Capital Services, Inc.?

19  A.  I'm not understanding.

20  Q.  Okay.

21  A.  I think that the interpretation is not correct.  I'm not

22  understanding the translation.

23        THE COURT:  All right.  So what do you want to do

24  about this, Mr. Werder?  It's your witness; right?  Twice now

25  your witness has complained about the interpretation.

16m1mlc3                        Possari – cross

1              MR. TIMMONS:  Yes, your Honor.  If we could, we'd like

2      to switch interpreters.  Perhaps the other interpreter can do a

3      better job.

4              THE COURT:  It's your call, but I mean, we can't do an

5      examination without an interpreter.  So you picked the

6      interpreters.  You decide what you want to do.  Do you want to

7      switch to Mr. Peterson?

8              MR. TIMMONS:  Yes, if we could, please.

9              THE COURT:  All right.  Okay.

10             All right.  Mr. Peterson, you're still under the same

11     oath you took before with respect to faithfully, accurately

12     translating from English into Portuguese and vice versa, all

13     right?

14             THE INTERPRETER:  Yes, your Honor.

15     BY MR. RICE:

16     Q.  All right.  Is Plaintiff's Exhibit 1 a contract that you

17     signed on behalf of UISA Finance?

18     A.  Yes.

19     Q.  And you understood in doing -- in signing that contract

20     that you were obligating UISA Finance to its obligations under

21     that contract; correct?

22     A.  Yes.

23     Q.  Take a look at the next document.  It should be

24     Plaintiff's -- or PX4.  Do you have that in front of you, sir?

25     A.  Yes.

1    Q.  All right.  Is this another contract that you executed in

2    the course of your duties for USINAS Itamarati?

3    A.  Yes.

4    Q.  And you see, sir, that you signed in several places on this

5    document.

6    A.  Yes.

7    Q.  You signed on behalf of UISA Finance; correct?

8    A.  True.  Yes.

9    Q.  And in doing that, you understood that you were obligating

10   UISA Finance to this agreement?

11   A.  Yes.

12   Q.  And you also signed on behalf of USINAS Itamarati; correct?

13   A.  Yes.

14   Q.  And you also understood that in signing on behalf of USINAS

15   Itamarati, you were obligating it to its part of this

16   agreement.

17   A.  Yes.  An observation:  When I was signing these documents,

18   I was signing --

19           THE INTERPRETER:  And the interpreter needs to

20   clarify.

21   A.  -- I was under the understanding that I was signing a

22   principal transaction of $125 million, not a derivative.

23   Q.  Sir, you had signed documents relating to a principal

24   transaction of $125 million back in November of 2007, isn't

25   that so?

16m1mlc3                          Possari - cross

1    A.  Yes, November of 2007, 125 million.

2    Q.  And --

3    A.  And this is April.

4    Q.  This is April of 2008; correct?

5    A.  Yes.

6    Q.  So -- and the agreement you signed in November of 2007 with

7    regard to the $125 million loan, that was with a lender called

8    Merrill Lynch Credit Products; correct?

9    A.  Both of them were with Merrill Lynch.

10   Q.  Okay.  Sir, would you take a look at tab -- Plaintiff's

11   Exhibit -- Plaintiff's Exhibit 11 in your binder.

12        Sir, you see on the first page there the lender is --

13   you see there's an entity identified as Merrill Lynch Credit

14   Products, LLC?

15   A.  Yes.

16   Q.  And this is -- and this, Plaintiff's Exhibit 11, is the

17   document that you signed in November of 2007 relating to the

18   $125 million loan; correct?

19   A.  Repeat, please.

20   Q.  Plaintiff's Exhibit 11, sir, that is the loan agreement

21   that you signed in November of 2007 in connection with the

22   $125 million loan that you just testified about; right?

23   A.  I signed it, yes.

24   Q.  And if you go back to Plaintiff's Exhibit 4 and look at the

25   first page of that, you can see, can you not, that there is a

1   different Merrill Lynch entity that it is shown on that

2   contract, specifically, Merrill Lynch Capital Services, Inc.?

3   A.  Yes.

4   Q.  You didn't think -- withdrawn.

5   A.  But here, here there's no distinction made.

6   Q.  You're saying on the logo on the top of the document it

7   just says Merrill Lynch, right.  But, sir, you're -- but, sir,

8   you're a lawyer; right?  Correct?

9   A.  Yes.

10  Q.  And you understand, looking at the document, that the party

11  with whom you were contracting was Merrill Lynch Capital

12  Services.  That's what it says; right?

13  A.  No, no.  No, no, no.  I repeat again, the understanding was

14  this was a continuation of the principal loan, not a

15  derivative, not with different rates or anything like that, not

16  a derivative.

17         THE COURT:  So what was the purpose of the document

18  then?  Just fun to do these multiple times?  It's just fun to

19  do these things multiple times, six months, eight months apart,

20  a year apart?

21         THE WITNESS:  It could have been an addition or

22  something, a change in the contract.  During the time of a

23  year, you could still do that.

24         THE COURT:  You signed the document, did you not?

25         THE WITNESS:  Yes, I signed it.

1              THE COURT:  Did you read it?

2              THE WITNESS:  No.

3              THE COURT:  Did you have it read to you, translated

4     for you?  Did you have it read, or rather translated into

5     Portuguese for you?

6              THE WITNESS:  No.

7              THE COURT:  Good practice, you think?

8              THE WITNESS:  No, no.  It was just trust in the one

9     that was responsible financially, the financial officer that

10    was taking care of the transaction.

11             THE COURT:  You're an attorney?

12             THE WITNESS:  Yes.

13             THE COURT:  Do you have an understanding of how

14    contracts operate in Brazil?

15             THE WITNESS:  Yes.

16             THE COURT:  When you signed this contract, did you

17    think you were binding the companies for which you were

18    signing?

19             THE WITNESS:  Yes, I signed it, but I repeat, I

20    thought I was signing with reference to the principal.  I

21    thought it was a continuation of the principal loan.

22             THE COURT:  You understood that by signing this

23    document, you were binding the entities for which you were

24    signing to the terms of the agreement.

25             THE WITNESS:  No.  I didn't understand.

1          THE COURT:  You didn't understand that, that your

2    signature would have no such effect.

3          THE INTERPRETER:  Interpreter clarification.  It

4    appears that he's saying he did not understand the question.

5          THE COURT:  Oh, I'm sorry.  Did you understand that by

6    signing the agreement, you were binding the companies for which

7    you were signing?

8          THE WITNESS:  Yes.

9          THE COURT:  All right.  Go ahead, Mr. Rice.

10   BY MR. RICE:

11   Q.  Now, sir, you told us a few minutes ago that you didn't

12   know anything about a derivative transaction with Merrill

13   Lynch.  Is that your testimony?

14   A.  Yes, yes.  I didn't know it was going to be a derivative.

15   Q.  And you never heard anything about a derivative transaction

16   with Merrill Lynch, in 2008.  That's your testimony.

17   A.  Yes, I hadn't.

18   Q.  Would you look at Plaintiff's Exhibit 56 in the binder in

19   front of you, sir.

20   A.  The same page 56?

21   Q.  It's PX56.  There's a tab there.

22          Sir, do you have that in front of you now?

23   A.  Yes.

24   Q.  All right.  And that is a series of e-mails; correct?

25   A.  True.

1    Q.  I'd like to direct your attention first to the one that is

2    second from the bottom, from Christiano Basto (ph) Morales to

3    you.

4    A.  Yes.

5    Q.  Okay.  And that references Merrill Lynch and ISDA, UISA

6    Finance; correct?

7    A.  Yes.

8    Q.  And Mr. Morales writes to you, "Ernesto, I am sending the

9    master contract for derivative operations with Merrill Lynch

10   for legal analysis."  Does he not?

11   A.  It is.

12   Q.  And you didn't write back to Mr. Morales and say, "What

13   derivative operation," did you?

14   A.  No.  I answered right here.

15   Q.  Right.  You didn't say to him, in this e-mail or any other

16   e-mail, "I don't know anything about derivative operations with

17   Merrill Lynch."  Right?

18   A.  Repeat, please.

19   Q.  Sir, you didn't -- you didn't tell Mr. Morales, in this

20   e-mail or any other e-mail that you can produce to us, that you

21   didn't understand that your company was doing derivative

22   operations with Merrill Lynch; right?

23   A.  No, no.

24   Q.  Sir, would you return back to PX4.  Now I'd like you to

25   turn to the signature pages.  First, we showed you before you

1   signed on behalf of UISA Finance.  I'd like you to find your

2   signature there.  Do you see that?

3   A.  Yes, yes.

4   Q.  And right below your signature, it says, USINAS Itamarati

5   SA, as guarantor.  Do you see that?

6   A.  That's true.

7   Q.  Right.  And even though you don't speak English, you know

8   what it means for Itamarati to sign as guarantor; isn't that

9   right?

10  A.  Yes, yes, but I keep saying, I understood that they were

11  the guarantor of $125 million, not as a swap.

12  Q.  All right.  But, sir, when you -- when you saw this

13  document and you saw "as Guarantor" after Itamarati's name and

14  you signed on behalf of Itamarati, you understood you were

15  obligating Itamarati as guarantor; correct?

16  A.  Yes, yes.

17  Q.  And, sir, isn't it true that after the date of this

18  document you signed two other confirmations just like this on

19  behalf of USINAS Itamarati as guarantor?

20  A.  What -- what documents?

21  Q.  You'd like to see the documents, sir?

22  A.  After the document of November of 2007?

23  Q.  Sir, let's look at the documents.  Look at PX5, the next

24  document in your binder there.  Sir, that is another contract

25  with Merrill Lynch Capital Services; correct?

16m1mlc3                          Possari - cross

1  A.  PX5; right?

2              THE COURT:  Yes.

3  Q.  Yes.

4  A.  Yes.

5  Q.  PX5 is the one we were just looking -- I'm sorry.  Yes,

6  PX5.  And your signature is all over that document; isn't that

7  correct?

8  A.  True.

9  Q.  And you signed not only on behalf of UISA Finance but also

10 again on behalf of USINAS Itamarati as guarantor; right?

11 A.  True.

12 Q.  And would you take a look at Exhibit 8.  Excuse me.  I

13 apologize.  PX -- PX6.  This is another agreement you signed on

14 behalf of UISA Finance and USINAS Itamarati as guarantor;

15 right?

16 A.  True.

17 Q.  And, sir -- sir, you'll agree with me -- withdrawn.

18              Sir, it was reasonable, was it not, for Merrill Lynch,

19 as the counterparty, to rely on your signature as being

20 authorized on behalf of USINAS Itamarati; isn't that right?

21 A.  USINAS Itamarati depended on my signature?  Please?

22 Q.  Sir, my question is -- to you is:  You understood in

23 signing this that Merrill Lynch was going to be relying on your

24 signature as binding USINAS Itamarati as guarantor; right?

25 A.  Yes.

16m1mlc3                         Possari - cross

1    Q.  Now, sir, it's true, isn't it, that to this very day no one

2    at Itamarati has criticized you for signing these documents?

3    A.  No.  Someone's criticized?  No, I didn't understand the

4    question.

5    Q.  Sir, isn't it true -- withdrawn.

6         You never told anyone from Merrill Lynch that you

7    weren't fully authorized to sign each and every one of these

8    contracts; isn't that right, sir?

9    A.  No, but always conscious that it was the principal loan,

10   not as a swap.

11   Q.  Sir, there was nothing to prevent you from having someone

12   read these documents to you or have them interpreted; correct?

13   A.  True.

14   Q.  All right.  And back to my question.  You certainly never

15   told anyone from Merrill Lynch that you were not fully

16   authorized to sign these documents on behalf of UISA Finance

17   and USINAS Itamarati.

18   A.  True.

19   Q.  Now the Itamarati group of companies was -- at all relevant

20   times in 2007 and 2008, it was a privately held company; right?

21   A.  Yes.  Close capital and private.

22   Q.  And you're familiar with the bylaws of USINAS Itamarati,

23   are you not?

24   A.  What laws?  What laws?

25        THE COURT:  The bylaws, corporate bylaws.

1   Q.  Sir, are you familiar with the corporate bylaws of USINAS

2   Itamarati?

3   A.  Oh, yes.  Yes, the statutes, yes.

4   Q.  Okay.  And you -- under those statutes, the board of

5   directors of USINAS Itamarati was to have three regular

6   meetings a year; right?

7   A.  No.  The board or what?

8   Q.  Yes, the board of directors.  Let me try it again.

9          Under the bylaws of USINAS Itamarati, its board of

10  directors was to have three regular meetings a year.  That's

11  what the bylaws say; right?

12  A.  No, no.  I don't remember those meetings were obligatory.

13  Q.  Would you take a look, sir, at PX21 in the binder in front

14  of you.

15  A.  21?

16  Q.  21.  You'll see the first page of that is a March 22nd,

17  2007 e-mail.  And then what is the document that follows that

18  e-mail?  I'm talking specifically about the document that

19  starts at the page number at the lower right-hand corner 11835.

20  A.  11835, yes.

21  Q.  Okay.  Is what appears on page 11835 or what starts there,

22  is that -- are those minutes of a shareholders meeting?

23  A.  Yes.  What -- no.  Wait.  What do you want to say about

24  page 1835?  That is the --

25  Q.  The document starts on page 11835 and finishes with your

1  signature on page 11837.  Sir, what is that?

2  A.  This is an act to approve the bylaw.

3  Q.  Okay.  And then starting on page 11838, is that where the

4  bylaws actually start?

5  A.  Yes.

6  Q.  Okay.  And would you take a look in the bylaws at Article

7  XXI.

8          THE COURT:  What page is it?

9          MR. RICE:  For Article XXI in his version --

10         THE COURT:  11844 or 118 -- no, 118 --

11         MR. RICE:  It's 11841.  And then for your Honor, it's

12  the same numbers with the translation.

13  A.  Yes, it's XXI.

14  Q.  That provides, does it not, sir, that the board of

15  directors ordinarily meet three times a year; right?

16  A.  The board of directors will meet once a trimester when

17  invited to.

18  Q.  And, sir, do you know -- withdrawn.

19         And it also says that there can be extraordinary

20  meetings of the board of directors; correct?

21  A.  Yes.

22  Q.  Sir, do you know whether the board of directors of

23  Itamarati, from your own personal knowledge, ever met at any

24  point in time in 2007 or 2008?

25  A.  No.  Yeah, well, 2007, 2000 -- yeah, sure, there would have

16m1mlc3                          Possari - cross

1   had -- there would have been a meeting to approve the material,

2   yes.  Could I clarify?  Could I clarify a little?

3   Q.  Sure.

4   A.  Any act that is going to be taken into effect by an

5   officer, that would have had to be approved by the board of

6   directors.  Any time that something would be discussed with --

7   with members of the board of directors --

8           THE INTERPRETER:  Excuse me, the interpreter.

9   A.  The board of directors, there would not necessarily be a

10  formal meeting because it's a private company.  There are no

11  stockholders involved.  The things would be discussed with the

12  officers or with the board, not necessarily having a formal

13  meeting, maybe even by telephone.

14  Q.  Sir --

15  A.  And then they would be brought to be signed.  At the point

16  of being signed, we would already have previous knowledge.

17  Q.  Sir, did you, in 2007 and 2008, attend any meeting of the

18  board of directors of USINAS Itamarati?

19  A.  No.

20  Q.  So you don't know from your own personal knowledge whether

21  the board ever met because you were never there.

22  A.  Yes, but I know -- I know that they had meetings.  They

23  would handle things over the phone, Edezio would go to

24  Claudia's house --

25  Q.  Sir, if I --

16m1mlc3                           Possari - cross

1   A.  -- they would handle things over the phone, they would

2   handle things in person.  It was not a formal meeting.

3   Q.  When you say they --

4   A.  And that was what happened at that time when the loan was

5   approved for 125 million --

6   Q.  Sir, you don't --

7   A.  -- which is completely in agreement with the bylaws.

8   Q.  Sir, you didn't attend any meetings of the board of

9   directors at which the $125 million loan was approved; right?

10  A.  I repeat.  I did not go to any meetings.  The meetings were

11  handled in the way that I just described.

12  Q.  Right.  But you were not present and you did not witness

13  this; right?

14  A.  No.  I know it was talked about.  I wasn't present, but I

15  know it was talked about.

16  Q.  Sir, would you take a look at --

17  A.  So much so that the members of the board signed.

18  Q.  You know the members of the board signed resolutions, but

19  you were not at any meetings where those resolutions were

20  discussed; right?

21  A.  True, no.  There wouldn't have been a need of my presence.

22  Q.  Sir, take a look at PX30 in the binder in front of you.

23  And turn to the second page of the document.  That's the one

24  that has the number in the lower right-hand corner 9976.  Do

25  you see that?

16m1mlc3                          Possari - cross

1    A.  996 or 7?

2    Q.  9976.  Do you see that, sir?

3    A.  Yes.

4    Q.  Is that the resolution of USINAS Itamarati that approves

5    its guaranty of the $125 million loan?

6    A.  Yes.

7    Q.  Let's look at those minutes for a moment.  The very first

8    thing those minutes say is, "Date, location, and time."

9    Correct?

10   A.  True.

11   Q.  And it reflects that on the 9th of November 2007, there was

12   a meeting at company headquarters in the city of Nova Olímpia,

13   state of Mato Grosso, Fazenda Guanabara; correct?

14   A.  True.

15   Q.  But if there was such a meeting, you weren't there, as you

16   just told us; right?

17   A.  True.

18   Q.  The next item on this minutes says, "Summoning and

19   attendance."  Right?

20   A.  No.  The summoning was -- was dismissed.  They didn't have

21   a summoning, because all were present.

22   Q.  Right.  So this says, "The summoning and attendance were

23   waived because of the presence at this meeting of all the

24   members of the board of directors."  Correct?

25   A.  Yes.

16m1mlc3                              Possari - cross

1    Q.  All right.  And this reflects, sir, that you were here,

2    doesn't it?

3           THE INTERPRETER:  Could the interpreter have that

4    question repeated, please.

5           MR. RICE:  Sure.

6    Q.  In this minutes the next thing it reflects is that you

7    acted as secretary of this meeting.

8    A.  Yes.

9    Q.  But you were at no meeting on November 9th, 2007; right?

10   A.  At the meeting, no.  At the meeting, no.  But I did talk

11   about it.  It was handled and I made the resolution.  Then in a

12   book where I put the resolution, I have the signatures of all

13   the shareholders, and I did this.

14   Q.  So it's your testimony, sir -- sorry.  Go ahead.

15   A.  And since it is a family business, the matters are talked

16   about between the family, including the mother-in-law, the

17   resolutions are signed, and then I have them all in a book.

18   And this is a resolution that's an abstract of the book that I

19   have, and all the resolutions are together in the book.

20   Q.  Sir, I'd like you to answer my question now, if we might.

21   A.  Yes.

22   Q.  You were designated as secretary for this meeting; right?

23   A.  Yes.

24   Q.  And you didn't attend any such meeting; right?

25   A.  No.

1   Q.  You say at the end -- you signed this at the end as

2   secretary; correct?

3   A.  Yes, it's here.

4   Q.  And just before you signed you say, "This is a true

5   copy --" withdrawn.

6           Just before your signature these -- this resolution or

7   these minutes say, "This is a true copy of the original drawn

8   up in the book."  Right?

9   A.  Yes.

10          THE COURT:  Just answer the question.

11  A.  Yes.

12  Q.  Have you looked at the book in relation to this meeting on

13  November 9th of 2007?

14  A.  Yes, I have.

15  Q.  Would you take a look at, in the stack of your binders,

16  it's DX22.

17          MR. RICE:  Can I --

18          THE COURT:  Yes.

19          MR. RICE:  See if I can help you, sir.

20          THE COURT:  Any particular page you want him to look

21  at?

22          MR. RICE:  I first want to ask him:

23  Q.  What is this?

24  A.  This is a page of the book.

25  Q.  Okay.  Would you now turn to --

1   A.  The resolution has the signature of the secretary and the

2   chairman of the table.

3          THE INTERPRETER:  The interpreter is going to ask for

4   that to be repeated.

5   A.  This resolution is a page of the book with the signatures

6   of all the members of the board, and the other is just an

7   abstract that goes to be registered.

8   Q.  Sir, I'd like you to look in the -- in the DX22 at the page

9   that has the number on the bottom right, 19741.

10  A.  DX?

11         THE COURT:  I don't have that one.  I don't know if he

12  does.  They're not in order?

13  A.  What page?

14  Q.  Hold on one second.  I'm looking at the English language

15  version.  Maybe there's a problem --

16         THE COURT:  65 of 71.

17         MR. RICE:  65 of 71 is the English language.

18  Q.  Sir, if you look in the middle on page 65 of 71 --

19  A.  65.

20         THE COURT:  In the middle, in the fold.  DX22, page 65

21  of 71?

22         MR. RICE:  Right.

23         THE COURT:  Look for that.  They're not in order.

24  That's the problem.  This is the number, but on the bottom

25  right they are not in order.

16m1mlc3                        Possari - cross

1   A.  Yes.

2   Q.  So does that appear to be minutes of the same meeting we

3   were just talking about where USINAS Itamarati approved the

4   guaranty of the $125 million loan?

5   A.  Yes.

6   Q.  This one shows Ms. Jatahy as the secretary, does it not?

7   A.  Yes, Carla Eloy Jatahy as secretary.

8   Q.  It shows her name in the text of the resolution and she

9   signed it as secretary.

10  A.  That's true.  That's correct.

11  Q.  Who was the secretary of this meeting, you or Ms. Jatahy?

12  A.  Here, Carla Eloy Jatahy was the secretary.

13  Q.  And sir, what we looked at in P -- in PX30, you were shown

14  as the secretary of the same meeting; correct?

15  A.  Let's look.  I want to turn back there.  I want to compare.

16  Q.  Okay.  So --

17  A.  P30?

18  Q.  And then go back to PX30.

19  A.  Can I explain?

20  Q.  No.  My question to you, sir, is:  Who was the secretary of

21  the meeting, you or Ms. Jatahy?

22  A.  These are two different documents.

23          THE COURT:  You're looking at the wrong one.  9976;

24  right?

25  Q.  If I can just show --

1              MR. RICE:  Can I, your Honor, come up and show him?

2              THE COURT:  Yes.

3    Q.  Let's first look at 9976.  This is the document you were

4    looking at before.  These are the minutes for the board of

5    directors meeting of USINAS Itamarati; correct?

6    A.  Yes.

7    Q.  And this related to the approval of its guaranty of the

8    $125 million loan; right?  And now going to the minute book,

9    you see these are -- also purport to be minutes of a meeting of

10   USINAS Itamarati --

11   A.  I see now, yes, correct.  That's correct.

12   Q.  -- relating to that --

13   A.  Yes, that's correct.

14   Q.  -- to the approval of the $125 million loan?

15   A.  That's correct, yeah, yeah.  I'm sorry.  That's correct.  I

16   understand.

17   Q.  Who was the secretary of the meeting, sir?  You don't know;

18   isn't that right?

19   A.  This -- this was -- this resolution right here was the

20   first one where it has two members of the board signing, and

21   Carla was the secretary.  The second one was where I signed.

22   This was an abstract of that.

23   Q.  Well, sir, when you signed an abstract saying it was a true

24   and correct copy of the original, sir, that wasn't -- that

25   wasn't correct; right?

16m1mlc3                          Possari – cross

1   A.  Yeah, that was –– that was my mistake in signing it.  But

2   because of my mistake, that does not invalidate the guaranty.

3   We did sign the guaranty.

4   Q.  Isn't it true, sir, that you –– that neither you nor

5   Ms. Jatahy was the secretary of any meeting on November 9th

6   of 2007?

7   A.  Isn't it true what?  I –– what?  Neither I nor her what?

8   Q.  You didn't attend the meeting on November 7th, 2007 ––

9   excuse me –– November 9th, 2007 of the Itamarati board of

10  directors; right?

11  A.  That's true.  No.  Like I said, they didn't –– there wasn't

12  a meeting.  They just made up the resolution and they got the

13  signatures and that was it.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

16MJMLC4                         Possari - cross

1    Q.  They just made up the resolution and got the signatures for

2    meetings like this on a routine basis, right?

3    A.  They would discuss it informally and then they would say

4    okay, we're going to do this, we're going to do this, and we

5    get the signatures and they would make the abstract of the

6    resolution.

7    Q.  You don't know what they discussed informally because you

8    weren't there, right?

9    A.  No, I wasn't there, but I know that they talked about the

10   approval for the loan.

11           THE COURT:  How do you know that?  How do you know

12   that?

13           THE WITNESS:  I didn't understand, how do I know what?

14           THE COURT:  How do you know that they talked about the

15   approval for the loan?

16           THE WITNESS:  Because I saw the signatures, because

17   that is how they would do all the time.  They would talk about

18   the matter, then they would bring it to me.  I would make the

19   resolution and then it would get the signatures.

20           When I get the signatures of the parties involved -- -

21           THE INTERPRETER:  Of the people involved --

22           THE WITNESS:  -- they would already know about the

23   subject that had been discussed.

24           THE COURT:  Who told you to do this?

25           THE INTERPRETER:  Interpreter error.

1          THE WITNESS:  The coordinator of whatever was being

2      discussed, in this case who is taking the lead with the bank,

3      it should have been Edezio, and then they would talk with the

4      shareholders and the board.  Once it had been approved, they

5      would come to me and I would draw up the resolution.

6          THE COURT:  Who would get the signatures?

7          THE WITNESS:  Me, I would get the signatures.

8          THE COURT:  Well, do you recall getting the signatures

9      for the resolution that was in the book?  You weren't there,

10     right?

11         THE WITNESS:  No, that's true, but the matter was

12     already closed and approved and it was just a matter of me

13     drawing up the resolution --

14         THE INTERPRETER:  Interpreter error.

15         THE WITNESS:  -- and getting the signatures.  When I

16     get the signatures, the people already knew what they were

17     signing about because the matter had already been discussed.

18     You have to understand that this is a family business.  It is

19     not a complex business.  The members of the board, they're

20     family.

21         THE COURT:  How did you know that they had this

22     conversation at all, that they weren't just blindly signing

23     something that had been slipped under their nose?

24         THE WITNESS:  Because when I would go to get the

25     signatures, I would say look, I need your signature for this

1    loan from the bank, and they would say oh, yeah, I know, I

2    know, we already talked about that.

3              THE COURT:  You recall that in this particular

4    instance?

5              THE WITNESS:  Getting the signatures?

6              THE COURT:  And having that conversation?

7              THE WITNESS:  Yes, with the members of the board, yes,

8    I remember.

9    BY MR. RICE:

10   Q.  It is your testimony, even though your signature is not on

11   the version of these minutes, it is in the book, you have a

12   specific recollection of collecting the signatures on that?

13   A.  I remember, yes, I remember.  Yes, I remember.  One is the

14   resolution in the book and the other is the abstract, and I

15   signed the abstract.

16             I might have done this because if there is ever a need

17   to register anything, you send an abstract of the resolution,

18   and so I probably did this to have it to register.

19             THE COURT:  Do you have any recollection of that?

20             THE WITNESS:  Yeah, of signing it?  No, no, I don't

21   remember.  I am seeing, I am perceiving this now.

22   BY MR. RICE:

23   Q.  This was a lot of red tape for the company, wasn't it, sir?

24             THE COURT:  What is "this"?

25   Q.  All --

1    A.  No.  It is very simple.  No, it was, the resolution was

2    assigned, signed it.  I don't have any doubt about the

3    document.

4    BY MR. RICE:

5    Q.  Sir, Itamarati --

6    A.  I confirm that this document is authentic.

7    Q.  Which document is authentic?

8    A.  The resolution that approved the transaction, the

9    resolution that was approved for USINAS Itamarati and the

10   resolution for the guaranty, but of the principal of the loan.

11              THE COURT:  The one in the book confirmed?

12              THE WITNESS:  All of this is in the book, all of these

13   decisions are in the book.

14              THE COURT:  The point is your signature is not on the

15   exhibit that is in the book?

16              THE WITNESS:  No, it is not there.

17              THE COURT:  But it is your testimony --

18              THE WITNESS:  It was another secretary that signed

19   there.

20              THE COURT:  So when did the board members sign the

21   book, November 9th or some other day?

22              THE WITNESS:  It could be -- I don't know, I don't

23   know what to say -- it could be the next day, it could be a

24   couple of days later.  The matter had already been approved.

25   Normally the same day, we would have it done the same day.

1    BY MR. RICE:

2    Q.  The answer the Judge's question, you don't know when the

3    board members put their signatures on this document that is in

4    the board book, right?

5    A.  This document?

6    Q.  Yes, sir.

7    A.  I don't know.

8    Q.  Sir, isn't it true that Itamarati no longer has a board of

9    directors?

10   A.  Right now, no.  It was, it was terminated May of 2009.

11   Q.  Isn't it true, sir, that the reason -- your understanding

12   is that the reason why the board was terminated in 2009 was to

13   reduce red tape, like the red tape we have been looking at?

14   A.  Yes.

15   Q.  Sir, you can close that book right now.

16       Would you find your affidavit again.  When you get

17   your affidavit, would you go to Paragraph 12 of the affidavit

18   and feel free to look at the translation that is Defendant's

19   Exhibit 30 that you have there as well.  Do you see in the

20   second sentence there it says, "Mr. Moraes was not authorized

21   to sign this legal opinion by me or by anyone else in the legal

22   department."  Do you see that?

23   A.  Yes.

24   Q.  What did you mean by that statement?

25   A.  As a subordinate, he should come to me.

1   Q.  So you're not saying you told him he can't sign legal

2   opinions, right?

3   A.  True, it is here in the document.

4   Q.  You're certainly not saying, sir, that you ever told anyone

5   from Merrill Lynch that Mr. Moraes was not authorized to

6   provide a legal opinion on behalf of USINAS Itamarati, correct?

7   A.  No, because I found out about this recently before this --

8           THE INTERPRETER:  The interpreter needs to clarify.

9           (Pause)

10  A.  -- I found out about this statement by Mr. Moraes recently.

11  Q.  My question was a simple one.  Your never told anyone from

12  Merrill Lynch that there was any limitation on Mr. Moraes'

13  authority?

14  A.  With him, no, never.  I didn't speak.  You're talking about

15  with respect to the statement?

16  Q.  I am talking about did you ever tell anyone from Merrill

17  Lynch in any way that Mr. Moraes was limited in terms of his

18  ability to provide a legal opinion?

19  A.  No, no, no, no.

20  Q.  It's true, sir, isn't it, that -- withdrawn -- Mr. Moraes

21  no longer works for you, right?

22  A.  Mr. Moraes, does he still work, is that what you're saying?

23  Q.  Is Mr. Moraes still employed by Itamarati?

24  A.  No.

25  Q.  He was laid off in 2009, right?

1   A.   Yes.

2   Q.   He was laid off, having nothing to do with any of the

3   matters that bring us here today, correct?

4   A.   True.

5   Q.   He was an admitted Brazilian lawyer, right?

6   A.   Yes, he was a Brazilian lawyer.

7   Q.   You knew that because you supervised him, right?

8   A.   Did I know what?

9   Q.   That he was a lawyer admitted to practice in Brazil?

10  A.   I'm not understanding, practice what?

11  Q.   Was Mr. Moraes a member of the Brazilian legal bar?

12  A.   He worked for us just two or three years at Itamarati.

13  After that he was let go.

14  Q.   In 2008 Mr. Moraes worked for you, you know he was a member

15  of the Brazilian legal bar, right?

16  A.   I think it was the terms that I'm not understanding.  I

17  think it is the terms I'm not understanding.  He was a

18  registered lawyer contracted by Itamarati.  He worked for us

19  for two or three years.  I don't understand this members and

20  things like that, but he was a registered, contracted attorney.

21  He was hired specifically to work with contracts.

22  Q.   Thank you, sir.

23       Sir, Ms. Tamer told us to ask you about some questions

24  about UISA Finance, so I'm going to do that.  What is UISA

25  Finance?

1   A.  It's an offshore that we have on the islands.

2   Q.  When was it formed?

3   A.  I don't remember the year.

4   Q.  Do you recall it was shortly before the loan agreements

5   with Merrill Lynch Credit Products?

6   A.  Yeah, a little bit before.  It was before.

7   Q.  It's a special purpose vehicle, isn't it?

8   A.  I don't know.

9   Q.  You don't know?

10  A.  I don't know.

11  Q.  You do know, sir, don't you, that it was set up in order to

12  facilitate financing transactions with USINAS Itamarati on a

13  tax advantage basis?

14  A.  I don't know.

15          THE COURT:  Who does know this?

16          THE WITNESS:  Who should know this?  The Jestor of the

17  company, Edezio.

18          THE INTERPRETER:  The interpreter is having a problem

19  with the word here.  Can I clarify, Judge?

20          THE COURT:  Yes.

21          (Pause)

22          THE COURT:  That might be more true than anyone

23  realizes.  Jestor?

24          THE WITNESS:  He's the one that directs the

25  businesses, he's above the officer.

16MJMLC4                        Possari - cross

 1  BY MR. RICE:

 2  Q.  The "he" is Mr. Olivera?

 3  A.  Yes.

 4  Q.  And Mr. Olivera, is he here in New York now?

 5  A.  Yes.

 6  Q.  He understands the financing transactions that are at issue

 7  in this case, right?

 8  A.  Yes.

 9  Q.  UISA Finance, you do know, I take it -- withdrawn -- are

10  you an officer of UISA Finance?

11  A.  Yes.

12  Q.  You were in 2007 and 2008, correct?

13  A.  Yes.

14  Q.  You do know it doesn't have any business of its own, right?

15  A.  It has its own business?  I didn't understand.

16  Q.  Let me back up.

17          Has UISA Finance done any transactions other than the

18  loan and a derivative that we have been talking about today?

19  A.  No, no, no, I don't know, I don't know, I don't remember, I

20  don't remember.  In the last years, the last few years?

21  Q.  At any point in time when it was formed in 2007, has UISA

22  Finance done any transactions other than the loan agreement and

23  the derivitives we have been talking about today?

24  A.  No, I don't know what to tell you.  I don't remember, I

25  don't remember if it has done any other transactions.

16MJMLC4                        Possari - cross

1   Q.  Do you remember if it has any assets of its own?

2   A.  Assets, assets, what are assets?

3   Q.  Does it own, does it own anything?

4           THE INTERPRETER:  Interpreter error.

5   A.  No.

6           THE COURT:  You don't know or you know that it has no

7   assets?

8           THE WITNESS:  I don't know.  I don't remember if it

9   has any.  It doesn't, it doesn't have, it doesn't have any, no,

10  no, I don't remember, I don't remember.

11  BY MR. RICE:

12  Q.  I am sorry, sir.  I want to get a straight answer here.  Do

13  you know one way or the other whether UISA Finance has any

14  assets of its own?

15  A.  No, no.

16  Q.  No, you don't remember?

17  A.  I don't remember.

18  Q.  Do you know whether UISA Finance has any employees of its

19  own?

20  A.  No.

21          THE COURT:  Who knows?  That is something again

22  Mr. Olivera knows?

23          THE WITNESS:  I didn't understand.

24          THE COURT:  Who would know whether this company has

25  assets or employees or what its purpose is.

 1              Again, Mr. Olivera?

 2              THE WITNESS:  Yeah, employees, I already said it

 3    doesn't have any, but assets I don't know.

 4              THE COURT:  Who would know these things?

 5              THE WITNESS:  Maybe, maybe the Jestor, Olivero.

 6              THE COURT:  Maybe?

 7              THE WITNESS:  He knows, he has knowledge of this.

 8              THE COURT:  Anyone else?

 9              THE WITNESS:  No, no,.  He should know.

10    BY MR. RICE:

11    Q.  Would you turn now in the book in front of you again to PX

12    193.  I would like you to take a look at the document, sir, and

13    see if you can tell us what it is.

14    A.  It's a change transaction.

15    Q.  In this transaction UISA Finance -- excuse me -- in this

16    transaction USINAS Itamarati is buying 500,000 U.S. dollars,

17    correct?

18              THE INTERPRETER:  The interpreter asks for the amount

19    to be repeated.

20    BY MR. RICE:

21    Q.  500,000 U.S. dollars?

22    A.  Yes.

23    Q.  You signed this exchange agreement on behalf of USINAS

24    Itamarati, right?

25    A.  Yes.

1   Q.  If you turn to the fourth page of the document which bears

2   the Production No. 14002, you see in a box there on that page

3   it indicates, does it not, sir, that those funds would be

4   transferred for the benefit of UISA Finance?

5   A.  Where is Page 4, here?

6   Q.  Looking at the fourth page of the document which bears the

7   Production No. 14002.

8   A.  Here.

9   Q.  You see there is a reference there to UISA Finance inside

10  that box?

11  A.  Yes.

12  Q.  So, sir, having looked at that, you understand, don't you,

13  that this was an exchange, a currency exchange transaction that

14  was done in late September so that $500,000 could be posted as

15  margin for UISA Finance's obligations to Merrill Lynch Capital

16  Services, right?

17  A.  That's true, yes.

18          MR. RICE:  This is a new exhibit which wasn't on our

19  list originally, but I move it in evidence.

20          THE COURT:  PX 193?

21          MR. RICE:  Yes.

22          THE COURT:  Is there an objection?

23          MR. TIMMONS:  No objection.

24          THE COURT:  Plaintiff's Exhibit 193 is received.

25          (Plaintiff Exhibit 193 received in evidence)

16MJMLC4                          Possari - cross

BY MR. RICE:

Q.  I'll try to deal with these quickly if I can.  Would you
please look at PX 191.  Sir, you're not shown on this e-mail,
but if you look on the to line, the first name is one named
Carlos Agusto Olsac Fretas.  Was Mr. --

A.  Carlos Agusto?

Q.  Olsac Fretas.  He worked for USINAS Itamarati, didn't he?

A.  Carlos Agusto?

Q.  Yes.

A.  No, I don't know Carlos Agusto.

Q.  How about you see in the CC line Mr. Rocha and Mr. Moraes,
they worked for USINAS Itamarati, right?

A.  Moraes, yes.  Carlos Agusto, he could be like an employee,
a financial employee.  I don't know.  I don't remember.  But
Moraes, yes, Moraes was a manager.

Q.  Maybe I can deal with this quickly.

            MR. RICE:  I move 191 and 192 in evidence.

            THE COURT:  Any objection?

            MR. TIMMONS:  No objection.

            THE COURT:  191 and 192 are received.

            (Plaintiff Exhibits 191 and 192 received in evidence)

            MR. RICE:  One moment, your Honor.

            (Pause)

            MR. RICE:  No further questions.

            THE COURT:  All right.  Okay.  Mr. Timmons?

1           MR. TIMMONS:  May I have one moment, your Honor?

2           THE COURT:  Yes.

3           (Pause)

4           MR. TIMMONS:  Nothing further, your Honor.

5           THE COURT:  I have a couple of questions.

6           Are you aware of any instance in which the board ever

7      disagreed with a recommendation made by Mr. Olivera?

8           THE WITNESS:  No, I don't remember.

9           THE COURT:  How often did Mr. Olivera speak with Ms.

10     Tamer?

11          THE WITNESS:  They talked constantly.

12          THE COURT:  How about with the other members of the

13     board, how often did Mr. Olivera, to your knowledge, speak with

14     those two persons?

15          THE WITNESS:  Well, to my knowledge, they talked

16     regularly with the chairman of the board.

17          THE COURT:  The other board members?

18          THE WITNESS:  Well, the other members, they speak, but

19     not with the same frequency that they speak with the chairman.

20          THE COURT:  Meaning Ms. Tamer, the chairman?

21          THE WITNESS:  Yes, she is the president, exactly.  The

22     other members are her family members.

23          THE COURT:  Any other questions in light of what I

24     asked?

25          MR. RICE:  No, your Honor.

1              MR. TIMMONS:  No, your Honor.

2              THE COURT:  You may step down.

3              (Witness excused)

4              THE COURT:  Next witness.

5              MR. CASHMAN:  The defendants call Paulo Marcos

6    Rodrigues Brancher..

7     PAULO MARCOS RODRIGUES BRANCHER,

8         called as a witness by the Defendants,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. CASHMAN:

12   Q.  Good afternoon, Mr. Brancher.

13   A.  Good afternoon.

14   Q.  I have placed before you a copy of your trial affidavit in

15   this case.  Would you refer to that, please, sir?

16   A.  Yes.

17   Q.  Specifically directing your attention to Paragraph 8,

18   please, sir, is there a typographical error in that paragraph?

19   Do you know, sir?

20   A.  It is Article 22, VI and not IV.

21   Q.  It should read Article 22?

22              THE COURT:  What paragraph is that?

23              MR. CASHMAN:  In Paragraph IV, your Honor.

24   BY MR. CASHMAN:

25   Q.  Flipping over to the next page, in Paragraph 13 there is a

1  translation of Article 166.  Do you see that, sir?

2  A.  Yes.

3  Q.  Is there another typographical error in the second

4  sentence?

5  A.  Yes, yes, and essential, and not E N.

6  Q.  With those two corrections, sir, have you had a chance

7  to -- you have had a chance to review your trial affidavit

8  before you signed it.  Is that correct?

9  A.  Correct.

10  Q.  Have you had a chance to review it since you signed it on

11  May 27th?

12  A.  Yes.

13  Q.  With the two errors we corrected just a moment ago, do you

14  believe your affidavit is true and correct to the best of your

15  knowledge and and your understanding?

16  A.  Yes.

17  Q.  You signed this affidavit on May 27th.  Is that correct?

18  A.  Correct.

19  Q.  Do you know, sir, whether that was the same date on which

20  Mr. Medrado signed an affidavit in this case?

21  A.  Yes.

22  Q.  Since May 27th, have you had a chance to review the

23  opinions that are set forth in Mr. Medrado's trial affidavit?

24  A.  Yes.

25  Q.  Did anything that you read, you have read in Mr. Medrado's

1    affidavit change your opinions in any way?

2    A.  No.

3    Q.  Now, in the course of reviewing Mr. Medrado's trial

4    affidavit, did you come across a discussion of the principles

5    of venire contra factum proprium?

6    A.  Yes.

7    Q.  Is that, in fact, a principle of Brazilian law?

8    A.  It is.

9    Q.  Is it a concept you're familiar with, sir?

10   A.  Yes, I am.

11   Q.  Would you please briefly explain what that concept is.

12   A.  It is a principle related to the good faith applicable to

13   relationship between parties, meaning that the parties that

14   participate in that transaction should not act on a

15   contradictory basis because that is exactly what good faith is

16   expected and that is the behavior that is expected, not to be

17   contradictory.

18   Q.  In connection with this case, and specifically in the

19   discovery phase, did you prepare your own opinion that related

20   to the principal of venire contra factum proprium?

21   A.  Yes.

22   Q.  I'll refer you to Defendant's Exhibit 18 which is placed

23   before you.

24   A.  Yes.

25   Q.  And specifically Paragraph 28 of Defendant's Exhibit 18.

16MJMLC4                    Brancher - direct

1    A.  Yes.

2    Q.  Let me back up.

3            Is Defendant's Exhibit 18 your rebuttal expert report

4    in this case, sir?

5    A.  It is.

6    Q.  It is dated March 15th, 2011?

7    A.  March 15th, 2011.

8    Q.  So focusing your attention now on Paragraph 28, does that

9    paragraph and the subsequent photographs contain a fair

10   statement of your opinion with respect to the applicability of

11   the venire contra factum proprium principle?

12   A.  Yes, and also in the case at hand.

13   Q.  Again could you just briefly summarize for us what is your

14   opinion with respect to the venire contra factum proprium

15   opinion that applies to the facts of this case?

16   A.  Basically it was a response to an argument developed by Mr.

17   Medrado saying that the fact that Itamarati was denying the

18   validity of the guaranty was something that would not be

19   accepted because of the principle of venire contra factum

20   proprium and because the acts seem to be contradictory.

21           From Paragraph 28 and on, I explain that my view of

22   that principle and also why it is not applicable here because

23   basically the approval of -- I am sorry -- the signature of a

24   guaranty depends not only on the signature of the officer but

25   the authorization of the board of directors, which means that

1    the will of the company depends on both organs, and that could

2    be the will of the officer but not the will of the entity

3    itself.

4            What the board did is exactly what it is expected to

5    do in the sense when they found out it was not authorized, that

6    they denied the validity.  This is not a contradictory

7    behavior; this is just that they were playing their role of

8    controlling the acts of the officers.

9    Q.  Thank you.

10           Is that opinion that you just summarized that is set

11   forth in Defendant's Exhibit 18, beginning at Paragraph 28, is

12   that an opinion that you're offering in this case, sir?

13   A.  Yes.

14   Q.  And together with the matter set forth in your trial

15   affidavit, does that constitute your expert opinion you're

16   offering in this case?

17   A.  Yes.

18           MR. CASHMAN:  No further questions.

19   CROSS EXAMINATION

20   BY MR. RICE:

21   Q.  Isn't this notion of a will of a board an entire fiction in

22   this case, sir?  Let me ask you a proper question.

23           Were you here in the courtroom this morning?

24   A.  Yes.

25   Q.  Did you hear the testimony of Ms. Tamer, the president of

1   the board?

2   A.  Yes.

3   Q.  Did you hear the testimony of Mr. Possari, who has at least

4   on paper served as secretary of the board?

5   A.  Yes.

6   Q.  Isn't it true, sir, you understand from that testimony that

7   it is really Mr. Olivera who runs this company and dictates

8   both from a management and from a board perspective what

9   happens?

10  A.  This is a conclusion that you are telling me, but this is

11  not what I can understand from the documents that I analyze and

12  even from what I heard today.

13  Q.  Even based on what you heard today, you are basing your

14  opinion on an assumption that the board of directors of USINAS

15  Itamarati was a governing, operating real entity that

16  deliberated on matters and acted as a check on management with

17  respect to matters that were within the scope of its duties and

18  responsibilities?

19  A.  That's what the bylaws set forth.  That was the resolutions

20  of the board set forth and that was the business was run at

21  that time.

22  Q.  Well, I was with you until the last one.  You said that is

23  how the business was run at that time.  You don't have, as you

24  sit here as an expert, you certainly don't have any

25  information -- let me back up -- you don't have any personal

knowledge that the board ever met and deliberated on any

matter, right?

A.   Physically speaking, I don't have that information, but

based on the minutes of the meetings, they deliberated and

exercised that power, that authority as of the board.

Q.   You're basing that on the same documents with Mr. Possari

and counsel talked with Ms. Tamer, right, the formal documents?

A.   The documents necessary for the board to express their

will.

Q.   Sitting here today, you don't, you have not reached the

conclusion -- withdrawn -- do you have any doubt in your mind

as you sit here today as to whether or not the board actually

acted pursuant to its fiduciary duties in the management of

this company?

A.   Can you repeat the question.

Q.   Sure.  Sitting here today, you've got to have some

question, sir, don't you, whether or not the board of USINAS

Itamarati carried out responsibilities, don't you?

A.   I am sorry, I don't think I am getting the scope of your

question.

Q.   I am trying to be simple.  I will try to back up.

        The members of the board of directors of a Brazilian

company, even a closely-held company, they've got duties, don't

they?

A.   Yes.

1  Q.  Tell the court what are the duties of a director of a

2  company like USINAS Itamarati?

3  A.  I can't speak about the duties of any officer of the

4  company, which means that --

5  Q.  I don't mean to interrupt you.

6          I would like to deal with the duties of the directors

7  of the company.  Can you tell the court what the duties are of

8  the members of the board of directors of USINAS Itamarati?

9  A.  The authority of the board of directors is set forth in the

10 bylaws and in the corporation law.

11         I can mention, for example, the controlling of

12 management activity, the prior approval, the approval of

13 certain acts, the approval of financial statements and so on.

14 Q.  Let's talk about controlling of management activity.  Do

15 the directors of Itamarati -- withdrawn -- in 2008, did the

16 directors, and 2007 -- did the directors of USINAS Itamarati

17 have duties with respect to the control of the management of

18 the company?

19 A.  If the board was existing at that time, I answer yes.

20 Q.  The board was existing at that time, right, that is your

21 understanding?

22 A.  Yes.

23 Q.  Those duties are essentially fiduciary in nature, aren't

24 they?

25 A.  Legal obligations, of course.  If it is a choice by the

1  shareholders, it means a fiduciary duty as well.

2  Q.  A part of that fiduciary duty is a duty of each of the

3  members of the board of USINAS Itamarati to act in a diligent

4  way?

5  A.  Yes.

6  Q.  As you sit here today and you listened to the testimony

7  that preceded you, you have to admit you have some question in

8  your mind whether, in fact, the members of this board of USINAS

9  Itamarati exercised their fiduciary duties to control

10  management?

11  A.  I have no reason to doubt that.

12          THE COURT:  Doubt what?

13          THE WITNESS:  To doubt that they didn't exercise with

14  their fiduciary duty.  Was that a question?

15  BY MR. RICE:

16  Q.  You're saying you have no reason to doubt that they

17  exercised their Fiduciary duties?

18  A.  I have no reason to doubt that they exercised their role

19  with following their fiduciary duties.

20          THE COURT:  Let's phrase it another way.

21          If I, as the fact-finder, conclude that this board

22  abdicated its responsibilities and basically just allowed

23  Mr. Olivera to run the company as he saw fit, what follows from

24  that under Brazilian law?

25          Is a board resolution then still necessary?

1          THE WITNESS:  It is -- well, let me put it this way:

2     As set forth by corporation law, there are some acts that

3     depend on board resolution.  So even if there is an officer or

4     there is someone in the company that is the person that

5     everybody counts on him, he needs to have the approval of the

6     ones that are responsible and that are in charge of that role

7     for approving certain acts.  So surely you need to have the

8     signature of the members of the board.

9          THE COURT:  You're saying it is irrelevant under

10    Brazilian law whether the board is functioning or whether the

11    board is a sham?  You're saying it doesn't matter?

12         THE WITNESS:  No, it matters.  I am sorry if I am

13    being misunderstood.  What I mean is that even if the board of

14    directors do not meet regularly, if there is a board of

15    directors, and as the corporation law set forth that there are

16    certain acts that depend on the board authorization, it's

17    mandatory to have the board approval for certain acts as set

18    forth in the bylaws or in the legislation specifically

19    regarding certain acts.

20         THE COURT:  If the board never considers anything,

21    they sign a piece of paper put in front of them, a

22    hypothetical, if the board members sign whatever the president

23    or the officer tells them to sign, nonetheless a resolution is

24    required before a third party would be entitled to rely upon

25    the authority of the officer?  That is what you're saying?

1          THE WITNESS:  Yes, yes.  Obviously, it depends on the

2     factual circumstance.

3          THE COURT:  Why does it depend on that?  I thought you

4     said yes?

5          THE WITNESS:  Yes, that would be denied only in the

6     court decision that a judge could understand on a different

7     perspective, but on a daily basis, a normal basis, the way

8     business is formalized, it is mandatory.

9          THE COURT:  I am the judge, okay?

10          If I don't bind under Brazilian law, I want to know

11     what authority I have under Brazilian law to conclude that the

12     board resolution is irrelevant because the board functions as a

13     rubber stamp to someone else, someone else is the alter ego of

14     the controlling party.  If that were the finding, then under

15     Brazilian law, what does that mean with respect to actual

16     authority?

17          THE WITNESS:  I keep my understanding that to have the

18     business on the safe side, on the way the legislation, the law

19     sets forth is the to have the board authorization.

20          THE COURT:  It is your view under Brazilian law, the

21     third party proceeds at his peril, and even if the corporation

22     acts in bad faith, that nonetheless, that still is a win for

23     the corporation?

24          THE WITNESS:  No.  If it acts in bad faith, that is a

25     different perspective.

1              THE COURT:  Would the abdication of the board of its

2     responsibility to understand the business of the corporation

3     constitute bad faith?

4              THE WITNESS:  I wouldn't say so.

5              THE COURT:  What would constitute bad faith?

6              THE WITNESS:  Well, if you want to defraud, if you

7     want to lead someone to error, if you deliberately want to

8     prejudice the counterpart, that would be bad faith.

9              THE COURT:  I have some other questions, but I don't

10    want to hijack your examination.

11    BY MR. RICE:

12    Q.  Let's stay with the bad faith thing.

13              What if the person, what if the court were to conclude

14    that the person who, in fact, ran the company and knowingly

15    entered into transactions and didn't get the formal board

16    approval, is that the kind of action that could be bad faith as

17    you've just mentioned?

18    A.  I don't think so.  I don't think necessarily so.  I would

19    say bad faith if the person deliberately wanted to damage the

20    other party, this is an example of bad faith, but because he

21    didn't get the information to the board, it doesn't mean

22    necessarily bad faith.

23    Q.  The principle you were talking about with Mr. Cashman again

24    that I never get quite right, venire contra factum proprium,

25    can you --

1   A.  Venire contra factum proprium.

2   Q.  I still won't be able to say it.

3           That principle you're saying in this case it is not

4   applicable because the board itself was still entitled to

5   exercise rights that were left to it, right?

6   A.  Right.

7   Q.  And you also separately I think said in your testimony that

8   there is, that there is a separation of powers idea, right, at

9   work in Brazilian corporate entities, right?

10  A.  That's the meaning of Article 42, meaning of Article 44 of

11  the corporation law.

12  Q.  That underlies a lot of your opinions, right, is really not

13  letting the officers, even if they act in good faith, somehow

14  deprive the board of directors of its ability to pass on

15  transactions that fall within the scope of its authority,

16  right?

17  A.  Can you rephrase that?  I am sorry.

18  Q.  Sure.  Underlying a lot of your opinion is this notion of

19  separation of powers and checks and balances within a

20  corporation like USINAS Itamarati, right?

21  A.  Right.

22  Q.  But it is your testimony to this Court even if those checks

23  and balances on which you rely for your opinion don't exist

24  because the board is not, you know, a legitimate operating

25  entity, that nonetheless the failure to obtain board approval

1   would render transactions like this --

2   A.  I don't understand why it is not legitimate.  It is duly

3   formalized in the bylaws.  Many times the company had board

4   approvals.  The members of the board were consulted and even if

5   you consider as a family-owned business I heard that the

6   chairman consulted with other parties, so it is a different

7   instance of decision.  So it is clear that there is a

8   counterbalancing of management with the board of directors.

9   Q.  That is your expert opinion based on everything you have

10  heard today, there was, in fact, an effective counterbalancing

11  between the board and management?

12  A.  I don't see that.  I just explained what I heard is that,

13  for example, for example, Ms. Tamer consulted with other

14  people, so it was a situation where she could think on a

15  different perspective.

16  Q.  I understand what you heard.  Based on what you heard -- we

17  have all heard the same testimony -- based on what you heard,

18  your expert conclusion is that the board at Itamarati acted as

19  effective counterbalance to management?

20  A.  Yes.

21  Q.  That is your opinion?

22  A.  That is my opinion, okay?

23  Q.  When did you get your law degree?

24  A.  Law degree?

25  Q.  Yes.

1    A.  1996.

2    Q.  You have never testified as an expert in any legal

3    proceeding before, right?

4    A.  As this one, no.

5    Q.  I am sorry.  Other than this one?

6    A.  No.  As I already explained in my deposition, to testify

7    only in the U.S.  In Brazil, we don't have this kind of witness

8    or expert.  We write expert opinions.

9    Q.  Even in Brazil you never served as an expert in litigations

10   on questions relating to the Brazilian corporate or civil

11   statutes about which you're testifying today, right?

12   A.  As an independent expert, no; as a lawyer, yes.

13   Q.  You're telling us you were a litigator on these issues,

14   right?

15          But in terms of acting as an expert in litigation,

16   you've never anyplace -- Brazil, the United States or any place

17   else in the world -- served as an independent expert in a

18   litigation relating to matters pertaining to the Brazilian

19   corporate law or the Brazilian civil law, right?

20   A.  If you mean expert as an independent person that is

21   contracted to write an opinion, no.

22   Q.  I mean to exclude from it acting as a lawyer.

23   A.  Okay, it is clear.

24          THE COURT:  It is almost 1:00 o'clock.  I want to ask

25   a question and I think we'll break.

 1            If you have your affidavit there, Paragraph 7, you

 2    reference Article 142.  It is in English, so this is a

 3    translation.  The translation is:  "The board of directors is

 4    empowered to authorize the transfer of fixed assets and the

 5    granting of guarantees and liabilities of third parties."

 6            Is it your testimony that the word "empowered," at

 7    least what is translated into English as empowered to, actually

 8    means is required to?

 9            THE WITNESS:  I think, "has the authority to."

10            THE COURT:  I have the authority to sentence people to

11    sometimes 20 years in jail.  That doesn't mean I am required to

12    sentence them to 20 years in jail.  That is my question.  Does

13    "empowered" mean that the board has the authority but can

14    delegate that authority to someone else?

15            Or does it mean that they must be consulted, they must

16    pass a resolution before a guaranty of liability, guaranty of

17    liability of third parties can be granted?

18            THE WITNESS:  The meaning of the article is that any

19    of these acts needs to have the board approval for their

20    validity.

21            THE COURT:  That is based on the language or that is

22    based on something else?

23            THE WITNESS:  It is based on the language which means

24    that it is upon the board of directors to approve, for example,

25    Item 8, unless the bylaws provide otherwise, the authorization

1   of the transfer of fixed assets.

2              THE COURT:  Well, the board of directors is empowered

3   unless the bylaws provide otherwise to authorize the granting

4   of guarantees.  It is not clear to me from the language at

5   least as translated that "empowered" means "is required to,"

6   but that is your testimony?

7              THE WITNESS:  Yeah, I would say that the best

8   translation, hearing from the best translation would be, "has

9   the authority to," meaning to me it is mandatory to have their

10   approval.  That is the way the Article 142 is interpreted.

11              THE COURT:  All right.  Let's stop there.  We'll pick

12   up tomorrow at 9:00 o'clock.  Can you be here tomorrow at 9:00?

13              THE WITNESS:  Yes.

14              THE COURT:  Thank you very much.  I appreciate it.

15              Anything we should cover before we break?

16              MR. RICE:  No, your Honor.  If we do finish tomorrow,

17   Thursday, it is a question of will your Honor like closings?

18   Do you think they're tomorrow or Monday?  Today is Wednesday.

19              THE COURT:  Today is Wednesday.  We are not going to

20   sit Friday because Friday is may calendar day.  I have no idea

21   how long the witnesses are likely go tomorrow.

22              MR. RICE:  I don't think they're going to be that long

23   tomorrow.  Yes, your Honor, we have Mr. Jhamb.  Can we put him

24   on first in the morning?  We promised.  He is a non-party and

25   we promised him he could start, we could interrupt and start

16MJMLC4                         Brancher - cross

1    him, and the defendants have agreed to that previously.

2              THE COURT:  That is all right with you?

3              MR. WERDER:  We did agree with that.

4              THE COURT:  You don't think he is very long?

5              MR. RICE:  No.

6              THE COURT:  Be be here at 9:00 o'clock anyway, but you

7    won't be first.  Your question is whether you should close

8    tomorrow?

9              MR. RICE:  I am hoping the answer is Monday.

10             MR. WERDER:  I have another trial to be Norfolk.  I

11   can move that if it is inconvenient for the court.

12             THE COURT:  I would like to have time to review the

13   transcripts.  I am getting them sort of --

14             MR. WERDER:  Monday is fine.

15             THE COURT:  Monday is my preference.

16             (Court adjourned until Thursday, June 23, 2010, at

17   9:00 o'clock a.m.)

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    ANA CLAUDIA DE MORAES TAMER

4    Direct By Mr. Werder . . . . . . . . . . . . 310

5    Cross By Mr. Russell . . . . . . . . . . . . 311

6    Redirect By Mr. Werder . . . . . . . . . . . 333

7    ERNESTO VALDOMIRO POSSARI

8    Direct The Court . . 340 STYLE1 DIRECT EXAMINATION

9    Cross By Mr. Rice . . . . . . . . . . . . . 346

10   PAULO MARCOS RODRIGUES BRANCHER

11   Direct By Mr. Cashman  . . . . . . . . . . . 387

12   Cross By Mr. Rice . . . . . . . . . . . . . 391

13                        PLAINTIFF EXHIBITS

14   Exhibit No.                              Received

15    193   . . . . . . . . . . . . . . . . . . . 384

16    191 and 192  . . . . . . . . . . . . . . . 385

17                        DEFENDANT EXHIBITS

18   Exhibit No.                              Received

19    300   . . . . . . . . . . . . . . . . . . 343

20

21

22

23

24

25