# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

———————————————

No. 09 Civ. 2324 (RJS)

———————————————

MERRILL LYNCH CAPITAL SERVICES, INC.

Plaintiff,

VERSUS

UISA FINANCE and USINAS ITAMARATI, S.A.,

Defendants.

————————————

OPINION AFTER BENCH TRIAL
April 10, 2012

————————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff Merrill Lynch Capital Services, Inc. ("MLCS"), brings this action alleging breach of contract against Defendants Usinas Itamarati S.A. ("Itamarati") and UISA Finance, an affiliate of Itamarati, arising out of a series of derivative transactions in and after April 2008. Following the Court's grant of Plaintiff's motion for summary judgment against UISA Finance as to liability, this case proceeded to a bench trial, which the Court conducted over five days in June 2011. The principal issues at trial were whether Itamarati's guaranty of UISA Finance's obligations under the derivative transactions is enforceable, and, if so, the amount of Plaintiff's damages. Plaintiff also seeks, pursuant to the terms of an alleged agreement between the parties, attorneys'

fees. For the reasons that follow, the Court finds that Defendants are liable to Plaintiffs for damages in the amount of $146,138,856, plus interest and expenses, including reasonable attorneys' fees.

## I. PROCEDURAL HISTORY

Plaintiff commenced this action on March 12, 2009, seeking approximately $146 million in damages, plus interest, pursuant to the terms of a derivatives transaction (the "Swap"). (Doc. No. 1.) On April 22, 2009, Defendants filed an answer and asserted six counterclaims against MLCS, which Defendants later amended. (Doc. Nos. 12, 42.) Plaintiff subsequently moved for summary judgment on its claims against Defendants and also moved to

dismiss Defendants' counterclaims. (Doc. Nos. 44, 45.) By Order dated June 18, 2010, the Court (1) granted Plaintiff's motion to dismiss the counterclaims; (2) granted Plaintiff's motion for summary judgment against UISA Finance with respect to liability; and (3) denied Plaintiff's motion for summary judgment against Itamarati. (Doc. No. 53.) The Court ordered discovery to proceed "solely on the issues of (1) damages, (2) ratification of the guaranty, and (3) apparent authority of the signer of the guaranty." (*Id.*) Following discovery, the case proceeded to a bench trial, which was conducted between June 21 and June 27, 2011.

The Court conducted the trial without objection in accordance with the Court's Individual Rules for the conduct of non-jury proceedings. In keeping with those provisions, the parties submitted affidavits or declarations containing the direct testimony of their respective anticipated witnesses, as well as copies of all the exhibits and deposition testimony that they intended to offer as evidence at trial. The Court received affidavits or declarations from Plaintiff's witnesses Fabio Da Silva, Liqiao Wang, Brian Weinstein, Renê G.S. Medrado, and John C. Hull, and from Defendants' witnesses Ana Claudia De Moraes Tamer, Ernesto Valdomiro Possari, Pankaj Jhamb, Paulo Marcos Rodrigues Brancher, and Andrew Smith, and Edézio Quintal de Oliveira. The parties were then invited to call those witnesses whom they wished to cross-examine at trial. Ultimately, the Court heard live testimony from each of the above-mentioned witnesses except for Oliveira.

## II. Findings of Fact[1]

MLCS is a Delaware corporation that operates primarily as a derivatives dealer and as a counterparty for derivative financial products. (Aff. of Fabio Da Silva ("Da Silva Aff."), dated May 27, 2011, ¶ 7.) Itamarati is a Brazilian company engaged in the production and sale of sugar, ethanol, and related products. 56.1 Response at 1. One of the leading sugar and ethanol producers in the world, Itamarati had net revenues approaching $300 million in 2007. (PX-29.) UISA Finance is a wholly-owned subsidiary of Companhia Itamarati de Investimentos, the Brazilian parent company that also owns Itamarati. (*See* Dep. of Edézio Quintal de Oliveira ("Oliveira Dep."), Jan. 21 & Feb. 25, 2011, Tr. 200–04.) As a Cayman Islands entity, UISA Finance was not subject to the same withholding tax on interest payments as companies operating in Brazil and was therefore used solely as a financing vehicle for Itamarati and its affiliates. (Da Silva Aff. ¶ 14.) UISA Finance had no operations or employees of its own. (Dep. of Ernesto Possari ("Possari Dep."), Jan. 18, 2011, Tr. 53:12–54:20.)

Itamarati is a privately-held corporation with one shareholder: Ana Claudia De Moraes Tamer ("Tamer"). At all times relevant to this action, Tamer, her ex-husband, Julio Tamer, and former mother-in-law, Linda Tamer, served as the only

[1] The following facts are taken from the evidence presented at trial, the trial transcript ("Tr."), witness depositions, trial affidavits and declarations, the parties' stipulated facts, the joint pre-trial order, the parties' exhibits admitted into evidence ("PX-__" or DX-__"), and Defendants' 56.1 Response to Plaintiff's 56.1 Statement ("56.1 Response") submitted in connection with Plaintiff's earlier motion for summary judgment. To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

members of Itamarati's board of directors (the "board"). (Dep. of Ana Claudia Moraes Tamer ("Tamer Dep."), Feb. 11, 2011, Tr. 16:2–22.) Itamarati's bylaws provide that the board "ordinarily" meets "once every trimester" (DX-25A, art. 21); however, the trial record reflects that the board did not regularly convene formal meetings. Instead, because Itamarati was a "family business," discussions of matters related to the company were conducted informally and irregularly, if at all. (See Tr. 367:9–19.) Additionally, the evidence at trial established that the board had little involvement with Itamarati's day-to-day operations. Instead, such operations were overseen by Edézio Quintal de Oliveira, whom Tamer referred to, among other titles, as Itamarati's CEO. (Id. at 317:10–25.) In the event that board approval was required for a certain decision or transaction, Oliveira would approach Tamer and seek her approval. The testimony at trial revealed that Tamer trusted Oliveira's judgment and typically approved the matters that Oliveira recommended to her. (See id. at 332:5–333:2.) The evidence at trial also indicated that Tamer, Oliveira, and Tamer's attorney, Sergio Spinelli, constituted an informal "executive committee" that acted as the *de facto* board of directors and oversaw all major decisions affecting Itamarati. (See id. at 77:21–78:7, 82:16–25, 83:13–19, 86:9–13, 94:24–95:10, 318:20–320:12.)[2]

On November 13, 2007, UISA Finance entered into a Loan and Guaranty Agreement with Merrill Lynch Capital Products LLC ("MLCP"), an affiliate of MLCS, pursuant to which UISA Finance borrowed $125 million, with interest calculated at the London Interbank Offered Rate ("LIBOR") plus 6% (the "November Loan").[3] (PX-11.) Itamarati served as a guarantor for UISA Finance's obligations under the November Loan. (See Tr. 186:23–187:4.) Prior to closing and the disbursement of funds, MLCP, as lender, required UISA Finance and Itamarati to provide MLCP with, among other things: (1) a legal opinion from Itamarati's outside counsel; (2) a resolution of Itamarati's board of directors authorizing Itamarati's guaranty of UISA Finance's obligations; and (3) a certificate of incumbency for Itamarati's officers. (See PX-13; PX-15; PX-30; DX-55; Tr. 188; Decl. of Brian Weinstein ("Weinstein Aff."), dated May 27, 2011, ¶ 14.)

Following the execution of the November Loan, Itamarati's management discussed with representatives of MLCS ways in which it could reduce UISA Finance's interest payments under the November Loan. The parties ultimately agreed on the terms of the Swap, pursuant to which UISA Finance accepted exposure to a strengthening of the U.S. dollar in relation to the Brazilian real in exchange for a reduced interest rate of LIBOR plus 1.6%. (Da Silva Aff. ¶ 17; Aff. of John C. Hull ("Hull Aff."), dated May 27, 2011, ¶ 16.) Itamarati, as the

---

[2] In May 2009, Itamarati's board was dissolved at Oliveria's request to reduce "red tape." (Tr. 324:24–325:15, 377:11–14.) Under Brazilian corporate law, closely held corporations are not required to have a board of directors. (See Decl. of Renê G.S. Medrado ("Medrado Decl."), dated May 27, 2011, ¶ 75.) The "executive committee" of Tamer, Oliveira, and Spinelli continued to function after the board's dissolution. (See Tr. 325:16–18.)

[3] In March 2007, prior to the issuance of the November Loan, MLCP made a loan of $20 million to Itamarati. (Tr. 193:25–194:7.) Itamarati borrowed an additional $5 million in June 2007. (Id.) In September 2007, MLCP and UISA Finance restructured the outstanding loans to Itamarati, which totaled $25 million, so that UISA Finance was the borrower. (See id. 186:16–19; PX-27.) The November Loan increased the amount of the loan to UISA Finance by $100 million, bringing the total amount outstanding to $125 million. (PX-11.)

party responsible for paying the interest on the loan and thus the principal beneficiary of the interest rate swap (Oliveira Dep. Tr. 162:3–19), represented to MLCS that it was comfortable with this exposure because it had substantial revenues in U.S. dollars and production costs in Brazilian reais. (Da Silva Aff. ¶ 17.) As a result, Itamarti expected that any losses to MLCS under the Swap would be offset by the resulting increases to Itamarti's operating profits. (*Id.*)

MLCS, UISA Finance, and Itamarati agreed to the Swap orally and confirmed the transaction via email on April 24, 2008. (*See* PX-47; Tr. 509:9–10.) Later that day, MLCS sent Itamarati a term sheet indicating that the Swap would be documented by a Swap confirmation and an ISDA Master Agreement – a standard contract published by the International Swaps and Derivatives Association. (PX-46.) On April 28, 2008, MLCS sent Itamarati an email attaching "the initial version of the . . . ISDA Master Agreement to be negotiated between UISA Finance and [MLCS]." (PX-48.) The ISDA agreement included a "schedule" of required documents to be delivered "concurrently with the execution of this Agreement." (*Id.*) Among other things, the schedule directed UISA Finance, as the Swap counterparty, to deliver a board resolution, certificate of incumbency, and "opinion of counsel" concerning the legality of the swap and UISA Finance's authority to enter into it. (*Id.*) With respect to Itamarati, as guarantor, the schedule only required an "opinion of counsel" letter. (*Id.*)[4]

On May 13, 2008, representatives of UISA Finance and Itamarati signed a Swap confirmation prepared by Merrill Lynch. (PX-4; DX-235.) Oliveira signed the May 13, 2008 confirmation on behalf of UISA Finance. (PX-4.) Alexandre Rocha, Itamarati's "Chief Financial Officer" or "Financial Manager," and Ernesto Possari, Itamarati's "Legal Counsel," "Chief Legal Officer," or, alternatively, "Legal Director," signed on behalf of Itamarati, as guarantor. (*Id.*; *see* Tr. 256:11–20, 342:11–16, 471:15–19; Dep. of Alexandre Rocha ("Rocha Dep."), Jan. 19, 2011, Tr. 35:3–16.) The May 13 confirmation provided, among other things, that Itamarati "absolutely, unconditionally and irrevocably . . . guarantees (as primary obligor and not merely as surety) the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of any amounts owed by Party B [UISA Finance] to Party A [MLCS] under the Transaction."[5] (PX-4.) The confirmation also provided that it "evidences a complete and binding agreement . . . as to the terms of the [Swap]," pending the negotiation, execution, and delivery of the ISDA Master Agreement. (*Id.*) The parties began making payments pursuant to the terms of the Swap

---

[4] Owing to the significant differences between loans, which result in the disbursement of cash upon signing, and swaps, which typically result in "zero exposure" on "day one," MLCP and MLCS had significantly different practices as to the documentation required to complete a transaction. (Tr. 92–93.) As a result, it was not uncommon for

ISDA agreements to be completed weeks or even months after the Swap agreement had commenced. (*Id.* 94.)

[5] Subsequently, Oliveira, Rocha, and Possari executed amended Swap confirmations, dated September 17, 2008 and September 24, 2008, respectively. Each of these amended Swap confirmations "supersede[d] and replace[d] all prior" confirmations but otherwise contained the same terms with respect to Itamarati's guaranty, including that Itamarati "absolutely, unconditionally and irrevocably . . . guarantees (as primary obligor and not merely as surety) the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of any amounts owed by Party B [UISA Finance] to Party A [MLCS] under the Transaction." (PX-5; PX-6.)

in May 2008, with UISA Finance and Itamarati saving approximately $2.7 million in interest rate payments in May 2008 alone. (PX-63; Oliveira Dep. Tr. at 264:6–19; Rocha Dep. Tr. 146:18–147:7.)

Despite returning the signed Swap confirmation to MLCS, Itamarati and UISA Finance did not immediately provide MLCS with an executed ISDA Master Agreement, guaranty, or legal opinion. On several occasions between May and July 2008, representatives from MLCS requested these documents from Rocha as well as from Christiano Morales, an employee in Itamarati's finance department. (*See* PX-55; PX-56; PX-57.) On July 29, 2008, still in need of these documents, a representative of MLCS emailed Rocha, reminding him that an executed ISDA Master Agreement was outstanding and that "the open derivative transaction that we have is major, and[,] during this past week[,] we've been pressured to obtain a response from your end." (PX-58.)

On August 27, 2008, UISA Finance signed and delivered the ISDA Master Agreement, Schedule, Credit Support Annex, and UISA Finance legal opinion. (PX-59.) However, MLCS identified certain problems with the executed documents and, on September 11, 2008, re-sent the ISDA Master Agreement to UISA Finance and Itamarati for additional revisions and signature. (PX-62.) MLCS also reminded Itamarati that it was required to execute and deliver a guaranty of UISA Finance's obligations under the Swap and therefore attached a draft guaranty and form legal opinion for Itamarati's review, comment, and execution. (PX-62.)

Beginning in September 2008, the world's financial markets entered a period of unprecedented volatility, and the value of the U.S. dollar increased significantly against the Brazilian real. (Oliveira Dep. Tr. 274–76.) UISA Finance's net potential losses under the Swap increased dramatically as a result and were not offset, as Itamarati had expected, by increased U.S. dollar revenues. (*See id.*) MLCS began making margin calls on UISA Finance and further increased its efforts to obtain the final executed ISDA Master Agreement and related documents from UISA Finance and Itamarati. (PX-60; Da Silva Aff. ¶¶ 44–53.)

On September 17, 2008, Oliveira, Rocha, and Possari signed an amended Swap confirmation on behalf of UISA Finance and Itamarati. (PX-5.) As with the May 13, 2008 confirmation, the September 17th confirmation expressly provided that Itamarati "absolutely, unconditionally and irrevocably . . . guarantee[d]" UISA Finance's obligations in the event of a default. (*Id.*) The September 17th confirmation also provided – like the May 13th confirmation – that "[t]his Confirmation evidences a complete and binding agreement" between the parties. (*Id.*)

The next day, September 18, 2008, MLCS once again sent an email to UISA Finance and Itamarati requesting executed copies of the ISDA documentation. (PX-77.) On September 22, 2008, UISA Finance delivered to MLCS the executed ISDA Master Agreement, which appears to have been signed by Oliveira and Possari, but did not include an executed guaranty or legal opinion. (PX-1.) Finally, on September 23, 2008, after further follow up from MLCS, Itamarati signed and delivered both the guaranty and the legal opinion from its in-house counsel. (PX-92.) The guaranty was signed by both Morales, who had a power of attorney for Itamarati, and Rocha, as Itamarati's CFO, and stated that it was effective "as of April 24, 2008." (PX-2.)

The guaranty provided that Itamarati "unconditionally guarantee[d] to [MLCS] the due and punctual payment of any and all amounts payable by [UISA Finance]" under the ISDA Master Agreement.  (*Id.*)

The legal opinion was signed by Marcio Antonio Marques de Moraes ("de Moraes"), an in-house lawyer for Itamarati.  (PX-3.) The opinion stated that counsel had "examined originals or copies, certified or otherwise identified to my satisfaction, of such documents, corporate records, certificates of public officials and other instruments and have conducted such other investigations of fact and law as I have deemed necessary or appropriate for purposes of this opinion," and represented that the guaranty (1) was "duly authorized" and (2) "constitutes the valid and legally binding obligation of [the] Guarantor[,] enforceable in accordance with its terms." (PX-3.)

By the end of September 2008, the global financial crisis had deepened, and the Swap had continued to turn against UISA Finance.  In response to requests from MLCS, Itamarati posted approximately $5.8 million in cash as collateral under the Swap. (Da Silva Aff. ¶ 72.)  On September 24, 2008, Itamarati emailed MLCS with a proposal to post additional collateral, including over $6 million in sugar and ethanol inventory.  (*See* PX-95; PX-96.) Ultimately, Itamarati was unable to provide acceptable collateral to MLCS, and the Swap was terminated on October 28, 2008. (*See* Aff. of Liqiao Wang ("Wang Aff."), dated June 6, 2011, ¶ 10.)  At the time of the termination, UISA Finance and Itamarati, as guarantor, owed MLCS approximately $146 million pursuant to the "wind-down" provisions of the Swap agreement.

III. DISCUSSION

As noted above, the principal issue at trial was whether Itamarati's guaranty of UISA Finance's obligations under the Swap was a valid contract and, therefore, enforceable.  Defendants argued that the guaranty is unenforceable because the individuals who executed the document lacked the authority to do so. Plaintiff, conversely, argued that the guaranty is enforceable on three independent grounds: (1) actual authority, (2) apparent authority, and (3) ratification.

In determining whether there was a valid contract under each of those three theories, the Court must first consider whether to apply New York or Brazilian law.  "New York choice of law principles require a court to apply the law of the state with the most significant relationship with the particular issue in conflict."  *Indosuez Int'l Finance B.V. v. Nat'l Reserve Bank*, 746 N.Y.S.2d 631, 635 (2002).  In determining which jurisdiction has the most "significant relationship," courts consider factors including the parties' choice of law provisions in the contract itself, the existence of confirmations cementing that choice of law, and the primary currency involved in the disputed contract.  *Id.* (finding that New York law applied where "the essence of the contract [was] an exchange pegged to the value of the United States dollar" and where the parties chose New York law and a New York forum in multiple confirmations); *IRB-Brazil Resseguros, S.A. v. Inepar Invs., S.A.*, 922 N.Y.S.2d 308, 310–11 (App. Div. 1st Dep't 2011) (finding that New York law applied to determine whether a guaranty, allegedly executed by officers lacking actual authority under Brazilian law, was enforceable because the parties had affirmatively chosen "New York law and a New York forum in a

6

transaction in United States dollars"). The enforcement of choice of law and forum clauses is particularly favored because "it protect[s] the justifiable expectation of the parties who choose New York law as the governing law in international financial transactions." *IRB-Brazil Resseguros, S.A.*, 922 N.Y.S.2d at 311 (internal quotation marks omitted).

Here, the parties affirmatively chose New York law in the guaranty (PX-2), the ISDA Master Agreement (PX-1), and in each of the signed Swap confirmations (PX-4; PX-5; PX-6). In addition, the parties selected New York as the forum of choice within the guaranty (PX-2). Given the strong preference for protecting the "justifiable expectation[s]" of the parties, *IRB-Brazil Resseguros, S.A.*, 922 N.Y.S.2d at 311, particularly in a transaction such as this one involving an exchange "pegged to the value of the United States dollar, *Indosuez Int'l Finance B.V.*, 746 N.Y.S.2d at 635, the Court finds that New York law applies in determining whether the guaranty is an enforceable contract.

In determining the enforceability of the guaranty, the Court considers the four elements of a breach of contract claim: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). The parties do not dispute the second and third elements, but, as to the first, they dispute whether Itamarati's *agents* – namely Oliveira, Rocha, Possari, Morales, and de Moreas – had authority to bind the company to the terms of the guaranty. Specifically, Itamarati argues that these agents lacked such authority altogether, whereas MLCS argues that the agents possessed not only

actual authority but also apparent authority sufficient to create an enforceable contract.

It is well settled under New York law that an agent may bind his principal when he has actual or apparent authority. *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998). "Actual authority arises from a direct manifestation of consent from the principal to the agent." *Meisel v. Grunberg*, 651 F. Supp. 98, 110 (S.D.N.Y. 2009); *see Minskoff v. Am. Express Travel Related Serv. Co.,* 98 F.3d 703, 708 (2d Cir. 1996) ("[Actual] authority may be express or implied, but in either case[,] it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act.") "Actual authority is express when conveyed orally or in writing and is implied when the grant of authority is shown circumstantially." *Halpert v. Manhattan Apartments*, No. 04 Civ. 1850 (BSJ), 2011 WL 5928782, at *3 (S.D.N.Y. 2011). Regardless, "[t]he existence of actual authority depends upon the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." *Meisel*, 651 F. Supp. 2d at 110 (internal citations omitted).

But even when an agent lacks actual authority, "he may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists." *Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 328 (2d Cir. 2010). "Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces a [third party] to believe that an individual has been authorized to act on its behalf." *Id.* (citation omitted). However,

a principal may be held liable under this theory "only when it was responsible for the appearance of authority in the agent" and when the "third party's reliance on apparent authority" was reasonable. *Meisel*, 651 F. Supp. 2d at 110.

Finally, in the absence of either actual or apparent authority, "a party may be held liable as a principal [under the doctrine of ratification] as a result of his affirmance of an act done by one who purports to be acting for the ratifier." *Id.* (internal quotations omitted).

With these three theories in mind, the Court addresses whether Itamarati, through the actions of its agents, formed an enforceable contract with MLCS.

### A.  Actual Authority

In his opening statement, Plaintiff's counsel acknowledged that "we're here really to try an apparent authority and ratification case." (Tr.   20:7–8.) Nevertheless, in his summation, counsel stated – for the first time – that "actual authority" had "ripened into another basis on which the court can find for [Plaintiff]." (*Id.* 625:8–10.)   The "ripening" that counsel referred to was the live testimony of Tamer and Possari, bordering on the preposterous, in which they often contradicted their written affidavits and the testimony of other defense witnesses.    The mind-boggling display revealed either a shameful ignorance of the most fundamental aspects of the company that they were ostensibly running or a conscious attempt to mislead the Court in order to limit Itamarati's liability under the guaranty.  In either event, there can be no doubt that the issue of actual authority truly "ripened" as a result.

In determining whether Itamarati entered into an enforceable contract pursuant to this theory, the Court considers whether the following individuals had authority to bind the company: (1) Rocha, who signed each of the confirmations and the guaranty; (2) Possari, who signed each of the confirmations; (3) Morales, who signed the guaranty; and (4) de Moraes, who signed the legal opinion.  For the reasons that follow, the Court finds that each of these individuals had actual authority to bind Itamarati.

#### 1.  Ana Claudia De Moraes Tamer

As noted above, whether these individuals had actual authority turns upon the words and actions of the principal – in this case, Tamer and the Itamarati board. Accordingly, the inquiry into actual authority appropriately begins with an assessment of Tamer's words and actions as Itamarati's sole shareholder and board chair to determine whether she or the board expressly or impliedly authorized Oliveira, who in turn authorized Rocha, Possari, Morales, and de Moraes to bind Itamarati.

Tamer's written testimony, submitted in the form of an affidavit, was largely unremarkable.  In her affidavit, Tamer stated that "the Board's responsibilities were to ensure that the company was being properly run by competent managers and to approve of major strategic decisions, investments, or transactions."    (Aff. of Ana Claudia de Moraes Tamer ("Tamer Aff."), dated May 27, 2011, ¶ 4.)  To this end, Tamer claimed to "discuss company business from time to time with the other Board members . . . and [to] inform them when Board action was required so that they could communicate their views to me."   (*Id.*)   With respect to the loan guaranty negotiated with MLCP and executed by Itamarati in November 2007, Tamer portrayed herself in her affidavit as the embodiment of corporate engagement and propriety:

I discussed the proposed loan transaction with my financial and legal advisors, and the other two directors and I issued a formal resolution approving the guaranty and authorizing Itamarati's corporate representatives to act on behalf of the company in signing it . . . .

I was subsequently advised that the loan transaction would be increased to $125 million[] and that Merrill Lynch was again requiring that Itamarati provide a guaranty of UISA Finance's obligations. I again discussed this proposed increase in the loan transaction with Mr. Oliveira and my advisors, and the two other directors[,] and I again approved the guaranty and authorized Itamarati's corporate representatives to act on behalf of the company in signing it.

(*Id.* ¶¶ 7–8.)

In contrast to the formal steps taken with regard to the loan guaranty, Tamer's affidavit insisted that she knew nothing of the Swap guaranty in 2008:

After the global financial crisis hit in September and October[] 2008, I was informed that Merrill Lynch had closed a derivative transaction with UISA Finance, and that Merrill Lynch was claiming that it was owed substantial amounts under the terms of that transaction. This was the first time I had heard of this derivative transaction.

. . .

Late in 2008 . . . I learned for the first time that Merrill Lynch was claiming that Itamarati was responsible for any amounts not paid by UISA Finance under the derivative transaction because of a guaranty it claimed it had obtained from . . . Itamarati. At no point prior to that had I been made aware of the existence of the supposed guaranty.

(*Id.* ¶¶ 10–12.) Thus, on the basis of Tamer's affidavit, and the absence of a formal, written board resolution expressly authorizing the guaranty, Itamarati asserts that no one at Itamarati had actual authority to bind the company to guarantee UISA Finance's obligations under the Swap.

In her live testimony, however, Tamer betrayed a striking variance from the formal business executive depicted in her affidavit. As an initial matter, Tamer admitted to a woeful lack of knowledge about the companies she controlled. For example, with respect to her ownership interest in Itamarati, Tamer could not say whether she owned the company "directly [her]self or through some other company." (Tr. 313:10–24.) Her response – without irony – was that "the lawyer could explain it better to you." (*Id.* at 312:12–14.) When asked about the other companies she owned or controlled, she replied, "I don't know the names of all of them [or] how they are composed . . . . I'm not capable of explaining them." (*Id.* at 312:21–24.) She did not even know who owned UISA Finance or what relationship UISA Finance had with Itamarati:

MR. RUSSELL: Do you know who the direct owner of UISA Finance is?

TAMER: No.

MR. RUSSELL: Do you know if it's owned by . . . Itamarati or some other company?

TAMER: No.

. . .

MR. RUSSELL: What is the business of UISA Finance?

TAMER: . . . I really don't know.

THE COURT: Who does?

TAMER: Mr. Possari maybe, the lawyer.

MR. RUSSELL: Do you know if UISA Finance engages in any business?

TAMER: No, I don't know.

MR. RUSSELL: Do you know if UISA Finance has any assets?

TAMER: No, I don't know.

. . .

MR. RUSSELL: . . . Do you know who makes decisions on behalf of UISA Finance?

TAMER: No. That should be talked about with Mr. Possari.

(*Id.* at 313:21–25; 314:3–11, 314:20–21.)

When asked about Oliveira's role in running Itamarati, Tamer could not say whether he was the CEO, a "counselor," or an adviser (*id.* at 315:25–16:6), notwithstanding the fact that she referred to him as the CEO of Itamarati at her deposition (*id.* at 317:10–15). She was plainly either confused or willfully deceptive when she expressed difficulty in distinguishing between Itamarati's board of directors and its informal "executive committee" (*id.* at 318–20), but she acknowledged that the board of directors in 2007 and 2008 consisted of herself, her ex-husband, and her former mother-in-law (*id.* at 320:17–321:13). She conceded that the board never met and that her fellow board members "do not discuss the company's business with me." (*Id.* at 323:13 – 15.) She further conceded that the board was dissolved in 2009 at the direction of Oliveira, who informed her that it was "just [for] bureaucratic reasons." (*Id.* at 325:13–15.)

Tamer's testimony grew from appalling to almost surreal when the subject turned to Itamarati's 2007 loan guaranty, which had been discussed with clarity and precision in Tamer's affidavit. At trial, Tamer was first confronted with her deposition testimony, in which she made the following admissions concerning the loan guaranty:

MR. RUSSELL: Do you recall being asked these questions and giving these answers:

"Question: . . . Are you aware that there were loans from a Merrill Lynch company to UISA Finance as well?

"Answer: Yes. Sure.

"Question: Why were some loans made to . . . Itamarati and others to UISA Finance?

"Answer: I have no idea whatsoever.

"Question: Do you recall which loans came first, the loans to . . . Itamarati or the loans to UISA Finance?

"Answer: No.

"Question: When the loans are made to UISA Finance, did . . . Itamarati guaranty UISA Finance's obligations?

"Answer: I don't know.

"Question: Did you ever – did anyone ever discuss with you the fact that . . . Itamarati would have to guaranty UISA Finance's obligations under a loan from a Merrill Lynch company?

"Answer: No.

"Question: No one ever discussed that with you?

"Answer: No."

(*Id.* at 326:21–327:18.)

When asked to reconcile her deposition testimony with her affidavit, Tamer unconvincingly attributed the discrepancy to a translation problem and her "difficulty understanding words like 'guaranty,' 'loan,' 'collateral,' [and] 'board of directors,' in English. From then until now my understanding has been clarified. I understand better now." (*Id.* at 327:19–23.) However, Tamer made no meaningful corrections to her deposition transcript, even though she was given the opportunity to review and amend it before the transcript became finalized. Once again, her excuse was, "I didn't understand." (*Id.* at 329:22.) And yet Tamer essentially repeated her deposition testimony when questioned directly by the Court:

> COURT: But at the time of the loan, did you know that . . . Itamarati was guaranteeing UISA Finance's obligation?

TAMER: No, I did not know.

(*Id.* at 330:10–13.)

She further acknowledged that Itamarati's board *never* met to discuss or ratify the loan guaranty (*id.* at 330:19–331:3), in direct conflict with her trial affidavit (Tamer Aff. ¶¶ 7–8) and with the board resolution (DX-53A; DX-282A). Moments later, she represented that Oliveira never discussed the 2007 loan with her, while at the same time conceding her almost blind dependence on both Oliveira and Sergio Spinelli (Tr. 331:4–332:24), an attorney and friend of her father's whom she described as "my complete and total lawyer" (*id.* at 313:11), and a person on whom she heavily relied both before and after the dissolution of the board by Oliveira in 2009 (*id.* at 325:16–20).

After re-direct examination by defense counsel, in which she was shown a copy of the board resolution authorizing Itamarati's guaranty of the loan (*id.* at 335), the Court again questioned Tamer about her knowledge of the loan in 2007.

> COURT: I asked you a moment ago if you knew in 2007 that Itamarati was being asked to sign a guaranty for the UISA [Finance] loan. Do you recall I asked you that?

TAMER: I remember.

COURT: And you said no, you did not know?

TAMER: Yes.

. . .

COURT: Do you not see the conflict between what you answered . . . and what is in your affidavit?

TAMER: I see a conflict due to a confusion of terms and understanding.

COURT: Did you understand in September and then again in November of 2007 that Itamarati was being asked to sign a guaranty for the obligations of UISA under a loan agreement?

. . .

TAMER: No, I did not know specifically . . . , no.

COURT: So why did you sign this affidavit which is inconsistent with what you just testified to under oath?

TAMER: I don't remember.  That was in 2007[,] and I trusted in the way that [Oliveira] had taken care of things with Merrill Lynch.

(*Id.* at 336:6–12; 336:23–337:17.)

And yet within minutes, Tamer did an about-face and testified that she *had* known about the loan guaranty in 2007 and claimed to have discussed it with Oliveira and others. (*Id.* at 338).  Struck by the abrupt reversal, the Court asked:

COURT: You understood or you didn't understand in the Fall of 2007 that Itamarati was being asked to guaranty the obligations of UISA Finance?

TAMER: I understood.

COURT: Okay.  And so two minutes ago you told me you didn't understand.  Now you tell me you understood?

(*Id.* at 338:16–22.)

Based on Tamer's shifting and contradictory deposition testimony, trial affidavit, and trial testimony, the Court was left with two wildly variant, but equally unflattering, portraits of Tamer.  The first reduced her to a complete cipher, willing to uncritically sign anything (including trial affidavits) put in front of her.  The second suggested a thoroughly dishonest witness willing to say or do anything to salvage the financial fortunes of her companies.  Neither is worthy of crediting, and each has implications for determining whether Itamarati's other officers had actual authority when they executed the Swap guaranty and accompanying documentation on behalf of Itamarati.  In fact, based upon Tamer's testimony, the Court has little trouble concluding that Tamer and the board not only bestowed unto Oliveira actual authority to obligate the company but also to direct *others* to obligate the company.  In short, Tamer was an utterly non-credible witness not worthy of belief.

2. Ernesto Valdomiro Possari

But if Tamer was a bad witness, the next witness, Ernesto Valdomiro Possari, who signed each of the confirmations on behalf of Itamarati, was even worse.  In light of the fact that Possari was a director of UISA Finance and served as Itamarati's chief legal officer and senior attorney for over thirty years (*id.* at 347–48), one might have expected Possari to be as knowledgeable about the companies and transactions in question as Tamer was ignorant.  Indeed, Tamer herself had identified Possari as the person likely to have the greatest knowledge about UISA Finance.  (*Id.* at 314.)  In point of fact, Possari proved to be among the most willfully ignorant and thoroughly unbelievable witnesses the Court has ever encountered in over twenty years at the bar and bench.

Among other things, Possari endeavored to match Tamer stride for stride in his professed ignorance of the workings and details of UISA Finance. Even though he was an officer and director of the company, authorized to sign documents on its behalf, Possari professed not to know when UISA Finance was created or the purpose for its creation:

> MR. RICE: [UISA Finance is a] special purpose vehicle, isn't it?
>
> POSSARI: I don't know.
>
> . . .
>
> MR. RICE: You do know, sir, don't you, that it was set up in order to facilitate financing transactions with . . . Itamarati on a tax advantage basis?
>
> POSSARI: I don't know.

(*Id.* at 380:7–14.)

He likewise claimed not to know whether UISA had "done any transactions other than the loan agreement and the derivatives" agreement with Merrill Lynch (*id.* at 381:21–25), and had no idea whether the company had any assets of its own (*id.* at 382:1–5.). When asked by the Court who would have this information, Possari passed the buck to Oliveira, stating "[h]e's the one that directs the businesses, he's above the officers." (*Id.* at 380:16–25.) Nevertheless, while Possari insisted that he was authorized to sign the ISDA Master Agreement on behalf of UISA Finance and the Swap confirmations on behalf of Itamarati, he was equally adamant that he never actually read or understood the documents before signing them:

> MR. RICE: Did you sign an ISDA master agreement with a Merrill Lynch entity in 2008?
>
> POSSARI: Yes, sir.
>
> . . .
>
> MR. RICE: And you understood that in signing on behalf of UISA Finance, you were obligating UISA Finance to the term and conditions of that ISDA [M]aster [A]greement[?]
>
> POSSARI: Yes. . . .
>
> . . .
>
> COURT: Did you read it?
>
> POSSARI: No.
>
> . . .
>
> COURT: You're an attorney?
>
> POSSARI: Yes.
>
> COURT: Do you have an understanding of how contracts operate in Brazil?
>
> POSSARI: Yes.
>
> COURT: When you signed this contract, did you think you were binding the companies for which you were signing?
>
> POSSARI: Yes, I signed it . . . .
>
> . . .
>
> MR. RICE: [Y]ou know what it means for Itamarati to sign [the confirmations] as guarantor; isn't that right?

POSSARI: Yes . . . but . . . I understood that they were the guarantor of $125 million, not as a swap.

MR. RICE: . . . But . . . when you saw this document and saw "as Guarantor" after Itamarati's name and you signed on behalf of Itamarati, you understood you were obligating Itamarati as guarantor; correct?

POSSARI: Yes, yes.

(*Id.* at 350:14–16, 351:4–7, 356:1–2, 356:11–19, 359:7–16.)

At every turn, Possari insisted that he had no idea that the transaction involved derivatives (*id.* at 357:11–19), notwithstanding the fact that he previously signed Swap confirmations on behalf of UISA Finance, as a director, and Itamarati, as "legal counsel," that expressly referenced the April 24, 2008 "swap transaction." (PX-4; PX-5; PX-6.) Indeed, each confirmation explicitly stated that it "evidences a complete and binding agreement" between the parties, and contemplated that the parties would "use all reasonable efforts promptly to negotiate, execute[,] and deliver an agreement in the form of the ISDA Master Agreement." (*Id.*) Each confirmation defined ISDA as the "International Swaps and Derivatives Association" – a good indicator that the transaction involved swaps – and used the terms "derivatives" and "swaps" no less than five times on the first page. (*Id.*) As early as November 2007, Possari was listed as the "addressee" for the first drafts of the Swap documents. (*See* PX-41 (addressing to the attention of Possari a document with the following subject line: "BRL/USD Dual Currency Swap Transaction").) Thereafter, Possari signed the original confirmation on May 13, 2008,

and then signed amendments containing virtually identical language on September 17, 24, and 29. (PX-4; PX-5; PX-6.)

In addition, Possari received or sent multiple emails referencing "the master contract for *derivative* operations with Merrill Lynch." (PX-56, dated June 17 & 23, 2008 (emphasis added).) The emails, which were in Possari's native Portuguese, reflected that Merrill was "waiting urgently for a response from your legal department, since the contract is essential for our *derivatives* operations." (*Id.* (emphasis added).) In one email, Christiano Morales, who ultimately signed the guaranty on behalf of Itamarati, forwarded a copy of the "master contract for derivative operations" to Possari "for legal analysis." (*Id.*) Possari responded: "As it is a fairly long contract drafted in English, I suggest sending it to" outside counsel "for detailed analysis" to be followed by "discussions from our financial and legal departments." (*Id.*) The firm referenced in Possari's email – the Mattos Filho firm – was the firm led by Sergio Spinelli, a member of Itamarati's informal "executive board" whom Tamer had described as my "complete and total lawyer." (Tr. 313:11.) Spinelli's firm had issued the opinion letter on behalf of Itamarati in connection with the loan guaranty in 2007, and Spinelli himself was frequently referenced in and copied on emails related to the Swap transaction through September 2008. (*See*, *e.g.*, PX-63.) The exchange with Morales took place in June 2008, fully three months before the ISDA agreement was signed. A week later, on July 1, 2008, Morales sent Possari a follow-up email inquiring, "Do you have an opinion about the contract." (PX-57.) Thus, the suggestion that Possari – or, for that matter, Morales – was unaware that the transaction related to derivatives (Tr. 357), or that Possari "[did] not understand what

this transaction is or what its purpose was supposed to be" (Aff. of Ernesto Valdomiro Possari ("Possari Aff."), dated May 27, 2011, ¶ 10), is laughable.

Even more outrageous were Possari's attempts to throw his junior colleague in the legal department – Marcos Antonio Marquesa de Moraes – under the bus for issuing the legal opinion letter in connection with the Swap guaranty. According to Possari, "Mr. [de] Moraes was not authorized to sign this legal opinion by me or anyone else in the legal department. Nor did Mr. [de] Moraes possess the degree of skill or experience needed to be able to offer such an opinion . . . . I only learned of this document recently in the course of this litigation, and was not aware of it at the time it was signed." (*Id.* ¶ 12.) However, the emails sent to and from Possari in his capacity as Itamarati's chief legal officer clearly reflected that Itamarati would be asked to provide "an opinion about the contract." (PX-57.) So too do the Swap confirmations, which Possari signed as "Legal Counsel" on behalf of Itamarati, and which, as noted above, expressly state that Itamarati, as guarantor, "absolutely, unconditionally and irrevocably . . . guarantees . . . the punctual payment when due . . . of any amounts owed by [UISA] to [MLCS]." (PX-4; PX-5; PX-6.) They also purported to be "binding" on the parties, including Itamarati, at the time they were signed by Possari. (*Id.*)

Thus, while insisting that he knew nothing about de Moraes's September 23, 2008 opinion letter and that de Moraes was "not authorized to sign this legal opinion by me or anyone else in the legal department" (Possari Aff. ¶ 12), Possari himself was signing "binding" guarantees on behalf of Itamarati as early as May 2008 and continued to do so just days before and after

de Moraes's letter. (*See* PX-4 (May 13, 2008); PX-5 (Sept. 17, 2008); PX-6 (Sept. 24, 2008).)

In short, the Court found Possari's testimony to be completely preposterous and unworthy of belief. The inescapable conclusion, from the documents and the testimony at trial, is that Possari knew exactly what he was signing, that he had actual authority – from Tamer by way of Oliveira – to sign the guaranty confirmations, and that he was well aware of the opinion letter issued by de Moraes. Thus, because Itamarati bestowed upon Possari actual authority to sign the confirmations, each of which contains a binding guaranty, the circumstantial evidence indicates that Possari also bestowed upon de Moraes implied actual authority to sign the legal opinion. *See Halpert*, 2011 WL 5928782, at *3 ("Actual authority . . . is implied when the grant of authority is shown circumstantially."). In addition, Possari's emails with Morales throughout the summer of 2008 indicate that Morales also had actual authority to sign the September 23, 2008 guaranty. Indeed, he was involved in the negotiations with MLCS from the beginning, with the clear knowledge of Possari and Oliveira, who ran the company with Tamer's blessing. Therefore, the Court finds that Morales also had actual authority to sign the guaranty.

### 3. Edézio Quintal de Oliveira

Finally, the Court turns to the trial affidavit of Edézio Quintal de Oliveira, who, remarkably, was never called by MLCS for live cross-examination testimony, but whose trial affidavit was often at odds with other live testimony and documentary evidence introduced at trial. Indeed, the inconsistencies between the affidavit and the other evidence further expose the fact that Oliveira effectively ran Itamarati and could

delegate his actual authority to other Itamarati officers. In the affidavit, Oliveira described himself as the "principal Executive Officer of UISA Finance" (Aff. of Edézio Quintal de Oliveira ("Oliveira Aff."), dated, May 27, 2011, ¶ 2), which he characterized as "a company that was incorporated in the Cayman Islands to obtain financing on terms more favorable than otherwise available to companies domiciled in Brazil" (*id.*). Notwithstanding the testimony of Tamer, Possari, and Rocha, who respectively described Oliveira as the "CEO of Itamarati" (Tr. 316–17), the "one who directs the businesses . . . [and is] above the officers" (*id.* at 380:24–25), and "the main or principal executive for the company" (Rocha Dep. Tr. 36:1–12), Oliveira modestly described himself as a member of "an informal executive committee" along with Tamer and Spinelli (Oliveira Aff. ¶ 5).

Consistent with Tamer's trial affidavit, but, as noted above, wholly at odds with Tamer's trial testimony, Oliveira's trial affidavit strives mightily to burnish the image of sobriety and formality associated with Itamarati's business practices. Indeed, Oliveira's trial affidavit goes to great lengths to contrast the formalities observed in connection with the loan guaranty in 2007 with lack of formalities observed in connection with the Swap guaranty in 2008 – with a particular focus on the board resolution and outside counsel letter that accompanied the former. (Oliveira Aff. ¶¶ 15–17) However, as noted above, Oliveira's assertion that he was the "primary liaison" between Tamer and the board of Itamarati on the loan transaction, and that he was "responsible for informing and seeking the consent of Ms. Tamer and the Board" concerning the details of the transaction (*id.* ¶ 18), is belied by the trial testimony of Tamer, who disclaimed any knowledge of

the loan guaranty in 2007 and denied recollection of any board meeting at which such a guaranty was discussed (Tr. 330).[6]

Oliveira's trial affidavit was equally misleading with respect to his involvement in the Swap transaction in 2008. According to Oliveira, he was "generally aware of the discussions between Merrill Lynch and UISA Finance and Usinas Itamarati" in 2008, but he was "not principally responsible for conducting these negotiations" over the swap. (Oliveria Aff. ¶ 19.) By contrast, Rocha identified Oliveira as "one of three people who jointly made the decision to enter into the transaction." (Rocha Dep. Tr. 89–91.) The documentary evidence bears this out, with Oliveira's signature on each of the Swap confirmations (PX-4; PX-5; PX-6) and the Master ISDA Agreement (PX-1). Confronted with these documents, Oliveira had no choice but to acknowledge signing them, but he insisted that he did so "without having a clear understanding of the exact exposure to foreign exchange rates incurred by UISA Finance." (Oliveira Aff. ¶ 22.) However, whether or not he fully appreciated the risks inherent in the interest

---

[6] Oliveira's assertion is also inconsistent with the testimony of Possari, who acknowledged that the board resolution that was ostensibly issued on November 9, 2007 was in fact fraudulent in that it falsely asserted that he attended a board meeting on that date when in fact no such meeting ever occurred. (Tr. 366–67, 372 ("MR. RICE: You didn't attend the meeting on . . . November 9, 2007 of the Itamarati board of directors; right? POSSARI: That's true. No. Like I said, . . . there wasn't a meeting. They just made up the resolution . . . .") In fact, Possari made it clear that he did not attend *any* Itamarati board meetings in 2007 or 2008 and that the $125 million loan guaranty was "handled" in the typical fashion – on the phone or with Oliveira going over to Tamer's house. (*Id.* at 364-65). And since Possari, as secretary of the board, never actually attended a board meeting, he relied on Oliveira to instruct him as to the resolutions passed at the imaginary meetings. (*Id.* at 367–68, 373–75.)

rate swap (and it should be clear that few anticipated the financial crisis of September 2008), there can be no doubt that Oliveira was thoroughly immersed in the negotiations relating to the transaction, that he was entrusted by Tamer to "take car[e] of things with Merrill Lynch" (Tr. 337:18–19), and that he authorized Rocha to sign the guaranty and confirmations on behalf of Itamarati.

Email traffic between Itamarati and UISA Finance personnel likewise corroborates that Oliveira was at the center of the negotiations and fully familiar with the terms of the deal. (*See* PX-35 (January 11, 2008 email from Da Silva to Oliveira: "Dear Edezio: Find below the answers to questions presented yesterday."); PX-36; PX-37; PX-38; PX-41; PX-42 (April 22, 2008 email from Rocha to Oliveira: "I would like your sign off about the structure below."); PX-43 (April 22, 2008 email from Oliveira to Rocha: "Inform Sergio [Spinelli]"); PX-44; PX-45; PX-46; PX-48; PX-52; PX-63 (September 11, 2008 email from Rocha to Oliveira and others regarding "Merrill Lynch Swap position": "I have already spoken to Edezio [Oliveira] and Richard [Rainer] on the matter."); PX-66; PX-69; PX-71; PX-72; PX-75; PX-80; PX-87 (April 24, 2008 email from MLCS, copying Oliveira regarding "Merrill Lynch: Bonus Swap Final Term Sheet"), PX-95; PX-96; PX-99; PX-105; PX-106; PX-108; PX-113; PX-117; PX-118; PX-121; PX-122.)

Particularly outrageous is Oliveira's assertion that "[s]ometime after September 2008, I also became aware that Mr. Rocha had signed a guaranty for the derivative transaction . . . . Based on my knowledge at the time, Mr. Rocha had not been authorized to sign the guaranty by the board or . . . Itamarati or anyone else." (Oliveira Aff.

¶ 25.) Once again, Oliveira intentionally overlooks the fact that he himself signed multiple versions of the Swap confirmations, each of which explicitly referenced Itamarati's "absolute[], unconditional[] and irrevocabl[e] . . . guarantee[]" of UISA Finance's obligations under the Swap agreement.[7] (PX-4; PX-5; PX-6).

Oliveira's trial affidavit is also at odds with Rocha's deposition testimony, in which Rocha made it quite clear that: (1) he believed he was authorized to sign the guaranty on behalf of Itamarati on September 23, 2008 (Rocha Dep. Tr. 137); (2) no one, including Oliveira, ever advised him that a "special authorization from the Board of Directors" was required before he could sign the guaranty (*id.* at 198–99); and (3) no one at Itamarati, including Oliveira, ever criticized him for signing the guaranty (*id.* at 124). At his own deposition, Oliveira confirmed that he never told Rocha – "at any point" – that he should not have signed the guaranty agreement or that he was not authorized to sign it. (Oliveira Dep. Tr. 237). He likewise never criticized – or even spoke to – Possari regarding the lawyer's allegedly unauthorized signing of the Swap confirmations, with their explicit guaranty provisions, on behalf of Itamarati. (*Id.* at 238–39). Again, the inconsistencies between Oliveira's affidavit and the testimony and documentary evidence only further support the conclusion that Oliveira had actual authority, bestowed by Tamer and the board, and that he delegated that authority to both Rocha and Possari to bind Itamarati.

---

[7] Oliveira acknowledged that he observed that his signature was above that of Itamarati as guarantor and was therefore aware that Itamarati was providing a guaranty by the time of the amended confirmations in September. (Oliveira Dep. Tr. at 287:22–288:22.)

The email traffic further corroborates this point and reveals that Oliveira had been fully apprised of Itamarati's Swap guaranty. (*See* PX-35; PX-45). Indeed, on the second day of his deposition, even Oliveira conceded that "[he] knew in September when [he] signed [the September 17, 2008 Trade Confirmation (PX-5)] that Mr. Rocha and Mr. Possari were signing on behalf of . . . Itamarati as guarantor." (Oliveira Dep. Tr. 288). And yet, even with this knowledge, Oliveira insisted that he did not discuss the guaranty with Tamer until well after the guaranty was signed and the Swap was terminated. (*Id.* at 289). Oliveira would have the Court believe that, notwithstanding his close relationship with Tamer, and the fact that he had known about the Swap and guaranty for months, he nevertheless neglected to mention it to Tamer – even at a time when the Swap had turned drastically against UISA and Itamarati. (*Id.* at 275–77). But this deposition testimony is impossible to square with Oliveira's trial affidavit, in which he insisted that "[i]f anyone had asked me to obtain approval for a guaranty from the Board, I would have conveyed that request to Ms. Tamer and Itamarati's legal advisors." (Oliveira Aff. ¶ 21.)

In point of fact, Itamarati's top legal advisors – Possari and Spinelli – had known about the agreement and the guaranty for months. On January 11, 2008, Oliveira received an email from da Silva, with Spinelli copied, regarding "Uisa/Merrill: Updating terms to close amended dual ccy swap." (PX-35.) Attached to the email was a draft confirmation that expressly identified Itamarati as a "Guarantor." (*Id.*) By March 25, 2008, Pedro Bianchi, a MLCS employee working on the Swap deal, wrote an internal email to his colleagues at Merrill "Re: Itamarati," in which he reported: "Talked to them. They like the trade, is in the executive board. Edézio and Roberto want

to do. Spinelli was analyzing . . . ." (PX-40). An internal email chain at Itamarati on April 22, 2008 revealed that Oliveira, Rocha, and Spinelli were communicating directly about the Swap. (PX-43.). Six days later, Oliveira and Rocha received an email from another MLCS employee working on the Swap deal regarding "Merrill Lynch-ISDA UISA Finance." (PX-48.) The email stated, "Attached, for the review of your legal department, is the initial version of the ISDA Master Agreement," as well as "standard models of the ISDA contract and of the Credit Support Annex." (*Id.*) As before, the models expressly referenced Itamarati as the guarantor and "Credit Support Provider." (*Id.*) In addition, the email stated that MLCS's "legal department has indicated that it requires a [L]egal Opinion along with the ISDA. A sample Legal Opinion is attached . . . ." (*Id.*) Among the documents attached was a schedule of documents to be delivered by the parties in connection with the Swap deal. According to the schedule, only one document was expected in connection with the guaranty – "[a]n opinion of counsel with respect to Party B's Credit Support Provider." (*Id.*)

The same documents and requests were resubmitted in September (PX-62), just days before Oliveira signed – for the third time, on behalf of UISA Finance – a Swap confirmation that expressly referenced Itamarati's role as guarantor and its "absolute[] and irrevocabl[e]" guaranty of UISA Finance's obligations under the Swap agreement. Since the legal opinion is exactly what MLCS had been requesting for months, and exactly what de Moraes provided to MLCS on September 23, 2008 (PX-3), it is difficult to see how Oliveira or Possari could have been surprised by it in September 2008.

In short, the record is quite clear that Oliveira conveyed the guaranty request to "Itamarati's legal advisors" from the outset. (Oliveira Aff. ¶ 21.) That he also conveyed that information to Tamer and the board seems a certainty from the circumstantial evidence, as well as from inferences drawn from the thoroughly unpersuasive testimony of Tamer, Possari, and Oliveira. Indeed, there is no question that Rocha, Possari, Morales, and de Moraes not only believed that they were obligating Itamarati but had authority to do so. In addition, Itamarati's board did not conduct formal meetings or meet regularly, and Tamer and the other directors would generally sign, without critical examination, any documents prepared by Itamarati's legal department. (Tr. 321:15–324:23.) Significantly, Possari could not recall a single instance in which the board ever disagreed with Oliveira's recommendations (*id.* at 386:6 – 8), and Tamer acknowledged at her deposition that she would have approved the Swap had Oliveira and Spinelli simply recommended it to her (*id.* at 331:1–333:8). Given that Oliveira was involved in the Swap transaction and guaranty from the inception and was considered by Tamer to be the "CEO" (*id.* 317:10–15), there is little doubt that he not only knew about the guaranty but also authorized Itamarati's other officers to obligate the company.

As noted above, "[a]ctual authority is express when conveyed orally or in writing and is implied when the grant of authority is shown circumstantially." *Halpert*, 2011 WL 5928782, at *3. Here, although there may not be direct evidence that Tamer bestowed *express* actual authority upon Itamarati's agents, there is more than ample circumstantial evidence that she conveyed actual authority, implied or express, sufficient to bind the principal under New York law. *See Meisel*, 651 F. Supp. 2d at 110.

4. Itamarati's Bylaws and Brazilian Law

Because New York law applies to the guaranty's enforceability, the Court's inquiry into alleged requirements under Brazilian law is limited. Nonetheless, Itamarati relies on its legal expert, Dr. Paulo Marcos Rodrigues Brancher, to suggest that Brazilian law and Itamarati's own corporate bylaws *required* a formal written board resolution as a prerequisite to entering into a guaranty on behalf of UISA Finance. (Decl. of Paulo Marcos Rodrigues Brancher ("Brancher Decl."), dated July 1, 2009, ¶ 12.) Itamarati also points to the 2007 loan agreement with MLCP as an example of such formalism and argues that anything less than a written resolution from the board would be insufficient to bind the company. (Tr. 569–70.)

However, even a brief review of the provisions at issue reveals that neither Itamarati's bylaws nor Brazilian law required such a resolution. To the contrary, Article 22 of Itamarati's bylaws merely states that "[i]t is the Board of Directors['] responsibility . . . , within its legal and statutory authority[, to]    . . . authorize [Officers] to . . . provide any guarantee in favor of third parties . . . [or] assume obligations or financing for the company . . . in excess of" certain nominal thresholds. (DX-25A.) Plainly, the bylaws say nothing about how such authorization was to be conveyed or that such approval had to be bestowed by formal written resolution.

Similarly, Article 142 of the Brazilian Law of Corporations provides simply that "[t]he board of directors is empowered[,] . . . unless the bylaws provide otherwise, [to] authorize . . . the granting of guarantees of liabilities of third parties." (Brancher Decl.

¶ 7 (quoting Brazilian Law of Corporations, Law No. 6404/76, Article 142).)  Once again, the plain language of the provision includes no *requirement* that the authorization be made by formal written resolution.  Even Brancher's gloss on the statute – in which he asserts that Article 142 "specifically requires the approval of the Board of Directors of a corporation for the granting of any guarantee to third parties" (*id.*) – does nothing to alter the obvious conclusion that Brazilian law, like Itamarati's own bylaws, imposes no obligation as to the form of board approval.

Nor should too much be made of the fact that Itamarati proceeded by way of written resolution in connection with the $125 million loan guaranty in 2007.  As the trial record made clear, that resolution was prompted by the insistence of MLCP, which, according to its own internal policies, would not close on the loan or disburse the loan proceeds until it received the guaranty, certificate of incumbency, opinion letter from counsel, and board resolution.  The reason for such a requirement was adequately and succinctly articulated by Da Silva when he explained the differences between loans and derivatives:

> [T]here's a big difference here between a derivative and a loan.  On day one of a loan, you disburse $125 million, so you want to make sure before you make that disbursement that you have all the documents in place. . . .  [O]n the derivative transaction, on day one, most likely you have zero exposure . . . .  So that's why the requirement[s are] not as strict . . . .

(Tr. 92–93.)  Moreover, the trial testimony revealed that the board resolution issued in connection with the November 2007 loan guaranty was, in fact, hardly the model of

corporate probity – it falsely reflected a board meeting that never took place on a subject that Tamer testified had never been discussed with her.  (*See id.* at 331:4–332:24, 364–6, 366–68, 372–75.)

\* \* \*

Thus, based on all the evidence introduced at trial, the Court has little difficulty concluding that, through the actions of Tamer and the board, Itamarati directly manifested consent to Oliveira, who in turn authorized Rocha, Possari, Morales, and de Moraes to bind the company in signing the guaranty, the Swap confirmations, and the legal opinion. *See Minskoff*, 98 F.3d at 708; *Meisel*, 651 F. Supp. 2d at 110.  Accordingly, pursuant to New York law, the Court finds that Itamarati's guaranty is a contract enforceable under a theory of actual authority.

### B.  Apparent Authority

But even if the representatives of Itamarati lacked actual authority to execute the guaranty, the Court concludes that the guaranty was nevertheless enforceable under principles of apparent authority.  As noted above, to prevail on a theory of apparent authority under New York law, MLCS must establish both that (1) Itamarati was responsible for the appearance of authority in its agent, and (2) MLCS's reliance on the appearance of authority in that agent was reasonable. *See Hallock v. State*, 64 N.Y.2d 224, 231 (1984).  MLCS bears the burden of proving both that Itamarati created the appearance of authority, *see, e.g., N.X. v. Cabrini Medical Center*, 97 N.Y.2d 247, 252 n.3 (2002), and that its reliance on Itamarati's "words or conduct" was reasonable at the time of the contract, *see Herbert Construction Co. v. Continental Insurance Co.*, 931 F.2d 989, 995-96 (2d

Cir. 1991). Based on the evidence presented at trial, the Court again has no trouble concluding that (1) Itamarati imbued its executives with the appearance of authority and (2) MLCS's reliance on that appearance was reasonable.

The inquiry as to the first element centers on the "words or conduct of [Itamarati], communicated to [MLCS], that give rise to the appearance and belief that the agent possesses authority to enter into a transaction." *Hallock*, 64 N.Y.2d at 231. An employee's title alone can indicate such authority. *See, e.g.*, *Goldston v. Bandwidth Tech. Corp.*, 859 N.Y.S.2d 651, 653 (App. Div. 1st Dep't 2008) (holding that defendants were bound by an agreement signed by their president because "[t]he president or other general officer of a corporation has power, prima facie, to do any act which the directors could authorize or ratify") (internal quotation marks omitted); *Goettel v. Wallace*, 162 A.D.2d 166, 167–68 (N.Y. App. Div. 1st Dep't 1990) (holding that a corporation's CFO had apparent authority). Additionally, where a company accepts payment into its bank account after transaction confirmations are signed by a high-ranking corporate representative, "[s]uch conduct alone constitutes an implied representation that the [representative] had authority to bind" the corporation. *Indosuez Int'l Finance B.V.*, 746 N.Y.S.2d at 636.

Here, there can be no doubt that Itamarati created the appearance of authority in its agents. As a preliminary matter, evidence at trial established that Itamarati's board engaged in little actual oversight of the company's business activities. As noted above, Tamer, despite being one of only three board members, claims to have had no knowledge of the most basic aspects of Itamarati's business – she did not know "the

business of UISA Finance," whether UISA Finance had any assets, or whether Itamarati owned the company. (Tr. 313:21–314:18.)

Moreover, as noted above, board approval appears to have been a mere formality. The board did not conduct formal meetings or even meet regularly (*id.* at 321:15–324:2), and Tamer and the other directors would generally sign, without critical examination, any documents prepared by Itamarati's legal department (*id.* at 324:2–23). There is also little evidence that the board ever questioned Oliveira's recommendations or those of the legal department generally. At trial, Possari could not recall a single instance in which the board ever disagreed with Oliveira (*id.* at 386:6–8), and, at her deposition, Tamer testified that she would have approved the Swap had Oliveira and outside counsel Sergio Spinelli simply recommended it to her. (*Id.* at 331:1–333:8.)

The actions of Itamarati personnel, as communicated to MLCS, further gave rise to the apparent authority of Itamarati's agents. Rocha, as Itamarati's Chief Financial Officer, and Possari, as Itamarati's Chief Legal Officer, signed multiple confirmations on behalf of Itamarati as guarantor of UISA Finance's obligations. (PX-4; PX-5; PX-6.) Possari's signature lines in these documents contained the title "Legal Counsel," while Rocha's signature line contained the title "Chief Financial Officer." (*Id.*) After the first of these confirmations was signed on May 13, 2008 (*see* PX-4), and amended thereafter, the parties began making and accepting payments pursuant to the terms of the Swap (Oliveira Dep. Tr. at 274–76), thereby impliedly representing that the signing agents had authority to bind Itamarati. *See Indosuez Int'l Finance B.V.*, 774 N.E.2d at 701–02.

Furthermore, Morales, who had power of attorney for Itamarati, and Rocha also signed the guaranty, which was delivered to Itamarati on September 23, 2008. On the same day, de Moraes signed the legal opinion attesting to the authorization of the guaranty. According to Da Silva, "[n]o one ever told [him] that either Mr. Rocha or Mr. Morales was not authorized to sign the Guaranty or that Marco de Moraes was not authorized to sign the Legal Opinion." (Da Silva Aff. ¶ 57.) At trial, Possari himself testified that he never told anyone at MLCS that there was any limitation on de Moraes's authority. (Tr. 378:11–15.) Also at trial, Brian Weinstein, a MLCP Vice President during the relevant period, testified that no Itamarati personnel ever represented on behalf of the company that Itamarati was not obligated to satisfy UISA Finance's obligation under the Swap. (*Id.* at 167:17–20.)

These actions demonstrate that Itamarati was indeed responsible for the appearance of authority in its agents. Thus, there is sufficient evidence in the record to find that MLCS has met its burden as to the first element under New York Law.

As to the second element, MLCS demonstrated that its reliance on the appearance of authority in Itamarati's agents was reasonable. Under New York Law, a third party's reliance is reasonable when it has no duty to inquire. *See FDIC v. Providence Coll.*, 115 F.3d 136, 141 (2d Cir. 1997). Such a duty arises "only when (1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud." *Id.* (citing *Herbert Constr. Co.*, 931 F.2d at 995–96 (discussing New York case law)). Courts in this district have held that there is no duty to

inquire – and, therefore, reasonable reliance exists – even when a corporation's bylaws contain express provisions denying actual authority to enter into a transaction. *Chiat/Day Direct Mktg., Inc. v. Nat'l Car Rental Sys.*, No 93 Civ. 2717 (JFK), 1994 WL 524982, at *4 (S.D.N.Y. Sept. 27, 1994) ("[N]o reasonable jury could find that [plaintiff] was not entitled to rely upon the apparent authority of [defendant's] Chairman, who negotiated the contract, its in-house counsel, who drafted the contract, or its Senior Vice-President, who signed the contract.").

Here, there is no question that MLCS relied on Itamarati's guaranty. Fabio Da Silva, MLCS's Managing Director and Head of Brazil Fixed Income Sales during the relevant period, testified during trial that, but for the guaranty, MLCS would have unwound the Swap and sustained minimal losses; instead, MLCS maintained the Swap to its detriment in late September and early October 2008. (Tr. 140:3–24.)

Furthermore, MLCS's reliance was reasonable. Although there is no evidence that MLCS employees asked for or inspected Itamarati's bylaws, neither did they need to, particularly given that Itamarati's own officers did not know that the bylaws provided any restriction on the officers' ability to authorize or execute documents on behalf of the company. For example, there is no dispute that Rocha believed that he had the authority to execute the guaranty. (*Id.* at 572:1–16.) There is also no evidence that approval by the board needed to be in any specific form (*see* DX-219A; PX-40), and the legal opinion signed by de Moraes represented that the guaranty had been "duly authorized" and "constitutes the valid and legally binding obligation of Guarantor[,] enforceable in accordance with its terms." (PX-3.) Although Defendants

make much of the fact that de Moraes executed the legal opinion without striking or amending certain bracketed language contained in the draft sent by MLCS on September 23, 2008, the existence of bracketed language in the legal opinion does not, alone, make it invalid or MLCS's reliance any less reasonable. De Moraes still signed the document, which Itamarati delivered in conjunction with the executed guaranty, and the opinions expressed therein were not limited by any of the retained bracketed language.[8]

Defendants also argue that the reasonableness of MLCS's reliance is undermined by Itamarati's purported failure to understand the nature of the transaction. But this argument too is unavailing. The fact that Itamarati was run with minimal corporate formality does not mean that it was an unsophisticated party. Oliveira's deposition testimony, and an overwhelming number of the documentary exhibits, demonstrates that he was familiar with the nature of the Swap (*see, e.g.*, Oliveira Dep. Tr. 159:20–161:25; DX-224), and when Da Silva requested at the end of September 2008 that Itamarati deliver the signed guaranty and legal opinion, he sent an email not just to Rocha but to Oliveira as well. (DX-246A.) Neither Oliveira nor Rocha ever questioned the nature of the guaranty or the underlying transaction. (*Id.*)

Possari's claim during trial that he did not read or understand the Swap contract is similarly unconvincing, particularly given

his acknowledgments that he is an attorney (Tr. 356:11–12), has an understanding of how contracts operate in Brazil (*id.* at 356:13–15), and understood that he was binding Itamarati at the time that he signed the confirmations (*id.* 356:16–18, 359:7–16). (*Compare* Tr. 352:23–357:8 (claiming that he did not understand that the Swap was for a derivative transaction), *with* PX-56 (email from Morales to Possari "sending the master contract for derivative operations with Merrill Lynch for legal analysis").) The Swap, while a derivative transaction and inherently different than other prior loans to Itamarati and UISA Finance, was not so extraordinary that it should have put MLCS on special notice or required extra solicitude. Indeed, the Swap confirmations expressly stated that "[e]ach party . . . is acting for its own account, and . . . has made its own independent decisions to enter into [the] Transaction and as to whether that Transaction is appropriate or proper for . . . its own judgment and upon advice from such advisers as it has deemed necessary." (PX-4; PX-5; PX-6.) That Itamarati's chief legal officer, and perhaps others, chose to sign the confirmation without reading it is not something MLCS should have been expected to know or presume.

Defendants further assert that MLCS was not reasonable in its reliance because its sister corporation, MLCP, had obtained copies of the Itamarati's bylaws and, as noted above, a resolution separately authorizing the loan transactions prior to the loan closing in November 2007. Thus, according to Defendants, MLCS should have sought the same documentation in connection with the Swap and the guaranty in 2008. However, there is a substantial difference in the type of documentation that MLCP received prior to issuing a *loan* and the documentation that MLCS would be expected to receive prior to a *derivative*

---

[8] For instance, the document included a bracketed section where Itamarati could have included a "brief description of the grounds on which [a] judgment would not be recognized without a reexamination of the merits." (PX-3.) However, Itamarati's decision to keep that bracketed section in place without alteration can at most be said to constitute a waiver of any such grounds limiting the guaranty and not an excuse to render the entire letter invalid.

*transaction*.  Again, as Da Silva testified, loan agreements have stricter requirements than ISDA agreements because, as to the former, there will be "money going out the door . . . on day one," while as to the latter, "[if] the client doesn't fulfill their obligation, you have the right to terminate the transaction." (Tr. 92:16–93:22.)  Thus, the fact that MLCS's approval and document retention policies in connection with swaps were different from those utilized by MLCP in the loan context does nothing to alter the Court's analysis or suggest that MLCS's reliance on the representations of Oliveira, Morales, Possari, and de Moraes was anything other than reasonable.

Accordingly, because Itamarati was responsible for the appearance of authority in its agents and MLCS's reliance on the appearance of authority in those agents was reasonable, the Court concludes that the guaranty is enforceable under New York law.[9]

---

[9] Even if the Court were to accede to Itamarati's request and apply Brazilian law with respect to apparent authority, the guaranty would *still* be enforceable under the objective good faith principle. (Medrado Decl. ¶ 37 (citing Brazilian case law and noting that even when contracts are not formally authorized, they are enforceable when the party seeking enforcement proceeded with "standard diligence" and "checked the powers of the signatories to bind the counterparty of a contract").)  The record demonstrates that MLCS did exercise standard diligence and proceed in good faith, having made repeated efforts to obtain the executed ISDA Master Agreement, guaranty, and legal opinion. (*See, e.g.*, PX-45; DX-246A.)  Moreover, MLCS clearly "checked the powers of the signatories to bind the counterparty of a contract" (Medrado Decl. ¶ 37), given that the guaranty stated that it was properly authorized (PX-2) and the legal opinion stated that the signatories were authorized to sign the guaranty (PX-3).

## C.  Ratification

Having concluded that Oliveira, Rocha, Possari, and de Moraes had actual authority to enter into the Swap contract, and, alternatively, that MLCS reasonably relied on Itamarati's representations giving rise to an appearance of authority, there is no need to address Plaintiff's alternative theory of liability – ratification.  Accordingly, the Court does not accept ratification as an alternative basis for finding liability under the September 23, 2008 guaranty.

## D.  Damages

"Under New York law, the normal measure of damages for breach of contract is expectation damages – the amount necessary to put the aggrieved party in as good a position as it would have been had the contract been fully performed."  *Scott-Macon Secs., Inc. v. Zoltek Cos.*, No. 04 Civ. 2124 (MBM), 2005 WL 1138476, at *17 (S.D.N.Y. May 12, 2005); *accord Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 728 (2d Cir. 1992).  To recover damages, MLCS must "establish with certainty that it suffered some loss," but "it need not prove the amount of loss with certainty."  *S&K Sales Co. v. Nike Inc.*, 816 F.2d 843, 852 (2d Cir. 1987).  Rather, it need only provide "a sound basis for approximating with reasonable certainty the [amount] lost."  *Id.*  MLCS has provided such a "sound basis" for seeking to recover expectation damages in the amount of $146,138,856 from UISA Finance and Itamarati.

Here, there can be no doubt that MLCS suffered a loss as a result of Defendants' breach.  As recounted by Pankaj Jhamb, MLCS's Managing Director and Head of Trading for Latin America during the relevant period, MLCS hedged the Swap, and, "[w]hen the Swap was terminated, MLCS had to enter into other transactions to

reestablish those hedges." (Aff. of Pankaj Jhamb ("Jhamb Aff."), dated May 27, 2011, ¶¶ 36–37.) Da Silva also explained that MLCS experienced an increased loss because Itamarati "never suggested that it would not provide" the executed ISDA Master Agreement and the guaranty, and that, had it done so earlier, MLCS "would have terminated the Swap" and experienced a lower loss. (Da Silva Aff. ¶ 58 & n.5.)

Having established the existence of a loss, MLCS properly relied on the loss calculation provisions contained in the ISDA Master Agreement to establish a "sound basis for approximating with reasonable certainty" the amount lost. *S&K Sales Co.*, 816 F.2d at 852; (*see* DX-2 at 10–11, 21.) Given the complex nature of derivative transactions and the difficulty in assessing damages efficiently after the fact, the parties agreed to employ a simpler and more readily ascertainable mechanism for assessing damages in the event of an early termination by UISA Finance. *See Brookfield Asset Mgmt., Inc. v. AIG Fin. Products Corp.*, No. 09 Civ. 8285 (PGG), 2010 WL 3910590, at *15–18 (S.D.N.Y. Sept. 29, 2010) (holding that a damages provision in an ISDA Master Agreement was enforceable under New York law). Specifically, under the Schedule to the ISDA Master Agreement, payments due upon early termination were to be determined by the "Market Quotation" method. (DX-2 at 10–11, 21.) Under that method, MLCS had to seek quotes from "reference market makers," defined as "four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith" (*id.* at 17), which would indicate the amount MLCS would have to pay to enter into a transaction that would provide MLCS the economic benefit of the terminated transaction.

Although Defendants argue that MLCS did not make a reasonable, good faith attempt to calculate its damages under the Market Quotation method, there is no evidence that MLCS did anything other than what it was required to do under the ISDA Master Agreement. In her affidavit, Liqiao Wang, an associate at Merrill Lynch who traded on behalf of MLCS in 2008, credibly testified that she was asked by her manager to contact four leading dealers to request a quote for the replacement value of the Swap. (Wang Aff. ¶¶ 10, 12; *see* Jhamb Aff. ¶ 21.) On October 28, 2008, Wang contacted Deutsche Bank, JPMorgan, Dresdner Bank, and Royal Bank of Scotland – all "significant dealers in Latin American foreign currency derivatives." (Wang Aff. ¶¶ 11–12; *see* Hull Aff. ¶ 37.) Not one could provide MLCS with a quotation when originally asked, and MLCS received only one quotation shortly thereafter. (Wang Aff. ¶ 15; PX-175.) According to John C. Hull, MLCS's expert, MLCS's requests to these four dealers "were for actual live quotes (*i.e.*[,] a quote for an actual transaction that would occur) rather than for indicative quotes (*i.e.*[,] a theoretical quote for a transaction that the parties never intended to occur)." (Hull Aff. ¶ 39.) As Hull explained, "[i]t is not at all surprising that MLCS did not obtain three quotes in response to its request. October 2008 was a particularly volatile and stressful period for financial markets." (*Id.* ¶ 41.)

Because MLCS obtained fewer than three quotes, it was required, per the ISDA Master Agreement, to calculate the early termination amount based on a secondary method – "Loss." (DX-2 at 10–11, 21; *see* Hull Aff. ¶ 42.) The Master Agreement defines "Loss" as the amount the non-defaulting party "reasonably determines in good faith to be its total losses and costs . . . including any loss of bargain, cost of

funding, or . . . loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or rated trading position." (*Id.* at 16.)

To calculate Loss, Wang first determined the value of the Swap by inputting "objective market data for the Brazilian real/U.S. dollar exchange rate, the dollar interest rate curve, and the volatility of the currency exchange rate into a Black-Scholes valuation model[,] which is the standard model for valuing options," and then by calculating the bid/offer spread to "reflect the cost to MLCS of reestablishing the positions that MLCS had under the Swap." (Wang Aff. ¶¶ 18–19.) She then calculated MLCS's Loss with respect to the two open currency options with UISA Finance. (*Id.* ¶ 20.) After deducting the amount MLCS already held as collateral from the total value of the Swap and the open currency options, she reached a $146,138,856 loss figure. (*Id.* ¶¶ 21–22.) In fact, when Hull independently calculated the early termination amount using three valuation models, the most conservative of his calculations yielded a $153,200,000 figure, which is *greater* than the amount sought by MLCS and represents less than a 1% difference from MLCS's valuation pre-deduction figure. (Hull Aff. ¶ 56.)

Defendants do not suggest that, should the "Loss" method apply, MLCS's calculation was in any way unreasonable or in bad faith. Thus, because MLCS followed the Early Termination procedures as laid out in the Master Agreement and its Schedule, providing a "sound basis" for its calculation, the Court finds Defendants liable to Plaintiffs in the amount of $146,138,856, plus interest.

## E. Attorneys' Fees

Attorneys' fees provisions in ISDA Master Agreements are enforceable under New York law. *See CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 Civ. 11078 (LTS) (AJP), 2010 WL 3239416, at *5 (S.D.N.Y. Aug. 16, 2010) (noting, in awarding attorneys' fees, that "the term 'legal fees,' which is used in ISDA Master Agreement § 11, is construed under New York law to include attorney[s'] fees"); *see Brookfield Asset Mgmt., Inc.*, 2010 WL 3910590, at *15–18. Here, Defendants do not dispute that the ISDA Master Agreement includes a provision for attorneys' fees in the event of a breach by the defaulting party:

> A Defaulting Party will, on demand . . . hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement and any Credit Support Document to which the Defaulting Party is a party or *by reason of the early termination of any Transaction . . . .*

(PX-1 § 11 (emphasis added).) Defendants also do not dispute that, should the Court find the guaranty and ISDA Master Agreement enforceable, attorneys' fees are appropriate. Therefore, because the Court finds that each of the Defendants is a "defaulting party" as defined by the ISDA Master Agreement, it awards Plaintiff reasonable attorneys' fees.

## IV. CONCLUSION

In 2008, Defendants made a bet on an interest rate swap that carried the potential to save the companies millions in interest payments. As it turned out, the financial

crisis of 2008 intervened, reducing that bet to a disastrous loser. Since then, Defendants have labored hard and long to extricate themselves from that bet. Nevertheless, after a lengthy bench trial, the Court finds that those labors are unavailing and that Defendants will be required to live up to the obligations they knowingly accepted in 2008. Therefore, for the foregoing reasons, Itamarati's guaranty of UISA Finance's obligations under the derivative transactions is enforceable, and as such, Defendants are liable to Plaintiffs for damages in the amount of $146,138,856, plus interest and expenses, including reasonable attorneys' fees.

IT IS HEREBY ORDERED that within two weeks of the entry of this Opinion, Plaintiff shall submit a proposed judgment to the Court. From the date of Plaintiff's submission, Defendants' shall have one week to submit a response, if any, to the proposed judgment.

IT IS FURTHER ORDERED that within two weeks of the entry of this Opinion, Plaintiff shall submit to the Court supporting documentation for its request for reasonable attorneys' fees. Defendants shall submit a response, if any, to Plaintiff's supporting documentation within one week from the date of Plaintiff's submission.

SO ORDERED.

* * *

Plaintiff is represented by Thomas C. Rice, Elizabeth A. Gudis, Elizabeth Joanne Owen, Michael Christopher Ledley, Paul Jacob Sirkis, and William Thomas Russell, Jr., attorneys at Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017.

Defendants are represented by Richard Irving Werder, Jr., Adam Seth Cashman, and R. Brian Timmons, attorneys at Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP, 51 Madison Avenue, New York, New York 10010.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-10-12

RICHARD J. SULLIVAN
United States District Judge

Dated: April 10, 2012
       New York, New York

27